1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
       borden@braunhagey.com
3  David H. Kwasniewski, Esq. (SBN: 281985)
       kwasniewski@braunhagey.com
4  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
5  San Francisco, CA 94104
   Telephone: (415) 599-0210
6  Facsimile: (415) 599-0210

7  ATTORNEYS FOR PLAINTIFF
   B&G FOODS NORTH AMERICA, INC.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&G FOODS NORTH AMERICA, INC., | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| KIM EMBRY and NOAM GLICK, acting as enforcement representatives under California Proposition 65 on behalf of the State of California, | |
| Defendants. | |

Plaintiff B&G Foods North America, Inc. ("Plaintiff") brings this action for declaratory relief under 42 U.S.C. § 1983 and the First Amendment of the U.S. Constitution against supposed Proposition 65 enforcement representatives of the State of California, and alleges as follows:

**PRELIMINARY STATEMENT**

1. Everyone – grown-ups, kids, and even blue furry monsters – likes cookies. Plaintiff B&G Foods likes cookies. That's why it sells and distributes devil's food cookie cakes around the country (the "Cookie Cakes"). Like all other cookies, Cookie Cakes are baked and, because of that, Plaintiff faces legal claims by representatives of the State of California asserting that the products somehow cause cancer. Defendants are serial enforcement agents under California's Proposition 65 regime who have threatened to prosecute Plaintiff unless all Cookie Cake labels are changed to include a bold disclaimer that they could kill and "cause cancer" due to the presence of a naturally-occurring substance called acrylamide. Defendants and the State's allegations are false and unconstitutional. Plaintiff accordingly seeks protection from the compelled false speech and requests injunctive and other relief.

2. Defendants have filed or threatened to file dozens of cases about acrylamide against a variety of food businesses and retailers, including Plaintiff. Acrylamide is a naturally occurring substance that arises when foods are cooked. Most scientists, including European and U.S. government scientists agree that acrylamide in food does not cause cancer in humans. Nonetheless, over the last few years, Defendants have extracted nearly $1.7 million in penalties and fines from food companies in frivolous acrylamide suits. Tens of millions more have been obtained by other State enforcers, all of which is done under the supervision, regulation and guidance of the State and its Attorney General's office.

3. Defendant's business model is pernicious and operates through the regulation, encouragement and self-interest of the California government. After testing products, Defendants are enabled by the State to threaten to file suit unless the products' manufacturer (or retailer) pays a massive penalty or agrees to change its label to warn consumers that the product contains substances "known" to cause cancer. The State permits Defendants to file suit against products containing modest trace amounts of substances, even if there is no possible health effect. This

includes substances like acrylamide that arise naturally, for example, by baking a cookie. The resulting penalties and fines collected by Defendants and the State do nothing to improve public safety and serve only to enrich lawyers and their accomplices.

4. Defendants have persisted in threatening suit against Plaintiff despite having no evidence that acrylamide or Cookie Cakes poses any health risk. Acrylamide has been present in cooked foods – like sweet potatoes, nuts, and wooly mammoth – since the discovery of fire. Many of these foods are so healthy that U.S. government agencies encourage people to eat them because they reduce the risk of cancer. The State also has admitted under oath that, despite listing acrylamide as a dangerous chemical, it has no knowledge of that fact. Still, the State continues to allow and encourage its representatives to threaten food companies with unconstitutional speech requirements, lest they not pay a sizable penalty to the enforcer and the State.

5. Plaintiff accordingly seeks protection from this activity, which violates the First Amendment and Section 1983 of the Civil Rights laws.

**PARTIES**

6. Plaintiff B&G Foods North America, Inc. dates back to 1889, when two immigrant families, the Blochs and Guggenheimers, started a business selling pickles in Manhattan. Today, Plaintiff carries on their legacy by selling a variety of high-quality frozen and shelf-stable foods throughout the country, including Cookie Cakes sold under the SNACKWELLS® brand. Plaintiff is a Delaware corporation with its headquarters in Parsippany, New Jersey.

7. Defendant Kim Embry is a serial Proposition 65 litigant who seeks to act on behalf of the State of California in suing and threatening to sue dozens of businesses based on the alleged presence of acrylamide in their products. She brings these suits in the "interest of the general public" of the State of California. On information and belief, Embry is a citizen of California who directly and indirectly consults with the State and its representatives to initiate Proposition 65 actions, including against Plaintiff.

