J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
    borden@braunhagey.com
David H.  Kwasniewski, Esq. (SBN: 281985)
    kwasniewski@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 599-0210

ATTORNEYS FOR PLAINTIFF
B&G FOODS NORTH AMERICA, INC.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&G FOOD NORTH AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KIM EMBRY and NOAM GLICK, acting in the purported public interest of the general public of the State of California,<br><br>Defendants. | Case No.  2:20-cv-00526-KJM-DB<br><br>**PLAINTIFF B&G FOODS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:          July 24, 2020<br>Time:          10:00 a.m.<br>Judge:        Hon. Kimberly Mueller<br>Courtroom:   3 |

# TABLE OF CONTENTS

**INTRODUCTION** .................................................................................................. 1

FACTS ........................................................................................................................ 3

    A.    The Accused Cookie Cakes .................................................................. 3

    B.    Naturally Occurring Acrylamide in Baked Goods Is Safe ..................................... 3

    C.    Defendants Enforce Proposition 65 on behalf of the State.................................... 4

ARGUMENT................................................................................................................ 5

I.     B&G FOODS PLAUSIBLY ALLEGES ITS RIGHTS WERE VIOLATED.................. 6

II.    B&G FOODS PLAUSIBLY ALLEGES DEFENDANTS ARE STATE
ACTORS.................................................................................................................. 6

    A.    Defendants Perform a Traditional, Exclusive Public Function by Prosecuting
Proposition 65 Actions ......................................................................... 7

    B.    Defendants Act Jointly with the Attorney General................................. 11

    C.    Private Enforcers Have a Symbiotic Relationship with the Attorney General..... 14

    D.    Defendants Act in Close Nexus with the Attorney General ................................. 15

III.   THE ANTI-INJUNCTION ACT DOES NOT APPLY.................................. 17

IV.  THE *NOERR-PENNINGTON* DOCTRINE DOES NOT APPLY .................. 18

V.   DEFENDANTS' "SPEECH" SHOULD NOT BE PROTECTED.................. 20

CONCLUSION............................................................................................................ 20

1

## <u>TABLE OF AUTHORITIES</u>

2

3

Page(s)

<u>Cases</u>

356 U.S. 715 (1961)..........................................................................................................14

*Adams v. Vandemark,*
   855 F.2d 312 (6th Cir. 1988) ......................................................................................15

*Aldrich v. Knab,*
   858 F. Supp. 1480 (W.D. Wash. 1994) .....................................................................18

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
   526 U.S. 40 (1999)......................................................................................................13

*Barsky v. Bd. of Regents,*
   347 U.S. 442 (1954)......................................................................................................8

*Brazil v. Dole Food Co., Inc.,*
   935 F. Supp. 2d 947 (N.D. Cal. 2013) .........................................................................8

*Bridgeman v. United States,*
   No. 2:10-cv-01457 JAM KJN PS, 2011 WL 221639 (E.D. Cal. Jan. 11, 2011) .........17

*Bronco Wine Co. v. Jolly,*
   33 Cal. 4th 943 (2004) ..............................................................................................8, 9

*Brunette v. Humane Soc'y of Ventura Cty.,*
   294 F.3d 1205 (9th Cir. 2002) .......................................................................6, 7, 11, 14

*Burton v. Wilmington Parking Auth.,*
   365 U.S. 715 (1961)......................................................................................................7

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
   404 U.S. 508 (1972)....................................................................................................18

*City of Columbia v. Omni Outdoor Advertising, Inc.,*
   499 U.S. 365 (1991)....................................................................................................18

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,*
   690 F.2d 1240 (9th Cir. 1982) ...............................................................................19, 20

*Consumer Advocacy Group, Inc. v. Kinetsu Enter. of Am.,*
   150 Cal. App. 4th 953 (2007) ....................................................................................10

*Consumer Def. Grp v. Rental Housing Industry Members,*
   137 Cal. App. 4th 1185 (2006) ....................................................................................9

*Cox Comm'n PCS, L.P. v. City of San Marcos,*
   204 F. Supp. 2d 1272 (S.D. Cal. 2002)......................................................................17

*Envtl. Research Ctr. v. Heartland Prod.,*
   29 F. Supp. 3d 1281 (C.D. Cal. 2014) ........................................................................18

*Ex parte Young,*
   209 U.S. 123 (1908)......................................................................................................2

*Farm Raised Salmon Cases,*
   42 Cal. 4th 1077 (2008) ...............................................................................................8

*Friends of Frederick Seig Grove #94 v. Sonoma Cty. Water Agency,*
   124 F. Supp. 2d 1161 (N.D. Cal. 2000)......................................................................17

*Gonzales v. Oregon,*
   546 U.S. 243 (2006)......................................................................................................7

*Head v. N.M. Bd. of Exam'rs in Optometry*,
374 U.S. 424 (1963)..................................................................................................... 7

*Hill v. Colo.*,
530 U.S. 703 (2000)..................................................................................................... 7

*Hillsborough County v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985)..................................................................................................... 8

*Huynh v. Northbay Med. Ctr.*,
No. 2:17-cv-2039-EFB PS, 2018 WL 4583393 (E.D. Cal. Sept. 25, 2018)................................ 17

*In re Outlaw Lab., LP Litig.*,
2019 WL 1205004 (S.D. Cal. Mar. 14, 2019) ................................................................. 19, 20

*Iskanian v. CLS Transp. L.A., LLC*,
59 Cal. 4th 348 (2014) ............................................................................................... 10

*Jacobson v. Mass.*,
197 U.S. 11 (1905)....................................................................................................... 8

*Lee v. Katz*,
276 F.3d 550 (9th Cir. 2002) ......................................................................................... 7

*Lime & Avocado Growers v. Paul*,
373 U.S. 132 (1963)..................................................................................................... 8

*Lugar v. Edmondson Oil Co., Inc.*,
457 U.S. 922 (1982).................................................................................................. 6, 11

*Manistee Town Ctr. v. City of Glendale*,
227 F.3d 1090 (9th Cir. 2000) ...................................................................................... 18

*Nabors Well Servs. Co. v. Bradshaw*,
No. CV 05-8334 GAF (CTX), 2006 WL 8432088 (C.D. Cal. Feb. 15, 2006)................ 10, 13, 14

*Naoko Ohno v. Uuko Yasuma*,
723 F.3d 984 (9th Cir. 2013) .................................................................................... 15, 16

*Nat'l Inst. of Family Life Advocates v. Becerra*,
138 S. Ct. 2361 ......................................................................................................... 6

*Newby v. Enron Corp.*,
302 F.3d 295 (5th Cir. 2002) ....................................................................................... 18

No. 2:19-CV-02019-KJM-EFB,
2020 WL 1030980 (E.D. Cal. March 3, 2020) ................................................................. 18

*Orion Wine Imports, LLC v. Applesmith*,
No. 2:18-CV-01721-KJM-DB, 2020 WL 869142 (E.D. Cal. Feb. 21, 2020) ........................... 5, 6

