**FILED**

**Mar 17, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| B&G FOODS NORTH AMERICA, INC., *Plaintiff-Appellant*, v. KIM EMBRY; NOAM GLICK, *Defendants-Appellees*. | No. 20-16971 D.C. No. 2:20-cv-00526-KJM-DB OPINION |

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, Chief District Judge, Presiding

Argued and Submitted January 12, 2022
San Francisco, California

Filed March 17, 2022

Before: Ronald M. Gould, Mark J. Bennett, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge Bennett

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal of a complaint, reversed the denial of leave to amend, and remanded to give plaintiff an opportunity to amend the complaint in an action brought pursuant to 42 U.S.C. § 1983 by food manufacturer B&G Foods North America, Inc., alleging that defendants Kim Embry and her attorney, Noam Glick, violated B&G's constitutional rights by threatening to sue and ultimately suing B&G to enforce California's Safe Drinking Water and Toxic Enforcement Act of 1986, better known as Proposition 65.

Proposition 65 requires businesses to notify customers if their products contain chemicals known to the state to cause cancer. Acrylamide, the chemical at issue, is on a state list of such chemicals based solely on laboratory studies in which pure acrylamide was given to rats or mice. Any person in the public interest may bring a Prop. 65 enforcement action upon satisfying certain requirements.

Embry, represented by Glick, sued B&G in state court, alleging that B&G's Cookie Cakes contain acrylamide and that B&G's failure to warn customers of that fact violates Prop. 65. B&G in turn sued Embry and Glick under § 1983 alleging that the naturally occurring acrylamide found in its Cookie Cakes did not cause cancer and that defendants' prelitigation activities and suit required B&G to engage in false compelled speech in violation of the First Amendment.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The district court dismissed B&G's complaint based on the *Noerr-Pennington* doctrine and denied leave to amend based on futility.

The *Noerr-Pennington* doctrine derives from the Petition Clause of the First Amendment and provides that those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct.

The panel applied a three-step analysis to determine whether defendants' conduct was immunized under *Noerr-Pennington*.  The panel first held that B&G's § 1983 suit burdened defendants' petition activities.  At step two, the panel held that defendants' prelitigation communications and suit to enforce Prop. 65, an initiative adopted by California voters to protect the public from harmful chemicals, were protected by the Petition Clause.  The panel further determined that B&G had failed to show that any of the sham exceptions to *Noerr-Pennington* applied based on the allegations in the complaint.  Finally, applying step three, the panel held that even assuming defendants were state actors, the *Noerr-Pennington* doctrine barred B&G's § 1983 action challenging defendants' protected petition conduct.

The panel reversed the district court's denial of B&G's motion for leave to amend the complaint because it was unclear whether amendment would be futile.  The panel noted that B&G proposed additional allegations that could support the application of the first sham exception, which examines the objective reasonableness of a defendant's suit and defendant's subjective motivation.

## COUNSEL

J. Noah Hagey (argued), Athul K. Acharya, David Kwasniewski, Tracy O. Zinsou, Braunhagey & Borden LLP, San Francisco, California, for Plaintiff-Appellant.

Shaun Markley (argued) and Craig M. Nicholas, Nicholas & Tomasevic, LLP, San Diego, California; Noam Glick, Glick Law Group, P.C., San Diego, California; Jonathan Weissglass, Law Office of Jonathan Weissglass, Oakland, California; for Defendants-Appellees.

Trenton H. Norris, Peg Carew Toledo, and David M. Barnes, Arnold & Porter Kaye Scholer LLP, San Francisco, California, for Amicus Curiae Consumer Brands Association.

## OPINION

BENNETT, Circuit Judge:

Plaintiff-Appellant B&G Foods North America, Inc. ("B&G"), a food manufacturer, sued Defendants-Appellees Kim Embry and her attorney, Noam Glick (collectively, "Defendants") under 42 U.S.C. § 1983.  B&G alleges that Defendants violated its constitutional rights by threatening to sue and ultimately suing B&G to enforce California's Safe Drinking Water and Toxic Enforcement Act of 1986, better known as Proposition 65 or Prop. 65.  The district court dismissed B&G's complaint based on the *Noerr-Pennington* doctrine[1] and denied leave to amend based on futility.  B&G

---

[1] "The *Noerr–Pennington* doctrine, originally derived from the decisions in *Eastern Railroad Presidents Conference v. Noerr Motor*

challenges those determinations.  We have jurisdiction under 28 U.S.C. § 1291.  We affirm the district court's decision that the *Noerr-Pennington* doctrine bars B&G's complaint, but we reverse the denial of leave to amend and remand to give B&G an opportunity to amend.

## I. FACTS AND PROCEDURAL BACKGROUND[2]

This case arises from Defendants' enforcement of Prop. 65, which, as relevant here, requires businesses to notify customers if their products contain chemicals "known to the state to cause cancer."    Cal. Health & Safety Code § 25249.6.  California's Office of Environmental Health Hazard Assessment ("OEHHA") maintains a list of such chemicals.  *See id.* § 25249.8.  Acrylamide, the chemical at issue, is on the list based solely on "laboratory studies in which pure acrylamide was given to rats or mice."  Studies on humans have shown that acrylamide does not increase the risk of cancer.  Indeed, OEHHA conceded in 2007 that acrylamide is not known to cause cancer in humans.

Any "person in the public interest" may bring a Prop. 65 enforcement action upon satisfying certain requirements. Cal. Health & Safety Code § 25249.7(d).  Private enforcers can seek injunctive relief and penalties of up to $2,500 per

---

*Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), provides that litigation activity (including pre-litigation cease-and-desist letters) cannot form the basis of liability unless the litigation is a 'sham.'" *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 347 n.1 (9th Cir. 2014) (parallel citations omitted).

[2] The facts are based on the allegations in B&G's complaint, which we accept as true and construe in the light most favorable to B&G.  *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016).

day per violation. *Id.* § 25249.7(a), (b)(1). A private enforcer receives 25% of any penalty collected, *id.* § 25249.12(d), and may also request reasonable attorneys' fees, Cal. Civ. Proc. Code § 1021.5. The state receives 75% of the penalty collected. Cal. Health & Safety Code § 25249.12(c).

Before bringing a private enforcement action, the person must give sixty days' notice of alleged violation ("NOV") to the Attorney General, other local prosecutors, and the alleged violator. *Id.* § 25249.7(d)(1). After receiving the NOV, the Attorney General must issue a no-merit letter if he believes the action is meritless, but the failure to do so is not an endorsement that the action has merit. *Id.* § 25249.7(e)(1). A no-merit letter doesn't prevent the person from bringing a private enforcement action. If the Attorney General or other prosecutor doesn't begin a prosecution within the sixty days' notice period, the person may commence a private enforcement action. *Id.* § 25249.7(d)(2).

California law offers businesses like B&G at least two exemptions under Prop. 65. First, a business need not provide a cancer warning if it "can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer." *Id.* § 25249.10(c). This is known as the "No Significant Risk Level" ("NSRL"). For some listed chemicals, like acrylamide, the OEHHA has published a quantitative NSRL. *See* Cal. Code Regs. tit. 27, § 25705. To determine whether exposure from a chemical in a food product exceeds the NSRL, the exposure is calculated based on the "average rate of intake or exposure for average users of the consumer product." *Id.* § 25721(d)(4). Because this scientific assessment is very burdensome and often

inconclusive (as enforcers disagree on how average consumption should be calculated), businesses often choose to settle when their products pose no health risks. Second, another exemption applies to products "where chemicals in food are produced by cooking necessary to render the food palatable or to avoid microbiological contamination." *Id.* § 25703(b)(1). But to qualify under this exemption, a business must satisfy a vague standard—that "sound considerations of public health support" an alternative risk level. *Id.* § 25703(b). In sum, because the standards are unclear and burdensome to prove, businesses often choose to settle Prop. 65 cases for certainty and to avoid paying substantial legal fees.

Embry, represented by Glick, has filed or threatened to file dozens of Prop. 65 acrylamide suits against food businesses and retailers. Over the last few years, Defendants have obtained about $1.7 million in penalties and fines from these actions. Consistent with Defendants' past practice, they began a Prop. 65 enforcement action against B&G. Glick, on behalf of Embry, served an NOV on B&G and the Attorney General (and others). The NOV alleged that B&G was violating Prop. 65 because its "Cookie Cakes" contain acrylamide and B&G provides no cancer warning. The Attorney General did not issue a no-merit letter and did not begin enforcement proceedings. Embry, again represented by Glick, then sued B&G in state court, alleging that B&G's Cookie Cakes contain acrylamide and that B&G's failure to warn customers of that fact violates Prop. 65. Although B&G doesn't add acrylamide to its Cookie Cakes, they contain some amount of acrylamide formed during the baking process.

On the same day Embry sued B&G, B&G sued Defendants. B&G's complaint alleges that the naturally

occurring acrylamide found in its Cookie Cakes does not cause cancer.  B&G claims Defendants are liable under 42 U.S.C. § 1983 because the NOV and suit against B&G requires B&G to engage in false compelled speech in violation of the First Amendment.  B&G seeks, among other things, an injunction barring any threats or lawsuits about acrylamide found in its Cookie Cakes, a declaration that Prop. 65's cancer warning as applied to its Cookie Cakes violates the First Amendment, and damages.

Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that (1) they are not state actors,[3] and (2) the *Noerr-Pennington* doctrine bars the action.  B&G argued in opposition that Defendants are state actors in enforcing Prop. 65.  It also argued that the *Noerr-Pennington* doctrine doesn't apply because (1) the doctrine protects First Amendment rights and states have no First Amendment rights, and (2) the sham exception to *Noerr-Pennington* applies because Defendants' Prop. 65 lawsuit is objectively meritless and brought for the wrongful subjective purpose of extorting money from businesses.

The district court granted the motion to dismiss with prejudice.  Assuming without deciding that Defendants were state actors, the court determined that *Noerr-Pennington* immunized Defendants from § 1983 liability.  The district court rejected B&G's argument that Defendants had no First Amendment petitioning rights protected by *Noerr-*

---

[3] A determination that Defendants are not state actors would be dispositive, as "[l]ike the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).

*Pennington*.  It reasoned that while states themselves do not have First Amendment rights, under Ninth Circuit precedent, government actors may receive *Noerr-Pennington* immunity when they petition on behalf of the public.  The district court found that Defendants' petitioning activities—sending prelitigation communications and suing—were done to enforce Prop. 65, which was a ballot measure sanctioned by California voters, and thus Defendants were petitioning on behalf of the public and entitled to *Noerr-Pennington* immunity.  The district court also rejected B&G's arguments that Defendants' Prop. 65 enforcement action was a sham, because Defendants had been largely successful given the allegation in B&G's complaint that "over the last few years, [Defendants] have extracted nearly $1.7 million in penalties and fines from food companies" in acrylamide suits.  After determining that the complaint should be dismissed, the district court denied B&G leave to amend.  The district court reasoned that any amendment would be futile because "[t]he *Noerr-Pennington* doctrine would apply equally to all claims based on Embry's acrylamide litigation against B&G." B&G timely appealed.

## II. STANDARD OF REVIEW

We review de novo "a district court's dismissal based on the *Noerr–Pennington* doctrine."   *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643 (9th Cir. 2009).  In doing so, "[w]e accept as true the well-pleaded factual allegations in the complaint" and construe them in the nonmoving party's favor. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016).

"We review the denial of leave to amend for an abuse of discretion, but we review the question of futility of amendment de novo."  *United States v. United Healthcare*

*Ins. Co.*, 848 F.3d 1161, 1172 (9th Cir. 2016) (citations omitted).

## III. DISCUSSION

### A. The *Noerr-Pennington* Doctrine

"The *Noerr–Pennington* doctrine derives from the Petition Clause of the First Amendment and provides that 'those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct.'" *Kearney*, 590 F.3d at 643–44 (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006)). "The doctrine immunizes petitions directed at any branch of government, including the executive, legislative, judicial and administrative agencies." *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000). "[C]onduct incidental to the prosecution of [a] suit," *Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991), like presuit demand letters and discovery communications, is also protected, *see Sosa*, 437 F.3d at 933–38; *Kearney*, 590 F.3d at 646. Though the *Noerr-Pennington* doctrine first arose in the antitrust context, we have extended its application, including to § 1983 claims. *See Manistee*, 227 F.3d at 1092 ("The immunity is no longer limited to the antitrust context; we have held that Noerr–Pennington immunity applies to claims under 42 U.S.C. § 1983 that are based on the petitioning of public authorities.").

To determine whether a defendant's conduct, which allegedly violates a statute, is immunized under *Noerr-Pennington*, we apply a three-step analysis to determine: (1) "whether the lawsuit imposes a burden on petitioning rights," (2) "whether the alleged activities constitute protected petitioning activity," and (3) "whether the statute[]"

at issue may be construed to [avoid] that burden." *Kearney*, 590 F.3d at 644. If the answer at each step is "yes," then a defendant's conduct is immunized under *Noerr-Pennington*. *See Sosa*, 437 F.3d at 932. But such immunity is not absolute, as "neither the Petition Clause nor the *Noerr–Pennington* doctrine protects sham petitions." *Id.* We decide whether the sham exception applies within step two of the three-part analysis. *See id.* at 938.

**1. Step One: whether B&G's § 1983 suit burdens Defendants' petitioning rights**

Step one asks "whether the success of [B&G's § 1983] lawsuit would constitute a burden on petitioning rights." *Kearney*, 590 F.3d at 645. In conducting this inquiry, we do not consider any alleged misconduct tied to the petitioning activities. *Id.* Rather, when the petitioning activity is incidental to the prosecution of a suit, the question is whether plaintiff's lawsuit "places a burden on [defendant's] ability" to prosecute its suit. *Id.* (holding that plaintiff's suit, which challenged defendants' "discovery communications, interactions with expert witnesses and contractors, and statements to the court," would burden defendants' right to prosecute an eminent domain proceeding because it would burden defendants' ability to bring such action).

B&G's lawsuit burdens Defendants' petitioning activities. Indeed, if successful, B&G's suit would completely prevent Defendants from engaging in their petitioning activities—sending prelitigation communications and suing to enforce Prop. 65. *See id.* at 644 (filing a lawsuit is "the very act of petitioning"); *Sosa*, 437 F.3d at 938 ("prelitigation settlement demands" are protected by the Petition Clause).

### 2. Step Two: whether Defendants' conduct is protected petitioning activity

Our focus at step two is whether Defendants' conduct qualifies as "*protected* petitioning activity." *Sosa*, 437 F.3d at 933 (emphasis added). In making this determination, we must first decide whether the Petition Clause extends to Defendants' conduct. *See id.* at 933–38. If it does, we next decide whether the sham exception to *Noerr-Pennington* applies. *See id.* at 938. Sham petitioning is not protected. "*Noerr–Pennington* immunity is not a shield for petitioning conduct that, although 'ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *Id.* (quoting *Noerr*, 365 U.S at 144).

We note that the *Noerr-Pennington* doctrine and its sham exception arose in the antitrust context, and so the sham-exception principles discuss whether petitioning is done for an anticompetitive purpose or to interfere with a competitor's business relationships. *See id.* Because these principles may be inapt in non-antitrust contexts in which we have extended the *Noerr-Pennington* doctrine, we do not treat them as rigid requirements in such situations. Rather, we rely on them to create analogous standards suitable to each case's context. *See, e.g.*, *Manistee*, 227 F.3d at 1095 (relying on the antitrust-subjective-sham-inquiry principles, which consider whether a process was used for an "anticompetitive" purpose but determining in a non-antitrust context that the corresponding inquiry is whether defendants caused the harm by "abus[ing] . . . the publicity/lobbying process" without any mention of an "anticompetitive" requirement).

### a. Whether the Petition Clause extends to Defendants' conduct

Assuming Defendants are state actors, our precedent compels the conclusion that their activities were protected by the Petition Clause. In *Manistee*, we held that the Petition Clause protected lobbying efforts by government actors—a city and its officials. *Id.* at 1093. We reasoned that applying *Noerr-Pennington* to government actors was "consistent with [the] 'representative democracy' rationale" for the doctrine, as government "petitioning may be nearly as vital to the functioning of a modern representative democracy as petitioning that originates with private citizens." *Id.*

In *Kearney*, we extended *Manistee* to litigation activities by government actors and their attorneys by holding that conduct related to an eminent domain suit, which allegedly violated § 1983, was protected petitioning. 590 F.3d at 644–45. We found that "[t]here is no reason . . . to limit *Manistee*'s holding to lobbying efforts," *id.* at 644, and that the representative democracy rationale applied equally to lawsuits like eminent domain proceedings in which "a governmental entity acts on behalf of the public it represents . . . [in] seek[ing] to take private property and convert it to public use." *Id.* at 645.

Defendants' activities seek to enforce Prop. 65, an initiative adopted by California voters to protect the public from harmful chemicals. *See AFL-CIO v. Deukmejian*, 260 Cal. Rptr. 479, 479 (Ct. App. 1989). Thus, Defendants' conduct falls squarely within the conduct that we held was protected in *Kearney*—litigation activities brought by government officials to advance public goals. *See Kearney*, 590 F.3d at 644–45. Defendants' conduct is therefore protected by the Petition Clause.

B&G's attempts to distinguish *Kearney* are unconvincing. B&G argues that *Kearney*'s extension of *Manistee* to litigation by government officials is non-binding dicta because, in *Kearney*, we ultimately found *Noerr-Pennington* inapplicable under the sham exception. But in reaching our ultimate holding in *Kearney*, we applied our three-part test. *See id.* at 644. Thus, before determining whether the sham exception applied, we first determined that defendants' activities amounted to protected petitioning activities. *See id.* at 646. In doing so, we engaged in a detailed analysis that included analyzing our rationale and holding in *Manistee*, finding that *Manistee* should be extended to litigation activities, and analyzing whether defendants' conduct was protected petitioning. *See id.* at 644–46. Our extension of *Manistee* was therefore not dicta, as whether defendants' conduct was protected petitioning under *Manistee* bore directly on *Noerr-Pennington*'s applicability, and we resolved the issue after considered analysis. *See United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." (alteration in original) (quoting *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004))).

B&G argues that *Kearney* is relevant only when government officials and their agents file eminent domain proceedings. But nothing in *Kearney* suggests such a limited holding. Indeed, in determining that *Manistee* should be extended to conduct beyond lobbying, we reasoned that *Manistee*'s rationale applied equally to "lawsuits" brought by government actors. *Kearney*, 590 F.3d at 644 ("In a representative democracy, . . . branches of government often

'act on behalf of the people' and 'intercede' to 'advance their constituents' goals, both expressed and perceived.' Such intercession is just as likely to be accomplished through lawsuits—the very act of petitioning—as through lobbying." (citation omitted) (quoting *Manistee*, 227 F.3d at 1093)). And we did not distinguish between eminent domain proceedings and other types of lawsuits. We therefore reject B&G's narrow view of *Kearney*.

Finally, according to B&G, *Kearney* involved "intergovernmental petitioning" by a municipal official to a state court. Thus, it argues that *Kearney* is distinguishable, because here, state officials have petitioned a state court and so there is no protected "intergovernmental petitioning." We are unpersuaded. Nothing in *Kearney* suggests that our holding extending *Noerr-Pennington* immunity to governmental entities and officials depended on whether it was a state or municipal official who had engaged in the petitioning activity. Moreover, why should it matter? "[A] city is a political subdivision of the state, created as a convenient agency for the exercise of such of the governmental powers of the state as may be intrusted to it." *City of Trenton v. New Jersey*, 262 U.S. 182, 185–86 (1923). We see no reason why *Noerr-Pennington* applicability should turn on whether the petitioner is an official of a state or one of its political subdivisions.

In short, under our precedent, Defendants' prelitigation communications and suit to enforce Prop. 65 are protected by the Petition Clause.

#### b. Whether the sham exception applies

We have identified three circumstances in which the sham exception might apply in the litigation context:

> [F]irst, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose; and third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.

*Sosa*, 437 F.3d at 938 (citations and quotation marks omitted).

As an initial matter, we reject Defendants' argument that these exceptions do not apply to the NOV because the NOV should be construed as petitioning directed toward a political entity rather than a judicial body.  The NOV is conduct incidental to the prosecution of a suit, as it is a prerequisite to filing a private enforcement action under Prop. 65 and, like a presuit demand letter, essentially threatens litigation against an alleged violator.  *See* Cal. Health & Safety Code § 25249.7(d).

B&G argues that all three exceptions apply.  But B&G forfeited its argument on the third exception because it failed to raise such argument below.  *See Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 869–70 (9th Cir. 2013).  We thus address only the first and second exceptions.

Under the first exception, Defendants' "lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Pro. Real*

*Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr . . . .*" *Id.* "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Id.* The subjective element can be satisfied by showing that Defendants "used government processes, as opposed to the outcome of those processes, as a mechanism to injure" B&G. *Empress LLC v. City & County of San Francisco*, 419 F.3d 1052, 1057 (9th Cir. 2005) (citing *Manistee*, 227 F.3d at 1094–95). *Compare Pro. Real Est. Invs.*, 508 U.S. at 60–61 (explaining that the subjective inquiry in the antitrust context examines "whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon" (cleaned up)) *with Manistee*, 227 F.3d at 1095 (relying on the antitrust-subjective-sham-inquiry principles in determining in a non-antitrust context that the inquiry is whether defendants caused the harm by "abus[ing] . . . the publicity/lobbying process").

B&G has not plausibly alleged that Defendants' suit was objectively baseless. As relevant here, Prop. 65 requires a plaintiff to show that a defendant (1) "knowingly and intentionally expose[d] any individual to a chemical known to the state to cause cancer" and (2) failed to give a "clear and reasonable warning to such individual." Cal. Health & Safety Code § 25249.6. It is undisputed that B&G's Cookie Cakes contain some amount of acrylamide, that acrylamide is on the list of chemicals "known to the state to cause cancer," and that B&G does not provide a warning. Given all this, an objective litigant could have concluded that Defendants' suit was "reasonably calculated to elicit a

favorable outcome." *Pro. Real Est. Invs.*, 508 U.S. at 60. Because B&G has failed to establish the objective element, we need not reach the subjective element. *See id.*[4]

We now turn to the second sham exception. We agree with the district court that, under our precedent, B&G's complaint fails to plausibly allege the application of the second sham exception. In *USS-POSCO Industries v. Contra Costa County Building & Construction Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994), we explained that the second sham exception applies "where the defendant is accused of bringing a whole series of legal proceedings" without regard to the merits, *id.* at 811. In such cases, "the question is not whether any one [suit] has merit— some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* To determine whether the exception applies, we ask: "Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Id.*

In *USS-POSCO Industries*, the record showed that "fifteen of the twenty-nine lawsuits" filed by defendants had

---

[4] B&G also argues that, as in the labor-relations context, we need not consider the objective element; we need consider only the subjective element. *But see White v. Lee*, 227 F.3d 1214, 1232, 1232 n.16 (9th Cir. 2000) (stating that "[o]bjective baselessness is the sine qua non of any claim that a particular lawsuit is not deserving of First Amendment protection" and noting only one exception to this rule, which arises in the labor relations context). We decline to address this argument because B&G forfeited it by failing to raise it below. *See Visendi*, 733 F.3d at 869–70.

been successful. *Id.* We reasoned: "The fact that more than half of all the actions as to which we know the results turn out to have merit cannot be reconciled with the charge that the unions were filing lawsuits and other actions willy-nilly without regard to success." *Id.* Thus, based on defendants' success rate alone, we held that plaintiff had failed to show that defendants' conduct fell within the second sham exception. *Id.*

B&G's complaint alleges that "Defendants have filed or threatened to file dozens of cases about acrylamide," and "Defendants have extracted nearly $1.7 million in penalties and fines from food companies." There are no allegations about Defendants' success rate.[5] Thus, the only reasonable inference is that Defendants have been largely successful, which as in *USS-POSCO Industries*, cannot be reconciled with the theory that Defendants were threatening to sue and suing without regard to success. *See id.* The district court therefore properly found the second sham exception inapplicable, given the allegations in the complaint.

In sum, Defendants' conduct is protected petitioning activity. Ninth Circuit precedent holds that government officials engaged in petitioning conduct on behalf of the public, like that present here, are entitled to *Noerr-Pennington* immunity. *See Manistee*, 227 F.3d at 1093; *Kearney*, 590 F.3d at 644–45. And B&G has failed to show that any of the sham exceptions could apply based on the

---

[5] B&G's reply brief points to information outside the complaint to support the application of the second sham exception. Because our review is limited to the complaint, we do not consider such outside information in analyzing whether B&G has plausibly alleged the applicability of a sham exception. *See Orellana v. Mayorkas*, 6 F.4th 1034, 1042–43 (9th Cir. 2021).

allegations in the complaint.  We thus move to the final part of our three-part analysis.

### 3.  Step Three: whether § 1983 can be construed to avoid burdening Defendants' protected petitioning activity

"[T]he *Noerr–Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause."  *Sosa*, 437 F.3d at 931.  "Under the *Noerr–Pennington* rule of statutory construction, we must construe federal statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute clearly provides otherwise."  *Id.*  Thus, we ask at step three whether the statute—here 42 U.S.C. § 1983—can be construed to avoid burdening Defendants' Petition Clause rights.  *See id.*; *see also id.* at 932 ("Where . . . the burdened conduct could fairly fall within the scope of the Petition Clause and a plausible construction of the applicable statute is available that avoids the burden, we must give the statute the reading that does not impinge on the right of petition.").

As we recognized in *Sosa*, we determined in *Manistee* that § 1983 cannot burden protected petitioning rights.  *Id.* at 932 n.6 (describing *Manistee* as a case in which we "declin[ed] to interpret 42 U.S.C. § 1983 as subjecting governmental entities or officials to liability for activity that would otherwise be with the protection of the *Noerr–Pennington* doctrine").  In *Manistee*, a city and its officials had lobbied a county not to lease space from a shopping center.  227 F.3d at 1091.  The shopping center sued the city and its officials, "alleging that the defendants' lobbying of the County had deprived [the shopping center] of its property (potential lease contracts) without due process of law in

violation of 42 U.S.C. § 1983." *Id.* We determined that the lobbying was protected petitioning activity and declined to interpret § 1983 as subjecting the government and its officials to liability for activity protected by *Noerr-Pennington*:

> Nor do we interpret § 1983 to subject government entities or officials to liability for activity that is protected by Noerr–Pennington immunity. . . . The petitioning or lobbying of another governmental entity is insufficient to "subject" . . . a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

*Id.* at 1093 (quoting 42 U.S.C. § 1983). Thus, *Manistee* held that § 1983 cannot burden protected petitioning rights. *Id.*

B&G tries to limit *Manistee*'s holding to lobbying only, as according to B&G, "[l]obbying is not the evil that § 1983 was created to address." But we said nothing in *Manistee* to suggest that *Noerr-Pennington* immunity should be limited to lobbying only. Rather, our statements in *Manistee* show that we believed that the *Noerr-Pennington* doctrine barred § 1983 claims based on any protected petitioning conduct. *See id.* ("[W]e [do not] interpret § 1983 to subject government entities or officials to liability *for activity that is protected by Noerr-Pennington immunity*." (emphasis added)); *id.* ("The *petitioning* or lobbying of another governmental entity is insufficient to 'subject' . . . a person 'to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" (emphasis added) (quoting 42 U.S.C. § 1983)).

B&G also argues that applying *Noerr-Pennington* immunity would undermine one of the foundational purposes of § 1983, which is to protect persons against unconstitutional enforcement actions. To support its argument, B&G discusses several cases in which § 1983 was used to remedy the unconstitutional enforcement of state laws. B&G's argument is flawed, however, because it ignores that its lawsuit does not merely seek to challenge a state law as unconstitutional; it seeks to hold Defendants liable for their petitioning conduct, thereby implicating the *Noerr-Pennington* doctrine.[6] And the cases that B&G discusses fail to advance its argument because none dealt with *Noerr-Pennington* immunity.

In short, even assuming Defendants were state actors, the *Noerr-Pennington* doctrine bars B&G's § 1983 action challenging Defendants' protected petitioning conduct.[7]

---

[6] For this reason, the circumstances here are unlike those in our concurrently filed opinion in *California Chamber of Commerce v. Council for Education and Research on Toxics*, No. 21-15745. In *California Chamber*, the plaintiff seeks declaratory and injunctive relief that would apply to only prospective Prop. 65 suits. *See Cal. Chamber of Com. v. Becerra*, 529 F. Supp. 3d 1099, 1113 (E.D. Cal. 2021); First Am. Compl. for Decl. and Inj. Relief at 25–26, No. 2:19-CV-02019-DAD-JDP (E.D. Cal. Mar. 16, 2020), ECF No. 57. In other words, unlike here, the plaintiff in *California Chamber* does not seek to hold Prop. 65 enforcers liable for their past petitioning conduct.

We acknowledge that, as an example, a merits decision in *California Chamber* that Prop. 65 acrylamide litigation involves unconstitutional compelled speech might practically put an end to such litigation. But because such a decision is only hypothetical for now, it does not affect our *Noerr-Pennington* analysis.

[7] We need not and do not decide whether Defendants acted under color of state law under § 1983. Although we have discretion to do so,

**B.  Leave to Amend**

"Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).  We reverse the district court's denial of leave to amend because it is unclear whether amendment would be futile.

B&G proposes additional allegations that could support the application of the first sham exception, which examines the objective reasonableness of defendant's suit and defendant's subjective motivation.  *See Pro. Real Est. Invs.*, 508 U.S. at 60.  For example, B&G says that it could allege that Cookie Cakes "unquestionably qualif[ies] for the NSRL safe harbor," and that Defendants made no effort to investigate their claims and filed without regard to the merits.  A reasonable factfinder could infer from these allegations that Defendants' suit was objectively baseless because they knew (or should have known) that B&G was not violating Prop. 65 but filed suit anyway.

The new allegations could also support the subjective element, as they could support the inference that Defendants

we believe it unwise given our decision to allow B&G to amend.  B&G's amendments could affect the state actor issue.  It is also possible that B&G's amendments could still fail to adequately allege application of the sham exception, in which case it would be unnecessary to reach the state actor issue.  Also, if the state actor issue needs to be reached, we would benefit from the district court's analysis of the issue in the first instance.  We also decline to address B&G's argument that the *Noerr-Pennington* doctrine does not apply to claims for declaratory relief, as B&G forfeited this argument by raising it for the first time in its reply brief.  *See Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) ("[W]e decline to consider new issues raised for the first time in a reply brief.").

threatened and filed suit because they wanted to improperly pressure B&G into settling, not because they believed that they could achieve their objective based on the merits. *See Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 353 (9th Cir. 2014) (holding that allegations that a party hoped to enforce its "rights through the *threat* of litigation rather than through actual litigation" could "satisfy[] the second criterion for the sham exception").

It is also unclear whether B&G could plausibly allege application of the second sham exception, which arises when defendant's "conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits' and for an unlawful purpose." *Sosa*, 437 F.3d at 938 (quoting *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998)). B&G points to information in the amicus brief that Embry, while represented by Glick or his co-counsel, has withdrawn 129 of her 260 NOVs concerning acrylamide and has settled only 25 cases. This information, which was omitted from the complaint, could support an inference that Defendants' acrylamide litigation was unsuccessful, as only a fraction of their threatened suits succeeded. Such an inference would undermine the district court's sole basis for finding the second sham exception inapplicable. Moreover, that inference, together with the other new and existing allegations—for example, that Defendants file without regard to the merits and undertake no efforts to investigate their claims, and businesses like B&G will often settle because Prop. 65 suits are burdensome and very expensive to defend—could support that Defendants' suits were not based on merit but were brought pursuant to a policy of improperly pressuring businesses, like B&G, to settle.

Because it is unclear whether B&G could allege the application of a sham exception to the *Noerr-Pennington* doctrine in an amended complaint, the district court erred in dismissing the complaint without leave to amend.

## IV. CONCLUSION

The district court properly concluded that B&G's § 1983 suit is barred by the *Noerr-Pennington* doctrine, given the allegations in the complaint. But the district court erred in denying leave to amend because it is unclear whether amendment would be futile. We therefore reverse the dismissal of B&G's complaint and remand to allow B&G an opportunity to amend.[8]

The parties shall bear their own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

[8] Nothing in this opinion should be construed as precluding B&G from raising on remand its arguments that have been forfeited in this appeal. B&G should be allowed to offer amendments going to such issues.