J. Noah Hagey, Esq. (SBN: 262331)
　　hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
　　borden@braunhagey.com
Forrest Hainline, Esq. (SBN 64166)
　　hainline@braunhagey.com
David H.  Kwasniewski, Esq. (SBN: 281985)
　　kwasniewski@braunhagey.com
Robert Petraglia, Esq. (SBN: 264849)
　　petraglia@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 599-0210

ATTORNEYS FOR PLAINTIFF
B&G FOODS NORTH AMERICA, INC.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&G FOODS NORTH AMERICA, INC.,<br><br>　　　　Plaintiff,<br><br>　　　　　　v.<br><br>KIM EMBRY and ENVIRONMENTAL HEALTH ADVOCATES, INC., acting as enforcement representatives under California Proposition 65 on behalf of the State of California,<br><br>　　　　Defendants. | Case No.  2:20-cv-00526-KJM-DB<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff B&G Foods North America, Inc. ("Plaintiff" or "B&G Foods") brings this action for injunctive relief, damages, and declaratory relief under 42 U.S.C. § 1983 and the First and Fourteenth Amendment of the U.S. Constitution against supposed Proposition 65 enforcement representatives of the State of California, and alleges as follows:

**PRELIMINARY STATEMENT**

1.  Plaintiff B&G Foods sold and distributed devil's food cookie cakes (the "Cookie Cakes") and chocolate crème sandwich cookies ("Sandwich Cookies") around the country.

2.  Plaintiff's Cookie Cakes were reduced fat chocolate cookies with marshmallow and fudge coating, and its Sandwich Cookies were reduced fat chocolate crème sandwiches made with two chocolate cookies.  They were sold nationwide and in California and included products sold under the SNACKWELL'S® brand:





FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3.      The interior cookie portion of the Cookie Cakes and the exterior chocolate cookies of the Sandwich Cookies were baked, just like any other cookie.  Otherwise, they would have been an unpalatable mess of sugar, flour, and chocolate.  Baked foods like cookies, cakes, and crackers contain trace amounts of a substance called acrylamide, which inevitably forms during the baking process.

4.      California's Office of Environmental Health Hazard Assessment ("OEHHA") added acrylamide to its list of "known" carcinogens subject to regulation under California's Proposition 65 in 1990.  The initial Proposition 65 listing was premised on potential exposures to acrylamide in industrial settings.  At that time, it was not known that acrylamide was present in cooked foods.  In fact, acrylamide was not detected in foods until 2002.

5.      The state has acknowledged that acrylamide in food does not cause cancer, or any other harm.  Defendants still, however, seek to compel companies like B&G Foods to label their baked goods with a bold disclaimer that they "contain a chemical known to the State of California to cause cancer" due to the presence of this naturally occurring acrylamide:

> WARNING: Consuming this product can expose you to [Acrylamide], which is known to the State of California to cause cancer.  For more information, go to www.P65Warnings.ca.gov/food.

27 Cal. Code Regs § 25607.2(a)(2).

6.      Defendants Kim Embry and Environmental Health Advocates Inc. ("EHA") are serial enforcement agents under California's Proposition 65 regime who, with the assistance and supervision of the State, threatened to prosecute litigation against Plaintiff unless all the Cookie Cakes and Sandwich Cookies labels were changed to include a false cancer warning.

7.      Defendants have continued to prosecute lawsuits against B&G Foods even though this Court held in *California Chamber of Commerce v. Becerra*, 529 F. Supp. 3d 1099 (E.D. Cal. 2021), *aff'd* 29 4th 468 (9th Cir. 2022) ("*Calchamber*"), Defendants' allegations are false and unconstitutional, and that the state does not, in fact "know" acrylamide causes cancer.

8.      Both Ms. Embry and EHA acknowledge that the final injunction that will be entered in *Calchamber* will be dispositive of their cases, and consequently both requested that their cases be stayed.

1    9.    Defendants, however, have not dismissed their claims.

2    10.    The lawsuits that Defendants have brought against B&G Foods are shams.  They are

3    not based on any good-faith investigation into the facts alleged, or a good-faith application of

4    Proposition 65.  Defendants' lawsuits were filed solely to extort money from B&G Foods.

5    Defendants file these lawsuits as part of a policy and practice of bringing Proposition 65

6    enforcement actions without regard to their merits.  Moreover, these lawsuits are predicated on

7    misrepresentations to the Court, including the misrepresentation that acrylamide that forms

8    naturally during the cooking process is a known carcinogen.

9    11.    Defendants' attempt to compel B&G Foods to make false statements about its own

10    products violates B&G Foods's First and Fourteenth Amendment rights.

11    12.    Plaintiff accordingly seeks protection from these violations of its constitutional

12    rights pursuant to Section 1983 of Title 42 of the United States Code and seeks injunctive and other

13    relief.

14    **PARTIES**

15    13.    Plaintiff B&G Foods North America, Inc. dates back to 1889, when two immigrant

16    families, the Blochs and Guggenheimers, started a business selling pickles in Manhattan.

17    14.    Today, Plaintiff carries on their legacy by selling a variety of high-quality frozen

18    and shelf-stable foods throughout the country, including the Cookie Cakes and Sandwich Cookies

19    sold under the SNACKWELL'S® brand.

20    15.    Plaintiff is a Delaware corporation with its headquarters in Parsippany, New Jersey.

21    16.    Defendant Kim Embry is a serial Proposition 65 litigant who seeks to act on behalf

22    of the State of California in suing and threatening to sue dozens of businesses based on the alleged

23    presence of acrylamide in their products.

24    17.    She brings these suits in the "interest of the general public" of the State of

25    California.

26    18.    On information and belief, Ms. Embry is a citizen of California who directly and

27    indirectly consults with the State and its representatives to initiate Proposition 65 actions, including

28    against Plaintiff.

3

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

19.     She has been represented by the same attorney—Noam Glick—in each of the several hundred Proposition 65 lawsuits she has filed.

20.     She has previously testified that she does not purchase, consume, or have any knowledge of the products on which her lawsuits are based, is unfamiliar with the scientific evidence regarding acrylamide's health effects, and functions as nothing more than a shill for her lawyer to file Proposition 65 lawsuits.

21.     Defendant EHA is, upon information and belief, a California Corporation created by Noam Glick so that he may file even more Proposition 65 lawsuits.

22.     Like Defendant Embry, Defendant EHA seeks to act on behalf of the State of California in suing and threatening to sue dozens of businesses based on the alleged presence of acrylamide in their products.

23.     EHA has also admitted it does not conduct a reasonable pre-suit investigation prior to bringing Proposition 65 actions.

24.     Ms. Embry and EHA share a business model.  They bring serial, meritless, "shake-down" actions in the hopes that some small percentage will settle for fees and penalties they share with the State.

25.     Both Ms. Embry and EHA have filed hundreds of notices of Proposition 65 violations ("NOV"), but only a small percentage of these NOVs result in any form of settlement or judgment.

26.     In all of these actions, Ms. Embry and EHA were simply shills used by their attorney, Noam Glick.[1]

27.     Ms. Embry and EHA have admitted to destroying evidence and filing lawsuits without any investigation into the truth of their allegations.

---

[1] Mr. Glick was dismissed from this case with prejudice by the Court on October 7, 2020; however, the Ninth Circuit reversed that portion of the opinion dismissing the Complaint without leave to amend.  *See B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 542 (9th Cir. 2022).  Mr. Glick has not been named in the amended complaint and is therefore dismissed from this action without prejudice.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

28.     Defendants Embry and EHA have extracted millions of dollars in penalties and fines from food companies through frivolous acrylamide suits.

29.     Defendants' business model is pernicious and operates through the regulation, encouragement, and self-interest of the State.  After testing products, Defendants are enabled by the State to threaten to file suit unless the products' manufacturer or retailer pays a massive penalty or agrees to change its label to warn consumers that the product contains substances "known" to cause cancer.

30.     The State permits Defendants to file suit against products containing modest, trace amounts of substances even if they pose no possible health effect.  This includes substances like acrylamide that arise naturally, for example, when baking a cookie.

31.     The resulting penalties and fines collected by Defendants Embry and EHA and the State do nothing to improve public safety and serve only to enrich lawyers and their accomplices. Still, the State continues to allow and encourage its representatives—including Ms. Embry and EHA—to threaten food companies with unconstitutional speech requirements lest they not pay a sizable penalty to the enforcer and the State.

## JURISDICTION AND VENUE

32.     This Court has federal question subject matter jurisdiction under Title 28, Section 1331 of the United States Code, which confers original jurisdiction on the federal district courts over actions arising under the Constitutions or laws of the United States.  Federal courts, including this judicial district, have assumed jurisdiction over similar federal constitutional challenges to the enforcement of Proposition 65.  *See, e.g.*, *Nat'l Ass'n of Wheat Growers v. Zeise*, 309 F. Supp. 3d 842 (E.D. Cal. 2018).

33.     Alternatively, should Defendants somehow be deemed non-state actors, then subject matter jurisdiction exists under Title 28, Section 1332 of the United States Code, which confers original jurisdiction on federal district courts over actions between private citizens of different states where the amount in controversy exceeds $75,000.

34.     Venue is proper under Title 28, Section 1391(b)(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

# FACTS

## I.  ACRYLAMIDE IN B&G FOODS'S PRODUCTS DOES NOT CAUSE CANCER.

35.  Plaintiff's Cookie Cakes and Sandwich Cookies have never caused cancer in people and Defendants have no evidence to the contrary.

36.  Nor is the alleged amount of acrylamide in Plaintiff's Cookie Cakes or Sandwich Cookies known to cause cancer in humans.

### A.  Acrylamide is Naturally Created During the Baking Process.

37.  Plaintiff has never added acrylamide to its products, which according to the FDA has likely "always been present in cooked foods."  Virtually every cookie or bread product on Earth that is baked has acrylamide in it.

38.  Acrylamide forms during a chemical reaction, known as the Maillard reaction and arises when food is baked, roasted, grilled or fried.

39.  Acrylamide is created when sugars such as glucose or fructose react with a naturally occurring free amino acid, asparagine.

40.  Acrylamide also naturally forms in uncooked foods such as nuts.  *See* OEHHA, *Acrylamide Fact Sheet* (Feb. 2019), https://www.p65warnings.ca.gov/sites/default/files/downloads/factsheets/acrylamide_fact_sheet.pdf.

41.  Acrylamide is created when cooking at home, whether in the oven, on the grill or in the skillet.  *See, e.g.*, Letter from Lester M. Crawford, DVM, Ph.D, Deputy Commissioner, FDA, to Joan E. Denton, M.S., Ph.D, Director, OEHHA (July 13, 2003).

42.  The State recognizes that the substance is widespread in ordinary products like breakfast cereals, roasted coffee, crackers, bread crusts, roasted asparagus, French fries, potato chips, canned sweet potatoes, canned black olives, roasted nuts, and toast.

### B.  There Is No Evidence that Acrylamide Created During the Baking Process Causes Cancer.

43.  The federal government has studied acrylamide and does not recommend avoiding foods that contain the substance.

44.     Rather, many of the foods consumers are encouraged to eat by the FDA, such as nuts, grains and other foods, contain acrylamide.

45.     Most scientists, including European and U.S. government scientists, agree that acrylamide in food does not cause cancer in humans.

46.     The National Cancer Institute ("NCI"), the federal government's principal agency for cancer research and training, states that "a large number of epidemiologic studies (both case-control and cohort studies) in humans have found no consistent evidence that dietary acrylamide exposure is associated with the risk of any type of cancer." NCI, *Acrylamide and Cancer Risk* (Dec. 5, 2017), https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/acrylamide-fact-sheet.

47.     The American Cancer Society recently has re-confirmed its review of epidemiological studies which "***show that dietary acrylamide isn't likely to be related to risk for most common types of cancer***."  American Cancer Society, *Acrylamide and Cancer Risk* (Feb. 11, 2019), https://www.cancer.org/cancer/cancer-causes/acrylamide.html (emphasis added).

48.     The American Cancer Society further states that it has no idea whether acrylamide increases cancer risk, stating that it is "not yet clear if the levels of acrylamide in foods raise cancer risk …." *Id.*

49.     In a 2012 systematic review published in the European Journal of Cancer Prevention, researchers found "no consistent or credible evidence that dietary acrylamide increases the risk of any type of cancer in humans, either overall or among nonsmokers":

> After an extensive examination of the published literature, we found no consistent or credible evidence that dietary acrylamide increases the risk of any type of cancer in humans, either overall or among nonsmokers.  In particular, the collective evidence suggests that a high level of dietary acrylamide intake is not a risk factor for breast, endometrial, or ovarian cancers ….
>
> In conclusion, epidemiologic studies of dietary acrylamide intake have failed to demonstrate an increased risk of cancer.  In fact, the sporadically and slightly increased and decreased risk ratios reported in more than two dozen papers examined in this review strongly suggest the pattern one would expect to find for a true null association over the course of a series of trials.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

L. Lipworth, et al., *Review of Epidemiologic Studies of Dietary Acrylamide Intake and the Risk of Cancer*, EUROPEAN J. OF CANCER PREVENTION, Vol. 21(4):375-86 (2012); *see also* C. Pelucchi, et al., *Dietary Acrylamide & Cancer Risk: An Updated Meta-Analysis*, INT'L J. OF CANCER, Vol. 136(12):2912–22 (2015) ("This systematic review and meta-analysis of epidemiological studies indicates that dietary acrylamide is not related to the risk of most common cancers."); A. Kotemori, et al., *Dietary Acrylamide Intake and Risk of Breast Cancer: the Japan Public Health Center-Based Prospective Study*, CANCER SCIENCE, Vol. 109(3):843-53 (2018) ("In conclusion, dietary acrylamide intake was not associated with the risk of breast cancer in this population-based prospective cohort study of Japanese women."); M. McCullough, et al., *Dietary Acrylamide Is Not Associated with Renal Cell Cancer Risk in the CPS-II Nutrition Cohort, Cancer Epidemiology*, BIOMARKERS & PREVENTION, Vol. 28(3):616-619 (2019) ("In conclusion, we found no evidence that greater dietary acrylamide intake was associated with risk of RCC [renal cell carcinoma]."); J. Hogervorst, et al., *Interaction Between Dietary Acrylamide Intake and Genetic Variants for Estrogen Receptor-Positive Breast Cancer Risk*, EUROPEAN J. OF NUTRITION, Vol. 58:1033-1045 (2019) ("This study did not provide evidence for a positive association between acrylamide intake and ER+ [estrogen receptor-positive] breast cancer risk. If anything, acrylamide was associated with a decreased ER+ breast cancer risk.").

50.     In fact, studies have shown that certain foods that contain acrylamide likely reduce the risk of cancer in humans.

51.     For example, in June 2018, the International Agency for Research on Cancer ("IARC") concluded that there is an "inverse association" between drinking coffee (which contains acrylamide) and certain types of cancer. IARC, *Monographs on the Evaluation of Carcinogenic Risks to Humans, Drinking Coffee, Mate, and Very Hot Beverages*, Vol. 116 at 434 (2018).

52.     Likewise, a recent study showed that whole-grain foods may reduce the risk of liver cancer. AMERICAN CANCER SOCIETY, *Study Ties Whole Grains to Lower Risk of Liver Cancer* (Feb. 27, 2019), https://www.cancer.org/latest-news/study-ties-whole-grains-to-lower-risk-of-liver-cancer.html.

53.     The sole basis for California's Proposition 65 warning requirement for acrylamide are laboratory studies in which pure acrylamide was given to rats or mice.

54.     As NCI has explained, however, "toxicology studies have shown that humans and rodents not only absorb acrylamide at different rates, they metabolize it differently as well." NCI, *Acrylamide and Cancer Risk* (Updated Dec. 5, 2017), https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/acrylamide-fact-sheet.

55.     Both the Environmental Protection Agency ("EPA") and IARC have not classified acrylamide as a probable carcinogen based on studies in humans.

56.     In its most recent assessment of acrylamide, for example, IARC concluded in 1994 that there was "*inadequate evidence* in humans for the carcinogenicity of acrylamide." IARC, *Monographs on the Identification of Carcinogenic Risks to Humans, Some Industrial Chemicals*, Vol. 60 at 425 (Feb. 1994), https://monographs.iarc.fr/wp-content/uploads/2018/06/mono60.pdf.

57.     Similarly, in its most recent toxicological review of acrylamide in 2010, EPA explained that human studies assessing the carcinogenicity of acrylamide (including studies of both dietary and industrial exposures) "are judged as providing limited or no evidence of carcinogenicity in humans." EPA, *Toxicological Review of Acrylamide*, 167 (March 2010), https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0286tr.pdf.

**C.      The State Has Acknowledged that Acrylamide in Food Does Not Cause Cancer.**

58.     The State of California also has admitted under oath that, despite listing acrylamide as a dangerous chemical, it has no knowledge of that fact.

59.     OEHHA conceded in 2007 that acrylamide is not actually known to cause cancer in humans.

60.     Specifically, Martha Sandy, now the Branch Chief of OEHHA's Reproductive and Cancer Hazard Assessment Branch, was designated as OEHHA's "Person Most Knowledgeable" in an action involving acrylamide. *See* Cal. Code Civ. P. § 2025.230. Ms. Sandy testified that: (a) she was not aware of any governmental health organization listing acrylamide as a known human carcinogen, (b) she was not aware of any pharmacodynamic data regarding rats and humans and acrylamide, and (c) OEHHA did not actually "know" that acrylamide was a human carcinogen.

61.     OEHHA also has recognized that acrylamide in certain food products – namely, coffee – does not increase human cancer risk.

62.     In particular, in June 2019, OEHHA adopted a new regulation that states: "Exposures to chemicals in coffee, listed on or before March 15, 2019 as known to the state to cause cancer, that are created by and inherent in the processes of roasting coffee beans or brewing coffee do not pose a significant risk of cancer."  27 Cal. Code Regs. § 25704 (effective Oct. 1, 2019).

63.     In adopting this regulation, OEHHA explained that "[t]he weight of the evidence from the very large number of studies in the scientific literature does not support an association between the complex mixture of chemicals that is coffee [including acrylamide] and significant risk of cancer to the average consumer."  OEHHA, *Final Statement of Reasons, Adoption of New Section 25704 Exposures to Listed Chemicals in Coffee Posing No Significant Risk* (June 7, 2019), https://oehha.ca.gov/media/downloads/crnr/fsorcoffee060719.pdf.

64.     In sum, Defendants and the State have no evidence that acrylamide in the Cookie Cakes or Sandwich Cookies is harmful to anyone.

## II.     COMPELLING B&G FOODS TO CLAIM ITS PRODUCTS CAUSE CANCER VIOLATES ITS FIRST AMENDMENT RIGHTS.

65.     The warning label that Defendants seek to compel Plaintiff to place on its products is false.  The State of California does not know that acrylamide causes cancer, or that the Cookie Cakes or Sandwich Cookies cause cancer.

66.      For these very reasons, on March 30, 2021, this Court enjoined future prosecution of Proposition 65 acrylamide lawsuits.  In issuing that injunction, the Court explained:

> [T]he State has not shown [the Proposition 65 acrylamide cancer warning] is purely factual and uncontroversial. By asserting vaguely that consuming a product can "expose" a person to acrylamide—a chemical most people have likely never used in preparing food or even heard of—the warning implies incorrectly that acrylamide is an additive or ingredient. . . .
>
> [D]ozens of epidemiological studies have failed to tie human cancer to a diet of food containing acrylamide. Nor have public health authorities advised people to eliminate acrylamide from their diets. . . .  California has also decided that coffee, one of the most

> common sources of acrylamide, actually reduces the risks of some cancers. . . . In short, the safe harbor warning is controversial because it elevates one side of a legitimately unresolved scientific debate about whether eating foods and drinks containing acrylamide increases the risk of cancer.

*Calchamber*, 529 F. Supp. 3d at 1117-18.  On March 17, 2022, the Ninth Circuit affirmed this Court's *Calchamber* decision.  29 F.4th 468.  Notwithstanding the injunction, Defendants have continued to threaten Plaintiff with prosecution of their claims and have continued to file new Proposition 65 claims based on the presence of acrylamide in food.

## III.   PROPOSITION 65 AS APPLIED TO ACRYLAMIDE IS UNCONSTITUTIONALLY VAGUE.

67.   Proposition 65 purports to give food companies objective information from which to determine whether they must apply cancer warning labels to their products.

68.   But that information is vague and does no such thing.

69.   **First**, the State exempts from regulation products "where chemicals in food are produced by cooking necessary to render the food palatable or to avoid microbiological contamination . . . ."  Cal. Code Regs. § 25703(b)(1).

70.   On its face, this cooking exemption should protect companies like B&G Foods that make or sell baked goods; however, state enforcers have continued to bring acrylamide actions anyway.

71.   That is because the burden is on defendants to show that the exemption applies to their products, and to qualify for this "cooking" exception, a business must also show that "sound considerations of public health support an alternative level [of acrylamide]" must be found in a product before a cancer warning is required.  *Id.*

72.   If the facts that:

1.   acrylamide appears naturally in cooked foods, and

2.   in foods that the government recommends that people eat, and

3.   there is no evidence that the acrylamide that forms naturally during cooking causes cancer in humans,

---

11
FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   are sufficient to demonstrate that baked goods are always exempt from Proposition 65's labeling

2   requirements for products that expose consumers to naturally occurring acrylamide as a matter of

3   law, then no action alleging otherwise could be brought or maintained in good faith.

4         73.    If those facts are insufficient to exempt baked goods from Proposition 65's labelling

5   requirement for products containing naturally occurring acrylamide, then the cooking exemption is

6   unconstitutionally vague.  No one who makes or sells baked goods could ever be sure whether the

7   exemption applies to their products, or if they are required to label their breads, cookies, or crackers

8   as carcinogens.

9         74.    The language of the cooking exemption is also vague on its face and subject to a

10  multitude of differing interpretations.

11        75.    There is no objective standard for determining "sound considerations of public

12  health support an alternative level [of acrylamide]."

13        76.    The cooking exemption does not provide notice to businesses of whether their

14  cooked foods will qualify, and the only way that a business can learn if their products require a

15  label is *after* they have been prosecuted for a Proposition 65 violation and litigated the defense.

16        77.    **Second**, the State exempts a food company from regulation if it "can show that the

17  exposure [to acrylamide] poses no significant risk assuming lifetime exposure at the level in

18  question for substances known to the state to cause cancer[.]"  Cal. Health & Safety Code

19  § 25249.10(c).  This threshold is commonly referred to as the "No Significant Risk Level"

20  ("NSRL").  For some listed substances, OEHHA has published a quantitative NSRL, often referred

21  to as a "safe harbor".  27 Cal. Code Regs. § 25705.

22        78.    To determine whether exposure from acrylamide in a food product exceeds the

23  NSRL, the exposure is calculated based on the "average rate of intake or exposure for average users

24  of the consumer product[.]"  27 Code Regs. § 25721(d)(4).

25        79.    Exposure can be determined by looking at the average consumer's consumption of

26  the Cookie Cakes or Sandwich Cookies over a period of time and then measuring the exposure to

27  acrylamide based on that consumption over such period.

28

80.     Proposition 65 lawsuits are pervasive even for chemicals, like acrylamide, that have a "safe harbor" NSRL because the safe harbor is an affirmative defense that is expensive to establish.

81.     Even if a food business engages a full range of experts and consumption scientists for every food product it formulates and sells in the State, the State and enforcers disagree on how average consumption of acrylamide is calculated.

82.     Food companies have expended millions of dollars in cases simply to show that the State enforcer is wrong about the application of Proposition 65 in a given case.

83.     As a result, businesses like Plaintiff have no means of protecting themselves when selling products in California – because the determination of the applicable NSRL and related safe harbor is very burdensome and because compliance does not prevent a company from being sued – such as in this case.

84.     California jurists have recognized how onerous Proposition 65 suits can be for anyone doing business in California.

85.     "[L]awsuits under Proposition 65 can be filed and prosecuted by any person against any business based on bare *allegations* of a violation unsupported by any evidence of an *actual* violation – or even a good faith belief that a defendant is using an unsafe amount of a chemical known by the state to cause cancer." *Consumer Cause, Inc. v. SmileCare*, 91 Cal. App. 4th 454, 477 (Vogel, J., dissenting) (emphasis in original).

86.     This burden-shifting regime results in "judicial extortion" where many private parties bring Proposition 65 claims (without an appropriate assessment that an exposure exceeds the NSRL) and force the defendant to settle to avoid legal fees and the costs of performing an expensive expert scientific assessment. *Id.* at 477-79.

87.     Nor does demonstrated compliance immunize food businesses from lawsuits in the first instance or from future enforcement efforts. *See DiPirro v. Bondo Corp.*, 153 Cal. App. 4th 150, 185 (2007).

88.     The one way to obtain certainty is to enter extortive monetary settlements with state representatives like Defendants, even though the business has attempted to comply in good faith and has made a product which poses no health risk.

89.     NSRL levels do not effectively deter a plaintiff with significant financial incentives from initiating suit in the hopes of collecting a settlement.

90.     Moreover, the State admits that the acrylamide found in cooked food does not cause cancer in humans, yet enforcers still bring actions against defendants alleging that their products have exceeded the NSRL for acrylamide.

## IV.   DEFENDANTS' INFRINGEMENT ON B&G FOODS'S CONSTITUTIONAL RIGHTS MAY BE REMEDIED THOUGH A SECTION 1983 ACTION.

### A.   Defendants Are State Actors.

91.     The State is responsible for, and benefits from, Defendants' conduct.

92.     Under Proposition 65, the State authorizes numerous persons to prosecute the statute on the State's behalf:  the Attorney General, a district attorney, a variety of local government officials or a private enforcer, such as Ms. Embry or EHA.  California Health & Safety Code § 25249.7(c) and (d).

93.     The State allows all these enforcement representatives to seek penalties of up to $2,500 per day for each violation.  *Id.* § 25249.7(b).

94.     Anyone who brings a case is eligible to recover 25 percent of the penalty, *id.* § 25249.12(d), as well as reasonable attorneys' fees and costs, Cal. Code Civ. Proc. § 1021.5.

95.     This creates strong incentives for litigation and a perverse incentive for abusive conduct.  *See, e.g., Anthony T. Caso, Bounty Hunters and the Public Interest—A Study of California's Proposition 65*, 13 ENGAGE 30, 31 (Mar. 2012) (describing case in which "law firm created an 'astroturf' environmental group to be a plaintiff in Proposition 65 litigation," which group "consisted of partners from the law firm" and which "sent out hundreds of demand letters charging businesses with failure to provide warnings" and "extort[ing] payments of attorney fees or contributions to the front group").

96.     In addition to penalties, the State allows enforcement representatives to seek injunctive relief to require mandatory consumer warnings by food companies in "a court of competent jurisdiction."  Cal. Health & Safety Code § 25249.7(a).

97.     Enforcement representatives rely on OEHHA to identify chemicals and concentration levels that are supposedly "known" to cause cancer.  *Id.* §§ 25249.8(a)-(b).

98.     Acrylamide currently is listed as a cancer-causing substance by OEHHA.

99.     The State encourages enforcement representatives like Defendants to sue food companies for injunctive and monetary relief.

100.     If a product such as the Cookie Cakes or Sandwich Cookies is found to contain acrylamide at the proscribed level, the State, through its representatives, requires food companies to notify consumers that the affected product contains acrylamide which is "known to the State of California to cause cancer":

> WARNING: Consuming this product can expose you to [Acrylamide], which is known to the State of California to cause cancer.  For more information, go to www.P65Warnings.ca.gov/food.

27 Cal. Code Regs § 25607.2(a)(2).

101.     The required warnings on product labels mandated by the State and enforced by prosecutors must be large and obvious, *i.e.*, "must be set off from other surrounding information" and "enclosed in a box."  *Id.* § 25607.1(b).

102.     The State revises and regulates these requirements from time to time, and consults with its private enforcement representatives in doing so.

103.     Under Proposition 65, private plaintiffs are required to provide 60-days' notice to the California Attorney General, the district attorney, city attorney, or prosecutor in whose jurisdiction the violation is alleged to have occurred, and to the alleged violator before filing suit. Cal. Health & Safety Code § 25249.7(d)(1).

104.     The California Attorney General maintains a database of these 60-day notices, available at https://oag.ca.gov/prop65/60-day-notice-search.

105.     To date, there have been nearly 600 60-day notices for alleged violations of the Proposition 65 warning requirement with respect to alleged exposures to acrylamide.

106.    More than 500 of these 60-day notices relate to acrylamide in food products.

107.    These 60-day notices include alleged violations related to potato and potato-based products (more than 90 notices); nut butters, including peanut and almond butter (more than 40 notices); almonds (more than 30 notices); cereals (more than 20 notices); and olives (more than 10 notices).

108.    The rate of notices of violation for acrylamide have steadily increased in recent years, from just 32 notices in 2016 to 205 in 2019.

109.    Ms. Embry and EHA's enforcement efforts are just a small part of the tidal wave of acrylamide litigation targeting innocent food companies.

110.    As described below, Defendants Embry and EHA are state actors purporting to act on behalf of the government of California.

        a.    The State is intimately entwined in, encourages, and closely monitors Defendants' Proposition 65 litigation, which it directly and indirectly regulates, controls and guides through the California Attorney General's office.

        b.    Prior to initiating any private action, bounty hunters like Defendants serve a Notice of Violation on the State through the Attorney General's office, together with evidence supporting the supposed merit of the bounty hunter's allegations.

        c.    This is so that the State can regulate, monitor, and encourage the proposed action.

        d.    If the State believes the notice lacks merit, it serves a letter on the parties to object to any action. Cal. Health & Safety Code § 25249.7(f). In doing so, the State takes an active role as gatekeeper to permit supposedly meritorious cases to proceed and to reject or contest cases that lack merit.

        e.    The State also monitors the activity of its Proposition 65 enforcement representatives such as Defendants by, among other things: requesting pre-approval of any potential settlement or consent judgment, receiving and reviewing notices regarding the progress of acrylamide case litigation, intervening in particular cases, regulating the conduct of representatives,

1   demanding to receive proportional cuts of civil penalties, and retaining the ability to change, alter

2   or amend the regulations governing a particular Proposition 65 chemical and enforcement activity.

3           f.      The Attorney General specifically regulates individual settlement

4   agreements involving Defendants.

5           g.      For example, in 2018, Defendants attempted to settle a Proposition 65 claim

6   against Earthbound Farm, LLC.  The Attorney General objected to this settlement, which included

7   $3,000 in civil penalties and a $37,000 attorney fee award, because (1) Defendant Embry received

8   more than 25% of the civil penalties; (2) the settlement "is not likely to result in any benefit to the

9   public," and (3) Defendant Glick's $37,000 fee award was unreasonable.

10          h.      The Attorney General concluded the settlement agreement was "contrary to

11   the law, against public policy, and not enforceable."  Attorney General's Mar. 2, 2018, Letter re

12   *Embry v. Earthbound Farm*, Out-of-Court Proposition 65 Settlement.

13          i.      In response to this letter, the parties rescinded the settlement agreement and

14   have not submitted another for review.

15          j.      Defendants' actions are so substantively "entwined" in the State's

16   enforcement regime that their action constitutes state conduct by the government.

17          k.      Indeed, without the State's imprimatur, support, guidance and regulations,

18   Defendants would not have the ability to threaten and impose upon Plaintiff's constitutional rights.

19   *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, (1961) (where restaurant leased premises

20   from a government agency and both parties benefited financially from the arrangement, restaurant's

21   racial discrimination constituted state action).

22          l.      Defendants also are performing a quintessential state function by acting as

23   California's enforcement arm relating to the presence of targeted chemicals in the environment.

24          m.      Moreover, the State is not merely a passive actor in such activity, but has an

25   entire department devoted to regulating, following, and encouraging the unconstitutional activity at

26   issue here.  *See Lee v. Katz*, 276 F.3d 550, 554-57 (9th Cir. 2002) (private lessee of a public

27   outdoor area owned by the city performed a traditional sovereign function when it sought to

28   regulate free speech activity on the land).

n.      Defendants are further engaged in state action because, on information and belief, they conspire with state officials to deprive businesses of their free speech right by enforcing Proposition 65 in violation of the First Amendment to the United States Constitution, in exchange for which state officials receive substantial compensation.  *See Dennis v. Sparks*, 449 U.S. 24 (1980) (private person who bribed a judge to obtain an injunction was engaged in state action).

111.    And, Defendants are serving as government actors because California has interjected itself into this dispute by virtue of the fact that Proposition 65 is a state statute and Defendants have filed suit in state court.  *See Grant v. Johnson*, 15 F.3d 146, 149 (9th Cir. 1994) (existence of state statute and necessary involvement of state judge provided state action necessary to present challenge to Oregon statute allowing appointment of temporary guardian ad litem for person deemed mentally incompetent).

112.    On information and belief, the State's employees have communicated with Defendants repeatedly over the last several years and encouraged and assisted them in securing monetary penalties from food companies accused of having acrylamide in their products.

**B.      Defendants Have Filed Sham Lawsuits Against B&G Foods.**

113.    On April 22, 2019, Defendant Embry notified the State and Plaintiff that she intended to require Plaintiff to place a warning label on all the Cookie Cakes to tell consumers that the products "cause cancer."

114.    The State did not object to Embry's Notice of Violation or seek to curtail or limit it.

115.    Ms. Embry's Notice of Violation seeks relief on behalf of the "Public" of California and pursuant to the State's regulations and enforcement guidelines discussed above.

116.    On October 8, 2020, Defendant EHA notified the State and Plaintiff that it intended to require Plaintiff to place a warning label on all Sandwich Cookies to tell consumers that the products "cause cancer."

117.    The State did not object to EHA's Notice of Violation or seek to curtail or limit it.

118.    EHA's Notice of Violation seeks relief on behalf of the "Public" of California and pursuant to the State's regulations and enforcement guidelines discussed above.

119.    On information and belief, the State has communicated with Defendants about these

1    or similar acrylamide cases in the past and has encouraged such lawsuits.

2        120.    The State also has received monetary compensation from Defendants in connection

3    with frivolous acrylamide lawsuits against other food companies and would receive compensation

4    should Defendants obtain monetary relief from Plaintiff.

5        121.    Plaintiff notified Defendants that the products at issue could not possibly violate

6    Proposition 65.

7        122.    Defendants, however, refused to withdraw their notices unless Plaintiff paid a

8    substantial sum or put a cancer warning on the products.

9        123.    Defendants have relied upon the *Noerr-Pennington* doctrine to protect their

10   extortionate practices.

11       124.    The *Noerr-Pennington* doctrine derives from the Petition Clause of the First

12   Amendment and provides that those who petition any department of the government for redress are

13   generally immune from statutory liability for their petitioning conduct.

14       125.    The Ninth Circuit has held that the *Noerr-Pennington* doctrine can be applied to

15   state actors.  The Ninth Circuit also acknowledges, however, that neither the Petition Clause nor the

16   *Noerr-Pennington* doctrine protect sham petitions.

17       126.    Immunity is not extended to conduct that, although ostensibly directed toward

18   influencing governmental action, is a mere sham to cover what is actually nothing more than an

19   attempt to interfere directly with the business relationships of a competitor, or to otherwise abuse

20   the publicity/lobbying process.

21       127.    The sham exception applies to the *Noerr-Pennington* Doctrine applies to litigation

22   in three circumstances:  first, where the lawsuit is objectively baseless and defendant's motive in

23   bringing it was unlawful; second, where the conduct involves a series of lawsuits brought pursuant

24   to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose;

25   third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the

26   court.

27       128.    Defendants' litigation against B&G Foods is a sham for all three of these reasons.

28

19

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  **Defendants' litigation was commenced without regard to the merits and with the improper intent of extorting money from B&G Foods.**

129.    As explained above, there is no evidence that acrylamide in food causes cancer.  But even if acrylamide were properly included in the Proposition 65 list, Defendants could not state a valid claim against B&G Foods.

130.    Cookie Cakes and Sandwich Cookies are the type of classic snack foods which consumers only enjoy at infrequent snacking intervals.  When the rate of consumption of the Cookie Cakes and Sandwich Cookies is considered, the amount of acrylamide allegedly present does not exceed the NSRL.

131.    Additionally, the only acrylamide present in the Cookie Cakes and Sandwich Cookies was the natural consequence of the cooking process, the same way acrylamide forms in any other cookie or baked good.

132.    For the foregoing reasons, Proposition 65 does not require placing a cancer warning on the Cookie Cakes or Sandwich Cookies, and any reasonable pre-suit investigation by Defendants would have shown that B&G Foods has not violated Proposition 65.

133.    But Defendants performed no such investigation because their intent was never to file claims that had any merit, but instead to extort money from B&G Foods.

134.    Ms. Embry has never read any scientific literature or analysis showing that acrylamide in food causes cancer.

135.    She likewise has no idea what a safe level of acrylamide in food would be, even though she acknowledged that she had entered into settlement agreements in the past allowing for acrylamide levels of up to 280 parts per billion.

136.    She was unaware of "any scientific study about whether the cookie cakes" cause cancer or birth defects or whether any person had ever contracted cancer or has had a birth defect as a result of eating the Cookie Cakes.  Deposition of Kim Embry, Nov. 13, 2020 ("Embry Dep."), 80:9-21.

137.    Ms. Embry did not do any research as to how often people eat Cookie Cakes before claiming in her complaint that people eat Cookie Cakes so frequently they are at risk of cancer or birth defects.  Embry Dep. 82:22-83:22.

138.    Ms. Embry never purchased the Cookie Cakes and did not know of anyone who ever had.  Embry Dep. 77:12-14.

139.    In short, Ms. Embry simply lends her name to her lawyer and has no personal knowledge of any of the allegations in her complaints.

140.    She purports to rely on her attorney and experts, but she was not aware of any expert analysis pertinent to her lawsuit against B&G Foods.

141.    Ms. Embry produced no evidence supporting the allegations in her claims at any time during discovery.

142.    Ms. Embry also spoliated evidence.

143.    On February 16, 2021, B&G Foods served IEH with a subpoena for records relating to its testing of the Cookie Cakes on behalf of Ms. Embry and the accuracy of its testing methodology.

144.    On March 30, 2021, IEH responded to the subpoena by producing some documents regarding its acrylamide testing protocols, and a letter noting that it was withholding all other responsive documents based on an objection interposed by Ms. Embry that the requested documents were "consumer records."

145.    On April 1, 2021, B&G Foods asked IEH if it had retained any of the Cookie Cakes it tested.

146.    IEH stated that it had destroyed the samples at Ms. Embry's instruction on or about 30 days after it tested the sample—approximately May 4, 2019, after Plaintiff initiated the litigation by filing her April 19, 2019, Notice of Violation.

147.    B&G Foods requested that Ms. Embry dismiss her claim, given the evidence upon which she based her entire lawsuit had been destroyed after commencement of the action.

148.   Ms. Embry declined to do so, admitting that the spoliation was intentional and, indeed that it was her practice to spoliate the product samples in every Proposition 65 case she brought.

149.   Ms. Embry demanded B&G Foods pay her $500,000 in exchange for a dismissal.

150.   When B&G Foods did not pay, Ms. Embry moved to stay the case.

151.   EHA is a sham organization formed by Noam Glick so that he can file Proposition 65 cases without the inconvenience of an actual client.

152.   EHA did not produce any evidence supporting its claims.

153.   EHA admitted in discovery that it "does not have, and has never had" any documents concerning the frequency with which consumers consume cakes, cookies, bars, or any other similar product, including the Sandwich Cookies, and ruled exclusively on the National Health Nutrition Examination Survey database—which shows that people eat cookies infrequently.

154.   EHA failed to provide or identify any evidence showing that acrylamide causes or potentially causes cancer.

155.   EHA failed to provide or identify any evidence showing that acrylamide is known to the State of California to cause cancer.

156.   EHA did not produce any documents supporting its claim.

157.   EHA admitted it had not reviewed any scientific research, analysis, or studies showing that acrylamide in food causes cancer.

158.   EHA admitted that it had done no research into the State of California's knowledge regarding acrylamide's carcinogenic effects.

159.   EHA also admitted that acrylamide forms in food when it is baked.

160.   EHA stated that it believed it is not safe for consumers to consume foods containing up to 280 parts per billion of acrylamide; but Mr. Glick signed off on a consent judgment in another matter permitting the defendant to sell products with an average level of 280 parts per billion or less without a Proposition 65 warning.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

161.    EHA also admitted that it had not obtained a written statement, or interviewed any person about its claims, and that no person—including any expert—had prepared a report pertaining to its claims.

162.    This failure to investigate a claim prior to initiating a Proposition 65 action violates the requirements of Proposition 65.  A private enforcer must execute a certificate of merit stating it "has consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the exposure to the listed chemical that is the subject of the action, and that, based on that information, the person executing the certificate believes there is a reasonable and meritorious case for the private action."  Cal. Health and Safety Code § 25249.7(d)(1).  The certificate of merit must be served on the Attorney General.  *Id.*

163.    Neither has dismissed their claims, even though they have no evidence showing that they are meritorious, and they are aware that it is unconstitutional to compel B&G Foods to place a false label on its products.

### 2. Defendants' lawsuits against B&G Foods are part of a series of lawsuits brought pursuant to their policy of starting legal proceedings without regard to their merit and for an unlawful purpose.

164.    Defendants file a high volume of Notice of Violation with the hope that some accused parties will pay them to go away.  This is their business model.  They are not interested in the merits of their cases, because their goal is to impose litigation costs on defendants.  The expense and burden of litigation is sufficient to coerce some defendants into labelling their products as carcinogens, regardless of whether it is true.

165.    Defendants typically will abandon their claims prior to a final adjudication when these "shake-down" tactics do not work.

166.    Defendant Embry has filed at least 260 Notices of Violation.

167.    Of those, she withdrew 129 without filing suit or obtaining a settlement.

168.    Of the remaining 131 Notices of Violation, Defendant Embry settled just 25 cases.

169.    Apart from her suit against B&G Foods, the remainder have not been meaningfully prosecuted.

170.     Thus, less than ten percent of Defendants' Proposition 65 acrylamide lawsuits have resulted in any sort of resolution.

171.     And virtually all of those settlements were for small, five-figure sums—classic "nuisance value" settlements paid by defendants because, as detailed above, the nature of Proposition 65 makes defending lawsuits prohibitively expensive, and not because the claims have any merit.

172.     These settlements do not demonstrate that Defendants' cases were meritorious or successful, but rather simply underscore that Defendants have a successful "shake-down" racket.

173.     Therefore, Ms. Embry's litigation history has produced no meaningful public benefit, and is comprised overwhelmingly of meritless cases she was unwilling or unable to prosecute.

174.     Similarly, EHA has filed over 800 Notices of Violation.

175.     Less than 30% of these Notices of Violation resulted in the filing of a complaint.

176.     Only approximately 20% of EHA's Notices of Violation resulted in any kind of settlement.

177.     Defendants do not bring these cases out of a genuine interest in redressing a grievance or protecting the public.

178.     Rather, Defendants fire off Notices of Violation at a blistering rate, without meaningful pre-suit investigation, hoping that they will acquire quick nuisance settlements.

179.     On information and belief, Defendants are willing to trade away benefits to the public and the State in exchange for larger settlement payments.

180.     On information and belief, the "attorney's fees" claimed by Defendants in their settlements are inflated, and bear little to no relationship to the amount of time or effort Defendants' counsel expend in prosecuting Proposition 65 actions.

181.     Defendants are aware that it is unconstitutional to compel a company to falsely label its products, but they have sought to do so hundreds of times, and will continue to do so unless the Court intervenes.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**3.  Third, Defendants' lawsuits against B&G Foods are predicated on a succession of misrepresentations to the state courts.**

182.  Defendants' lawsuits allege acrylamide in food causes cancer, and is known to the state of California to cause cancer; but as Defendants know full well, there is no sound, scientific basis for that notion.

183.  Defendants also allege that the Cookie Cakes and Sandwich Cookies cause cancer, despite knowing full well that there is no evidence to support that allegation.

184.  Defendants also represent to the Court that they have completed an investigation into the facts of their claims and have found that it is likely that B&G Foods's products require Proposition 65 warning labels, which is not true.

185.  Defendants' conduct has caused B&G Foods to incur monetary damages by imposing litigation costs in excess of $345,000, and impugning the reputation of its products and brands.

## CAUSES OF ACTION

**First Cause of Action against All Defendants**
**(42 U.S.C. § 1983)**
**(Violation of the First and Fourteenth Amendments to the United States Constitution)**

186.  Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

187.  The Free Speech Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech." U.S. CONST. AMEND. I. The Fourteenth Amendment of the United States Constitution made this proscription applicable to the States and their political subdivisions. *Id.* AMEND. XIV § 1.

188.  In addition to providing protections against restrictions on speech, the First Amendment provides protection against the government *compelling* individuals or entities to engage in speech.

189.  Under the First Amendment, laws compelling speech receive strict scrutiny. *Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977). Laws regulating commercial speech generally receive at least intermediate scrutiny, *i.e.*, they are prohibited if they do not directly and materially advance the government's interest, or are more extensive than necessary. *Cent. Hudson Gas & Elec. Corp.*

*v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).  And even laws that require businesses to provide information in connection with commercial transactions are permissible only if the compelled disclosure is of information that is purely factual and uncontroversial, reasonably related to a substantial government purpose, and not unjustified or unduly burdensome.  *Nat'l Inst. of Family Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372, 2377; *Zauderer v. Office of Disciplinary Counsel*, 471 U.S.  626, 651 (1985).

190.    A Proposition 65 warning, irrespective of the specific language used, conveys that the chemical at issue (here, acrylamide) causes cancer in humans.

191.    Contrary to the warning mandated by Proposition 65, there is no reliable scientific evidence that dietary acrylamide found in the Cookie Cakes or Sandwich Cookies increases the risk of cancer in humans.

192.    To the contrary, a large number of epidemiological studies suggest that there is no association between exposure to acrylamide from food products and cancer in humans.

193.    Nor does California "know" that dietary acrylamide causes cancer.

194.    In fact, the California agency responsible for implementing Proposition 65, OEHHA, has admitted that it does *not* know that acrylamide is a human carcinogen.

195.    The Proposition 65 warning requirement as applied to acrylamide in the Cookie Cakes or Sandwich Cookies thus seeks to compel speech that is literally false, misleading, and factually controversial.  *See California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022).

196.    Because Proposition 65's warning requirement as applied to acrylamide in the Cookie Cakes and Sandwich Cookies is false, misleading, and factually controversial, it cannot survive any level of constitutional scrutiny.  *See Video Software Dealers Ass'n v.  Schwarzenegger*, 556 F.3d 950, 967 (9th Cir.  2009) ("[T]he State has no legitimate reason to force retailers to affix false information on their products.").  Proposition 65's warning as applied constitutes impermissible compelled speech under the First Amendment and should be enjoined.

197.    Defendants are enforcement representatives of the State of California.  Their actions are regulated, governed by and ostensibly taken to economically benefit the State.

198.    Defendants seek to enforce Proposition 65 against Plaintiff based on the alleged presence of acrylamide in the Cookie Cakes and Sandwich Cookies.

199.    Defendants' threatened enforcement and prosecution violates Plaintiff's rights under the First Amendment to the Constitution, by impermissibly seeking to require Plaintiff to place an objectionable warning on its products that would falsely tell consumers the products cause cancer. *See California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022)

200.    Cookie Cakes and Sandwich Cookies have never caused cancer.

201.    Defendants' threatened enforcement is made under color of state law for many reasons highlighted throughout this Complaint:  The State is entwined and has a symbiotic relationship with Defendants; Defendants are fulfilling a traditional governmental function; and Defendants and the State are engaged in conduct that would rise to a conspiracy.

202.    All of those actions involve an intended violation of Plaintiff's First Amendment Rights.

203.    Further, a California statute and California court are necessarily involved in this dispute.

204.    Plaintiff is entitled to an injunction against further prosecution or threats of prosecution under Proposition 65 related to the alleged acrylamide in its Cookie Cakes and Sandwich Cookies, and to an award of double Plaintiff's damages, including attorneys' fees and costs, as permitted under Section 1983.

205.    Federal courts are obligated under Section 1983 to provide a remedy against state prosecutions impinging on Constitutional rights, including the First Amendment.  *Mitchum v. Foster*, 407 U.S. 225, 227 (1972).

206.    Moreover, Defendants' Proposition 65 litigation relating to the alleged acrylamide in the Cookie Cakes and Sandwich Cookies is not protected petitioning activity because their lawsuits are objectively baseless and Defendants' motive in bringing them was to extort money from B&G Foods; Defendants initiated litigation against B&G Foods as part of a series of lawsuits

1   brought pursuant to a policy of starting legal proceedings without regard to the merits and for the

2   purpose of extorting settlements; and, Defendants made intentional misrepresentations to the court.

3   **Second Cause of Action Against All Defendants**
    **(42 U.S.C. § 1983)**

4   **(Violation of the Due Process Clause of the Fourteenth Amendment to the United States**
    **Constitution)**

5

6   207.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

7   208.    One of the most basic guarantees of Due Process is that laws "be sufficiently clear

8   so as not to cause persons of common intelligence …necessarily [to] guess at its meaning and [to]

9   differ as to its application …." *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996)

10  (quoting *Connallly v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

11  209.    For this reason, courts have long recognized that laws which are vague are voided

12  by the Due Process Clause, the so-called void-for-vagueness doctrine.  This doctrine is premised on

13  the notion that:

14              [v]ague laws offend several important values. First, because we
                assume that man is free to steer between lawful and unlawful
15              conduct, we insist that laws give the person of ordinary intelligence a
                reasonable opportunity to know what is prohibited, so that he may act
16              accordingly. Vague laws may trap the innocent by not providing fair
                warning. Second, if arbitrary and discriminatory enforcement is to be
17              prevented, laws must provide explicit standards for those who apply
                them.  ...  Third, but related, where a vague statute "abuts upon
18              sensitive areas of basic First Amendment freedoms," it "operates to
                inhibit the exercise of those freedoms." Uncertain meanings
19              inevitably lead citizens to "steer far wider of the unlawful zone" ...
                than if the boundaries of the forbidden areas were clearly marked.

20  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

21  210.    Thus, where a regulation implicates speech, as here, "heightened vagueness scrutiny

22  applies." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001).

23  211.    In the vagueness context, the requirement that laws be precise is aimed at preventing

24  "chill":  rather than risk sanctions, citizens will steer far wider than necessary to avoid engaging in

25  prohibited speech; the First Amendment, however, needs breathing space to survive.  Accordingly,

26  "the standards of permissible statutory vagueness are strict in the area of free expression."  *NAACP*

27  *v. Button*, 371 U.S. 415, 432-33 (1963).

28

28

212.    Proposition 65's warning requirement for acrylamide, as applied to the Cookie Cakes and Sandwich Cookies, is impermissibly vague for two separate and independent reasons.

213.    **First**, Proposition 65's cooking exception is impermissibly vague because it requires a business to show that "sound considerations of public health" merit an alternative risk level, an undefined and undefinable term.

214.    Accordingly, Proposition 65's warning requirement for acrylamide violates the Due Process Clause as applied to the Cookie Cakes and Sandwich Cookies.

215.    **Second**, because the NSRL is not predetermined, but rather established on a case-by-case basis and only after litigation, it is impossible for businesses to know whether a warning is required.

216.    This is particularly so in the context of acrylamide because the NSRL level is very low and not in any way related to the risk dietary acrylamide poses to humans (namely, none at all).

217.    Moreover, Defendants' Proposition 65 litigation relating to the alleged acrylamide in the Cookie Cakes and Sandwich Cookies is not protected petitioning activity because their lawsuits are objectively baseless and Defendants' motive in bringing them was to extort money from B&G Foods; Defendants initiated litigation against B&G Foods as part of a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of extorting settlements; and, Defendants made intentional misrepresentations to the court.

218.    Defendants are enforcement representatives of the State of California.  Their actions are regulated, governed by and ostensibly taken to economically benefit the State.

219.    Defendants seek to enforce Proposition 65 against Plaintiff based on the alleged presence of acrylamide in the Cookie Cakes and Sandwich Cookies.

220.    Cookie Cakes and Sandwich Cookies have never caused cancer.

221.    Defendants' threatened enforcement is made under color of state law for many reasons highlighted throughout this Complaint:  The State is entwined and has a symbiotic relationship with Defendants; Defendants are fulfilling a traditional governmental function; and Defendants and the State are engaged in conduct that would rise to a conspiracy.

222.    Further, a California statute and California court are necessarily involved in this dispute.

223.    Plaintiff is entitled to an injunction against further prosecution or threats of prosecution under Proposition 65 related to the alleged acrylamide in its Cookie Cakes and Sandwich Cookies, and to an award of double Plaintiff's damages, including attorneys' fees and costs, as permitted under Section 1983.

224.    Federal courts are obligated under § 1983 to provide a remedy against state prosecutions impinging on Constitutional rights, including the First Amendment. *Mitchum v. Foster*, 407 U.S. 225, 227 (1972).

225.    Moreover, Defendants' Proposition 65 litigation relating to the alleged acrylamide in Cookie Cakes and Sandwich Cookies is not protected petitioning activity because their lawsuits are objectively baseless and Defendants' motive in bringing them was to extort money from B&G Foods; Defendants initiated litigation against B&G Foods as part of a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of extorting settlements; and, Defendants made intentional misrepresentations to the court.

**Third Cause of Action against All Defendants**
**Declaratory Judgment**
(28 U.S.C. § 2201)

226.    Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

227.    There is an actual and imminent controversy between the parties regarding whether the application of Proposition 65's acrylamide warning requirement to the Cookie Cakes and Sandwich Cookies violates the First and/or Fourteenth Amendments to the United States Constitution.

228.    Plaintiff accordingly requests a declaration that the enforcement of Proposition 65 against the Cookie Cakes and Sandwich Cookies is unconstitutional.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief against Defendants as follows:

A.      For an injunction against further unconstitutional threats and lawsuits against Plaintiff regarding the acrylamide in its Cookie Cakes and Sandwich Cookies products.

1      B.     A declaration that the Proposition 65 warning requirement for cancer as applied to

2 Cookie Cakes and Sandwich Cookies violates the First Amendment of the United States

3 Constitution.

4      C.     For damages in an amount to be determined according to proof.

5      D.     Plaintiff's attorneys' fees and costs.

6      E.     All such other and further relief as the Court may deem just, proper, and equitable.

7

8 Dated:  July 7, 2022                      Respectfully Submitted,

9                                 BRAUNHAGEY & BORDEN LLP

10

11                              By:  /s/ *J. Noah Hagey*
                                    J.  Noah Hagey

12

13                              *Attorneys for Plaintiff*
                              *B&G Foods North America, Inc.*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF