UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&G Foods North America, Inc., | No. 2:20-cv-00526-KJM-DB |
| Plaintiff, | ORDER |
| v. | |
| Kim Embry and Environmental Health Advocates, Inc., | |
| Defendants. | |

Plaintiff B&G Foods North America, Inc. (B&G) brings this action under 42 U.S.C. § 1983 against defendants Kim Embry and Environmental Health Advocates, Inc. (EHA). B&G alleges Embry and EHA violated its First and Fourteenth Amendment rights by bringing private enforcement actions under California chemical disclosure rules, commonly known as "Proposition 65." Embry and EHA contend B&G's complaint is barred by *Noerr-Pennington* immunity. In response, B&G argues the defendants' Proposition 65 citizen enforcement lawsuits are a sham and entitled to no protections. B&G has not alleged sufficient facts to support that claim, so Embry and EHA's **motion is granted and the complaint is dismissed with leave to amend**.

1

## I. BACKGROUND

B&G sold and distributed devil's cookie cakes and chocolate crème sandwich cookies in California and across the country. First Am. Compl. (FAC) ¶¶ 1–2, ECF No. 45. These cookies contained acrylamide, a naturally occurring byproduct of all baking. *Id.* ¶ 3. Since 1990, California has included acrylamide on its list of "known" carcinogens under Proposition 65. *Id.* ¶ 4. Proposition 65 imposes certain warning requirements on foods and drinks that contain chemicals on this list, and it permits private litigants to enforce those warning requirements after sending the alleged violator a "Notice of Violation." *See* Cal. Health & Safety Code §§ 25249.6, 25249.7(d). Defendants Embry and EHA sent Notices of Violation to B&G about its cookies, intending to require B&G to place a warning label on the cookies. *Id.* ¶¶ 6, 113, 116. They subsequently filed lawsuits in state court to enforce Proposition 65. *Id.* ¶¶ 7–9.

B&G alleges these Proposition 65 citizen enforcement actions rest on false allegations and were brought without regard to their merit. *Id.* ¶ 10. As a result, B&G argues these lawsuits aim to "compel" it to make false statements about its cookies, and thus deprive it of its constitutional rights. *Id.* ¶ 11. B&G seeks injunctive relief against future acrylamide lawsuits by the defendants about the cookies, and a declaration that a Proposition 65 warning as applied to its cookies violates the First Amendment. *Id.*, Prayer for Relief A–B.

This court previously dismissed B&G's complaint without leave to amend as barred by the *Noerr-Pennington* doctrine. *See* Order, ECF No. 33. The Ninth Circuit affirmed the dismissal but reversed and remanded to give B&G an opportunity to amend its complaint. *See B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527 (9th Cir. 2022), *cert. denied*, ___ S. Ct. ___, 2022 WL 4654543 (2022). B&G then filed an amended complaint. FAC. The defendants move again to dismiss because, among other reasons, they contend the complaint is still barred by the *Noerr-Pennington* doctrine. Mot., ECF No. 52. B&G opposes the motion, arguing the defendants' lawsuits fall within the sham exception to *Noerr-Pennington* immunity. Opp'n at

6–11, ECF No. 53.[1]  The defendants replied.  Reply, ECF No. 54.  The court submitted the motion without hearing oral argument.  Min. Order, ECF No. 55.

## II.   LEGAL STANDARD

A party may move to dismiss for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6).  On a motion to dismiss, the court assumes all factual allegations are true, construing "them in the light most favorable to the nonmoving party." *Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (mark and citation omitted).  The motion may be granted if the complaint's factual allegations do not support a "cognizable legal theory." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted).  To survive a motion to dismiss, a complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But formulaic recitations of elements are inadequate.  *Id.*  "[S]ufficient factual matter" must make the claim plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The defendants claim B&G must satisfy a heightened pleading standard to overcome their assertion of *Noerr-Pennington* immunity.  *See* Mot. at 13.  B&G disagrees.  *See* Opp'n at 7 n.1. Courts in this district and others within the Ninth Circuit have applied a heightened pleading standard to the sham exception to the *Noerr-Pennington* doctrine in recent years.  *See, e.g.*, *Wonderful Real Est. Dev. LLC v. Laborers Int'l Union of N. Am. Loc. 220*, No. 19-0416, 2020 WL 91998, at *7 (E.D. Cal. Jan. 8, 2020) ("[A]llegations that the sham litigation exception applies are subject to a heightened pleading standard."); *Dairy, LLC v. Milk Moovement, Inc.*, No. 21-2233, 2022 WL 4387981, at *3 (E.D. Cal. Sept. 22, 2022) (same); *Evanger's Dog & Cat Food Co., Inc. v. Env't Democracy Project*, No. 21-8489, 2022 WL 180205, at *4 (C.D. Cal. Jan. 20, 2022) (same); *3M Co. v. AIME LLC*, No. 20-1096, 2021 WL 5824376, at *4 (W.D. Wash. Dec. 8, 2021) (same).  In so doing, they have relied on *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir. 1998), and earlier Circuit decisions, not on the Federal Rules of Civil Procedure.  After

---

[1] Pages cited in this document are those applied by the CM/ECF system.

all, the Federal Rules impose a heightened pleading standard only for allegations of fraud and mistake.  Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

In *Kottle*, the Circuit applied a heightened pleading standard to a sham exception to the *Noerr-Pennington* doctrine due to concerns about chilling the exercise of First Amendment rights. *Kottle*, 146 F.3d at 1063.  In turn, *Kottle* relied on an earlier Circuit decision holding that "where a plaintiff seeks damages or injunctive relief, or both, for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required." *Franchise Realty Interstate Corp. v. S.F. Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1082–83 (9th Cir. 1976); *see also Or. Nat. Res. Council v. Mohla*, 944 F.2d 531, 536 (9th Cir. 1991).

Subsequently, the Circuit held that intervening Supreme Court precedent – most recently, *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) – "dictates that a heightened pleading standard should only be applied when the Federal Rules of Civil Procedure so require." *Empress LLC v. City & County of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005) (holding district court erred by applying heightened pleading standard in *Noerr-Pennington* case regarding constitutional tort when not required by Federal Rules); *see also Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (holding "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority").  Because no federal rule imposes a heightened pleading standard on plaintiffs who contest a defendant's assertion of *Noerr-Pennington* immunity, *Empress* would appear to resolve the matter.  To be sure, Rule 9(b)'s heightened pleading standard applies to *Noerr-Pennington* immunity contests based on fraud, as explained in subsection A.3 below.  But for non-fraud allegations, *Empress* appears to require this court to apply the Rule 8(a) standard.  *See* 419 F.3d at 1057; Fed. R. Civ. P. 8(a).

But subsequent Circuit decisions still have relied on *Kottle*'s heightened pleading standard due to First Amendment concerns, *see Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 646–47

1  (9th Cir. 2009), and have suggested the heightened standard continues to apply in the *Noerr-*
2  *Pennington* context, *see Miller v. Sawant*, 18 F.4th 328, 337 n.9 (9th Cir. 2021). This court could
3  read *Kearney*'s result as compatible with *Empress* because *Kearney* only addressed fraud
4  allegations. 590 F.3d at 646. But *Kearney*'s reasoning expressly relied on First Amendment
5  concerns, not the Federal Rules. *Id.* at 647. As a result, this court is faced with conflicting
6  Circuit precedents, interspliced with a series of Supreme Court cases rejecting common law
7  heightened pleading standards in other contexts. *See Swierkiewicz*, 534 U.S. at 515 ("A
8  requirement of greater specificity for particular claims is a result that must be obtained by the
9  process of amending the Federal Rules, and not by judicial interpretation.") (employment
10 discrimination claim); *Crawford-El v. Britton*, 523 U.S. 574, 595–96 (1998) (constitutional
11 claims in which improper motive is necessary element); *Leatherman v. Tarrant Cty. Narcotics*
12 *Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993) (municipal liability under § 1983); *see also*
13 *Twombly*, 550 U.S. at 569–70 (distinguishing plausibility pleading from heightened pleading
14 standard rejected in *Swierkiewicz*).

15       This court is not in a position to resolve any dispute about which pleading standard applies
16 to the sham exception of the *Noerr-Pennington* doctrine. That said, in this court's considered
17 opinion, *Empress* correctly read *Swierkiewicz* to foreclose common law heightened pleading
18 standards such as the one articulated in *Franchise Realty*. *See also Miranda v. Clark County,*
19 *Nev.*, 319 F.3d 465, 470 (9th Cir. 2003) ("We have now held that no heightened pleading standard
20 applies unless required by the Federal Rules of Civil Procedure."); *Thomas v. Fry's Electronics,*
21 *Inc.*, 400 F.3d 1206, 1207 (9th Cir. 2005) (same); *Kong v. Shirazi-Fard*, 814 F. App'x 292, 293
22 (9th Cir. 2020) (Mem.) (unpublished) ("A heightened pleading standard may be imposed only by
23 legislative directive, not by judicial interpretation."). Moreover, given that Rule 9(b) does apply
24 to *Noerr-Pennington* doctrine sham exceptions based on fraud, the application of a heightened
25 pleading standard to non-fraud-based allegations runs counter to the Federal Rules.

26       Therefore, because B&G cannot meet the Rule 8(a) pleading standard here, the court
27 applies the Rule 8(a) standard in general to B&G's complaint. It only imposes a heightened
28 pleading standard to B&G's fraud allegations.

## III. ANALYSIS

This court previously assumed without deciding that if the defendants – then Embry and Glick, now Embry and EHA – "are 'state actors' who can be sued under 42 U.S.C. § 1983, they would be entitled to the protections of the *Noerr-Pennington* doctrine." Order at 4. The Ninth Circuit agreed. *See* 29 F.4th at 536 ("Assuming Defendants are state actors, our precedent compels the conclusion that their activities were protected by the Petition Clause."). This court also held that B&G could not take advantage of an exception to the *Noerr-Pennington* doctrine for sham lawsuits. Order at 5. That exception did not apply because B&G had alleged the defendants' Proposition 65 litigation was, at least partially, successful. *Id.* Again, the Ninth Circuit agreed. *See* 29 F.4th at 539 ("B&G has failed to show that any of the sham exceptions could apply based on the allegations in the complaint."). The Circuit remanded to permit B&G to amend its complaint with allegations supporting its claims of a sham. *See id.* at 541–42. B&G has now amended its complaint. *See generally* FAC.

As a result, the first and ultimately dispositive question here is whether B&G has alleged sufficient facts to support a plausible inference that the defendants' underlying litigation is a sham. If the defendants' Proposition 65 lawsuits are not a sham, then the *Noerr-Pennington* doctrine bars B&G's complaint.

### A. Sham Exception

"Under the *Noerr–Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). This protection arises from the First Amendment's Petition Clause, *see id.*, and it includes litigation in a state's courts, *see Kottle*, 146 F.3d at 1059. The Petition Clause does not, however, shield a lawsuit if it is "a mere sham[.]" *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *see Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 51, 56 (1993). A person cannot claim the protections of the Petition Clause when a lawsuit is "not genuinely aimed at procuring favorable government action," but rather seeks a result "through improper means."

*City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4, 508 n.10 (1988)) (cleaned up).

The Ninth Circuit has "identified three circumstances in which the sham exception might apply in the litigation context[.]" *B&G Foods*, 29 F.4th at 537. First, a lawsuit is a sham when it is objectively baseless and brought for an unlawful purpose. *See Sosa*, 437 F.3d at 938. Second, a series of lawsuits can be a sham, even if some cases in the series have merit, when brought "pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose[.]" *B&G Foods*, 29 F.4th at 537 (quoting *Sosa*, 437 F.3d at 938). Third, litigation predicated on "intentional misrepresentations to the court" is a sham if that "knowing fraud . . . deprive[s] the litigation of its legitimacy." *Kottle*, 146 F.3d at 1060 (quoting *Liberty Lake Invs., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir. 1993)).

The parties present these circumstances as rigid and independent categories. *See* FAC ¶¶ 127–28; Mot. at 12; Opp'n at 7. They are not. "[T]he *Noerr-Pennington* doctrine and its sham exception arose in the antitrust context, and so the sham-exception principles discuss whether petitioning is done for an anticompetitive purpose or to interfere with a competitor's business relationships." *B&G Foods*, 29 F.4th at 536. These principles can be "inapt" outside the antitrust context, so courts "do not treat them as rigid requirements" in cases like this one. *Id.* In *Manistee Town Center. v. City of Glendale*, for example, the Circuit focused on whether the alleged harm was a "direct injury from the process, rather than the outcome[.]" 227 F.3d 1090, 1095 (9th Cir. 2000). The plaintiff alleged the defendants had "orchestrated a publicity and lobbying campaign to convince the County not to lease space" owned by the plaintiff. *Id.* Because the harm of failure to lease space was caused by an outcome of the process reflected in a county decision, rather than the process itself consisting of the publicity and lobbying, the court held it was not a sham. *Id.*

It is easy to lose sight of what the three circumstances are: "three ways in which litigation might be a sham[.]" *Kottle*, 146 F.3d at 1061. They might overlap, and they might not. For example, it is not obvious that one case could be a sham in all three ways, as B&G assumes. *See* Opp'n at 7. The first and second circumstances are likely to overlap only rarely. They might

even be mutually exclusive.  In the first, a party receives no First Amendment protections for a single lawsuit if the case is objectively baseless and seeks to advance an improper purpose. *Kottle*, 146 F.3d at 1060.  In the second, the question is not whether any particular case has merit. *Id.*  In that circumstance, there is not just one or a few cases to investigate, but rather a "series of lawsuits," and the policy driving them.  *See id.*  Nor is it clear whether the categories or circumstances are always independent.  Consider the third.  If a person makes intentional misrepresentations to the court that deprive the litigation of its legitimacy, the case is a sham and receives no protection.  *See Sosa*, 437 F.3d at 938.  In many cases, the misrepresentation might both deprive the litigation of legitimacy and render it objectively baseless.  *Cf. Liberty Lake*, 12 F.3d at 159 (citing, by way of example, an attempt to enforce a patent obtained by fraud). These cases would fall in both the third category and the first.

Because the parties have put forward arguments about each of the three sham litigation circumstances, the court will consider all three in turn.  Recognizing the complicated relationship between and among the circumstances, as well as the difficulty of exhaustively cataloging sham litigation, the court will analyze defendants' Proposition 65 citizen enforcement actions using the more general principles the Circuit employed in *Manistee*.

**1.     Objectively Baseless Lawsuit**

In the first type of sham case, a plaintiff must show the lawsuit is objectively baseless and was brought for unlawful reasons.  A lawsuit is objectively baseless when "no reasonable litigant could realistically expect success on the merits." *B&G Foods*, 29 F.4th at 538 (quoting *Prof'l Real Est. Invs.*, 508 U.S. at 60).  In other words, if "the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr* . . . ." *Id.*

Here, B&G points to four factual allegations that, in its view, show the underlying Proposition 65 litigation is objectively baseless.  First, "there is no evidence that acrylamide in food causes cancer."  FAC ¶ 129; *see* Opp'n at 14.  Second, the cookies "are the type of classic snack foods which consumers only enjoy at infrequent snacking intervals[,]" so its cookies fall within a statutory safe harbor for foods that contain only a very small amount of acrylamide. FAC ¶ 130; *see* Opp'n at 14.  Third, acrylamide is only present as "the natural consequence of the

8

cooking process," and thus falls within another statutory exemption from liability. FAC ¶ 131; *see* Opp'n at 14. And, lastly, the defendants conducted no reasonable pre-suit investigation to determine if B&G violated Proposition 65. FAC ¶¶ 132–33; *see* Opp'n at 14. Even in the light most favorable to B&G, these allegations do not plausibly show plaintiffs' Proposition 65 litigation was objectively baseless.

B&G's first three allegations, if proven, would support affirmative defenses to a Proposition 65 citizen enforcement action. But on their own, they do not demonstrate an enforcement action had no realistic chance of success. After all, "[i]t is undisputed that B&G's [cookies] contain some amount of acrylamide, that acrylamide is on the list of chemicals 'known to the state to cause cancer,' and that B&G does not provide a warning." *B&G Foods*, 29 F.4th at 538. Proposition 65 enforcers do not need to independently determine whether a listed chemical causes cancer, and they could prevail in a lawsuit if the chemical is listed. *See generally* Cal. Health & Safety Code § 25249.7. These undisputed facts could offer an objective basis for the action.

Moreover, B&G admits that "[n]o one who makes or sells baked goods could ever be sure whether the [cooking] exemption applies to their products . . . [because t]he language of the cooking exemption is also vague on its face and subject to a multitude of differing interpretations." FAC ¶¶ 73–74. If B&G itself could not be sure whether the cooking exemption applied to its cookies, then the exemption's application cannot be so obvious that lawsuits against B&G are objectively baseless. Similarly, B&G admits that even with "a full range of experts and consumption scientists for every food product . . . , the State and enforcers disagree on how average consumption of acrylamide is calculated . . . [in part] because the determination of the applicable [No Significant Risk Levels] and related safe harbor is very burdensome[.]" FAC ¶¶ 81–83. If the applicable safe harbor limit is so difficult to determine – and all the more so in this case, given that people have widely varying snack habits – then it does not render the lawsuits objectively baseless. The court recognizes that B&G made the concessions reviewed above in explaining how expensive Proposition 65 lawsuits are to defend, not in discussing whether the underlying litigation is a sham. But relying on them now is fair; they demonstrate

why the affirmative defenses do not make the defendants' lawsuits baseless. *Cf. Burke v. Soto*, No. 16-1311, 2017 WL 4811832, at *4 (E.D. Cal. Oct. 24, 2017) (finding plaintiff's "own allegations undermine his claim").

In addition, B&G does not offer facts to support its conclusion that the defendants conducted no meaningful pre-suit investigation. B&G points to a list of admissions the defendants made in the underlying litigation. *See* FAC ¶¶ 134–61. Among these admissions is that EHA had not obtained a written statement, interviewed any person about its claims, or obtained a report about its claims. *Id.* ¶ 161. These allegations do not make it plausible the defendants did not conduct a meaningful pre-suit investigation. California law requires private enforcers to attest that they conducted a pre-suit investigation. Under the applicable statute, a prospective litigant must certify they "consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the exposure to the listed chemical that is the subject of the action . . . [and] believes there is a reasonable and meritorious case for the private action." Cal. Health & Safety Code § 25249.7(d)(1). Nothing in the complaint suggests the defendants did not comply with this requirement. If the defendants filed a certificate of merit as required by law, then B&G's allegations about additional steps not taken do not plausibly convey that no meaningful pre-suit investigation was conducted. As a result, B&G has not pled sufficient facts to permit a plausible inference that the defendants conducted no meaningful investigation.

Lastly, B&G alleges the statutory scheme makes it very easy for private enforcers to bring Proposition 65 claims and to extract extortionary settlements. *See* FAC ¶¶ 85–89. These allegations attack Proposition 65, not the defendants' litigation. If anything, B&G's allegations about low standards and advantageous rules undermine its claim that the defendants' lawsuits are objectively meritless.

### 2. Series of Lawsuits

A series of meritless lawsuits can also be a sham. "In such cases, the question is not whether any one suit has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits

and for the purpose of injuring a market rival." *B&G Foods*, 29 F.4th at 539 (internal citation and marks omitted). To evaluate whether this circumstance applies, courts ask: "Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council, AFLO-CIO*, 31 F.3d 800, 811 (9th Cir. 1994). In *USS-POSCO*, fifteen out of twenty-nine lawsuits were successful, so there was no sham. *Id*. Similarly, in this case, the Circuit held that because the defendants had won $1.7 million in penalties and fines from their Proposition 65 litigation, the only reasonable inference is they had been "largely successful" and thus were not pursuing a policy of disregard for the merits. *B&G Foods*, 29 F.4th at 539.

There is more to a sham than quantity and scale. If lawsuits are brought for an unlawful purpose, such as delaying the entry of generic drugs into the market, then those lawsuits are a sham. *See In re Xyrem Antitrust Litig.*, 555 F. Supp. 3d 829, 881 (N.D. Cal. 2021). Even a mere four prior lawsuits could qualify as a sham, so long as they were initiated "for the sole purpose of delaying competing real estate projects." *Relevant Grp., LLC v. Nourmand*, No. 19-5019, 2020 WL 2523115, at *5 (C.D. Cal. May 18, 2020). In sum, district courts often focus on the purpose of the prior lawsuits – whether lawsuits were filed for unlawful aims – to determine whether the instant case is a sham.

Here, B&G argues the defendants "routinely" file many notices of Proposition 65 violations and subsequent lawsuits without regard to merit "to extort money from businesses." Opp'n at 16. B&G alleges the defendants' unsuccessful track record demonstrates their sole purpose is to "acquire quick nuisance settlements." FAC ¶ 178. Defendant Embry has filed at least 260 Notices of Violation, pursued a lawsuit in 131, and settled 25 cases.[2] FAC ¶¶ 166–68.

---

[2] B&G's complaint does not say how many of these cases, if any, were filed against B&G. If defendants Embry and EHA have never before filed a Proposition 65 action against B&G—a reasonable interpretation of its ambiguous allegations—then B&G could not prove the defendants are pursuing a series of lawsuits against it. B&G would need to show why lawsuits against others demonstrate the defendants sued B&G for improper reasons. *See Evans Hotels, LLC v. Unite Here Loc. 30*, 433 F. Supp. 3d 1130, 1148 (S.D. Cal. 2020) ("Where a plaintiff alleges a series of sham lawsuits against entities other than the plaintiff, the lawsuits 'are relevant only to the extent

11

Defendant EHA has filed over 800 Notices of Violation, pursued a lawsuit in 240, and settled 160 cases.[3] FAC ¶¶ 174–76. It is unclear whether the appropriate comparison is settlements to Notices of Violation or settlements to lawsuits filed. The defendants argue that "litigation does not ensue from every such notice" because sometimes "legitimate reasons," such as the volume of products sold in California, counsel against filing suit. Mot. at 23; *see* Reply at 10. If the appropriate comparison is lawsuits filed to cases settled, then defendant Embry is successful 19 percent of the time and defendant EHA is successful 67 percent of the time. If the appropriate comparison is between Notices of Violation and successful settlements, then defendant Embry is successful only about 10 percent of the time, and defendant EHA is successfully only 20 percent of the time.

Regardless of which metric should serve as the denominator, the key question is whether the success rate is so low that it is plausible to infer a sham operation. In this case, it is not. Even with the low-end success rates of 25 out of 260 and 160 out of 800, such an inference is not plausible. These rates do not plausibly show the litigation is a sham. *See P.R. Telephone Co., Inc. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 248, 338 (D.P.R. 2016) (finding not plausible inference of a sham from "a 4 for 13 record" because "[when] more than an insignificant number of filings have objective merit, a defendant likely did not have a policy of filing willy-nilly without regard to success") (quotation marks and citation omitted). More facts would be needed to tip the scale from possible to plausible.

Nor do the defendants' profits permit the court to infer they are operating a sham. B&G admits the defendants "have extracted millions of dollars" through the lawsuits but argues these

---

that they demonstrate that the defendant was improperly motivated in filing its lawsuit against the plaintiff.'") (quoting *Mohla*, 944 F.2d at).

[3] B&G alleges private enforcers have filed "nearly 600 60-day notices" for Proposition 65 warnings regarding acrylamide, 500 of which have concerned food products. FAC ¶¶ 105–06. This allegation raises a question that B&G does not answer. If all private enforcers have filed only 500 notices related to acrylamide, and if Embry and EHA have filed more than 800, then this statistic impliedly reports notices, and perhaps lawsuits and settlements, about other substances. In other words, these numbers might not reflect the defendants' track record for bringing acrylamide lawsuits under Proposition 65. If they do not, then B&G's allegations might not permit any broader inferences about the merits of the defendants' acrylamide litigation.

numbers indicate a successful "shake-down." FAC ¶¶ 28, 24; *see* Opp'n at 10. These numbers could mean either (1) the lawsuits have some merit, or (2) the shakedown is a success. B&G's complaint contains no factual allegations to show the second is a plausible explanation. The closest B&G comes is its allegation that the defendants "trade away benefits to the public and to the State in exchange for larger settlement payments." FAC ¶ 179. However, even this allegation is just a conclusion: there are no specific factual allegations about what benefits they traded away, when they traded them away, or how much additional settlement they received in return. In the absence of factual allegations regarding the supposed "shakedown," B&G's complaint does not permit a plausible inference that the defendants' litigation is a shakedown, rather than a series of successful Proposition 65 citizen enforcement actions.

Instead of putting forth factual allegations, B&G makes a variety of conclusory statements. For example, it alleges the defendants "are not interested in the merits of their cases" because they file large numbers of cases "with the hope that some accused parties will pay them to go away." FAC ¶ 164. In the absence of specific allegations about the defendants' motives or about why these cases lack merit, and given B&G's allegations about the large number of settlements (156) worth millions of dollars, it is not plausible to infer the defendants' litigation is a sham.

### 3. Intentional Misrepresentations

In the third type of sham litigation recognized in previous Ninth Circuit decisions, the filer makes intentional misrepresentations. "[I]f the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *B&G Foods*, 29 F.4th at 537–38 (quoting *Sosa*, 437 F.3d at 938). Here, B&G argues the defendants' claims in its underlying litigation are intentional misrepresentations because (1) acrylamide does not cause cancer, and (2) B&G's cookies do not require Proposition 65 warning labels. *See* FAC ¶¶ 182–85. There are two interrelated flaws in this argument.

First, B&G must allege facts that permit a plausible inference of intentional misrepresentation. In other words, B&G must plead facts that establish the defendants knew the

13

cookies do not require Proposition 65 warning labels. Otherwise, a plaintiff could plead its way around the *Noerr-Pennington* doctrine just by reiterating disputed facts. As discussed with the first sham exception, the complaint's allegations do not permit that inference.

Second, a heightened pleading standard applies to the third sham exception under Rule 9(b). *See* Fed. R. Civ. P. 9(b); *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 646–47 (9th Cir. 2009) (applying heightened pleading standard[4] in the context of allegations of "intentional misrepresentations to the court, and fraud upon the court through the suppression of evidence"). Because the third sham exception requires a showing of fraud, B&G "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Here, B&G alleges the defendants "know[] full well that there is no evidence to support" the allegation its cookies cause cancer and it "is not true" the defendants completed an investigation into the facts of their claims. FAC ¶¶ 183–84. Although B&G needs only to allege generally the defendants' knowledge, *see* Fed. R. Civ. P. 9(b), it must state with particularity the circumstances constituting fraud: what was the false statement; when was it made; to whom; and so on. *See Kearney*, 590 F.3d at 647 (explaining "the required specifics would include such things as exactly what representations defendant made, or to whom; with whom defendant conspired; and what exactly its improper and/or unlawful methods of advocacy were") (internal quotation marks and brackets omitted). B&G's complaint contains no such allegations.

### 4. *Noerr-Pennington* Principles: Injured by Process

In *Manistee*, the Ninth Circuit held that *Noerr-Pennington* immunity extends to government officials who petition other government entities because such petitions are "vital to the functioning of a modern representative democracy[.]" 227 F.3d at 1093. The core of this protection ensures government officials can petition even for outcomes that some do not desire. In other words, the *Noerr-Pennington* doctrine immunizes government officials' legitimate, if

---

[4] As discussed in the legal standard section, *Kearney* relies on *Kottle* and *Franchise Realty*'s First Amendment rationale for the heightened pleading standard. However, putting that rationale aside, *Kearney*'s application of the heightened pleading standard is notable because it is only discussed regarding the third sham exception, i.e., allegations of fraud. This application is thus justified under Rule 9(b).

1 unpopular, petitioning. But this protection does not extend to abuses of the process—to shams.
2 As a result, petitioning is not covered by *Noerr-Pennington* immunity when the alleged harm is a
3 "direct injury from the process, rather than the outcome." *Id.* at 1095.

4 These principles fit cases of legal "petitioning" just as well. Litigants should not be
5 punished for pursuing unpopular but legitimate lawsuits. When a lawsuit seeks a valid outcome,
6 its filing is protected by the *Noerr-Pennington* doctrine. This protection should be withdrawn,
7 however, if the litigant has used the process itself to directly inflict harm.

8 In this case, B&G seeks an injunction against further lawsuits about the acrylamide in its
9 cookies, a declaration that the Proposition 65 warning requirement is unconstitutional as applied
10 to its cookies, damages, and attorneys' fees. FAC, Prayer for Relief A–D. This requested relief
11 goes to the merits of the defendants' litigation: whether the cookies are subject to the Proposition
12 65 regulatory scheme.

13 If the cookies are subject to Proposition 65, then future lawsuits would be warranted, and
14 a warning label could be applied. If they are not, then B&G's requested relief is largely
15 redundant because the resolution of the underlying litigation would establish that Proposition 65
16 does not apply to B&G's cookies. The requested relief in the instant case therefore mirrors the
17 outcome of the defendants' litigation. B&G does not target the process. B&G seeks to avoid
18 harm that could occur only if the defendants' Proposition 65 litigation were successful. Such
19 harm is not a "direct injury from the process" of litigation. *Manistee*, 227 F.3d at 1095.

20 In sum, considering the defendants' litigation in light of the *Noerr-Pennington* principles
21 explained in *Manistee*, B&G has not alleged facts to support a plausible inference that the
22 defendants' conduct is a sham. Instead, the defendants' Proposition 65 litigation appears to be the
23 type of legitimate lawsuit that the Petition Clause protects, even if the litigation is unpopular in
24 certain quarters.

25 **B.     Leave to Amend**

26 If a motion to dismiss is granted, "[the] district court should grant leave to amend even if
27 no request to amend the pleading was made[.]" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir.
28 2016) (citation omitted). However, leave to amend should be denied when the plaintiff could not

amend the complaint to state a viable claim without contradicting the complaint's original allegations. *See Garmon v. County of Los Angeles*, 828 F.3d 837, 845–46 (9th Cir. 2016).  The key question in this case is futility. *See B&G Foods*, 29 F.4th at 541.  Here, amendment might not be futile.  B&G could amend to add factual allegations that make it plausible the defendants' Proposition 65 litigation is a sham.  For example, it could allege the defendants did not file the certificate of merit required by Proposition 65, or that the certificate filed contains falsehoods.  The court cautions, however, that any amendments must comply with Rule 11, including the requirement that factual allegations "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]"  Fed. R. Civ. P. 11(b)(3).

Because B&G has already been given leave to amend, the court now grants leave to amend its complaint only with respect to the sham exception to the *Noerr-Pennington* doctrine and only to advance factual allegations to support its claim that the underlying lawsuits are a sham.

### IV. CONCLUSION

The court **grants the defendants' motion to dismiss with limited leave to amend**, as explained above.  Any amended complaint must be filed **within twenty-one days of this order**.

This order resolves ECF No. 52.

IT IS SO ORDERED.

DATED: November 2, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE