J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
  borden@braunhagey.com
Forrest A. Hainline III, Esq. (SBN: 64166)
  hainline@braunhagey.com
David H. Kwasniewski, Esq. (SBN: 281985)
  kwasniewski@braunhagey.com
Robert Petraglia, Esq. (SBN: 264849)
  petraglia@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

ATTORNEYS FOR PLAINTIFF
B&G FOODS NORTH AMERICA, INC.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&G FOOD NORTH AMERICA, INC., | Case No. **2:20-cv-00526-KJM-DB** |
| Plaintiff, | **PLAINTIFF B&G FOODS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| KIM EMBRY and ENVIRONMENTAL HEALTH ADVOCATES, INC., acting as enforcement representatives under California Proposition 65 on behalf of the State of California, | Date: March 10, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. Kimberly J. Mueller<br>Courtroom: 3 |
| Defendants. | SAC Filed: November 23, 2022<br>Trial Date: None Set |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................... I

TABLE OF AUTHORITIES ..................................................................................... III

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................... 2

    A.    The Accused Cookies ...................................................................... 2

    B.    Defendants File Sham Lawsuits against B&G Foods............................ 2

    C.    B&G Foods Seeks Redress from This Court ........................................ 3

    D.    The New Allegations in the SAC .......................................................... 4

I.     B&G FOODS HAS ALLEGED DEFENDANTS' LAWSUITS ARE SHAMS .............. 5

    A.    Defendants Spoliated Evidence ........................................................... 6

    B.    Defendants Failed to File Proper Certificates of Merit ........................ 8

    C.    Defendants Failed to Conduct an Adequate Pre-suit Investigation ...................... 11

    D.    Defendants Made False Statements in Their Complaints...................... 13

    E.    Defendants' Lawsuits Are Part of a Series of Lawsuits Filed for an Improper Purpose, Without Regard to the Merits ............................... 15

    F.    Defendants' Lawsuits Knowingly Violate the First Amendment........................ 16

II.    B&G FOODS HAS PLAUSIBLY ALLEGED DEFENDANTS ARE STATE ACTORS............................................................................................. 17

    A.    Defendants Perform a Public Function by Prosecuting Proposition 65 Actions.. 17

    B.    Defendants Act Jointly with the Attorney General................................ 18

Case No.  2:20-cv-00526-KJM-DB

C.    Private Enforcers Have a Symbiotic Relationship with the State.......................... 19

D.    Defendants Act in Close Nexus with the Attorney General ................................. 19

CONCLUSION........................................................................................................................... 20

PLAINTIFF B&G FOODS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

**TABLE OF AUTHORITIES**

2

Cases                                                                                                                                    Page(s)

3

*B&G Foods N. Am., Inc. v. Embry*,

4
　29 F.4th 527 (9th Cir. 2022) ............................................................................................. passim

5

*B&G Foods N. Am., Inc. v. Embry*,

6
　No. 2:20-CV-00526-KJM-DB, 2022 WL 16702141................................................... 4, 5, 16

7

*Brazil v. Dole Food Co., Inc.*,
　935 F. Supp. 2d 947 (N.D. Cal. 2013) ........................................................................... 18

8

*Brunette v. Humane Soc'y of Ventura Cty.*,

9
　294 F.3d 1205 (9th Cir. 2002) ........................................................................... 17, 18, 19

10

*Bucur v. Ahmad*,

11
　244 Cal.App.4th 175 (2016) ........................................................................................... 11

12

*Burton v. Wilmington Parking Auth.*,
　365 U.S. 715 (1961)....................................................................................................... 17

13

*Cal. Chamber of Commerce v. Becerra*,

14
　529 F. Supp. 3d 1099 (E.D. Cal. 2021) ...................................................................... 1, 2

15

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,

16
　29 F.4th 468 (9th Cir. 2022) .............................................................................................. 2

17

*City of Columbia v. Omni Outdoor Advert., Inc.*,

18
　499 U.S. 365 (1991)........................................................................................................ 5

19

*Consumer Advocacy Group, Inc. v. Kinetsu Enter. of Am.*,
　150 Cal.App.4th 953 (2007) ........................................................................................... 18

20

*Consumer Def. Grp. v. Rental Hous. Indus. Members*,

21
　137 Cal.App.4th 1185 (2006) ................................................................... 8, 12, 14, 15

22

*DiPirro v. Am. Isuzu Motors, Inc.*,

23
　119 Cal.App.4th 966 (2004) ............................................................................................. 9

24

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
　365 U.S. 127 (1961)......................................................................................................... 5

25

*Environmental Law Foundation v. Beech-Nut Nutrition Corp.*,

26
　235 Cal.App.4th 307 (2015) ................................................................................... 11, 14

27

*Ernest W. Hahn, Inc. v. Codding*,

28
　615 F.2d 830 (9th Cir. 1980) ........................................................................................... 9

*F.C.C. v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)................................................................................ 12, 14

*F.D.I.C. v. Calhoun*,
   34 F.3d 1291 (5th Cir. 1994) ............................................................ 11

*Gonzales v. Oregon*,
   546 U.S. 243 (2006)........................................................................ 17

*In re Outlaw Law., LP Litig.*,
   2019 WL 1205004 (S.D. Cal Mar. 14, 2019) ................................. 17

*In re Vaccine Cases*,
   134 Cal.App.4th 438 (2005) ............................................................ 9

*Johnson v. American Standard, Inc.*,
   43 Cal.4th 56 (2008) ...................................................................... 14

*Kearney v. Foley & Lardner, LLP*,
   590 F.3d 638 (9th Cir. 2009) ................................................. 6, 7, 10

*Kottle v. Nw. Kidney Centers*,
   146 F.3d 1056 (9th Cir. 1998) ........................................................ 5

*Lee v. Katz*,
   276 F.3d 550 (9th Cir. 2002) .......................................................... 17

*Liberty Lake Invs., Inc. v. Magnuson*,
   12 F.3d 155 (9th Cir. 1993) ............................................................ 5

*Lugar v. Edmondson Oil Co., Inc.*,
   457 U.S. 922 (1982)................................................................... 17, 18

*Mix v. Neeb*, No. 2:14-CV-01594-KJM-A,
   C, 2014 WL 6469130 (E.D. Cal. Nov. 17, 2014) ........................... 5

*Naoko Ohno v. Yuko Yasuma*,
   723 F.3d 984 (9th Cir. 2013) ..................................................... 19, 20

*Playup, Inc. v. Mintas*,
   No. 2:21-CV-02129-GMN-NJK, 2022 WL 4985098 (D. Nev. Sept. 2, 2022) ............................. 8

*Real Estate Bar Ass'n For Mass, Inc. v. Nat. Real Estate Info. Servs.*,
   608 F.3d 110 (1st Cir. 2010) .......................................................... 18

*Smith v. Sup. Court*,
   189 Cal. App. 2d 6 (1961) .............................................................. 10

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ................................................................. 5

*Tulsa Prof. Collection Serv., Inc. v. Pope*,
   485 U.S. 478 (1988) ............................................................................ 20

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council*,
   31 F.3d 800 (9th Cir. 1994) ................................................................ 15

*William v. Russ*,
   167 Cal.App.4th 1215 (2008) ................................................................ 7

Statutes

Cal. Code Civ. Proc. § 128.7 ................................................................... 11

Cal. Health and Saf. Code § 25249.7(d) ................................................. 18

Cal. Health and Saf. Code § 25249.7(d)(1) ....................................... 9, 10

Cal. Health and Saf. Code § 25249.7(h)(2) ....................................... 10, 20

Regulations

Cal. Code Regs. Tit. 27, § 25703(b) ................................................ 11, 12

Cal. Code Regs. tit. 27, § 25821 .............................................................. 14

PLAINTIFF B&G FOODS'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff B&G Foods North America, Inc. ("B&G Foods") respectfully submits this opposition to Defendants Motion to Dismiss Plaintiff's Second Amended Complaint (ECF 66).

## INTRODUCTION

B&G Foods brought this § 1983 case to protect its constitutional right to truthfully advertise Snackwell® Devil Food Cookie Cakes and Chocolate Crème Sandwich Cookies. Defendants are self-described prosecutors acting on behalf of the State of California who have filed Proposition 65 lawsuits seeking to compel B&G Foods to place false cancer warnings on its products. Defendants know that the cookies do not cause cancer and that their lawsuits violate the First Amendment. This Court issued, and the Ninth Circuit affirmed, an injunction precluding Defendants from maintaining the claims that Defendants are prosecuting against B&G Foods in state court. *Cal. Chamber of Commerce v. Becerra,* 529 F. Supp. 3d 1099 (E.D. Cal. 2021), *aff'd,* 29 F.4th 468 (9th Cir. 2022) ("*Calchamber*"). Yet Defendants are still trying to force B&G Foods to put an untruthful cancer warning on its accused cookies—or to pay Defendants to "settle" the unconstitutional claim.

Defendants argue that B&G Foods cannot vindicate its First Amendment rights in this case because Defendants' lawsuits are legitimate petitioning activity. (Mot. at 4-15.) They are not. In response to the Court's Order on Defendants' last motion to dismiss, B&G Foods added substantial sham litigation allegations in the Second Amended Complaint ("SAC"). Taken as true, these new facts show that Defendants are engaged in sham litigation for at least the following reasons, any one of which, alone, is sufficient grounds for denying Defendants' motion: (1) Defendants spoliated evidence; (2) Defendants' lawsuits are based on fraudulent certificates of merit; (3) Defendants failed to adequately investigate their claims before filing suit; (4) Defendants made false statements to the courts in their complaints; (5) Defendants' lawsuits are part of a series of sham Proposition 65 lawsuits; (6) Defendants know their lawsuits violate federal and state law. Rather than engage with these allegations, Defendants cite extrinsic evidence and dispute the facts, both of which are inappropriate on a Rule 12(b)(6) motion.

Defendants also offer the alternative theory that they are not state actors and thus cannot be sued under § 1983. (Mot. at 15-16.) However, as detailed in the SAC, Defendants purport to enforce public health regulations, a quintessential traditional government function. In prosecuting their

claims, Defendants work hand-in-glove with the State, which oversees every step of the process. The State and Defendants exist in a symbiotic relationship, cemented by hundreds of thousands of dollars Defendants make for the State each year in exchange for the States' imprimatur on their business. The State actively encourages Defendants to continue to enforce Proposition 65. Such conduct constitutes state action. Were it otherwise, states could enforce unconstitutional laws and enact invidious policies simply by delegating these tasks to "private" parties.

For all these reasons, and those set forth below, Defendants' motion should be denied.

## BACKGROUND

### A.   The Accused Cookies

B&G Foods is a 130-year-old American brand that makes and sells a wide variety of shelf-stable and frozen foods. Until recently, B&G Foods made Snackwells® cookies. (SAC ¶¶ 4-8.)

The accused cookies are baked, of course, and "contain trace amounts of a substance called acrylamide, which inevitably forms during the baking process." (SAC ¶¶ 9, 34-36, 38). According to the FDA, acrylamide has likely "always been present in cooked foods." (SAC ¶ 34.) Decades of research by scientists around the world have identified no link between acrylamide in food and any health risk in humans. (SAC ¶¶ 42-54.) The State of California acknowledged in 2007 and 2019 that acrylamide in food is not "known" to cause cancer in humans. (SAC ¶¶ 56-60.) Yet acrylamide is on Proposition 65's list of chemicals "known" to the State to cause cancer—a relic of a time when it was only known as a synthetic chemical used in industrial processes. *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 473 (9th Cir. 2022).

The lack of any scientific evidence that acrylamide in food causes cancer in humans led this Court to hold that Proposition 65 acrylamide litigation is unconstitutional because "the First Amendment prohibits the state from compelling false or controversial speech." *Calchamber*, 529 F. Supp. 3d at 1117-18. The Ninth Circuit agreed. *California Chamber of Com.*, 29 F.4th 468 at 478.

### B.   Defendants File Sham Lawsuits against B&G Foods

Defendants Kim Embry and EHA are serial Proposition 65 litigants who, on behalf of the State of California, sue or threaten to sue dozens of businesses every year based on the alleged presence of acrylamide in their products. (SAC ¶¶ 12, 18.) Despite lending her name to numerous

lawsuits, Embry functions as nothing more than a shill for her lawyer to file Prop 65 lawsuits. (SAC ¶¶ 15-16, 18, 21-24, 29, 110, 147, 153-156.) Defendant EHA is a shell corporation formed by Defendants' lawyers for the purpose of filing Proposition 65 lawsuits. (SAC ¶¶ 16, 23.) Both Defendants share the same lawyers and the same business model: "[t]hey bring serial, meritless 'shake-down' actions in the hopes that some small percentage will settle for fees and penalties they share with the State." (SAC ¶ 21.) Defendants disregard the notice requirements of Prop 65, which are mandatory and intended to deter meritless actions. (SAC ¶¶ 86-123.) They routinely destroy evidence. (SAC ¶¶ 2, 75-82, 166.) Most of Defendants' claims are abandoned; the few settlements Defendants do reach do not improve public safety, undermine the purpose of Proposition 65, and serve only to enrich Defendants and their attorney. (SAC ¶¶ 1, 29, 146, 179.) The lawsuits Defendants have filed against B&G Foods are no exception.

Defendants' litigation is closely supervised, regulated, and encouraged by the State. Prior to initiating any action, Defendants must first serve a Notice of Violation ("NOV") on the State through the Attorney General's Office, together with evidence supporting the supposed merit of their allegations. The State further monitors Defendants by "requesting pre-approval of any potential settlement or consent judgment, receiving and reviewing notices regarding the progress of acrylamide case litigation, intervening in particular cases, regulating the conduct of representatives, demanding to receive proportional cuts of civil penalties," and promulgating regulations governing the particular mechanisms and methods of Prop 65 enforcement. (SAC ¶ 234.) The Attorney General also may review settlement agreements. (*Id.*) Prop 65 enforcement actions have netted the State millions of dollars in recent years, and the State has actively encouraged and assisted private enforcers. (SAC ¶¶ 27, 29, 223, 234, 236.)

### C.    B&G Foods Seeks Redress from This Court

B&G Foods initiated this action on March 6, 2020. On October 7, 2020, this Court granted Defendants' motion to dismiss on *Noerr-Pennington* grounds without leave to amend. On March 17, 2022, the Ninth Circuit reversed. It held that B&G Foods should be permitted to amend its complaint to plead "the application of a sham exception to the *Noerr-Pennington* doctrine." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 541 (9th Cir. 2022). The Ninth Circuit stated that "[a]

reasonable factfinder could infer . . . that Defendants' suit was objectively baseless because they knew (or should have known) that B&G was not violating Prop. 65 but filed suit anyway" if B&G Foods "could allege that Cookie Cakes 'unquestionably qualifies for [an affirmative defense],' and that Defendants made no effort to investigate their claims and filed without regard to the merits." *Id.* The Ninth Circuit explained the fact that "Glick or his co-counsel, has withdrawn 129 of [Embry's] 260 NOVs concerning acrylamide and has settled only 25 cases . . . . could support an inference that Defendants' acrylamide litigation was unsuccessful, as only a fraction of their threatened suits succeeded." *Id.* "Such an inference would undermine the district court's sole basis for finding the second sham exception inapplicable." *Id.* The Ninth Circuit further explained:

> [T]hat inference, together with the other new and existing allegations—for example, that Defendants file without regard to the merits and undertake no efforts to investigate their claims, and businesses like B&G will often settle because Prop. 65 suits are burdensome and very expensive to defend—could support that Defendants' suits were not based on merit but were brought pursuant to a policy of improperly pressuring businesses, like B&G, to settle.

*Id.*

On July 7, 2022, B&G Foods filed its First Amended Complaint. Defendants moved to dismiss, and the Court granted this motion, but gave B&G Foods leave to amend to "add factual allegations that make it plausible the defendants' Proposition 65 litigation is a sham . . . For example, it could allege the defendants did not file the certificate of merit required by Proposition 65, or that the certificate filed contains falsehoods." *B&G Foods N. Am., Inc. v. Embry,* No. 2:20-CV-00526-KJM-DB, 2022 WL 16702141, at *4.

### D.    The New Allegations in the SAC

Consistent with the Court's guidance, on November 23, 2022, B&G Foods filed the SAC. The SAC adds detailed allegations that Defendants' claims are shams because Defendants spoliated evidence (SAC ¶¶ 75-82), claimed they filed code complaint notices of violation and certificates of merit when they did not do so (SAC ¶¶ 86-102), and made false statements in their complaints regarding their investigation and the basis for their claims (SAC ¶¶ 124-159). The SAC further alleges Defendants' certificates of merit were invalid and not submitted "as required by law," (SAC 88-89, 95-97, 127-128), which is a complete defense to their actions and eliminates any reasonable

probability of success. The SAC further alleges that Defendants' lawsuits are part of a practice of filing cases without regard to the merits, because the vast majority of Defendants' asserted claims are abandoned, and those few that are resolved are "shake-down" settlements which provide no benefit to the public. (SAC ¶¶ 160-200.)

## ARGUMENT

A motion to dismiss must be denied unless, taking all the allegations as true and drawing all inferences in favor of the plaintiff, the plaintiff cannot plausibly state a claim. *Mix v. Neeb*, No. 2:14-CV-01594-KJM-AC, 2014 WL 6469130, at *3 (E.D. Cal. Nov. 17, 2014)

## I.    B&G FOODS HAS ALLEGED DEFENDANTS' LAWSUITS ARE SHAMS

Defendants argue the *Noerr-Pennington* doctrine immunizes them from liability. (Mot. at 4-15.) This judge-made rule generally protects parties from being sued for petitioning activity. It does not, however, shield a lawsuit if it is "a mere sham[.]" *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961). It does not apply to a lawsuit that is "not genuinely aimed at procuring favorable government action," but rather seeks a result "through improper means." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (cleaned up).

The Ninth Circuit "identified three circumstances in which the sham exception might apply in the litigation context[.]" *B&G Foods*, 29 F.4th at 537. First, a lawsuit is a sham when it is objectively baseless and brought for an unlawful purpose. *Id.* Second, a series of lawsuits can be a sham, even if some cases in the series have merit, when brought "pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose[.]" *Id.* (quoting *Sosa v. DIRECTV, Inc.,* 437 F.3d 923, 938 (9th Cir. 2006)). Third, litigation predicated on "intentional misrepresentations to the court" is a sham if that "knowing fraud … deprive[s] the litigation of its legitimacy." *Id.* (citing *Kottle*, 146 F.3d 1060 (quoting *Liberty Lake Invs., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir. 1993)). These three circumstances are, however, only "three ways in which litigation might be a sham[.]" *B&G Foods N. Am., Inc. v. Embry,* No. 2:20-CV-00526-KJM-DB, 2022 WL 16702141, at *4. They are not rigid categories, nor are they exhaustive. *Id.*

The SAC plausibly alleges at least six reasons why Defendants' Prop 65 lawsuits are shams including: (1) Defendants routinely destroy evidence (SAC ¶¶ 75-82) (2) Defendants did not submit

certificates of merit supported by factual information prior to filing their lawsuits, as required by Prop 65, and claimed they did (SAC ¶¶ 86-102); (3) Defendants did not investigate their claims, and filed them without regard to the merits (SAC ¶¶ 103-188); (4) Defendants' complaints contain misrepresentations (SAC ¶¶ 124-159); (5) Defendants' lawsuits are part of a pattern of filings made without regard to the merits (SAC ¶¶ 160-188); (6) Defendants knowingly violated the First Amendment and the California Constitution. (SAC ¶¶ 189-214). Any one of these reasons, alone, and especially taken together, is sufficient to plead the sham exception to *Noerr-Pennington*. Defendants' Motion either ignores these well-pled allegations in the SAC or attempts to raise factual disputes that are inappropriate for resolution on a motion to dismiss.

## A. Defendants Spoliated Evidence

The Ninth Circuit has held the sham litigation exception is satisfied when the party initiating the litigation spoliates evidence. *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 647 (9th Cir. 2009) (allegations of destruction or suppression of evidence "were precisely the sort the sham exception was created to address.") Here, B&G Foods alleges that Defendants destroyed the only evidence upon which their state court lawsuits are based: the samples they claim contained elevated levels of acrylamide. (SAC ¶¶ 75, 80-81; SAC Ex. J) Defendants concede that this is true. (Mot. at 5.) For this reason alone, their Motion should be denied.

Defendants' spoliation "prevent[ed] B&G Foods from retesting the products to determine if Plaintiff's results were adequate." (SAC ¶ 75.) Defendants caused this spoliation "by testing their products at an out-of-state laboratory [(IEH)] that uses non-standard testing procedures (including the destruction of all samples immediately after testing)." (SAC ¶ 76.) "IEH routinely uses improper or unreliable testing methodologies to produce skewed results showing unusually high levels of acrylamide are present in foods. B&G Foods's own testing shows that the acrylamide levels in the Cookies were an order of magnitude lower and, crucially, below the [No Significant Risk Level contained in Proposition 65's enacting regulations ("NSRL")]." (SAC ¶ 76.) After being subpoenaed, IEH ultimately admitted that it had destroyed the samples at Ms. Embry's instruction on or about 30 days after it tested the sample—approximately May 4, 2019, after Plaintiff initiated the litigation by filing her April 19, 2019, NOV. (SAC ¶¶ 77, 80) Ms. Embry has admitted that the

1   spoliation was intentional and, indeed, that it was her practice to spoliate the product samples in

2   every Proposition 65 case she brought. (SAC ¶ 82.)

3       Spoliation of evidence is tantamount to fraud upon the Court. *Kearney*, 590 F.3d at 647. In

4   *Kearney*, plaintiff alleged that defendant had withheld the results of environmental testing of a

5   parcel of land during an eminent domain proceeding, and that the testing would have shown that the

6   land could support more residential buildings and would therefore be more valuable than the

7   government claimed. *Id.* at 642-43. Plaintiff claimed that it was forced to accept a lower valuation

8   of its property because of the suppression or spoliation of this evidence and sued in federal court.

9   *Id.* The District Court dismissed the action on *Noerr-Pennington* grounds. *Id.* at 643. The Ninth

10  Circuit reversed, finding that the sham pleading exception applied because discovery misconduct

11  was "quite clearly" an intentional misrepresentation to, and fraud upon, the court. *Id.* at 647. Here,

12  Defendants have admitted to committing a fraud on the Court in their cases against B&G Foods,

13  and in every case they bring. This alone deprives Defendants' cases of legitimacy, and any

14  protection under *Noerr-Pennington*. *See Kearney*, 590 F.3d at 647

15      Defendants argue no spoliation occurred because the laboratory they hired destroyed the

16  evidence. (Mot. at 5.) Hiring a third party to handle evidence with knowledge that the third party

17  will destroy it as a matter of policy is the same as destroying the evidence oneself. *See William v.*

18  *Russ*, 167 Cal.App.4th 1215, 1225 (2008). For example, in *William v. Russ*, an attorney placed a

19  large number of files in a rented storage unit. *Id.* at 1218-19. The attorney fell behind on his rental

20  payments and received "numerous and repeated warnings from the storage facility that the contents

21  of his storage space would be sold." *Id.* at 1224. The attorney "did nothing to prevent their sale and

22  concomitant destruction." *Id.* The court of appeal held that "this is tantamount to intentionally

23  destroying those files" and affirmed terminating sanctions. *Id.*

24      Defendants also assert that their laboratory always destroys evidence. (Mot. at 5.) It is

25  unclear how this fact would help Defendants: their knowledge that they were providing the

26  evidence to someone who they knew was going to destroy it would just make their destruction of

27  evidence all the more deliberate. In point of fact, however, the standard testing order forms for the

28  lab that Defendants use require customers to select whether they want the sample preserved,

returned, or destroyed after testing. (Declaration of David Kwasniewski ("Kwasniewski Decl."), Ex. A (Standard Form providing customer option to have IEH destroy, store, or return sample).)

Defendants also contend that their destruction of evidence does not matter because other product samples could be tested. (Mot. at 5.) This ignores the allegations to the contrary in SAC ¶¶ 75-85, which must be taken as true. Moreover, the extent to which B&G Foods was prejudiced by Defendants' spoliation is a factual question that cannot be resolved at the pleading stage. *Playup, Inc. v. Mintas*, No. 2:21-CV-02129-GMN-NJK, 2022 WL 4985098, at *1 (D. Nev. Sept. 2, 2022) ("[D]eciding whether a party engaged in sanctionable spoliation is a fact-intensive decision that is generally made upon a full record.").[1] In any event, B&G Foods has alleged that Defendants' testing was abnormal and thus the ability to test other product samples cannot cure Defendants' spoliation. (SAC ¶¶ 13, 76, 165.) Without the ability to retest the products supposedly tested by Defendants, B&G Foods is unable to evaluate whether Defendants' abnormal results were the result of poor testing methodology, contamination, or some other factor. Notably, the test result Defendants did belatedly produce was heavily redacting, suggesting they knowingly based their case on an outlier. (SAC ¶ 90.)

### B.    Defendants Failed to File Proper Certificates of Merit

A second and independent reason that Defendants' lawsuits are shams is that Defendants do not provide proper certificates of merit. Under California law, a certificate of merit is a legal predicate to filing a Prop 65 lawsuit. This is critical because failure to timely include a certificate of merit is grounds for dismissal even if such a certificate is offered after the litigation has begun. *Consumer Def. Grp. v. Rental Hous. Indus. Members*, 137 Cal.App.4th 1185, 1209 (2006).

Prior to initiating a Prop 65 lawsuit, California law requires a plaintiff to consult with "one or more persons with relevant and appropriate experience or expertise [(an expert)] who has reviewed facts, studies, or other data regarding the exposure to the listed chemical that is the subject

---

[1] Defendants' citation to an unpublished state court discovery order (Mot. at 6), does not support their position. That order simply explained the defendant in a Prop 65 lawsuit could bring a sanctions motion for spoliation of product samples on a showing that the testing results could not be replicated. (February 3, 2022 Minute Order, *CalSafe Research Center, Inc. v. Earthly Treats Inc.*, Orange County Superior Court, Case No. 30-2021-01193600-CU-TT-CXC).)

of the action. *See* Cal. Health & Saf. Code § 25249.7(d)(1). After such a consultation, a plaintiff must prepare three things: (1) an NOV, (2) a certificate of merit attesting that the enforcer had conferred with an expert about the alleged exposure to be served with the NOV, and (3) "factual information sufficient to establish the basis of the certificate of merit," which must be attached to the certificate of merit that is served on the Attorney General. *DiPirro v. Am. Isuzu Motors, Inc*., 119 Cal.App.4th 966, 970 (2004). These procedures are mandatory because they are intended to prevent filing a lawsuit without regard to the merits. *In re Vaccine Cases*, 134 Cal.App.4th 438, 456-57 (2005) (failure to serve certificates of merit warrants dismissal).

B&G Foods alleges that Defendants failed to follow these procedures because Defendants admitted in discovery that they had not obtained an expert report or analysis prior to submitting their NOV and Certificate of Merit. (SAC ¶¶ 97, 110-112.) Further, Defendant Embry admitted in her deposition she was unaware of any expert report, and Defendant EHA submitted a sworn interrogatory response stating it had no expert report. (SAC ¶¶ 86-101, 110-112.)

The SAC further details how, years after they filed their original NOVs, and only after the Ninth Circuit rendered its opinion in this case, Defendants amended their NOVs to include "expert reports." (SAC ¶¶ 90, 98.) These reports – one paragraph in length –assert that the test results obtained by Defendants show enough acrylamide is present in the products to pose a cancer risk. (SAC ¶¶ 90, 98.) As alleged in the SAC, the fact that Defendants said in discovery they did not exist or were unaware of any reports (SAC ¶¶ 97,98; Ex. F), and that Defendants only produced these reports after the Ninth Circuit questioned whether their Certificates of Merit were valid, supports the inference that the reports were generated after the fact, or where excluded from the original certificates of merit. (SAC ¶ 112.) No "amendment" would have been required had Defendants included this information with the certificates of merit they initially served on the Attorney General. (SAC ¶ 128.) This is what sets these Defendants apart from the typical private attorney general: they did not follow the rules meant to protect businesses and Courts from abuse of Prop 65, but told the Attorney General, B&G Foods, and courts that they did. (SAC ¶¶ 86-101.)

Such allegations must be taken as true, and are a separate ground for meeting the sham litigation exception. *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 840–41 (9th Cir. 1980)

1  (holding sham exception was sufficiently pled when plaintiff alleged defendant knowingly filed

2  thirteen meritless lawsuits against it in an effort to interfere with its business.)

3       Defendants argue that they did not admit that they failed to consult with an expert in their

4  discovery responses, and only objected to the discovery requests. (Mot. at 7.) This is incorrect.

5  B&G Foods asked Defendant EHA: "was a report made by any PERSON concerning the

6  INCIDENT?" and in response, EHA stated "No." (SAC ¶ 97, SAC Ex. F.) Either this response was

7  true, meaning no expert report existed, or Defendant gave a knowingly false discovery response.

8  Such "fraudulent discovery conduct" would also deprive the litigation of legitimacy, and *Noerr-*

9  *Pennington* immunity. *See Kearney,* 590 F.3d at 647.

10       Defendants claim that their discovery response was not false because it was made "subject

11  to and without waiving" various objections. (Mot. at 7.) Regardless of their objections, California

12  law does not permit litigants to deny the existence of an expert report. While the content of the

13  report may be withheld until expert discovery commences, the existence of the report cannot. *Smith*

14  *v. Sup. Court,* 189 Cal. App. 2d 6, 12 (1961) ("[O]nly the contents [of expert reports] could be

15  privileged not the fact of the document's existence."). Prop 65 itself contemplates that materials

16  provided in support of the Certificate of Merit may be subject to discovery. Cal. Health and Saf.

17  Code § 25249.7(h)(2) (plaintiff may not resist "the discovery of information related to the

18  certificate of merit . . . solely on the ground that it was used in support of the certificate of merit.").

19       Defendants assert that their NOVs and Certificates of Merit were timely (Mot. at 8.), but

20  that misses the point. Defendants are required by law to submit certificates of merit with "[f]actual

21  information sufficient to establish the basis of the certificate of merit, including [the facts, studies,

22  or other data reviewed by the certifier] attached to the certificate of merit that is served on the

23  Attorney General." Cal. Health & Safety, § 25249.7(d)(1), (h)(2). Defendants failed to include this

24  "factual information" with the certificates of merit they filed prior to bringing suit, and therefore did

25  not submit certificates of merit "as required by law" as they claimed in their complaints and

26  subsequent filings. (SAC ¶ 86-87, 95-98, 106-117.)

27       Finally, Defendants claim that their certificates of merit must have complied with the rules

28  because the Attorney General did not state otherwise (Mot. at 8-9). This argument goes beyond the

pleadings. Moreover, Defendants have not produced their correspondence with the Attorney General regarding their lawsuits, making it impossible to evaluate this assertion. At the pleading stage, Defendants' amendment of their NOVs supports the inference that the Attorney General did not believe the NOVs as originally filed were sufficient.

## C.    Defendants Failed to Conduct an Adequate Pre-suit Investigation

A third way that Defendants' lawsuits are shams is that Defendants fail to adequately investigate them before filing them. Failing to investigate claims and making obviously legally deficient claims are both forms of sham litigation. *B&G Foods*, 29 F.4th at 542 (allegations that Defendants "knew (or should have know) that B&G was not violating Prop. 65 but filed suit anyway" and "Defendants file without regard to the merits and undertake no efforts to investigate their claims" support finding a sham exception.)

The SAC at ¶¶ 91-102 alleges that Defendant's pre-suit investigation was deficient because Defendants were obliged under California law to investigate any obvious affirmative defenses, and they certified that they had done so when the requisite pre-suit investigation did not occur. Cal. Code Civ. Proc. § 128.7; *Bucur v. Ahmad*, 244 Cal.App.4th 175, 191 (2016) (affirming sanctions against a party whose "assertion of claims so clearly barred by (the affirmative defenses) res judicata, judicial admissions and judicial estoppel was objectively unreasonable."); *see also F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1299 (5th Cir. 1994) (prior to filing suit, parties must consider "whether any obvious affirmative defenses bar the case").

Defendants' "expert" did not research the rate of consumption of the accused cookies, or other similar foods, as would be necessary to determine whether they require a Prop 65 warning. *Environmental Law Foundation v. Beech-Nut Nutrition Corp.,* 235 Cal.App.4th 307, 327 (2015) (explaining rate of consumption of food is necessary to calculate whether exposure to chemical exceeds NSRL); Cal. Code Regs. Tit. 27, § 25703(b) (NSRL based on lifetime exposure); (SAC ¶ 113). Therefore, Defendants did not investigate whether the trace amounts of acrylamide allegedly present in the accused cookies would exceed the NSRL when considering the rate at which consumers actually enjoy them. When the rate of consumption is considered, the amount of acrylamide allegedly present does not exceed the NSRL. (SAC ¶¶ 105, 123; ECF 52-1 at 13:21-28.)

Defendants also did not investigate whether the cooking exception would apply and warrant a different NSRL for the Cookies, because any acrylamide in the cookies forms from baking, which is necessary to ensure the Cookies are safe to eat. (SAC ¶ 103.) In short, Defendants "should have known[] that B&G was not violating Prop. 65 but filed suit anyway." *See B&G Foods N. Am., Inc. v. Embry*, 29 F.4th at 541. Defendants respond to these allegations by asking the Court to draw inferences in Defendants' favor and find that their pre-suit investigation was adequate contrary to B&G Foods allegations. (Mot. at 5-7, 11-12.) These arguments are improper under Rule 12(b)(6).

Defendants likewise failed to investigate whether their claims are barred by Prop 65's "cooking exception." The cooking exception provides that the NSRL calculated for any chemical will not apply "where chemicals in food are produced by cooking necessary to render the food palatable or to avoid microbiological contamination" Cal. Code Regs. Tit. 27, § 25703(b)(1). Moreover, because acrylamide only forms during the cooking process, and because it is necessary to cook cookies for them to be safe to eat, B&G Foods cannot be said to have "knowingly and intentionally" caused anyone to be exposed to acrylamide. Such language has typically been construed to mean that a statute is only "concerned with substances *added* to the environment." *See Consumer Def. Grp.*, 137 Cal.App.4th at 1214. Defendants and their "expert" knew that the acrylamide in the accused cookies was created during the cooking process, and therefore falls within an exception to Prop 65's labelling requirements. (SAC ¶¶ 118-126, 130; SAC Ex. B, (Embry Supp. Resp. RFA No. 7 ("Plaintiff understands this statement [that acrylamide may form in food when it is baked] to be true")); SAC Ex. D, (EHA Resp. RFA No. 7 (admitting "acrylamide may form in food when it is baked.")).

Defendants note that B&G Foods has asserted that the cooking exception creates a vagueness problem for Proposition 65, because it does not provide clear guidance for when a cooked product exempt from the warning requirement. (Mot. at 6-7.) Defendants' contention that whether or not a warning is required can only be determined through litigation would render the statute unconstitutional as applied, as B&G Foods previously alleged. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary

intelligence fair notice of what is prohibited . . . regulated parties should know what is required of them so they may act accordingly[.]") (internal quotes omitted) Either Defendants' lawsuits were barred as unconstitutional, or they were barred because only acrylamide that is intentionally added to the accused cookies (there is none) is considered—and not the acrylamide that forms during cooking.  In any event, Defendants did not consider what impact the cooking exception would have on their case, and thereby failed to investigate an obvious affirmative defense.

Defendants argue that the existence of an affirmative defense does not show that a case is objectively baseless. (Mot. at 11-12.) It does if the Defendants are aware, or should be aware, that the affirmative defense forecloses the action. *See B&G Foods*, 29 F.4th at 541 (alleging that Cookie Cakes unquestionably qualifies for the NSRL safe harbor, and that Defendants made no effort to investigate their claims and filed without regard to the merits would support the application of the sham exception to the *Noerr-Pennington* Doctrine).

### D.    Defendants Made False Statements in Their Complaints

A fourth reason the sham exception applies is that Defendants' complaints made misrepresentations, including  that acrylamide is "known" to the State to cause cancer (SAC ¶ 124); that Defendants filed valid certificates of merit prior to bringing suit (SAC ¶¶ 86-130); that Defendants performed an adequate pre-suit investigation (*id.*); that B&G Foods's products were not exempt from Proposition 65 under any known affirmative defenses (SAC ¶¶ 91-94); and that B&G Foods had caused Californians irreparable harm (SAC ¶¶ 124, 130.) These misrepresentations also satisfy the sham litigation rule. *B&G Foods*, 29 F.4th at 537-38.

First, Defendants are aware that California does not "know" acrylamide in foods causes cancer because it has admitted as much in a deposition. (SAC ¶¶ 126, 151, 194) Defendants likewise know that acrylamide naturally forms in food from the cooking process and therefore does not necessitate a cancer warning. (SAC ¶¶ 119-121) B&G Foods provided them with this information before they filed suit (SAC ¶ 157), and this Court and the Ninth Circuit have told them as well. Defendants filed suit and continue to prosecute their lawsuits against B&G Foods anyway.

Second, as discussed above, Defendants know that they did not provide factual support for their certificates of merit and likely never bothered to collect such information. (SAC ¶¶ 147-155.)

Third, Defendants did not adequately investigate their claims as required by Prop 65 and California law. (SAC ¶¶ 90-98.) Defendants contend, contrary to the allegations in the SAC, that they did conduct the required investigation because an IEH employee found that one serving of the accused cookies exceeds the NSRL.[2] (Mot. at 12.) This is a non-sequitur. Prop 65 requires exposure to be calculated by averaging test results across lots and time, rather than evaluating one individual exposure on the day of consumption. *See Beech-Nut Nutrition Corp.*, 235 Cal.App.4th 307, 327 (2015); Cal. Code Regs. tit. 27, § 25821.

Fourth, Defendants contend that no affirmative defense to their claims was proven because the cooking exception is vague and even after applying it the permissible level of acrylamide "would be the subject of litigation." (Mot. at 6-7.) If this were true, it would mean that Proposition 65 is void for vagueness. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). It is also beside the point: the fact is that Defendants made no effort to investigate whether the cooking exception applied before filing suit.

Fifth, Defendants claim Californians were irreparably harmed because they were not given a false warning about B&G Foods's products. (Mot. at 9.) Defendants know there is no public health benefit to a false cancer warning, and in fact such over-warning is harmful to the people of California. *See Johnson v. American Standard, Inc.*, 43 Cal.4th 56, 70 (2008) ("Requiring manufacturers to warn their products' users in all instances would place an onerous burden on them and would invite mass consumer disregard and ultimate contempt for the warning process") (quotations omitted); *Consumer Def. Grp.*, 137 Cal.App.4th at 1208 ("[a]s the Attorney General pointed out in oral argument, it does not serve the public interest to have almost the entirety of the state of California 'swamped in a sea generic warning signs.'"). B&G Foods did not violate Californian's "right to know"—rather it protected this right by resisting Defendants' efforts to pressure them into over-warning Californians of phantom health risks.

Defendants' misrepresentations were intended to make the meritless actions that they filed for the sole purpose of extracting a settlement from B&G Foods appear as if they were legitimate

---

[2] There is a fact question about whether this "expert" arrived at this conclusion prior to Defendants' serving their Notices of Violation or filing their complaints.  (SAC ¶¶ 90-97; SAC Ex. F.)

1    actions brought in accordance with a complex regulatory scheme. Such conduct constitutes sham

2    litigation. *B&G Foods*, 29 F.4th at 537-38 (intentional misrepresentations render litigation a sham.)

3        **E.     Defendants' Lawsuits Are Part of a Series of Lawsuits Filed for an Improper**
         **Purpose, Without Regard to the Merits**

4        A fifth reason why the sham litigation rule applies is that Defendants' lawsuits are part of a

5    broader pattern of misconduct that includes filing cases without regard to the merits in hopes of

6    getting a quick settlement. *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th at 541 (sham exception

7    "arises when defendant's conduct involves a series of lawsuits brought pursuant to a policy of

8    starting legal proceedings without regard to the merits' and for an unlawful purpose."). As the

9    Ninth Circuit held in this case, "[T]he question is not whether any one suit has merit—some may

10   turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting

11   legal proceedings without regard to the merits and for the purpose of injuring a market rival." *B&G*

12   *Foods*, 29 F.4th at 539. "To evaluate whether this circumstance applies, courts ask: 'Were the legal

13   filing made, not out of a genuine interest in redressing grievances, but as part of a pattern or

14   practice or successive filings undertaken essentially for purposes of harassment?'" *USS-POSCO*

15   *Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994).

16       The SAC easily satisfies this requirement because it alleges that Defendants file hundreds of

17   NOVs in hopes of extracting a settlement, many of which they never pursue. (SAC ¶ 22, 160.) It

18   further alleges that the NOVs that do result in settlements either provide illusory relief or require

19   warnings where none is needed. (SAC ¶ 130, 146, 172.) Such "shake-down" Prop 65 settlements

20   are contrary to California public policy. *Consumer Def. Grp.*, 137 Cal.App.4th at 1217-18.

21       The Attorney General has also found that Embry and Glick have attempted to enter at least

22   one settlement that was "contrary to the law, against public policy, and not enforceable." Attorney

23   General's Mar. 2, 2018, Letter re *Embry v. Earthbound Farm*, Out-of-Court Proposition 65

24   Settlement. The Attorney General objected to this settlement because (1) Defendant Embry received

25   more than 25% of the civil penalties; (2) the settlement "is not likely to result in any benefit to the

26   public," and (3) Defendant Glick's fee award was unreasonable. (SAC ¶ 183.) Defendants argue

27   that, because they have only gotten caught by the Attorney General once, the Court should infer

28

their settlements are usually legitimate. (Mot. at 15.) On a motion to dismiss, the opposite is true.

Defendants also contend they have a sufficiently high success rate to show that their cases are not shams (Mot. at 14). To begin, this "success rate" is below ten percent. Over 90% of their cases are abandoned – because, as the SAC details, they have no merit. (SAC ¶ 171.) Additionally, as the Ninth Circuit held in this case, "There is more to a sham than quantity and scale. It lawsuits are brought for an unlawful purpose . . . then those lawsuits are a sham . . . . In sum, district courts often focus on the purpose of the prior lawsuits – whether lawsuits were filed for unlawful aims – to determine whether the instant case is a sham." *B&G Foods North Am.*, 2022 WL 16702141 at *6. Here, as detailed in the SAC, even when Defendants settle a case, they do so in a manner that does not benefit the public and betrays that their suits are filed without regard to the merits and only to extract sham settlements. (SAC ¶ 130, 146, 172-173.)

### F.     Defendants' Lawsuits Knowingly Violate the First Amendment

A sixth reason why the sham litigation rule applies is that Defendants filed their lawsuits, and continue to prosecute them, despite knowing their lawsuits violate the First Amendment and its corollary in the California Constitution. As this Court held in *Calchamber*, there has been a longstanding scientific debate regarding whether acrylamide in food causes cancer in humans. As prolific filers of Proposition 65 acrylamide lawsuits, Defendants were surely aware of this controversy, including that the state had admitted it did not, in fact, "know" that acrylamide in food causes cancer in humans, before bringing their lawsuits. (SAC ¶ 194.) Defendants are likewise aware of this Court's holdings, and the Ninth Circuit's holdings, in *Calchamber*. Nonetheless, Defendants continue to prosecute their unconstitutional claims against Plaintiff because they hope to leverage settlements from Plaintiff.  (SAC ¶¶ 197-198.)

Defendants note that they asked for a stay of their state court lawsuits after this Court's decision in *Calchamber* issued. However Defendants are now seeking to lift this stay, ostensibly because OEHHA has promulgated a new regulation modifying the acrylamide warning. (Mot. at 12-13.) But the new warning would still require B&G Foods to falsely state that acrylamide causes cancer, and in any event, the brief stay and new warning do nothing to redress the injury B&G Foods has already suffered at the hands of the Defendants.

For all the above reasons, together and independently, application of the *Noerr-Pennington* Doctrine would be improper. Rather, this Court should accept B&G Foods's allegations as true and disregard Defendants' ersatz protestations that they are innocent of the conduct alleged. *In re Outlaw Law., LP Litig.*, 2019 WL 1205004, at *5 (S.D. Cal Mar. 14, 2019) ("'[C]ourts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage, where the Court must accept as true the non-moving party's well-pleaded allegations' with respect to sham litigation.").

## II.  B&G FOODS HAS PLAUSIBLY ALLEGED DEFENDANTS ARE STATE ACTORS

Courts extend § 1983 liability to private parties who (1) deprive plaintiffs of rights secured by the Constitution or federal statutes and (2) do so while acting under color of state law. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 930-31 (1982). This "is a highly factual question," requiring a careful "sifting" of the "facts and circumstances" in order "to ferret out obvious as well as non-obvious State involvement in private conduct." *Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1209 (9th Cir. 2002) (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)). "Several tests have emerged" by which courts conduct this analysis. *Brunette*, 294 F.3d at 1210. At least five of these tests independently warrant finding that Defendants act under color of state law: (1) the public function test; (2) the joint action test; and (3) the symbiotic relationship test; (4) the state compulsion test; and (5) the governmental nexus test. The Court need only find that one satisfies to deny a motion to dismiss. *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).

### A.  Defendants Perform a Public Function by Prosecuting Proposition 65 Actions

Under the public function test, a private party becomes a state actor by engaging in activity that has been "traditionally the exclusive prerogative of the State." *Brunette*, 294 F.3d at 1214. Here, Defendants act as state officials because they exercise a function that is traditionally and exclusively governmental in nature: enforcing a public health law—one concerning food labeling, no less—on behalf of the public interest.  (SAC ¶¶ 234, 254.)

Public health is a quintessential traditional governmental function. The "structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (cleaned up). Food labeling is likewise a traditional governmental

1  function. *Brazil v. Dole Food Co., Inc.*, 935 F. Supp. 2d 947, 955 (N.D. Cal. 2013) ("[L]aws

2  regulating the proper marketing of food . . . are traditionally within states' historic police powers.").

3      Defendants admit that Proposition 65 is a "quasi-criminal" "health and safety" statute, in

4  which "the Attorney General had a meaningful opportunity to investigate." (ECF 31 at 2-3; ECF

5  52-1 at 17-18.) Yet Defendants argue that their enforcement of the "quasi-criminal" Proposition 65

6  is no different from declaratory judgment suits held not to be state action in *Real Estate Bar Ass'n*

7  *For Mass, Inc. v. Nat. Real Estate Info. Servs.*, 608 F.3d 110, 122 (1st Cir. 2010). (Mot. at 6.) But in

8  that case, the statute at issue did "nothing more than grant bar associations… standing to bring suit

9  enforcing the unauthorized-practice-of-law statute" and "obtain a declaration as to legality." By

10  contrast, the "quasi-criminal" Proposition 65 deputizes "private prosecutors" with the authority to

11  both sue in the public interest *and* to "collect funds for the public treasury." *Consumer Advocacy*

12  *Group, Inc. v. Kinetsu Enter. of Am.*, 150 Cal.App.4th 953, 963 (2007). Where, as here, private

13  citizens have been empowered to enforce a public health and food labeling law on behalf of the

14  *public* interest and to collect penalties for the *public* treasury, they are performing functions that

15  traditionally and exclusively belong to the government.

16      **B.**    **Defendants Act Jointly with the Attorney General**

17      Defendants' Motion should also be denied because the "joint action" test is met. *See Lugar*,

18  457 U.S. at 941. The joint action test is satisfied where state officials and private parties act in

19  concert in causing a deprivation of constitutional rights, and "the government has so far insinuated

20  itself into a position of interdependence with a private entity that the private entity must be

21  recognized as a joint participant in the challenged activity." *Brunette*, 294 F.3d at 1210 (citation

22  omitted). As detailed in the SAC (at ¶¶ 215-237), this level of joint activity is present. Private

23  enforcers cannot commence an action until at least 60 days after the Attorney General has had the

24  opportunity to review a notice, and then only if the Attorney General has not begun prosecuting the

25  alleged violation himself. Cal. Health & Safety Code § 25249.7(d). Private enforcers cannot resolve

26  an action unless they provide a copy of a proposed settlement to the Attorney General, to provide

27  him the chance to review whether the settlement is consistent with the public interest. *Id.*

28

§ 25249.7(f). Consequently, private enforcers cannot bring or resolve actions *but for* the Attorney General acting jointly in fulfilling his statutory duties.  (SAC ¶¶ 182-184, 234(d),(f),(h).)

### C.    Private Enforcers Have a Symbiotic Relationship with the State

Plaintiffs' motion should be denied because the symbiotic relationship test is also met. The symbiotic relationship test asks whether the government has "so far insinuated itself into a position of interdependence (with a private entity) that it must be recognized as a joint participant in the challenged activity…. Often significant financial integration indicates a symbiotic relationship." *Brunette*, 294 F.3d at 1213. (citations omitted) As alleged in the Complaint, the State and private enforcers mutually profit from their prosecution of Proposition 65 claims. (Kwasniewski Decl., Ex. B (OEHHA Budget Report) (showing 13.8% to 16.6% of OEHHA funding came from Proposition 65 civil penalties from 2017 through 2020).) Not only would current jobs at OEHHA likely not exist in the absence of up to *one-sixth* of OEHHA's funding, but OEHHA's implementation of the Proposition 65 would also be seriously impaired.

Private enforcers benefit from the state's creation of a private enforcement scheme that deputizes them to collect millions in civil penalties and enforcement fees, all under the supervision of the Attorney General and the backing of the Office's "power" and "prestige." *See Brunette*, 294 F.3d at 1213. And the Attorney General benefits through the prosecution of public health enforcement actions he himself is not capable of prosecuting, which secure injunctive relief and millions of dollars of penalties each year. *Id.* This is an archetypal symbiotic relationship.

### D.    Defendants Act in Close Nexus with the Attorney General

Plaintiffs' motion should also be denied because the state compulsion test and the governmental nexus test are met. These nexus tests are typically considered in tandem. *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 995-96 (9th Cir. 2013). Under these tests a private party becomes a state actor where the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [private actor's] choice must in law be deemed to be that of the State" or where "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 995 n.13 (cleaned up).

Courts applying the state compulsion test have found that "intimate involvement" between a private party and the government is sufficient to find state action. *See Tulsa Prof. Collection Serv., Inc. v. Pope*, 485 U.S. 478, 487 (1988). Here, the Attorney General makes private enforcement of Proposition 65 possible by fulfilling his statutory duty of reviewing 60-day notices and proposed settlements. While the Defendants observe that the State's provision of a monetary award does not qualify as significant encouragement (Mot. at 10), Proposition 65's civil penalties are not simply money awards. Rather, they are penalties (not damages) collected by "private prosecutors" (who need not have been harmed) to enforce a public health law on behalf of the public interest. On top of making private enforcement possible and allocating penalties to private enforcers, the Attorney General *encourages* private enforcers to enforce Proposition 65.  (SAC ¶ 223.)

The same reasons the joint action test is satisfied warrant finding a sufficiently close nexus between the State and private enforcers such that the actions of private enforcers "may be fairly treated as that of the State itself." *Naoko Ohno*, 723 F.3d at 995 n.13 (citation omitted). Defendants contend the Attorney General cannot block private actions he believes are meritless or block settlements he believes are improper. But the Attorney General is obligated to review Notices of Violation and settlements; and private enforcers who proceed after receiving a no-merits letter proceed at the risk of sanctions, Cal. Health & Safety Code § 25249.7(h)(2), and the Defendants in this very case, like virtually all other private enforcers, heed the Attorney General's recommendations including by rescinding settlements to which he has objected. (SAC ¶¶ 182-184, 234(f).) Defendants' contention (Mot. at 9) that, in enforcing these procedural safeguards, the Attorney General may become an adverse party to private enforcers, thus falls flat. Proposition 65 was designed to facilitate the State's *duty* to enforce laws "controlling hazardous chemicals." The procedural safeguards imposed on Defendants ensure that, when the State delegates this duty to private enforcers, it still retains control over how they exercise it. That control, detailed in the SAC (¶¶ 215–237), is fatal to Defendants' motion.

### CONCLUSION

For the foregoing reasons, B&G Foods respectfully requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint.

Dated:  February 16, 2023

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By:  /s/ David H. Kwasniewski
　　　　David H. Kwasniewski

*Attorneys for Plaintiff*
*B&G Foods North America, Inc.*