8. Defendant Noam Glick is, upon information and belief, a citizen of California and lawyer who seeks to represent the "interest of the general public" of the State of California in bringing Proposition 65 actions.

9. As described below, Defendants are state actors purporting to act on behalf of the government of California.

  a. The State is intimately entwined in, encourages, and closely monitors Defendants' Proposition 65 litigation, which it directly and indirectly regulates, controls and guides through the California Attorney General's office.

  b. Prior to initiating any private action, bounty hunters like Defendants serve a Notice of Violation on the State through the Attorney General's office, together with evidence supporting the supposed merit of the bounty hunter's allegations. This is so that the State can regulate, monitor and encourage the proposed action. If the State believes the notice lacks merit, it serves a letter on the parties to object to any action. Cal. Health & Safety Code § 25249.7(f). In doing so, the State takes an active role as gatekeeper to permit supposedly meritorious cases to proceed and to reject or contest cases that lack merit.

  c. The State also monitors the activity of its Proposition 65 enforcement representatives such as Defendants by, among other things: requesting pre-approval of any potential settlement or consent judgment, receiving and reviewing notices regarding the progress of acrylamide case litigation, intervening in particular cases, regulating the conduct of representatives, demanding to receive proportional cuts of civil penalties, and retaining the ability to change, alter or amend the regulations governing a particular Proposition 65 chemical and enforcement activity.

  d. The Attorney General specifically regulates individual settlement agreements involving Defendants. For example, in 2018, Defendants attempted to settle a Proposition 65 claim against Earthbound Farm, LLC. The Attorney General objected to this settlement, which included $3,000 in civil penalties and a $37,000 attorney fee award, because (1) Defendant Embry received more than 25% of the civil penalties; (2) the settlement "is not likely to result in any benefit to the public," and (3) Defendant Glick's $37,000 fee award was unreasonable. The Attorney General concluded the settlement agreement was "contrary to the law, against public policy, and not enforceable." Attorney General's Mar. 2, 2018, Letter re *Embry v. Earthbound Farm*, Out-of-Court Proposition 65 Settlement. In response to this letter, the parties rescinded the settlement agreement and have not submitted another for review.

   e. Defendants' actions are so substantively "entwined" in the State's enforcement regime that their action constitutes state conduct by the government. Indeed, without the State's imprimatur, support, guidance and regulations, Defendants would not have the ability to threaten and impose upon Plaintiff's constitutional rights. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, (1961) (where restaurant leased premises from a government agency and both parties benefited financially from the arrangement, restaurant's racial discrimination constituted state action).

   f. Defendants also are performing a quintessential state function by acting as California's enforcement arm relating to the presence of targeted chemicals in the environment. Moreover, the State is not merely a passive actor in such activity, but has an entire department devoted to regulating, following and encouraging precisely the unconstitutional activity at issue here. *See Lee v. Katz*, 276 F.3d 550, 554-57 (9th Cir. 2002) (private lessee of a public outdoor area owned by the city performed a traditional sovereign function when it sought to regulate free speech activity on the land).

   g. Defendants are further engaged in state action because, on information and belief, they conspire with state officials to deprive businesses of their free speech right by enforcing Proposition 65 in violation of the First Amendment to the United States Constitution, in exchange for which state officials receive substantial compensation. *See Dennis v. Sparks*, 449 U.S. 24 (1980) (private person who bribed a judge to obtain an injunction was engaged in state action).

   h. And, last but not least, Defendants are serving as government actors because California has interjected itself into this dispute by virtue of the fact that Proposition 65 is a state statute and Defendants have filed suit in state court. *See Grant v. Johnson*, 15 F.3d 146, 149 (9th Cir. 1994) (existence of state statute and necessary involvement of state judge provided state action necessary to present challenge to Oregon statute allowing appointment of temporary guardian ad litem for person deemed mentally incompetent).

## JURISDICTION AND VENUE

10. This Court has federal question subject matter jurisdiction under Title 28, Section 1331 of the United States Code, which confers original jurisdiction on the federal district courts

over actions arising under the Constitutions or laws of the United States. Federal courts, including this judicial district, have assumed jurisdiction over similar federal constitutional challenges to the enforcement of Proposition 65. *See, e.g.*, *Nat'l Ass'n of Wheat Growers v. Zeisse*, 309 F. Supp. 3d 842 (E.D. Cal. 2018).

11. Alternatively, should Defendants somehow be deemed non-state actors, then subject matter jurisdiction exists under Title 28, Section 1332 of the United States Code, which confers original jurisdiction on federal district courts over actions between private citizens of different states where the amount in controversy exceeds $75,000.

12. Venue is proper under Title 28, Section 1391(b)(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## FACTS

**A.    Plaintiff's Cookie Cakes Are Good to Eat**

13. Plaintiff's Cookie Cakes are reduced fat chocolate cookies with marshmallow and fudge coating. They are sold nationwide and in California and include products sold under the SNACKWELL'S® brand:



14. The interior cookie portion of the Cookie Cakes is baked, just like any other cookie. Otherwise it would be an unpalatable mess of sugar, flour, and chocolate.

15. Plaintiff's Cookie Cakes are free from high fructose corn syrup and partially

hydrogenated oils. They do not cause cancer.

### B. Baked Products Naturally Create Acrylamide During the Cooking Process

16. Plaintiff does not add acrylamide to its products, which according to the FDA has likely "always been present in cooked foods." Virtually every cookie or bread product on earth that is baked has acrylamide in it.

17. Acrylamide forms during a chemical reaction, known as the Maillard reaction and arises when food is baked, roasted, grilled or fried.

18. To create acrylamide, sugars such as glucose or fructose react with a naturally occurring free amino acid, asparagine.

19. The State recognizes that the substance is widespread in ordinary products like breakfast cereals, roasted coffee, crackers, bread crusts, roasted asparagus, French fries, potato chips, canned sweet potatoes, canned black olives, roasted nuts, and toast.

20. Acrylamide also naturally forms in *uncooked* foods such as nuts. *See* OEHHA, *Acrylamide Fact Sheet* (Feb. 2019), https://www.p65warnings.ca.gov/sites/default/files/downloads/factsheets/acrylamide_fact_sheet.pdf.

21. And, acrylamide is created when cooking at home, whether in the oven, on the grill or in the skillet. *See, e.g.*, Letter from Lester M. Crawford, DVM, Ph.D, Deputy Commissioner, FDA, to Joan E. Denton, M.S., Ph.D, Director, OEHHA (July 13, 2003).

### C. Acrylamide in Plaintiff's Cookie Cakes Is Safe

22. Plaintiff's Cookie Cakes are not dangerous.

23. They do not cause cancer in people and Defendants have no evidence to the contrary.

24. Nor is the alleged amount of acrylamide in Plaintiff's products harmful to humans.

25. The federal government has studied acrylamide and does not recommend avoiding foods that contain the substance. Many of the foods consumers are encouraged to eat by the FDA, such as nuts, grains and other foods, contain acrylamide.

26. The National Cancer Institute ("NCI"), the federal government's principal agency for cancer research and training, states that "a large number of epidemiologic studies (both case-

control and cohort studies) in humans have found no consistent evidence that dietary acrylamide exposure is associated with the risk of any type of cancer." NCI, *Acrylamide and Cancer Risk* (Dec. 5, 2017), https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/acrylamide-fact-sheet.

27. The American Cancer Society recently has re-confirmed its review of epidemiological studies which "***show that dietary acrylamide isn't likely to be related to risk for most common types of cancer***." American Cancer Society, *Acrylamide and Cancer Risk* (Feb. 11, 2019), https://www.cancer.org/cancer/cancer-causes/acrylamide.html. The American Cancer Society further states that it has no idea whether acrylamide increases cancer risk, stating that it is "not yet clear if the levels of acrylamide in foods raise cancer risk …." *Id.*

28. In a 2012 systematic review published in the European Journal of Cancer Prevention, researchers found "no consistent or credible evidence that dietary acrylamide increases the risk of any type of cancer in humans, either overall or among nonsmokers":

> After an extensive examination of the published literature, we found no consistent or credible evidence that dietary acrylamide increases the risk of any type of cancer in humans, either overall or among nonsmokers. In particular, the collective evidence suggests that a high level of dietary acrylamide intake is not a risk factor for breast, endometrial, or ovarian cancers ….
>
> In conclusion, epidemiologic studies of dietary acrylamide intake have failed to demonstrate an increased risk of cancer. In fact, the sporadically and slightly increased and decreased risk ratios reported in more than two dozen papers examined in this review strongly suggest the patter one would expect to find for a true null association over the course of a series of trials.

L. Lipworth, et al., *Review of Epidemiologic Studies of Dietary Acrylamide Intake and the Risk of Cancer*, EUROPEAN J. OF CANCER PREVENTION, Vol. 21(4):375-86 (2012); *see also* C. Pelucchi, *et al.*, *Dietary Acrylamide & Cancer Risk: An Updated Meta-Analysis*, INT'L J. OF CANCER, Vol. 136(12):2912–22 (2015) ("This systematic review and meta-analysis of epidemiological studies indicates that dietary acrylamide is not related to the risk of most common cancers."); A. Kotemori, et al., *Dietary Acrylamide Intake and Risk of Breast Cancer: the Japan Public Health Center-Based Prospective Study*, CANCER SCIENCE, Vol. 109(3):843-53 (2018) ("In conclusion, dietary acrylamide intake was not associated with the risk of breast cancer in this population-based

prospective cohort study of Japanese women."); M. McCullough, *et al.*, *Dietary Acrylamide Is Not Associated with Renal Cell Cancer Risk in the CPS-II Nutrition Cohort, Cancer Epidemiology*, BIOMARKERS & PREVENTION, Vol. 28(3):616-619 (2019) ("In conclusion, we found no evidence that greater dietary acrylamide intake was associated with risk of RCC [renal cell carcinoma]."); J. Hogervorst, *et al.*, *Interaction Between Dietary Acrylamide Intake and Genetic Variants for Estrogen Receptor-Positive Breast Cancer Risk*, EUROPEAN J. OF NUTRITION, Vol. 58:1033-1045 (2019) ("This study did not provide evidence for a positive association between acrylamide intake and ER+ [estrogen receptor-positive] breast cancer risk.  If anything, acrylamide was associated with a decreased ER+ breast cancer risk.").

29.     In fact, studies have shown that certain foods that contain acrylamide likely reduce the risk of cancer in humans.  For example, in June 2018, the International Agency for Research on Cancer ("IARC") concluded that there is an "inverse association" between drinking coffee (which contains acrylamide) and certain types of cancer.  IARC, *Monographs on the Evaluation of Carcinogenic Risks to Humans, Drinking Coffee, Mate, and Very Hot Beverages*, Vol. 116 at 434 (2018).  Likewise, a recent study showed that whole-grain foods may reduce the risk of liver cancer.  AMERICAN CANCER SOCIETY, *Study Ties Whole Grains to Lower Risk of Liver Cancer* (Feb. 27, 2019), https://www.cancer.org/latest-news/study-ties-whole-grains-to-lower-risk-of-liver-cancer.html.

30.     The sole basis for California's Proposition 65 warning requirement for acrylamide are laboratory studies in which pure acrylamide was given to rats or mice.  As NCI has explained, however, "toxicology studies have shown that humans and rodents not only absorb acrylamide at different rates, they metabolize it differently as well."  NCI, *Acrylamide and Cancer Risk* (Updated Dec. 5, 2017), https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/acrylamide-fact-sheet.  Both the Environmental Protection Agency ("EPA") and IARC did not classify acrylamide as a probable carcinogen based on studies in humans.  In its most recent assessment of acrylamide, for example, IARC concluded in 1994 that there was "inadequate evidence in humans for the carcinogenicity of acrylamide."  IARC, *Monographs on the Identification of Carcinogenic Risks to Humans, Some Industrial Chemicals*, Vol. 60 at 425 (Feb. 1994), https://monographs.iarc.fr/wp-

content/uploads/2018/06/mono60.pdf. Similarly, in its most recent toxicological review of acrylamide in 2010, EPA explained that human studies assessing the carcinogenicity of acrylamide (including studies of both dietary and industrial exposures) "are judged as providing limited or no evidence of carcinogenicity in humans." EPA, *Toxicological Review of Acrylamide*, 167 (March 2010), https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0286tr.pdf.

31. In sum, Defendants and the State have no evidence that acrylamide in Cookie Cakes is harmful to anyone. As such, their threat to compel Plaintiff to say otherwise is false and unconstitutional. Yet that is exactly what Defendants and the State hope to do.

**D.    The State Regulates, Guides, Supports and Benefits from Defendants' Actions**

32. The State is responsible for, and benefits from, Defendants' conduct.

33. Under Proposition 65, the State authorizes numerous persons to prosecute the statute on the State's behalf: the Attorney General, a district attorney, a variety of local government officials or a private enforcer, such as Defendants. California Health & Safety Code § 25249.7(c) and (d).

34. The State allows all of these enforcement representatives to seek penalties of up to $2,500 per day for each violation. *Id.* § 25249.7(b).

35. Anyone who brings a case is eligible to recover 25 percent of the penalty, *id.* § 25249.12(d), as well as reasonable attorneys' fees and costs, Cal. Code Civ. Proc. § 1021.5. This creates strong incentives for litigation and a perverse incentive for abusive conduct. *See, e.g., Anthony T. Caso, Bounty Hunters and the Public Interest—A Study of California's Proposition 65*, 13 ENGAGE 30, 31 (Mar. 2012) (describing case in which "law firm created an 'astroturf' environmental group to be a plaintiff in Proposition 65 litigation," which group "consisted of partners from the law firm" and which "sent out hundreds of demand letters charging businesses with failure to provide warnings" and "extort[ing] payments of attorney fees or contributions to the front group").

36. In addition to penalties, the State allows enforcement representatives to seek injunctive relief to require mandatory consumer warnings by food companies in "a court of competent jurisdiction." *Id.* § 25249.7(a).

37.     Enforcement representatives rely on the State's Office of Environmental Health Hazard Assessment ("OEHHA") to identify chemicals and concentration levels that are supposedly "known" to cause cancer. Cal. Health & Safety Code §§ 25249.8(a)-(b).

38.     Acrylamide currently is listed as a cancer-causing substance by OEHHA and the State encourages enforcement representatives like Defendants to sue food companies for injunctive and monetary relief.

39.     If a product such as Cookie Cakes is found to contain acrylamide at the proscribed level, the State's mandatory warning imposed by its representatives require food companies to notify consumers that the affected product contains acrylamide which is "known to the State of California to cause cancer":

> WARNING: Consuming this product can expose you to [Acrylamide], which is known to the State of California to cause cancer. For more information, go to www.P65Warnings.ca.gov/food.

27 Cal. Code Regs § 25607.2(a)(2).

40.     The required warnings on product labels mandated by the State and enforced by prosecutors must be large and obvious, *i.e.*, "must be set off from other surrounding information" and "enclosed in a box." *Id.* § 25607.1(b).

41.     The State revises and regulates these requirements from time to time, and consults with its private enforcement representatives in doing so.

42.     On information and belief, the State's employees have communicated with Defendants repeatedly over the last several years and encouraged and assisted them in securing monetary penalties from food companies accused of having acrylamide in their products.

**E.      The Regulation of Acrylamide is Unconstitutionally Vague**

43.     Proposition 65 purports to give food companies objective information from which to determine whether they must apply cancer warning labels to their products. But that information is completely vague and does no such thing.

44.     **First**, the State exempts a food company from regulation if it "can show that the exposure [to acrylamide] poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer." Cal. Health & Safety Code

§ 25249.10(c). This threshold is commonly referred to as the "No Significant Risk Level" ("NSRL"). For some listed substances, OEHHA has published a quantitative NSRL, often referred to as a "safe harbor". 27 Cal. Code Regs. § 25705.

45. Proposition 65 lawsuits are pervasive even for chemicals, like acrylamide, that have a "safe harbor" NSRL because the safe harbor is an affirmative defense that is expensive to establish. It does not effectively deter a plaintiff with significant financial incentives from initiating suit in the hopes of collecting a settlement.

46. To determine whether exposure from acrylamide in a food product exceeds the NSRL, the exposure is calculated based on the "average rate of intake or exposure for average users of the consumer product." 27 Code Regs. § 25721(d)(4). Exposure can be determined by looking at the average consumer's consumption of Cookie Cakes over a period of time and then measuring the exposure to acrylamide based on that consumption over such period.

47. In practical terms, the exception is meaningless. Even if a food business engages a full range of experts and consumption scientists for every food product it formulates and sells in the State, the State and enforcers disagree on how average consumption of acrylamide is calculated and applied.

48. Food companies have expended millions of dollars in cases simply to show that the State and an enforcer is wrong about the application of such information in a given case.

49. As a result, businesses like Plaintiff have no means of protecting themselves when selling products in California – because the determination of the applicable NSRL and related safe harbor is very burdensome and because compliance does not prevent a company from being sued – such as in this case.

50. California jurists have recognized how onerous Prop 65 suits can be for anyone doing business in California. "[L]awsuits under Proposition 65 can be filed and prosecuted by any person against any business based on bare allegations of a violation unsupported by any evidence of an actual violation – or even a good faith belief that a defendant is using an unsafe amount of a chemical known by the state to cause cancer." *SmileCare*, 91 Cal. App. 4th at 477 (Vogel, J., dissenting) (emphasis in original). This burden-shifting regime results in "judicial extortion"

1 where many private parties bring Proposition 65 claims (without an appropriate assessment that an exposure exceeds the NSRL) and force the defendant to settle to avoid legal fees and the costs of performing an expensive expert scientific assessment. *Id.* at 477-79.

51. The State makes things worse because businesses have the burden to demonstrate that the exposure at issue does not exceed the NSRL. Nor does demonstrated compliance immunize food businesses from lawsuits in the first instance or from future enforcement efforts. *See DiPirro v. Bondo Corp.*, 153 Cal. App. 4th 150, 185 (2007).

52. The one way to obtain certainty is to enter extortive monetary settlements with State representatives like Defendants, even though the business has attempted to comply in good faith and has made a product which poses no health risk.

53. **Second**, the State exempts from regulation products "where chemicals in food are produced by cooking necessary to render the food palatable or to avoid microbiological contamination …." Cal. Code Regs. § 25703(b)(1).

54. One might expect that such cooking exception would protect companies like Plaintiff, but again that is not the case.

55. To qualify under this "cooking" exception, a business must also show that "sound considerations of public health support an alternative level …." *Id.*

56. Such language is vague on its face and subject to a multitude of differing and unconstitutionally vague interpretations and enforcement actions.

**F.   The State Has Acknowledged that Acrylamide is Not Harmful**

57. Despite encouraging acrylamide prosecution in hundreds of cases, the State readily acknowledges it has no evidence that the substance actually is harmful or causes cancer.

58. OEHHA added acrylamide to the Proposition 65 list in 1990. The initial Proposition 65 listing was premised on potential exposures to acrylamide in industrial settings. At that time, it was not known that acrylamide was present in cooked foods. Acrylamide was not detected in foods until 2002.

59. OEHHA conceded in 2007 that acrylamide is not actually known to cause cancer in humans. Specifically, Martha Sandy, now the Branch Chief of OEHHA's Reproductive and

Cancer Hazard Assessment Branch, was designated as OEHHA's "Person Most Knowledgeable" in an action involving acrylamide. *See* Cal. Code Civ. P. § 2025.230. Ms. Sandy testified that (a) she was not aware of any governmental health organization listing acrylamide as a known human carcinogen, (b) she was not aware of any pharmacodynamic data regarding rats and humans and acrylamide, and (c) OEHHA did not actually "know" that acrylamide was a human carcinogen.

60. OEHHA also has recognized that acrylamide in certain food products – namely, coffee – does not increase human cancer risk. In particular, in June 2019, OEHHA adopted a new regulation that states: "Exposures to chemicals in coffee, listed on or before March 15, 2019 as known to the state to cause cancer, that are created by and inherent in the processes of roasting coffee beans or brewing coffee do not pose a significant risk of cancer." 27 Cal. Code Regs. § 25704 (effective Oct. 1, 2019). In adopting this regulation, OEHHA explained that "[t]he weight of the evidence from the very large number of studies in the scientific literature does not support an association between the complex mixture of chemicals that is coffee [including acrylamide] and a significant risk of cancer." OEHHA, *Final Statement of Reasons, Adoption of New Section 25704 Exposures to Listed Chemicals in Coffee Posing No Significant Risk* (June 7, 2019), https://oehha.ca.gov/media/downloads/crnr/fsorcoffee060719.pdf.

61. Under Proposition 65, private plaintiffs are required to provide 60-days' notice to the California Attorney General, the district attorney, city attorney, or prosecutor in whose jurisdiction the violation is alleged to have occurred, and to the alleged violator before filing suit. Health & Safety Code § 25249.7(d)(1). The California Attorney General maintains a database of these 60-day notices, available at https://oag.ca.gov/prop65/60-day-notice-search.

62. To date, there have been nearly 600 60-day notices for alleged violations of the Proposition 65 warning requirement with respect to alleged exposures to acrylamide. More than 500 of these 60-day notices relate to acrylamide in food products.

63. These 60-day notices include alleged violations related to potato and potato-based products (more than 90 notices); nut butters, including peanut and almond butter (more than 40 notices); almonds (more than 30 notices); cereals (more than 20 notices); and olives (more than 10 notices).

64. The rate of notices of violation for acrylamide have steadily increased in recent years, from just 32 notices in 2016 to 205 in 2019. Defendants' enforcement efforts are just a small part of the tidal wave of acrylamide litigation targeting innocent food companies.

### G. Plaintiff Faces State Action and Lawsuits by Defendants and Others

65. On April 22, 2019, Defendants notified the State and Plaintiff that they intend to require Plaintiff to place a warning label on all Cookie Cakes to tell consumers that the products cause cancer.

66. The State did not object to Defendants' Notice of Violation or seek to curtail or limit it.

67. Defendants' Notice of Violation seeks relief on behalf of the "Public" of California and pursuant to the State's regulations and enforcement guidelines discussed above.

68. On information and belief, the State has communicated with Defendants about this or similar acrylamide cases in the past and has encouraged such lawsuits.

69. The State also has received monetary compensation from Defendants in connection with frivolous acrylamide lawsuits against other food companies, and would receive compensation should Defendants obtain monetary relief from Plaintiff.

70. Plaintiff notified Defendants that the products at issue could not possibly violate Proposition 65.

71. Defendants, however, refused to withdraw their notice unless Plaintiff paid a substantial sum or put a large cancer warning on the products.

## CAUSES OF ACTION

### First Cause of Action against All Defendants
### (Violation of the First Amendment to the United States Constitution)

72. Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

73. The Free Speech Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech." U.S. CONST. AMEND. I. The Fourteenth Amendment of the United States Constitution made this proscription applicable to the States and their political subdivisions. *Id.* AMEND. XIV § 1.

74. In addition to providing protections against restrictions on speech, the First Amendment provides protection against the government *compelling* individuals or entities to engage in speech.

75. Under the First Amendment, laws compelling speech receive strict scrutiny. *Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977). Laws regulating commercial speech generally receive at least intermediate scrutiny, *i.e.*, they are prohibited if they do not directly and materially advance the government's interest, or are more extensive than necessary. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). And even laws that require businesses to provide information in connection with commercial transactions are permissible only if the compelled disclosure is of information that is purely factual and uncontroversial, reasonably related to a substantial government purpose, and not unjustified or unduly burdensome. *Nat'l Inst. of Family Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372, 2377; *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

76. A Proposition 65 warning, irrespective of the specific language used, conveys that the chemical at issue (here, acrylamide) causes cancer in humans.

77. Contrary to the warning mandated by Proposition 65, there is no reliable scientific evidence that dietary acrylamide in Cookie Cakes increases the risk of cancer in humans. To the contrary, a large number of epidemiological studies suggest that there is no association between exposure to acrylamide from food products and cancer in humans.

78. Nor does California "know" that dietary acrylamide causes cancer. In fact, the California agency responsible for implementing Proposition 65, OEHHA, has admitted that it does *not* know that acrylamide is a human carcinogen.

79. The Proposition 65 warning requirement as applied to acrylamide in Cookie Cakes thus seeks to compel speech that is literally false, misleading, and factually controversial.

80. Because Proposition 65's warning requirement as applied to acrylamide in Cookie Cakes is false, misleading, and factually controversial, it cannot survive any level of constitutional scrutiny. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009) ("[T]he State has no legitimate reason to force retailers to affix false information on their

products."). Proposition 65's warning as applied constitutes impermissible compelled speech under the First Amendment and should be enjoined.

**Second Cause of Action against All Defendants**
**(Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution)**

81. Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

82. One of the most basic guarantees of Due Process is that laws "be sufficiently clear so as not to cause persons of common intelligence …necessarily [to] guess at its meaning and [to] differ as to its application …." *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996) (quoting *Connallly v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

83. For this reason, courts have long recognized that laws which are vague are voided by the Due Process Clause, the so-called void-for-vagueness doctrine. This doctrine is premised on the notion that:

> [v]ague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. ... Third, but related, where a vague statute "abuts upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of those freedoms." Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

84. Thus, where a regulation implicates speech, as here, "heightened vagueness scrutiny applies". *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). In the vagueness context, the requirement that laws be precise is aimed at preventing "chill": rather than risk sanctions, citizens will steer far wider than necessary to avoid engaging in prohibited speech; the First Amendment, however, needs breathing space to survive. Accordingly, "the standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432-33 (1963).

85. Proposition 65's warning requirement for acrylamide, as applied to Cookie Cakes, is impermissibly vague for two separate and independent reasons. **First**, because the NSRL is not predetermined, but rather established on a case-by-case basis and only after litigation, it is impossible for business to know whether a warning is required.  This is particularly so in the context of acrylamide because the NSRL level is very low and not in any way related to the risk dietary acrylamide poses to humans (namely, none at all).

86. **Second**, Proposition 65's cooking exception is also impermissibly vague, because it requires a business to show that "sound considerations of public health" merit an alternative risk level, and undefined and undefinable term.

87. Accordingly, Proposition 65's warning requirement for acrylamide violates the Due Process Clause as applied to the Cookie Cakes.

**Third Cause of Action against All Defendants**
**Deprivation of Civil Rights**
(42 U.S.C. § 1983)

88. Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

89. Defendants are enforcement representatives of the State of California.  Their actions are regulated, governed by and ostensibly taken to economically benefit the State.

90. Defendants seek to enforce Proposition 65 against Plaintiff based on the alleged presence of acrylamide in Cookie Cakes.

91. Defendants' threatened enforcement and prosecution violates Plaintiff's rights under the First Amendment to the Constitution, by impermissibly seeking to require Plaintiff to place an objectionable warning on its products that would falsely tell consumers the products cause cancer. Cookie Cakes are enjoyable cookies and do not cause cancer.

92. Defendants' threatened enforcement is made under color of state law for many and reasons highlighted throughout this Complaint:  the State is entwined and has a symbiotic relationship with Defendants; Defendants are fulfilling a traditional governmental function; Defendants and the State are engaged in conduct that would rise to a conspiracy.

93. All of those actions involve an intended violation of Plaintiff's First Amendment Rights.  Further, a California statute and California court are necessarily involved in this dispute.

94. Plaintiff is entitled to an injunction against further prosecution or threats of prosecution under Proposition 65 related to the alleged acrylamide in its Cookie Cakes, and to an award of double Plaintiff's damages, including attorneys' fees and costs, as permitted under Section 1983.

### Fourth Cause of Action against All Defendants
### Declaratory Judgment
(28 U.S.C. § 2201)

95. Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

96. There is an actual and imminent controversy between the parties regarding whether the application of Proposition 65's acrylamide warning requirement to the Cookie Cakes violates the First and/or Fourteenth Amendments to the United States Constitution.

97. Plaintiff accordingly requests a declaration that the enforcement of Proposition 65 against the Cookie Cakes is unconstitutional.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Defendants as follows:

A. For an injunction against further unconstitutional threats and lawsuits against Plaintiff regarding the acrylamide in its Cookie Cakes products.

B. A declaration that the Proposition 65 warning requirement for cancer as applied to Cookie Cakes violates the First Amendment of the United States Constitution.

C. For damages in an amount to be determined according to proof.

D. Plaintiff's attorney's fees and costs.

E. All such other and further relief as the Court may deem just, proper, and equitable.

Dated: March 6, 2020

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By: /s/ *J. Noah Hagey*
J. Noah Hagey

*Attorneys for Plaintiff B&G Foods North America, Inc.*