*Plumley v. Massachusetts,Mass.*,
155 U.S. 461 (1894)..................................................................................................... 8

*Real Estate Bar Ass'n For Mass, Inc. v. Nat. Real Estate Info. Servs.*,
608 F.3d 110 (1st Cir. 2010).......................................................................................... 10

*Schucker v. Rockwood*,
846 F.2d 1202 (9th Cir. 1988) ...................................................................................... 14

*Sonus Networks, Inc. v. Inventergy, Inc.*,
2015 WL 4539814 (N.D. Cal. July 27, 2015) .............................................................. 19, 20

State. *Toxic Injuries Corp. v. Safety Kleen Corp.*,
57 F. Supp. 947 (N.D. Cal. 1999).................................................................................. 10

*Tanasescu v. State Bar*,
2012 WL 1401294 (C.D. Cal. March 26, 2012).................................................................. 13

*Thomas v. Nakatani*,
309 F.3d 1203 (9th Cir. 2002) ................................................................................... 2, 4

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Tulsa Prof. Collection Servv., Inc. v. Pope*,
    485 U.S. 478 (1988).............................................................................................. 16
*USS-POSCO*,
    31 F.3d ................................................................................................................ 18, 19
*Yeroushalmi v. Miramar Sheraton*,
    88 Cal. App. 4th 738 (2001) ............................................................................... 9
*Yeroushalmi*,
    106 Cal. App. 4th.............................................................................................. 9
*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)........................................................................................... 6, 21

<u>Statutes</u>

16 U.S.C. § 1540(a)(1) ............................................................................................ 10
28 U.S.C. § 2283...................................................................................................... 2, 17
42 U.S.C. § 300g-3(b).............................................................................................. 10
42 U.S.C. § 7420(b)................................................................................................. 10
Cal. Health & Safety Code § 25249.7(f) ................................................................. 5, 11
Health & Safety Code § 25249.7(d) ........................................................................ 9, 11
Health & Safety Code § 25249.7(h)(2).................................................................... 12, 16

<u>Regulations</u>

11 C.C.R. § 3203(b)................................................................................................. 15
Chapters 1 and 3, Tit. 11 C.C.R. (2016) ................................................................. 9

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    Plaintiff B&G Foods North America, Inc. ("B&G Foods") respectfully submits this

2   Opposition to Defendants' Motion to Dismiss (Dkt. No. 18).

3                                            **INTRODUCTION**

4    Plaintiff B&G Foods brought this § 1983 case to protect its constitutional right to free

5   speech.  Defendants seek to force B&G Foods to place a false cancer warning on Cookie Cakes that

6   B&G Foods sells around the country.  Defendants are self-described prosecutors acting on behalf

7   of the State of California under California's Proposition 65 regime.  They seek to compel this false

8   warning, unless B&G Foods pays a handsome extortive fee, due to the alleged presence of

9   acrylamide, a naturally occurring result of baking.  But Defendants know there is no evidence that

10  Cookie Cakes pose any cancer risk to anyone.

11   Over the last few years, under the supervision, regulation, and guidance of the State and its

12  Attorney General's office, Defendants have punished food companies with nearly $1.7 million in

13  regulatory "penalties" and "fines" for failing to include a false cancer warning about acrylamide.

14  Acrylamide naturally forms when food is cooked – including when cookies are baked.  Scientists,

15  and leading United States, European, and international health agencies all agree that acrylamide in

16  food does not cause cancer in humans.  Even the State of California has conceded it does not

17  "know" that acrylamide is a carcinogen.

18   In their Motion to Dismiss, Defendants make no attempt to defend their actions on behalf of

19  the State or their extortive business model, much less the constitutionality of their conduct.

20  Instead, they assert a hodgepodge of defenses, all of which ignore the facts in the Complaint and

21  construe those contested issues against B&G Foods in violation of the tenets of Rule 12(b)(6).

22   ***First***, Defendants assert that § 1983 does not apply to them because they are not state

23  actors.  (Mot. at 4-14.)  But as detailed in dozens of allegations in the Complaint, Defendants are in

24  the business of enforcing Proposition 65, a purported public health regulation directed to food

25  labeling, a quintessential traditional government function.  (Compl. ¶ 9(f).)  In prosecuting their

26  claims, Defendants work hand-in-glove with the State, which oversees every step of the process –

27  from pre-approving their claims prior to filing, to monitoring their litigation activity, to approving

28  the terms of any regulatory fines made by Defendants' targets.  (Compl. ¶¶ 9(a)-(d).)  The State and

Defendants exist in a symbiotic relationship, cemented by the hundreds of thousands of dollars Defendants make for the State each year in exchange for the State's imprimatur on their extortionate business. (Compl. ¶ 9(e).)  And the State actively encourages Defendants and others like them to continue to enforce Proposition 65, including through confidential communiques directly to Proposition 65 enforcers and their attorneys, creating a close nexus between the State and Defendants. (Compl. ¶ 9(a)–(h).)  Under established law, such conduct constitutes state action. And for good reason:  were it otherwise, states could enforce unconstitutional laws and enact invidious policies simply by delegating these tasks to "private" parties.

*Second*, Defendants assert that the Complaint is barred by the Anti-Injunction Act, 28 U.S.C. § 2283.  (Mot. at 12-15.)  Defendants have not proven that B&G Foods could never obtain an injunction under any set of facts.  Under *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff may "enjoin future state action by suing a state official for prospective injunctive relief rather than the state itself." *Thomas v. Nakatani*, 309 F.3d 1203, 1208 (9th Cir. 2002).  B&G Foods seeks prospective injunctive relief to aid in the enforcement of any judgment rendered in its favor; it is not seeking a preliminary injunction.  (Compl. ¶¶ 94, Prayer for Relief A.)  This is expressly permitted by the Anti-Injunction Act.  28 U.S.C. § 2283.

*Third*, Defendants contend that B&G Foods's claims are barred by the *Noerr-Pennington* doctrine.  (Mot. at 16-20).  This argument is coextensive with their argument that they are not state actors because the *Noerr-Pennington* doctrine does not apply to state actors.  Separately, the *Noerr-Pennington* doctrine also does not apply because Defendants' "petitioning activity" is a sham.

*Fourth*, Defendants argue that allowing this suit to proceed would invite many similar suits and chill the protected activities of Proposition 65 enforcers.  (Mot. at 12-13.) But neither Defendants nor any Proposition 65 enforcer has the right to use the statute to extort money from businesses selling products that are perfectly safe.  If a ruling in B&G Foods's favor means that businesses are no longer forced to make ransom payments to Defendants to avoid the unconstitutional enforcement of Proposition 65, that will simply mean justice has been done.

**FACTS**

On Rule 12(b)(6), the Court must accept the following factual allegations of the Complaint as true.

**A.      The Accused Cookie Cakes**

B&G Foods is a hundred-and-thirty-year-old American brand that makes, sells, and distributes a wide variety of shelf-stable and frozen foods.  (Compl. ¶ 6.)  Its "Cookie Cakes are reduced fact chocolate cookies with marshmallow and fudge coating, sold under the SNACKWELL'S® brand":



(Compl. ¶ 13.)  "The interior cookie portion of the Cookie Cakes is baked, just like any other cookie.  Otherwise it would be an unpalatable mess of sugar, flour, and chocolate."  (*Id.* ¶ 14.)  "The Cookie Cakes are free from high fructose corn syrup and partially hydrogenated oils.  They do not cause cancer."  (*Id.* ¶ 15.)

**B.      Naturally Occurring Acrylamide in Baked Goods Is Safe**

B&G Foods does not add acrylamide to its Cookie Cakes.  (Compl. ¶ 16.)  Acrylamide forms when food is baked, roasted, grilled, or fried.  (Compl. ¶ 18.)  According to the FDA, acrylamide has likely "always been present in cooked foods," including every cookie ever baked in any oven – industrial, home, or EZ-bake.  (Compl. ¶ 16.)

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Decades of research by scientists around the world have identified no link between naturally occurring acrylamide in food and nay health risk in humans. (Compl. ¶¶ 26-28.) Indeed, many foods containing acrylamide are considered essential parts of a healthy diet and are linked with lower rates of cancer. (Compl. ¶¶ 25, 29.) "The sole basis for California's Proposition 65 warning requirement for acrylamide are laboratory studies in which pure acrylamide was given to rats or mice." (Compl. ¶ 30.) These studies have been questioned, if not outright disregarded by then National Cancer Institute, the Environmental Protection Agency, and the International Agency for Research on Cancer, all of whom have concluded there is no evidence that dietary acrylamide poses any risk of harm to humans. (*Id.*)[1] Even the State itself acknowledged in 2007 that acrylamide in food is not actually "known" to cause cancer in humans. (Compl. ¶ 59.)

B&G Foods's Cookie Cakes thus do not cause cancer. The small amount of acrylamide they contain occurs naturally and is not harmful to humans. (Compl. ¶¶ 22-24.) Defendants have no evidence to the contrary, nor do they claim they will ever produce such evidence.

### C.    Defendants Enforce Proposition 65 on behalf of the State

Defendant Kim Embry is a serial Proposition 65 litigant who, on behalf of the State of California, sues or threatens to sue dozens of businesses every year based on the alleged presence of acrylamide in their products. (Compl. ¶ 6.) Despite lending her name to numerous lawsuits, Defendant Embry has never testified at a deposition, hearing, or trial. (Decl. of David H. Kwasniewski ("Kwasniewski Decl.") ¶ 2.) She has claimed, including in pleadings in this action, that she has no relevant or percipient knowledge regarding her Proposition 65 claims. (Dkt. No. 19 at 8 (Embry's testimony "is wholly irrelevant" and "[s]he would be an unlikely trial witness"); Kwasniewski Decl. ¶ 2 (In her state court lawsuit, Defendant Embry initially refused to appear for deposition on the ground she had no "percipient knowledge")). Defendant Embry does not even herself purchase the products over which she files suit. In this case, for example, the accused

---

[1] Defendants claim the EPA and IARC have determined that acrylamide may be a carcinogen. (Mot. at 3.) But those determinations were limited to chronic ingestion of pure acrylamide either orally or through inhalation, as may occur in certain industrial settings where synthetic acrylamide is used in the production of various polymers. EPA Review at 166; IARC Monograph at 425. And the EPA review **specifically concluded that there was no statistically significant link between consumption of foods with acrylamide and any type of cancer**. EPA Review at 167.

1    Cookie Cakes were purchased at a Ralphs Grocery store even though Embry, who resides in San

2    Francisco, lives at least 200 miles from the nearest Ralphs location.

3         Defendant Noam Glick is Embry's lawyer and the real driver of their joint Proposition 65

4    enforcement enterprise.  He resides in San Diego (Compl. ¶ 8), where there are numerous Ralphs

5    locations and presumably purchases the products over which Defendants file suit.  He drafts and

6    personally signs the Proposition 65 Notices of Violation and submits them to the Attorney

7    General's office (Dkt. No. 18-5).  The lion's share of the $1.7 million collected by Embry from the

8    businesses she has sued has gone to pay Defendant Glick's supposed fees.  (Compl. ¶ 2.)

9         Defendants' Proposition 65 enforcement actions are closely supervised, regulated, and

10   encouraged by the State.  Prior to initiating any action, Defendants must "first serve a Notice of

11   Violation on the State through the Attorney General's Office, together with evidence supporting the

12   supposed merit" of their allegations.  (Compl. ¶ 9(b).)  If the Notice lacks merit, the State serves a

13   letter on the parties objecting to further action, and a private enforcer who proceeds with an action

14   after receiving such a letter may be sanctioned.  Cal. Health & Safety Code § 25249.7(f).

15        The State further monitors Defendants by "requesting pre-approval of any potential

16   settlement or consent judgment, receiving an reviewing notices regarding the progress of

17   acrylamide case litigation, intervening in particular cases, regulating the conduct of representatives,

18   demanding to receive proportional cuts of civil penalties," and routinely promulgating regulations

19   governing the particular mechanisms and methods of Proposition 65 enforcement.  (Compl. ¶ 9(c).)

20   The Attorney General specifically regulates the settlement agreements of the Defendants, and

21   recently rejected one because it awarded Defendant Glick nearly $40,000 in fees despite delivering

22   no benefit to the public.  (Compl. ¶ 9(d).)  The Proposition 65 enforcement actions of Defendants

23   and similar private prosecutors have netted the State millions of dollars in recent years, and the

24   State has responded by actively encouraging and assisting private Proposition 65 enforcers.

25   (Compl. ¶ 9(e)-(h).)

26                                  **ARGUMENT**

27        A motion to dismiss for failure to state a claim tests whether a complaint "contain[s]

28   sufficient factual matter to state a claim to relief that is plausible on its face." *Orion Wine Imports,*

1 | *LLC v. Applesmith*, No. 2:18-CV-01721-KJM-DB, 2020 WL 869142 *4 (E.D. Cal. Feb. 21, 2020)

2 | (internal quotations and citations omitted).  "In making this context-specific evaluation, this court

3 | must construe the complaint in the light most favorable to the plaintiff and accept its factual

4 | allegations as true." *Id.*

5 | **I.    B&G FOODS PLAUSIBLY ALLEGES ITS RIGHTS WERE VIOLATED**

6 |          Defendants do not dispute that B&G Foods has plausibly alleged its constitutional rights are

7 | violated by the enforcement of Proposition 65 against the Cookie Cakes.  Laws compelling

8 | businesses to provide information in connection with commercial transactions are permissible only

9 | if the compelled disclosure is purely factual and uncontroversial, reasonably related to a substantial

10 | government purpose, and not unjustified or unduly burdensome.  *Nat'l Inst. of Family Life*

11 | *Advocates v. Becerra*, 138 S. Ct. 2361, 2372, 2377; *Zauderer v. Office of Disciplinary Counsel*,

12 | 471 U.S. 626, 651 (1985).  As alleged in the Complaint, Proposition 65, when enforced against the

13 | Cookie Cakes, fails this test because a warning that the Cookie Cakes cause cancer would be

14 | literally false:  there is no scientific evidence, and California certainly does not "know," that dietary

15 | acrylamide causes cancer.  (Compl. ¶¶ 77-78.)  Because the First Amendment does not permit the

16 | State to compel businesses to say false things about their products, enforcing Proposition 65 against

17 | the Cookie Cakes is unconstitutional.  (Compl. ¶¶ 79-80.)

18 | **II.    B&G FOODS PLAUSIBLY ALLEGES DEFENDANTS ARE STATE ACTORS**

19 |          Defendants argue they are private citizens and thus presumptively not state actors.  (Mot. at

20 | 4.)  They ask the Court to ignore dozens of detailed factual allegations establishing the extensive

21 | collaboration between the State and Defendants to enforce a public health and food labeling law, a

22 | relationship from which both parties profit handsomely.  These allegations are more than sufficient

23 | to treat Defendants are state actors.

24 |          Courts extend § 1983 liability to private parties who (1) deprive plaintiffs of rights secured

25 | by the Constitution or federal statutes and (2) do so while acting under color of state law.  *Lugar v.*

26 | *Edmondson Oil Co., Inc.*, 457 U.S. 922, 930-31 (1982).  This "is a highly factual question,"

27 | requiring a careful "sifting" of the "facts and circumstances" in order "to ferret out obvious as well

28 | as non-obvious State involvement in private conduct."  *Brunette v. Humane Soc'y of Ventura Cty.*,

294 F.3d 1205, 1210 (9th Cir. 2002) (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)).  Since the state action requirement was first articulated over a hundred years ago, "[s]everal tests have emerged" by which courts conduct this analysis.  *Brunette*, 294 F.3d at 1210. At least five of these tests independently warrant finding that Defendants act under color of state law: (1) the public function test; (2) the joint action test; and (3) the symbiotic relationship test; (4) the state compulsion test; and (5) the governmental nexus test.  Where, as here, the facts plausibly alleged in the complaint would satisfy multiple state action tests, the Court need only find one satisfied to deny a motion to dismiss.  *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).  As shown below all are met here.

### A. Defendants Perform a Traditional, Exclusive Public Function by Prosecuting Proposition 65 Actions

The allegations in the Complaint easily satisfy the public function test.  Under this test, a private party becomes a state actor by engaging in activity that has been "traditionally the exclusive prerogative of the State."  *Brunette*, 294 F.3d at 1214.  *See also Katz*, 276 F.3d 550, 554-55 (9th Cir. 2002) ("Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the state and subject to constitutional limitations.") (citation and quotation omitted).  Here, as alleged in the Complaint, Defendants act as state officials because they exercise a function that is traditionally and exclusively governmental in nature:  enforcing a public health law – one concerning food labeling, no less – on behalf of the public interest.  (Compl. ¶¶ 9, 32-42.)

Public health is a quintessential "traditional governmental function."  The "structure and limitations of federalism … allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (quotation and citation omitted); *see also*, *e.g.*, *Hill v. Colo.*, 530 U.S. 703, 715 (2000) ("It is a traditional exercise of the States' police powers to protect the health and safety of their citizens.") (quotation omitted); *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 428 (1963) ("the statute here involved is a measure directly addressed to protection of the public health, and the statute thus falls within the most traditional concept of what is

compendiously known as the police power"); *Barsky v. Bd. of Regents*, 347 U.S. 442, 449 (1954) ("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power."); *Jacobson v. Mass.*, 197 U.S. 11, 25 (1905) ("the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."); *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ("the regulation of health and safety matters is primarily, and historically, a matter of local concern").

Food labeling is likewise a traditional governmental function.  *Brazil v. Dole Food Co., Inc.*, 935 F. Supp. 2d 947, 955 (N.D. Cal. 2013) ("[L]aws regulating the proper marketing of food … are traditionally within states' historic police powers."); *FloridaFla. Lime & Avocado Growers v. Paul*, 373 U.S. 132, 144 (1963) ("States have always possessed a legitimate interest in the protection of their people … in the sale of food products at retail markets within their borders." (quotation omitted); *Plumley v. Massachusetts,Mass.*, 155 U.S. 461, 472 (1894) ("If there be any subject over which it would seem the states have plenary control … it is the [regulation] of the sale of food products.").  This is particularly true in California, which has been regulating food labeling since the 1860s. *Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1088 (2008); *see also Bronco Wine Co. v. Jolly*, 33 Cal. 4th 943, 959-81 (2004) (recounting California's centuries-long history of food regulation).  Numerous agencies have been created to regulate food labeling, including the California Department of Public Health, the California Department of Food and Agriculture, and the Office of Environmental Health Hazard Assessment – the agency responsible for determining which chemicals merit a Proposition 65 warning.  *See* https://www.cdfa.ca.gov/AHFSS/Animal_Health/Food_Safety.html (listing all the agencies that regulate food in California), last visited on June 1, 2020.   Thus, contrary to Defendants' suggestion promoting "public policy" (Mot. at 6), Proposition 65's enforcement scheme empowers private enforcers to enforce a public health and food-labeling law on the State's behalf.

The history of Proposition 65 likewise shows it was intended to enhance the State's regulation of public health and food labeling.  In the original Proposition 65 ballot, the people of

1   California declared that Proposition 65 was necessary "[t]o secure strict enforcement of the laws

2   controlling hazardous chemicals and deter actions that threaten public safety."  (Ballot Pamp.,

3   Proposed Law, Gen. Elect. (Nov. 4, 1986) p. 53).  Before Proposition 65, the enforcement of these

4   laws was the exclusive function of the government, but according to the ballot language "state

5   government agencies have failed to provide [the public] with adequate protection, and … these

6   failures have been serious enough to lead to investigations by federal agencies of the administration

7   of California's toxic protection programs."  *See id.*  Stated differently, "[C]itizen enforcement was

8   conditioned upon the failure of state and local governments to commence or diligently prosecute an

9   action, after due notice."  *Yeroushalmi v. Miramar Sheraton*, 88 Cal. App. 4th 738, 748 (2001).

10          Proposition 65's 60-day notice requirement is accordingly structured to facilitate public

11   enforcement, and to make private enforcement an option of last resort.  (Compl. ¶¶ 9(b)-(c).)(").)

12   California courts that have analyzed Proposition 65's 60-day notice requirement have concluded

13   that "the framers of the initiative intended that the notice contain sufficient facts to facilitate and

14   encourage the alleged polluter to comply with the law, and to *encourage the public attorney*

15   *charged with enforcement to undertake its duty*."  *Yeroushalmi*, 106 Cal. App. 4th at 750 (emphasis

16   added).  This requirement is paramount, as "[t]he one party who necessarily represents the public

17   interest in any Proposition 65 litigation is the Attorney General."  *Consumer Def. Grp v. Rental*

18   *Housing Industry Members*, 137 Cal. App. 4th 1185, 1206 (2006).  If, and only if, public enforcers

19   fail to exercise this *duty*, can private enforcers – or, as the Attorney General has stated in other

20   contexts, "private prosecutor[s]"– step into the State's shoes and bring an enforcement action on

21   the public's behalf.  Health & Safety Code § 25249.7(d).  (Initial Statement of Reasons, Revision

22   of Chapters 1 and 3, Tit. 11 C.C.R. (2016) ("ISOR").)"), *available at*

23   https://oag.ca.gov/sites/all/files/agweb/pdfs/prop65/prop-65-isor.pdf (last visited June 1, 2020).

24          Defendants argue that their enforcement of Proposition 65 is merely litigation, which "is far

25   from an exclusive function of government."  (Mot. at 6.)  But the cases Defendants cite are not on

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   point.[2]  They also misleadingly cite *Nabors Well Servs. Co. v. Bradshaw*, No. CV 05-8334 GAF

2   (CTX), 2006 WL 8432088 *1 (C.D. Cal. Feb. 15, 2006), a case under the Private Attorney General

3   Act ("PAGA"), which held that PAGA enforcement was not state action. Cal. But what they

4   neglect to mention is that since *Nabors* was decided, the California Supreme Court held PAGA

5   claims **are** "public enforcement action[s]" brought by "a statutorily designated proxy for the

6   [government] agency" and thus cannot be waived by arbitration clauses in employment

7   agreements.  *Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348, 389 (2014).  Moreover, unlike the

8   PAGA claims in *Nabors*, where plaintiffs sought damages, under Proposition 65, "private

9   prosecutors" (like their public counterparts) seek only *penalties*, and need not suffer any personal

10  harm to bring an enforcement action.  For this reason, federal courts have found that private

11  enforcers lack Article III standing, as they are suing on behalf of, and collecting penalties for, the

12  State.  *Toxic Injuries Corp. v. Safety Kleen Corp.*, 57 F. Supp. 947, 952-53 (N.D. Cal. 1999).

13       For the same reasons, Defendants' analogy to *Real Estate Bar Association* falls flat.  There,

14  the statute at issue did "nothing more than grant bar associations … standing to bring suit enforcing

15  the unauthorized-practice-of-law statute" and "obtain a declaration as to legality." *Real Estate Bar*

16  *Ass'n For Mass, Inc. v. Nat. Real Estate Info. Servs.*, 608 F.3d 110, 122 (1st Cir. 2010).  Here

17  Proposition 65 deputizes its "private prosecutors" with the authority to both sue in the public

18  interest *and* to "collect funds for the public treasury."  *Consumer Advocacy Group, Inc. v. Kinetsu*

19  *Enter. of Am.*, 150 Cal. App. 4th 953, 963 (2007).  Thus, neither *Nabors* nor *Real Estate Bar* is

20  analogous to this case, where private citizens have been empowered to enforce a public health/food

21  labeling law on behalf of the *public* interest and to collect penalties for the *public* treasury,

22  functions that traditionally and exclusively belong to the government.

23

24

---

25  [2] Defendants (Mot. at 12) cite to federal environmental statutes such as the Endangered Species
    Act, Clean Air Act, and Safe Drinking Water Act and observe that these statutes permit private

26  parties to seek civil penalties and injunctive relief.  As these statutes provide express *federal* rights
    of action for private enforcers, it is not surprising that no court has ever needed to address whether

27  private plaintiffs under these statutes are state actors under Section 1983.  Penalties paid under
    these statute, moreover, are paid to the government, *not* the private enforcers.  [16 U.S.C.

28  § 1540(a)(1); 42 U.S.C. § 7420(b); 42 U.S.C. § 300g-3(b).

1    Nor should the State be permitted to avoid constitutional scrutiny of enforcement of

2 Proposition 65 by delegating that enforcement to private parties.  To hold otherwise would enable

3 states to pass any number of unconstitutional laws so long as enforcement was not directly carried

4 out by State officials.  For instance, under Defendants' proposed rule, if the State passed a law

5 banning a religious minority from public spaces, but delegated all enforcement to private enforcers,

6 members of the targeted group would have no constitutional recourse.  The State cannot delegate

7 its way around the Constitution.

8        **B.    Defendants Act Jointly with the Attorney General**

9    Defendants' motion should be denied for the separate and independent reason that the joint

10 action test is also met.  A private party also becomes a state actor by acting jointly with the

11 government.  *See Lugar*, 457 U.S. at 931 ("To act 'under color' of law does not require that the

12 accused be an officer of the State.  It is enough that he is a willful participant in joint activity with

13 the State or its agents.") (citation omitted).  The joint action test is satisfied where state officials

14 and private parties act in concert in causing a deprivation of constitutional rights, and "the state has

15 so far insinuated itself into a position of interdependence with the private entity that it must be

16 recognized as a joint participant in the challenged activity."  *Brunette*, 294 F.3d at 1210 (citation

17 omitted).  Such was the case in *Lugar*, where the Supreme Court held that a creditor who used a

18 state prejudgment attachment statute acted under color of state law because, in attaching the

19 debtor's property with the aid of the court clerk and sheriff, the creditor and state officials engaged

20 in joint activity.  *Lugar*, 457 U.S. at 942.

21    As detailed in the Complaint (at ¶¶ 32-42), this level of joint activity is present because the

22 statutory rights to both commence and resolve private enforcement actions necessarily derive from

23 the Attorney General's ability to enforce the statute.  Private enforcers cannot commence an action

24 until at least 60 days after the Attorney General has had the opportunity to review a notice, and

25 then only if the Attorney General has not begun prosecuting the alleged violation himself.  Health

26 & Safety Code § 25249.7(d).  And private enforcers cannot resolve an action unless they provide a

27 copy of a proposed settlement to the Attorney General, to provide him the chance to review

28 whether the settlement is consistent with the public interest.  *Id.* § 25249.7(f).  Consequently,

private enforcers cannot bring or resolve actions in the public interest *but for* the Attorney General acting jointly in fulfilling his statutory duties.  (Compl. ¶¶ 9(b)-(d).)

Further, while the allegations in the Complaint suffice to show state action here, in other contexts, the Attorney General has also confirmed the close relationship between the State and private enforcers:

> In 2001, when the Legislature amended Proposition 65, it vested this office with a significant role in reviewing and overseeing private-plaintiff Proposition 65 enforcement.  We take that role seriously. We are committed to addressing the challenges in a manner that protects businesses from needless litigation, and insures that the law operates to protect public health and safety as intended by voters.

Letter to Private Enforcers re: 2013 Annual Summary of Proposition 65 Settlements (May 13, 2014), *available at*

https://oag.ca.gov/sites/all/files/agweb/pdfs/prop65/ag_letter_prop65_2013rpt.pdf? (last visited June 1, 2020.  Indeed, as the Attorney General has stated when advocating for Proposition 65 amendments to increase its oversight, the Attorney General "monitor[s] such litigation from the notice through judgment/settlement stage."  (ISOR at 1.)

As alleged in the Complaint, this oversight can lead to the Attorney General objecting to, and effectively ending, Proposition 65 claims or proposed settlements.  All claims must be reviewed by the Attorney General and if the Attorney General concludes the claim has no merit, he must serve a letter stating so on the enforcer.  (Compl. ¶ 9(b).)  While, as Defendants point out (Mot. at 10), private enforcers can still proceed if they receive a no-merits letter, private enforcers do so at the risk of being sanctioned if there was "no actual or threatened exposure to a listed chemical."  Health & Safety Code § 25249.7(h)(2).  And in fact, these objections appear to be heeded in most cases as many notices – including many notices issued for acrylamide – never make it past the 60-day stage.  For example, in the past year, Defendants withdrew 11 notices just weeks after issuing them.  Another enforcer, Christopher Bair, in 2018 withdrew 34 notices for acrylamide in "products used in restaurants." All notices were withdrawn just weeks after having been filed.  *See* 60-Day Notice Search, https://oag.ca.gov/prop65/60-day-notice-search.[3]

---

[3] These notices can be accessed by typing the name of the Defendants or Christopher Blair, respectively, in the "Plaintiff or Plaintiff's Attorney" field.

Likewise, the Attorney General can effectively cancel proposed consent judgments. As alleged in the complaint, the Attorney General previously objected to one of Defendants' proposed consent judgments because of it unreasonably awarded 90% of the settlement proceeds to Defendant Glick while doing nothing to benefit the public. (Compl. ¶ 9(d).)

And in other instances, the Attorney General has teamed up with private enforcers to prosecute Proposition 65 claims. *E.g.,* Consent Judgment, *People ex rel. Lockyer v. PepsiCo, Inc.*, LA Superior Court Case No. BC 351120 (Apr. 14, 2006))) (Attorney General, crediting work of private enforcer, brought Proposition 65 claim for lead in labels on soft drinks, obtaining millions of dollars in penalties and fees), *available at* https://www.oag.ca.gov/system/files/attachments/press_releases/06-039_0a.pdf (last visited June 1, 2020); Attorney General Press Release dated Aug. 26, 2005 ( announcing Attorney General would be initiating Proposition 65 claims for acrylamide against defendants selected because they had been previously targeted by private enforcers), *available at* https://oag.ca.gov/news/press-releases/attorney-general-lockyer-files-lawsuit-require-consumer-warnings-about-cancer (last visited June 1, 2020).

The "cradle-to-grave" supervision exercised by the Attorney General extends far-beyond "mere approval or acquiescence," as Defendants claim. (Mot. at 10). This distinguishes this case from the cases cited by Defendants, such as *Nabors* (where the Court found there was "*no additional involvement or interaction with state officials*" beyond the existence of a statute allowing private actions) or *Sullivan* (where, pursuant to an amended statute, the government elected not to intervene in a dispute between insurers and employees). 2006 WL 8432088, at *3 (emphasis in original); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53 (1999).

Moreover, in Defendants' case, this coordination exists between the Attorney General and Defendant Glick. As detailed above and in the Complaint (at ¶¶ 8-9), as well as in Defendants' papers (at 2-3), Defendant Glick prepares the Notices of Violation, communicates with the Attorney General, negotiates with his targets, and takes a hefty cut of the resulting proceeds. Defendant Embry simply lends her name to these suits despite having no apparent knowledge of their contents. This makes this case is very different than *Tanasescu v. State Bar*, 2012 WL

13                                  Case No.  2:20-cv-00526-KJM-DB

1   1401294 *16 (C.D. Cal. March 26, 2012) or *Schucker v. Rockwood*, 846 F.2d 1202 (9th Cir. 1988),

2   which involved attempts to assert § 1983 claims against attorneys simply for engaging in typical

3   litigation activities.  The Complaint alleges a course of conduct by Defendants that more than

4   crosses the line from ordinary civil litigation to outright law enforcement.  (Compl. ¶¶ 7-9, 32-42.)

5   These factual allegations satisfy the joint action test, and thus Defendants' motion to dismiss

6   should be denied.

7           **C.        Private Enforcers Have a Symbiotic Relationship with the Attorney General**

8           Plaintiffs' motion should be denied for the separate and independent reason that the

9   symbiotic relationship test is also met.  Under this rule, private parties also become state actors

10  when they deprive others of constitutional rights while acting in a symbiotic relationship with the

11  government.  *Brunette*, 294 F.3d at 1213.  Similar to the joint action test, the symbiotic relationship

12  test asks whether the government has "so far insinuated itself into a position of interdependence

13  (with a private entity) that it must be recognized as a joint participant in the challenged activity….

14  Often significant financial integration indicates a symbiotic relationship."  *Id.* (citations omitted).

15          The Supreme Court established in the symbiotic relationship test in *Burton v. Wilmington*

16  *Parking Authority*, where it found a private restaurant located in a public parking garage acted

17  under color of state law when it refused to serve African American customers.  356 U.S. 715, 716

18  (1961).  The Court observed that the relationship between the two entities was symbiotic:  the

19  restaurant was located in the parking garage and benefitted from the Parking Authority's tax

20  exemption and maintenance of the premises, and the Parking Authority received "indispensable"

21  funding from the restaurant that maintained its viability.  *Id.* at 719-20.  Because the Parking

22  Authority had decided "place its power, property, and prestige behind the admitted discrimination,"

23  it constituted state action.  *Brunette*, 294 F.3d at 1213 (citing *Burton*, 356 U.S. at 725).

24          As alleged in the Complaint, the State and private enforcers mutually profit from their

25  prosecution of Proposition 65 claims.  (Compl. ¶¶ 9(d), 33-36.)  The extend of this profit is

26  demonstrated in the below chart summarizing OEHHA's annual budget:

27

| Year | OEHHA Budget | Prop. 65 Civil Penalties | Percentage of Funding |
|------|-------------|--------------------------|----------------------|
| 2017-18 | $23.453 Million | $3.702 Million | 15.8% |

28

| | | | |
|---|---|---|---|
| 2018-19 | $28.615 Million | $4.764 Million | 16.6% |
| 2019-20 | $28.362 Million | $3.909 Million | 13.8% |
| **Cumulative** | $80.43 Million | $12.38 Million | 15.4% |

(Kwasniewski Decl., Ex. 1 (OEHHA Budget Reports).)  Plainly, not only would current jobs at

OEHHA likely not exist in the absence of up to *one-sixth* of OEHHA's funding, but OEHHA's

implementation of the Proposition 65 would also be seriously impaired.  *See* Tit. 11 C.C.R.

§ 3203(b) ("Recovery of civil penalties (75% of which must be provided to the Office of

Environmental Health Hazard Assessment) serves the purpose and intent of Proposition 65.").

As a result, the relationship between the Attorney General and the private enforcers it

supervises is the archetypal symbiotic relationship.  *See Adams v. Vandemark*, 855 F.2d 312, 314

(6th Cir. 1988) (defining symbiosis as a "relationship in which each partner does for the other

something which the other partner needs but cannot do for itself").  Private enforcers benefit by the

state's creation of a "private enforcement scheme" that deputizes them to collect millions in civil

penalties and enforcement fees, all under the supervision of the Attorney General and the backing

of the Office's "power" and "prestige."  And the Attorney General benefits through the prosecution

of public health enforcement actions he himself is not capable of prosecuting, which secure

injunctive relief and in millions of dollars of penalties each year.  Such is the essence of symbiosis.

### D.   Defendants Act in Close Nexus with the Attorney General

Plaintiffs' motion should be denied for the separate and independent reason that the nexus

test is also met. Courts commonly apply the state compulsion test and the governmental nexus test

in tandem.  *Naoko Ohno v. Uuko Yasuma*, 723 F.3d 984, 995-96 (9th Cir. 2013).  Under the state

compulsion test, a private party becomes a state actor where the state "has exercised coercive

power or has provided such significant encouragement, either overt or covert, that the [private

actor's] choice must in law be deemed to be that of the state."  *Id.* (citation and quotation omitted).

A party is a state actor under the governmental nexus test where "there is a sufficiently close nexus

between the State and the challenged action of the regulated activity so that the action of the latter

may be fairly treated as that of the State itself.  *Id.* (citation and quotation omitted).  Under either

formulation, private enforcers act under color of state law.

Courts applying the state compulsion test have found that "intimate involvement" between a private party and the government is sufficient to find state action. *See Tulsa Prof. Collection Servv., Inc. v. Pope*, 485 U.S. 478, 487 (1988) (finding "significant state action" where a probate court triggered a statute of limitations by appointing executor and by accepting notices and affidavits of publication, on grounds that court was "intimately involved in executing the nonclaim statute). Here, the Attorney General, as the "one party who necessarily represents the public interest in any Proposition 65 litigation," makes private enforcement of Proposition 65 possible by fulfilling his statutory duty of reviewing 60-day notices and proposed settlements. While the Defendants observe that the State's provision of a monetary award does not qualify as significant encouragement (Mot. at 9), Proposition 65's civil penalties are not simply "money awards." Rather, they are penalties (not damages) collected by "private prosecutors" (who need not have been harmed) to enforce a public health law on behalf of the public interest. On top of making private enforcement possible and allocating civil penalties to private enforcers, the Attorney General actively *encourages* private enforcers to enforce Proposition 65. (Compl. ¶¶ 9, 32-42.)

The same reasons described above on the joint action test warrant finding that there is a sufficiently close nexus between the State and private enforcers such that the actions of private enforcers "may be fairly treated as that of the State itself." The additional points raised in the Defendants' discussion of this test all fail to hold water. For instance, Defendants note the Attorney General cannot block private actions he believes are meritless or block settlements he believes are improper. But the Attorney General is obligated to review Notices of Violation and settlements, private enforcers that proceed after receiving a no-merits letter proceed at the risk of sanctions, Health & Safety Code § 25249.7(h)(2), and the Defendants in this very case, like virtually all other private enforcers, carefully heed the Attorney General's recommendations including by rescinding settlements to which he has objected. (Compl. ¶ 9(d).)

Defendants' contention (at 10) that, in enforcing these procedural safeguards, the Attorney General may become an adverse party to private enforcers, thus falls flat. Proposition 65 was designed to facilitate the State's *duty* to enforce laws "controlling hazardous chemicals." The procedural safeguards imposed on Defendants were ensure that, when the State delegates this duty

1   to private enforcers, it still retains control over how they exercise it.  That control, abundantly

2   detailed in the Complaint (at ¶¶ 9, 32-42), is fatal to Defendants' motion.

3   **III.     THE ANTI-INJUNCTION ACT DOES NOT APPLY**

4           Defendants assert the Complaint's prayer for relief should be dismissed because it seeks

5   injunctive relief.  (Mot. at 15.)  But B&G Foods does not seek an preliminary injunction against a

6   pending case and Defendants fail to show there is any circumstance where one would be sought.

7   "Injunctive relief is a remedy derived from the underlying claims and not an independent claim in

8   itself."  *Huynh v. Northbay Med. Ctr.*, No. 2:17-cv-2039-EFB PS, 2018 WL 4583393 *4 (E.D. Cal.

9   Sept. 25, 2018) (citing *Bridgeman v. United States*, No. 2:10-cv-01457 JAM KJN PS, 2011 WL

10  221639 *17 (E.D. Cal. Jan. 11, 2011); *Cox Comm'n PCS, L.P. v. City of San Marcos*, 204 F. Supp.

11  2d 1272, 1283 (S.D. Cal. 2002).  Courts routinely deny motions to dismiss prayers for injunctive

12  relief as "the court need not determine at this time what remedies should be available to [plaintiff]

13  should she succeed on her claims."  *Huynh*, 2018 WL 4583393 *4; *see also Friends of Frederick

14  Seig Grove #94 v. Sonoma Cty. Water Agency*, 124 F. Supp. 2d 1161, 1172 (N.D. Cal. 2000)

15  (finding "no authority" permitting dismissal of the plaintiff's request for relief).

16          Moreover, the Anti-Injunction Act permits injunctions "to protect or effectuate" the

17  judgments of a District Court.  28 U.S.C. § 2283.  B&G Foods's complaint is clear:  it seeks a final

18  or permanent injunction at the conclusion of this case against "*further* unconstitutional threats and

19  lawsuits."  (Prayer for Relief A; *see also* Compl. ¶ 94 (requesting injunction against *"further"*

20  prosecution.).  B&G Foods does not seek to enjoin Defendants' pending state court action.  The

21  Complaint's request for injunctive relief is limited to prospective judgment enforcement.

22          *All* the cases on which Defendants rely are inapposite, as they involved plaintiffs who

23  sought *preliminary* injunctions to enjoin pending proceedings.  (Mot. at 14-15.)  B&G Foods has

24  not sought any such injunction here.  This Court's decision in *California Chamber of Commerce v.*

25  *Becerra* is on point.  There, the Court recognized that the Anti-Injunction Act does not preclude a

26  party from seeking prospective injunctive relief from future enforcement actions.  No. 2:19-CV-

27  02019-KJM-EFB, 2020 WL 1030980 *3 (E.D. Cal. March 3, 2020) (citing *Newby v. Enron Corp.*,

28  302 F.3d 295, 301 (5th Cir. 2002) ("[F]ederal courts possess power under the All Writs Act to issue

1   narrowly tailored orders enjoining repeatedly vexatious litigants from filing future state court

2   actions without permission from the court."). That is all the relief B&G Foods seeks.

3   **IV.     THE *NOERR-PENNINGTON* DOCTRINE DOES NOT APPLY**

4          Defendants contend that the *Noerr-Pennington* doctrine precludes B&G Foods'

5   constitutional claims. (Mot. at 16.) The *Noerr-Pennington* doctrine does not apply because

6   Defendants are state actors and their claims against B&G Foods are a sham.

7          The *Noerr-Pennington* doctrine provides limited immunity from lawsuits arising from those

8   who "petition the government for a redress of grievances." *City of Columbia v. Omni Outdoor*

9   *Advertising, Inc.*, 499 U.S. 365, 378 (1991). This immunity flows from the First Amendment. *Cal.*

10  *Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972). As such, it does not apply to

11  state actors, because the states themselves have no First Amendment rights. *See Aldrich v. Knab*,

12  858 F. Supp. 1480, 1491 (W.D. Wash. 1994) ("the state itself does not enjoy First Amendment

13  rights").The *Noerr-Pennington* doctrine does not apply here because, as shown above, when

14  Defendants serve as private enforcers, they are stepping in the shoes of the Attorney General. *See*

15  *Envtl. Research Ctr. v. Heartland Prod.*, 29 F. Supp. 3d 1281, 1283 (C.D. Cal. 2014) (explaining

16  that "a private citizen steps into the state's shoes" when filing a Proposition 65 lawsuit).

17         Further, the *Noerr-Pennington* doctrine does not apply to individuals who assert "sham"

18  claims, as such claims do not merit First Amendment protection. *Manistee Town Ctr. v. City of*

19  *Glendale*, 227 F.3d 1090 (9th Cir. 2000); *USS-POSCO*, 31 F.3d at 811. Defendants' argument that

20  they are immune from any claims based on their pursuit of B&G Foods (Mot. at 18) separately and

21  independently fails because Defendants' lawsuit is a sham. A lawsuit is a sham if it is part of a

22  "series of lawsuits … brought pursuant to a policy of starting legal proceedings without regard to

23  the merits" and for the purpose of injuring the defendant. *USS-POSCO*, 31 F.3d at 811. Put

24  differently, "[t]he inquiry in such cases is prospective: Were the legal filings made, not out of a

25  genuine interest in redressing grievances, but as part of a pattern or practice of successive filings

26  undertaken essentially for the purposes of harassment?" *Id.*

27         Defendants' theory requires the Court to ignore the factual allegations in the Complaint,

28  rather than take them as true, as required. "Whether something is a genuine effort to influence

government action, or a mere sham is a question of fact." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253-54 (9th Cir. 1982).   "As a result, 'courts rarely award *Noerr–Pennington* immunity at the motion to dismiss stage, where the Court must accept as true the non-moving party's well-pleaded allegations' with respect to sham litigation." *In re Outlaw Lab., LP Litig.*, 2019 WL 1205004 *5 (S.D. Cal. Mar. 14, 2019) (denying motion to dismiss because sham litigation was adequately alleged); *Sonus Networks, Inc. v. Inventergy, Inc.*, 2015 WL 4539814 *2 (N.D. Cal. July 27, 2015) (same).  So long as plaintiff pleads "specific allegations of specific activities," the sham litigation exception bars dismissal under the *Noerr-Pennington* doctrine.  *Outlaw*, 2019 WL 1205004 *5.

B&G Foods's Complaint more than plausibly alleges Defendants have filed a series of lawsuits based on the false premise that acrylamide in Cookie Cakes or similar foods poses some risk of harm.  (Compl. ¶¶ 13-31.)  Defendants have filed dozens of lawsuits and collected nearly $1.7 million despite their claims having no legitimate basis in fact.  This squarely constitutes sham litigation.  "The Ninth Circuit has consistently invoked the sham litigation exception where the defending party was accused of automatically petitioning governing bodies 'without regard to and regardless of the merits of said petitions.'"  *Outlaw*, 2019 WL 1205004 *9.  Such conduct satisfies both the "objective" and "subjective" components of the *Noerr-Pennington* sham litigation analysis because it is both objectively meritless and bespeaks a subjective intent "to 'use the governmental process – as opposed to the outcome of that process' – as a tool for extortion."  *Id.* *9 n. 7.

In *Outlaw,* for example, a defendant in a false labeling lawsuit brought counterclaims alleging that the plaintiff was engaged in a "shakedown" scheme by sending extortionate demand letters and filing meritless suits against California merchants.  *Id.* *1-2.  Much like Defendants' Proposition 65 demands here, the letters threatened to sue the merchants over their alleged failure to disclose the contents of supplement products, unless the merchants entered into a "settlement" with the putative enforcer.  *Id.* *1.  The Court denied a motion to dismiss, holding that the sham litigation exception applied based on allegations that the plaintiff "reflexively and repeatedly mail[ed] demand letters without regard to the individual merit thereof."  *Id.* *9.  Similarly, in *Sonus Networks,* the Court held that the sham litigation applied where plaintiff alleged that Defendant

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   sent a series of extortionate demand letters threatening to file suit based on objectively meritless

2   allegations.  2015 WL 4539814 *2.  Here, B&G Foods' Complaint includes detailed factual

3   allegations establishing that Defendants are engaged in precisely this kind of scheme to harm B&G

4   Foods unless it acquiesces in Defendants' demand for a ransom.

5          Defendants assert that their lawsuits have been "successful," and attach several consent

6   judgments to their Motion.  But that is a factual assertion based on extrinsic evidence inappropriate

7   for consideration on a motion to dismiss.  *Clipper Exxpress*, 690 F.2d at 1253–54.  Moreover, these

8   consent judgments involve awards of just a few thousand dollars in statutory penalties, when

9   Proposition 65 authorizes penalties up to $2,500 per product per day.  Despite collecting only a

10  pittance in penalties, Defendants collected an order of magnitude more in attorney fees.  This is not

11  success – this is a shakedown under color of law.

12         Regardless, Defendants' motion does not – and cannot – refute the total lack of evidence to

13  support their claim that the Cookie Cakes contain harmful levels of acrylamide.  Nor, for that

14  matter, do Defendants offer even a scintilla of evidence that any of their other lawsuits, which also

15  involved dietary acrylamide, had any legitimate basis.  B&G Foods's complaint plausibly alleges,

16  in considerable detail, that there is a serious reason to doubt the legitimacy of Defendants' claims.

17  The *Noerr-Pennington* doctrine thus has no applicability here.

18  **V.      DEFENDANTS' "SPEECH" SHOULD NOT BE PROTECTED**

19         For the reasons above, Defendants' professed "free speech" rights are not implicated here.

20  This is a lawsuit directed against Defendants acting as the State in violation to impose

21  unconstitutional speech requirements on innocent businesses.  The First Amendment places no

22  value on false speech, and certainly does not condone Defendants' efforts to compel businesses to

23  place false warnings on their products.  *Zauderer*, 471 U.S. at 651.  Likewise, Defendants'

24  purported concerns that a ruling in B&G Foods's favor will deter other Proposition 65 private

25  enforcers or lead to more suits in this court is irrelevant.  A ruling in B&G Foods's favor will only

26  deter enforcers who violate the Constitution.

27                                      **<u>CONCLUSION</u>**

28         For the foregoing reasons, the motion to dismiss should be denied.

1

Dated:  June 1, 2020

Respectfully Submitted,

2

BRAUNHAGEY & BORDEN LLP

3

4

By: _s/ J. Noah Hagey_
         J. Noah Hagey

5

Attorneys for Plaintiff

6

B&G FOODS NORTH AMERICA, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS