# EXHIBIT 1

Document comparison by Workshare 10.0 on Tuesday, February 21, 2023
1:09:37 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\ridge\Desktop\Compare\2022-07-07- First Amended Complaint_updated.docx |
| Description | 2022-07-07- First Amended Complaint_updated |
| Document 2 ID | file://C:\Users\ridge\Desktop\Compare\2022-11-23 - Second Amended Complaint.docx |
| Description | 2022-11-23 - Second Amended Complaint |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 522 |
| Deletions | 410 |
| Moved from | 76 |
| Moved to | 76 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1084 |

J. Noah Hagey, Esq. (SBN: 262331)
   hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
   borden@braunhagey.com
Forrest A. Hainline III, Esq. (SBN 64166)
   hainline@braunhagey.com
David H.  Kwasniewski, Esq. (SBN: 281985)
   kwasniewski@braunhagey.com
Robert Petraglia, Esq. (SBN: 264849)

   ~~petraglia@braunhagey.com~~petraglia@braunhagey.com.m

BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 599-0210

ATTORNEYS FOR PLAINTIFF
B&G FOODS NORTH AMERICA, INC.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&G FOODS NORTH AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KIM EMBRY and ENVIRONMENTAL HEALTH ADVOCATES, INC., acting as enforcement representatives under California Proposition 65 on behalf of the State of California,<br><br>Defendants. | Case No.  2:20-cv-00526-KJM-DB<br><br>**~~FIRST~~SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff B&G Foods North America, Inc. ("Plaintiff" or "B&G Foods") brings this action for injunctive relief, damages, and declaratory relief under 42 U.S.C. § 1983 and the First and Fourteenth Amendment of the U.S. Constitution against supposed Proposition 65 enforcement representatives of the State of California, and alleges as follows:

**PRELIMINARY STATEMENT**

1.  B&G Foods brings this action to remedy sham litigation filed against it by Kim Embry and Environmental Health Advocates (collectively, "Defendants"). Defendants sued B&G Foods to force it to falsely label Snackwell's Devil's Food Cookie Cakes and Chocolate Crème Sandwich Cookies (collectively, the "Cookies") as causing cancer. The basis for Defendants' lawsuits is that the Cookies contain acrylamide, a chemical naturally present in many foods, including all cookies and baked goods. Defendants claim acrylamide is known to the State of California to cause cancer; but acrylamide does not cause cancer. The State of California knows this, and so do Defendants. Defendants' lawsuits are not protected petitioning activity but a sham intended to enrich themselves and their lawyers.

2.  As the Ninth Circuit held in this case, Defendants' lawsuits may be a sham if they "made no effort to investigate their claims and filed without regard to the merits;" or if "Defendants threatened and filed suit because they wanted to improperly pressure B&G into settling, not because they believed that they could achieve their objective based on the merits" or their lawsuits are predicated on "fraud upon, or intentional misrepresentations to[] the court." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 538, 541–42 (9th Cir. 2022). In accordance with the Ninth Circuit's ruling, B&G Foods in this complaint sets forth detailed allegations showing that Defendants' lawsuits are a sham for at least the following reasons:

    a.  Defendants intentionally and willfully spoliated the evidence of the testing that supposedly shows the Cookies contain acrylamide;

    b.  Defendants' lawsuits are based on false and/or fraudulent certificates of merit;

c.      Defendants failed to adequately investigate their claims before filing suit, including by falsely stating they conducted expert analysis to support their claims when discovery in the underlying lawsuits revealed that to be untrue;

d.      Defendants made false statements to the courts in their complaints;

e.      Defendants know that the Cookies do not cause cancer and that there would be no public benefit in requiring the Cookies to carry a false cancer warning;

f.      Defendants' lawsuits are part of a pattern of sham Proposition 65 lawsuits manufactured by Defendants' lawyers and which are filed and settled without regard to the public interest, including by bringing claims based on bogus test results obtained from out-of-state labs that Defendants know use improper testing procedures and destroy products after testing to prevent challenges to their testing methodology or accuracy; and

g.      Defendants knew or reasonably should have known that their lawsuits violated the First Amendment to the United States Constitution, as this Court held in *California Chamber of Commerce v. Becerra*, 529 F. Supp. 3d 1099 (E.D. Cal. 2021), *aff'd* 29 F.4th 468 (9th Cir. 2022), *pet. for r'hg denied*, 51 F.4th 1182 (2022) ("*Calchamber*"); and

h.      Defendants' lawsuits in fact violated the First Amendment to the United States Constitution; and

i.      Defendants' lawsuits also violated the California Constitution.

3.      Defendants lawsuits are no ordinary state-court claims, or even typical of Proposition 65 litigation. They are sham suits manufactured by Defendants' lawyers to extort businesses, predicated on the destruction of evidence, misrepresentations to the court, and junk science. These facts, and the facts alleged below, establish that Defendants' lawsuits are a sham. Because Defendants' lawsuits are shams, B&G Foods has a remedy under Title 42, Section 1983 of the United States Code for damages, injunctive, and declaratory relief. *B&G Foods N. Am., Inc.*, 29 F.4th 527, 538, 541–42 (9th Cir. 2022) (reversing this Court for dismissing B&G Foods's prior complaint without leave to amend when there were additional factual allegations which could be added to show Defendants' lawsuits are a sham).

**PARTIES**

4.   Plaintiff B&G Foods North America, Inc. dates back to 1889, when two immigrant families, the Blochs and Guggenheimers, started a business selling pickles in Manhattan.

5.   Today, Plaintiff carries on their legacy by selling a variety of high-quality frozen and shelf-stable foods throughout the country, including the Cookie Cakes and Sandwich Cookies sold under the SNACKWELL'S® brand.

6.   Plaintiff is a Delaware corporation with its headquarters in Parsippany, New Jersey.

7.   1. Plaintiff B&G Foods sold and distributed devil's food cookie cakes (the "Cookie Cakes") and chocolate crème sandwich cookies ("Sandwich Cookies") around the country.

8.   2. Plaintiff's Cookie Cakes were reduced fat chocolate cookies with marshmallow and fudge coating, and its Sandwich Cookies were reduced fat chocolate crème sandwiches made with two chocolate cookies.  They were sold nationwide and in California and included products sold under the SNACKWELL'S® brand:





3

FIRST SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    9.    3. The interior cookie portion of the Cookie Cakes and the exterior chocolate

2    cookies of the Sandwich Cookies were baked, just like any other cookie.  Otherwise, they would

3    have been an unpalatable mess of sugar, flour, and chocolate.  Baked foods like cookies, cakes, and

4    crackers contain trace amounts of a substance called acrylamide, which inevitably forms during the

5    baking process.

6    10.    4. California's Office of Environmental Health Hazard Assessment ("OEHHA")

7    added acrylamide to its list of "known" carcinogens subject to regulation under California's

8    Proposition 65 in 1990.  The initial Proposition 65 listing was premised on potential exposures to

9    acrylamide in industrial settings.  At that time, it was not known that acrylamide was present in

10   cooked foods.  In fact, acrylamide was not detected in foods until 2002.

11   11.    5. The state has acknowledged that acrylamide in food does not cause cancer, or any

12   other harm.  Defendants still, however, seek to compel companies like B&G Foods to label their

13   baked goods with a bold disclaimer that they "contain a chemical known to the State of California

14   to cause cancer" due to the presence of this naturally occurring acrylamide:

15
16          WARNING: Consuming this product can expose you to
             [Acrylamide], which is known to the State of California to cause
             cancer.  For more information, go to www.P65Warnings.ca.gov/food.
17   27 Cal. Code Regs § 25607.2(a)(2).

18   6.    Defendants Kim Embry and Environmental Health Advocates Inc. ("EHA") are

19   serial enforcement agents under California's Proposition 65 regime who, with the assistance and

20   supervision of the State, threatened to prosecute litigation against Plaintiff unless all the Cookie

21   Cakes and Sandwich Cookies labels were changed to include a false cancer warning.

22   7.    Defendants have continued to prosecute lawsuits against B&G Foods even though

23   this Court held in *California Chamber of Commerce v. Becerra*, 529 F. Supp. 3d 1099 (E.D. Cal.

24   2021), *aff'd* 29 4th 468 (9th Cir. 2022) ("*Calchamber*"), Defendants' allegations are false and

25   unconstitutional, and that the state does not, in fact "know" acrylamide causes cancer.

26   8.    Both Ms. Embry and EHA acknowledge that the final injunction that will be entered

27   in *Calchamber* will be dispositive of their cases, and consequently both requested that their cases

28   be stayed.

4

1    9.    Defendants, however, have not dismissed their claims.

2    10.    The lawsuits that Defendants have brought against B&G Foods are shams.  They are

3    not based on any good-faith investigation into the facts alleged, or a good-faith application of

4    Proposition 65.  Defendants' lawsuits were filed solely to extort money from B&G Foods.

5    Defendants file these lawsuits as part of a policy and practice of bringing Proposition 65

6    enforcement actions without regard to their merits.  Moreover, these lawsuits are predicated on

7    misrepresentations to the Court, including the misrepresentation that acrylamide that forms

8    naturally during the cooking process is a known carcinogen.

9    11.    Defendants' attempt to compel B&G Foods to make false statements about its own

10   products violates B&G Foods's First and Fourteenth Amendment rights.

11   12.    Plaintiff accordingly seeks protection from these violations of its constitutional

12   rights pursuant to Section 1983 of Title 42 of the United States Code and seeks injunctive and other

13   relief.

14

15   **PARTIES**

15   13.    Plaintiff B&G Foods North America, Inc. dates back to 1889, when two immigrant

16   families, the Blochs and Guggenheimers, started a business selling pickles in Manhattan.

17   14.    Today, Plaintiff carries on their legacy by selling a variety of high-quality frozen and

18   shelf-stable foods throughout the country, including the Cookie Cakes and Sandwich Cookies sold

19   under the SNACKWELL'S® brand.

20   15.    Plaintiff is a Delaware corporation with its headquarters in Parsippany, New Jersey.

21   12.    16. Defendant Kim Embry is a serial Proposition 65 litigant who seeks to act on

22   behalf of the State of California in suing and threatening to sue dozens of businesses based on the

23   alleged presence of acrylamide in their products.

24   13.    17. She bringsEmbry purports to bring these suits in the "interest of the general

25   public" of the State of California.

26   14.    18. On information and belief, Ms. Embry is a citizen of California who directly and

27   indirectly consults with the State and its representatives to initiate Proposition 65 actions, including

28   against Plaintiff.

FIRSTSECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1      15.   19. SheEmbry has been represented by the same attorney—Noam Glick—in each of

2   the several hundredhundreds of Proposition 65 lawsuits she has filed.

3      16.   20. SheEmbry has previously testified that she does not purchase, consume, or have

4   any knowledge of the products on which her lawsuits are based, is unfamiliar with the scientific

5   evidence regarding acrylamide's health effects, and functions as nothing more than a shill for her

6   lawyer to file Proposition 65 lawsuits.

7      17.   21. Defendant EHA is, upon information and belief, a California Corporation

8   created by Noam Glick so that he may file even more Proposition 65 lawsuits.

9      18.   22. Like Defendant Embry, Defendant EHA seeks to act on behalf of the State of

10   California in suing and threatening to sue dozens of businesses based on the alleged presence of

11   acrylamide in their products.

12      19.   23. EHA has also admitted it does not conduct a reasonable pre-suit investigation

13   prior to bringing Proposition 65 actions.

14      20.   Ms. Embry and EHA have admitted to destroying evidence.

15      21.   24. Ms. Embry and EHA share a business model.  They bring serial, meritless,

16   "shake-down" actions in the hopes that some small percentage will settle for fees and penalties they

17   share with the State.

18      22.   25. Both Ms. Embry and EHA have filed hundreds of notices of Proposition 65

19   violations ("NOV"), but only a small percentage of these NOVs result in any form of settlement or

20   judgment.

21      23.   26. In all of these actions, Ms. Embry and EHA were simply shills used by their

22   attorney, Noam Glick.[1]

23      27.   Ms. Embry and EHA have admitted to destroying evidence and filing lawsuits

24   without any investigation into the truth of their allegations.

25

26   _____

[1] Mr. Glick was dismissed from this case with prejudice by the Court on October 7, 2020;
27   however, the Ninth Circuit reversed that portion of the opinion dismissing the Complaint without
leave to amend.  *See B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 542 (9th Cir. 2022).  Mr. Gl
28   ick has not been named in the amended complaint and is thereforehas been dismissed from this act
ion without prejudice.

FIRSTSECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

24. ~~28.~~ Defendants Embry and EHA have extracted millions of dollars in penalties and fines from food companies through frivolous acrylamide suits.

25. Defendants have continued to prosecute lawsuits against B&G Foods even though this Court held in *California Chamber of Commerce v. Becerra*, 529 F. Supp. 3d 1099 (E.D. Cal. 2021), *aff'd* 29 4th 468 (9th Cir. 2022) ("*Calchamber*"), Defendants' allegations are false and unconstitutional, and that the state does not, in fact "know" acrylamide causes cancer.

26. Both Ms. Embry and EHA acknowledge that the final injunction that will be entered in *Calchamber* will be dispositive of their cases, and consequently both requested that their cases be stayed.

27. ~~29.~~ Defendants' business model is pernicious and operates through the regulation, encouragement, and self-interest of the State.  After testing products, Defendants are enabled by the State to threaten to file suit unless the products' manufacturer or retailer pays a massive penalty or agrees to change its label to warn consumers that the product contains substances "known" to cause cancer.

28. ~~30.~~ The State permits Defendants to file suit against products containing modest, trace amounts of substances even if they pose no possible health effect.  This includes substances like acrylamide that arise naturally~~, for example,~~ when ~~baking a cookie~~starches are baked, as in breads and cookies.

29. ~~31.~~ The resulting penalties and fines collected by Defendants Embry and EHA and the State do nothing to improve public safety~~and.  They~~ serve only to enrich lawyers and their accomplices.  Still, the State continues to allow and encourage its representatives—including Ms. Embry and EHA—to threaten food companies with unconstitutional speech requirements lest they not pay a sizable penalty to the enforcer and the State.

## JURISDICTION AND VENUE

30. ~~32.~~ This Court has federal question subject matter jurisdiction under Title 28, Section 1331 of the United States Code, which confers original jurisdiction on the federal district courts over actions arising under the Constitutions or laws of the United States.  Federal courts, including this judicial district, have assumed jurisdiction over similar federal constitutional

7

1 | challenges to the enforcement of Proposition 65. *See, e.g.*, *Nat'l Ass'n of Wheat Growers v. Zeise*,

2 | 309 F. Supp. 3d 842 (E.D. Cal. 2018).

3 |    31. ~~33.~~ Alternatively, should Defendants somehow be deemed non-state actors, then

4 | subject matter jurisdiction exists under Title 28, Section 1332 of the United States Code, which

5 | confers original jurisdiction on federal district courts over actions between private citizens of

6 | different states where the amount in controversy exceeds $75,000.

7 |    32. ~~34.~~ Venue is proper under Title 28, Section 1391(b)(b)(2) because a substantial part

8 | of the events giving rise to Plaintiff's claims occurred in this district.

9 | **FACTS**

10 | **I.    ACRYLAMIDE IN B&G FOODS'S PRODUCTS DOES NOT CAUSE CANCER.**

11 |    33. ~~35.~~ Plaintiff's ~~Cookie Cakes and Sandwich~~ Cookies have never caused cancer in

12 | people and Defendants have no evidence to the contrary. ~~36.~~ Nor is the alleged amount of

13 | acrylamide in Plaintiff's ~~Cookie Cakes or Sandwich~~ Cookies known to cause cancer in humans.

14 | The State of California has admitted it does not know that acrylamide causes cancer. Because

15 | Defendants' lawsuits are all predicated on the false notion that Plaintiff's Cookies cause cancer,

16 | they are a sham and violate B&G Foods's First Amendment rights.

17 |    **A.    Acrylamide ~~is~~ Is Naturally Created During ~~the~~ The Baking Process.**

18 |    34. ~~37.~~ Plaintiff has never added acrylamide to its products, which according to the FDA

19 | has likely "always been present in cooked foods." Virtually every cookie or bread product on Earth

20 | that is baked has acrylamide in it.

21 |    35. ~~38.~~ Acrylamide forms during a chemical reaction, known as the Maillard reaction

22 | and arises when food is baked, roasted, grilled or fried.

23 |    36. ~~39.~~ Acrylamide is created when sugars such as glucose or fructose react with a

24 | naturally occurring free amino acid, asparagine.

25 |    37. ~~40.~~ Acrylamide also naturally forms in uncooked foods such as nuts. *See* OEHHA,

26 | *Acrylamide Fact Sheet* (Feb. 2019), https://www.p65warnings.ca.gov/sites/default/files/downloads/

27 | factsheets/acrylamide_fact_sheet.pdf.

28 |

38.   41. Acrylamide is created when cooking at home, whether in the oven, on the grill or in the skillet.  *See, e.g.*, Letter from Lester M. Crawford, DVM, Ph.D, Deputy Commissioner, FDA, to Joan E. Denton, M.S., Ph.D, Director, OEHHA (July 13, 2003).

39.   42. The State recognizes that the substance is widespread in ordinary products like breakfast cereals, roasted coffee, crackers, bread crusts, roasted asparagus, French fries, potato chips, canned sweet potatoes, canned black olives, roasted nuts, and toast.

**B.    There Is No Evidence ~~that~~That Acrylamide Created During ~~the~~The Baking Process    Causes Cancer.**

40.   43. The federal government has studied acrylamide and does not recommend avoiding foods that contain the substance.

41.   44. Rather, many of the foods consumers are encouraged to eat by the FDA, such as nuts, grains and other foods, contain acrylamide.

42.   45. Most scientists, including European and U.S. government scientists, agree that acrylamide in food does not cause cancer in humans.

43.   46. The National Cancer Institute ("NCI"), the federal government's principal agency for cancer research and training, states that "a large number of epidemiologic studies (both case-control and cohort studies) in humans have found no consistent evidence that dietary acrylamide exposure is associated with the risk of any type of cancer." NCI, *Acrylamide and Cancer Risk* (Dec. 5, 2017), https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/acrylamide-fact-sheet.

44.   47. The American Cancer Society recently has re-confirmed its review of epidemiological studies which "***show that dietary acrylamide isn't likely to be related to risk for most common types of cancer.***"  American Cancer Society, *Acrylamide and Cancer Risk* (Feb. 11, 2019), https://www.cancer.org/cancer/cancer-causes/acrylamide.html (emphasis added).

45.   48. The American Cancer Society further states that it has no idea whether acrylamide increases cancer risk, stating that it is "not yet clear if the levels of acrylamide in foods raise cancer risk …." *Id.*

9

1   46.   49. In a 2012 systematic review published in the European Journal of Cancer

2   Prevention, researchers found "no consistent or credible evidence that dietary acrylamide increases

3   the risk of any type of cancer in humans, either overall or among nonsmokers":

>   After an extensive examination of the published literature, we found
>   no consistent or credible evidence that dietary acrylamide increases
>   the risk of any type of cancer in humans, either overall or among
>   nonsmokers.  In particular, the collective evidence suggests that a
>   high level of dietary acrylamide intake is not a risk factor for breast,
>   endometrial, or ovarian cancers ….
>
>   In conclusion, epidemiologic studies of dietary acrylamide intake
>   have failed to demonstrate an increased risk of cancer.  In fact, the
>   sporadically and slightly increased and decreased risk ratios reported
>   in more than two dozen papers examined in this review strongly
>   suggest the pattern one would expect to find for a true null
>   association over the course of a series of trials.

11   L. Lipworth, et al., *Review of Epidemiologic Studies of Dietary Acrylamide Intake and the Risk of*

12   *Cancer*, EUROPEAN J.  OF CANCER PREVENTION, Vol.  21(4):375-86 (2012); *see also* C. Pelucchi,

13   et al., *Dietary Acrylamide & Cancer Risk: An Updated Meta-Analysis*, INT'L J.  OF CANCER, Vol.

14   136(12):2912—22 (2015) ("This systematic review and meta-analysis of epidemiological studies

15   indicates that dietary acrylamide is not related to the risk of most common cancers."); A. Kotemori,

16   et al., *Dietary Acrylamide Intake and Risk of Breast Cancer: the Japan Public Health Center-Based*

17   *Prospective Study*, CANCER SCIENCE, Vol. 109(3):843-53 (2018) ("In conclusion, dietary

18   acrylamide intake was not associated with the risk of breast cancer in this population-based

19   prospective cohort study of Japanese women."); M. McCullough, et al., *Dietary Acrylamide Is Not*

20   *Associated with Renal Cell Cancer Risk in the CPS-II Nutrition Cohort, Cancer Epidemiology*,

21   BIOMARKERS & PREVENTION, Vol. 28(3):616-619 (2019) ("In conclusion, we found no evidence

22   that greater dietary acrylamide intake was associated with risk of RCC [renal cell carcinoma]."); J.

23   Hogervorst, et al., *Interaction Between Dietary Acrylamide Intake and Genetic Variants for*

24   *Estrogen Receptor-Positive Breast Cancer Risk*, EUROPEAN J. OF NUTRITION, Vol. 58:1033-1045

25   (2019) ("This study did not provide evidence for a positive association between acrylamide intake

26   and ER+ [estrogen receptor-positive] breast cancer risk.  If anything, acrylamide was associated

27   with a decreased ER+ breast cancer risk.").

28

47. 50. In fact, studies have shown that certain foods that contain acrylamide likely reduce the risk of cancer in humans.

48. 51. For example, in June 2018, the International Agency for Research on Cancer ("IARC") concluded that there is an "inverse association" between drinking coffee (which contains acrylamide) and certain types of cancer.  IARC, *Monographs on the Evaluation of Carcinogenic Risks to Humans, Drinking Coffee, Mate, and Very Hot Beverages*, Vol.  116 at 434 (2018).

49. 52. Likewise, a recent study showed that whole-grain foods may reduce the risk of liver cancer.  AMERICAN CANCER SOCIETY, *Study Ties Whole Grains to Lower Risk of Liver Cancer* (Feb. 27, 2019), https://www.cancer.org/latest-news/study-ties-whole-grains-to-lower-risk-of-liver-cancer.html.

50. 53. The sole basis for California's Proposition 65 warning requirement for acrylamide are laboratory studies in which pure acrylamide was given to rats or mice.

51. 54. As NCI has explained, however, "toxicology studies have shown that humans and rodents not only absorb acrylamide at different rates, they metabolize it differently as well." NCI, *Acrylamide and Cancer Risk* (Updated Dec. 5, 2017), https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/acrylamide-fact-sheet.

52. 55. Both Neither the Environmental Protection Agency ("EPA") and IARC have not classified acrylamide as a probable carcinogen based on studies in humans.

53. 56. In its most recent assessment of acrylamide, for example, IARC concluded in 1994 that there was "*inadequate evidence* in humans for the carcinogenicity of acrylamide."  IARC, *Monographs on the Identification of Carcinogenic Risks to Humans, Some Industrial Chemicals*, Vol. 60 at 425 (Feb. 1994), https://monographs.iarc.fr/wp-content/uploads/2018/06/mono60.pdf.

54. 57. Similarly, in its most recent toxicological review of acrylamide in 2010, EPA explained that human studies assessing the carcinogenicity of acrylamide (including studies of both dietary and industrial exposures) "are judged as providing limited or no evidence of carcinogenicity in humans."  EPA, *Toxicological Review of Acrylamide*, 167 (March 2010), https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0286tr.pdf.

FIRST SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**C.** **The State Has Acknowledged** ~~that~~**That** **Acrylamide** ~~in~~**In** **Food Does Not Cause Cancer.**

<u>55.</u> ~~58.~~ The State of California also has admitted under oath that, despite listing acrylamide as a dangerous chemical, it has no knowledge of that fact.

<u>56.</u> ~~59.~~ OEHHA conceded in 2007 that acrylamide is not actually known to cause cancer in humans.

<u>57.</u> ~~60.~~ Specifically, Martha Sandy, now the Branch Chief of OEHHA's Reproductive and Cancer Hazard Assessment Branch, was designated as OEHHA's "Person Most Knowledgeable" in an action involving acrylamide.  *See* Cal. Code Civ. P. § 2025.230.  Ms. Sandy testified that: (a) she was not aware of any governmental health organization listing acrylamide as a known human carcinogen, (b) she was not aware of any pharmacodynamic data regarding rats and humans and acrylamide, and (c) OEHHA did not actually "know" that acrylamide was a human carcinogen.

<u>58.</u> ~~61.~~ OEHHA also has recognized that acrylamide in certain food products ~~—~~ <u>—</u> namely, coffee ~~—~~ <u>—</u> does not increase human cancer risk.

<u>59.</u> ~~62.~~ In particular, in June 2019, OEHHA adopted a new regulation that states: "Exposures to chemicals in coffee, listed on or before March 15, 2019 as known to the state to cause cancer, that are created by and inherent in the processes of roasting coffee beans or brewing coffee do not pose a significant risk of cancer."  27 Cal. Code Regs. § 25704 (effective Oct. 1, 2019).

<u>60.</u> ~~63.~~ In adopting this regulation, OEHHA explained that "[t]he weight of the evidence from the very large number of studies in the scientific literature does not support an association between the complex mixture of chemicals that is coffee [including acrylamide] and significant risk of cancer to the average consumer."  OEHHA, *Final Statement of Reasons, Adoption of New Section 25704 Exposures to Listed Chemicals in Coffee Posing No Significant Risk* (June 7, 2019), <u>https://oehha.ca.gov/media/downloads/crnr/fsorcoffee060719.pdf</u>.

<u>61.</u> ~~64.~~ In sum, Defendants and the State have no evidence that acrylamide in the Cookie Cakes or Sandwich Cookies is harmful to anyone.

12

**D.      The Warning Defendants Require Would Be False.**

62.      Despite the overwhelming evidence that acrylamide in food does not cause cancer and despite the pendency of a serious challenge to the constitutionality of Proposition 65 acrylamide lawsuits in *Calchamber*, on April 22, 2019, Defendant Embry notified the State and Plaintiff that she intended to require Plaintiff to place a warning label on the Cookie Cakes telling consumers that the products "cause cancer."

63.      The State did not object to Embry's Notice of Violation or seek to curtail or limit it.

64.      Ms. Embry's Notice of Violation seeks relief on behalf of the "Public" of California and pursuant to the State's regulations and enforcement guidelines discussed above.

65.      On October 8, 2020, despite the overwhelming evidence that acrylamide in food does not cause cancer and despite the pendency of *Calchamber*, Defendant EHA notified the State and Plaintiff that it intended to require Plaintiff to place a warning label on all Sandwich Cookies to tell consumers that the products "cause cancer."

66.      The State did not object to EHA's Notice of Violation or seek to curtail or limit it.

67.      EHA's Notice of Violation also seeks relief on behalf of the "Public" of California and pursuant to the State's regulations and enforcement guidelines discussed above.

68.      On March 6, 2020, Kim Embry sued B&G Foods.  Her lawsuit seeks to compel B&G Foods to label its Cookie Cakes with a warning that they contain a chemical "known" to the state to cause cancer.

69.      On January 22, 2021, EHA sued B&G Foods.  The lawsuit seeks to compel B&G Foods to label its Sandwich Cookies with a warning that they contain a chemical known to the state to cause cancer.

II.      ~~COMPELLING B&G FOODS TO CLAIM ITS PRODUCTS CAUSE CANCER VIOLATES ITS FIRST AMENDMENT RIGHTS.~~**DEFENDANTS' LAWSUIT IS AN UNPROTECTED SHAM THAT MAY BE REMEDIED THOUGH A SECTION 1983 ACTION**

70.      Defendants have relied upon the *Noerr-Pennington* doctrine to protect their extortionate practices. But their lawsuits are a sham and not protected by *Noerr-Pennington* for at least nine reasons: (a) Defendants spoliated evidence; (b) Defendants' lawsuits are based on false

13

and/or fraudulent certificates of merit; (c) Defendants failed to adequately investigate their claims before filing suit; (d) Defendants made false statements to the courts in their complaints;(e) Defendants know that the Cookies do not cause cancer and there would be no public benefit in requiring the Cookies to carry a false cancer warning; (f) Defendants' lawsuits are part of a pattern of sham Proposition 65 lawsuits manufactured by Defendants' lawyers and which are filed and settled without regard to the public interest; (g) Defendants knowingly filed their lawsuits, and continue to prosecute them, despite the fact they violate the First Amendment to the United States Constitution.

71.     The *Noerr-Pennington* doctrine derives from the Petition Clause of the First Amendment and provides that those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. The Ninth Circuit has held that the *Noerr-Pennington* doctrine can be applied to state actors.  The Ninth Circuit also acknowledges, however, that neither the Petition Clause nor the *Noerr-Pennington* doctrine protect sham petitions.

72.     Immunity is not extended to conduct that, although ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor, or to otherwise abuse the publicity/lobbying process. The sham exception to the *Noerr-Pennington* Doctrine applies to litigation in three circumstances:  "first, where the lawsuit is objectively baseless and defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose; third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy" *B&G Foods N. Am. v. Embry*, 29 F.4th 527, 537–38 (9th Cir. 2022), *cert. denied*, No. 22-83, 2022 WL 4654543 (U.S. Oct. 3, 2022).

73.     These three circumstances are simply three ways in which litigation might be a sham because it lacks legitimacy.

74. Defendants' litigation against B&G Foods is a sham for all of these reasons, and because Defendants conduct deprives their lawsuits of legitimacy.

**A. Defendants Spoliated The Only Evidence Supporting Their Claims.**

75. Defendants intentionally and willfully destroyed the only products they tested to support their claims, thereby preventing B&G Foods from retesting the products to determine if Plaintiff's results were adequate. Spoliation of evidence warrants a finding that third sham exception applies. *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 647 (9th Cir. 2009) (finding that spoliation of evidence was tantamount to fraud upon the court).

76. Defendants spoliated evidence by testing their products at an out-of-state laboratory that uses non-standard testing procedures (including the destruction of all samples immediately after testing). On information and belief, Defendants' chosen laboratory, IEH routinely uses improper or unreliable testing methodologies to produce skewed results showing unusually high levels of acrylamide are present in foods. B&G Foods' own testing showed that the acrylamide levels in the Cookies were an order of magnitude lower and, crucially, below the NSRL. Defendants' spoliation prevents B&G Foods from ever uncovering how Defendants tested the products or if the testing was accurate or reliable. Under California state law, such spoliation warrants terminating sanctions. *Williams v. Russ*, 167 Cal. App. 4th 1215, 1223 (2008).

77. B&G Foods learned of Defendants' spoliation when it attempted to subpoena Defendants' laboratory. On February 16, 2021, B&G Foods served IEH with a subpoena for records relating to its testing of the Cookie Cakes on behalf of Ms. Embry and the accuracy of its testing methodology.

78. On March 30, 2021, IEH responded to the subpoena by producing some documents regarding its acrylamide testing protocols, and a letter noting that it was withholding all other responsive documents based on an objection interposed by Ms. Embry that the requested documents were "consumer records."

79. On April 1, 2021, B&G Foods asked IEH if it had retained any of the Cookie Cakes it tested.

80.    IEH stated that it had destroyed the samples at Ms. Embry's instruction on or about 30 days after it tested the sample—approximately May 4, 2019, after Plaintiff initiated the litigation by filing her April 19, 2019, Notice of Violation. Ex. J, Decl. of David Kwasniewski in support of mot. for terminating sanctions (April 30, 2021), Exhibit 4, Case No. RG20057491.

81.    B&G Foods requested that Ms. Embry dismiss her claim, given the evidence upon which she based her entire lawsuit had been destroyed after commencement of the action.

82.    Ms. Embry declined to do so, admitting that the spoliation was intentional and, indeed that it was her practice to spoliate the product samples in every Proposition 65 case she brought.

83.    Ms. Embry demanded B&G Foods pay her $500,000 in exchange for a dismissal. *Id.*, Exhibit 7.

84.    When B&G Foods did not pay, Ms. Embry moved to stay the case.

85.    Defendants' conduct prevents B&G Foods from testing the validity of the spurious test results Defendants purport to rely upon.

**B.    Defendants Made False Statements In Their Certificates Of Merit.**

86.    Defendants' lawsuits are shams for the separate and independent reason that they are based on certificates of merit which are either fraudulent or false. Proposition 65 requires that, prior to filing suit, private enforcers submit certificates of merit to the State attesting, under oath, that they have conducted reasonable and good faith investigation into their claims and determined that a Proposition 65 violation occurred. While Defendants submitted certificates of merit, they do not reflect any such investigation, are inconsistent with Defendants' prior statements in discovery, and indeed appear to have been manufactured to avoid a finding of sham litigation in this case.

87.    Defendants had a statutory duty to produce certificates of merit attesting that the signatory "has consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the exposure to the listed chemical" when they served their notices of violation.  Cal. Health & Safety Code § 25249.7(d)(1).

88.    The certificates of merit submitted by Defendants contained false statements.

~~FIRST~~SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

89.     In this case Embry submitted a pro-forma certificate of merit on April 22, 2019, and an "amended" notice of violation with an updated certificate of merit attached on July 27, 2022, after it had sued B&G Foods and shortly before it filed its motion to dismiss in this case.

90.     The amended certificate of merit included the apparent basis for Ms. Embry's claims—a brief letter from John Meeker, an employee of the lab that provides Defendants and other Proposition 65 enforcers with test results, which stated a single sample of the Cookie Cakes contained a high level of acrylamide.  The report is heavily redacted, so it is unclear if the results of other tests of the Cookie Cakes returned different results.

91.     This supposed expert admitted that acrylamide is caused by cooking, which would provide Plaintiff with an affirmative defense to this action.  Cal. Code Regs. Tit. 27, § 25703(b)(1).

92.     Embry also admitted in discovery that the acrylamide in cookies is the result of cooking.

93.     Therefore, Embry and her attorneys were aware that Plaintiff had an affirmative defense that would defeat the action.

94.     Yet Embry's certificates of merit, signed by Noam Glick, claims that his pre-suit investigation did not prove any affirmative defense. That statement was false.

95.     EHA also submitted a pro-forma certificate of merit on October 8, 2020, and an amended certificate of merit after it had commenced this litigation on July 27, 2022.

96.     Again Noam Glick attested that he "consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the exposure to the listed chemical that is the subject of the action, and that, based on that information, the person executing the certificate believes there is a reasonable and meritorious case for the private action."  Cal. Health and Safety Code § 25249.7(d)(1).  The certificate of merit must be served on the Attorney General.  Id.

97.     This statement was false, as EHA admitted that it had not obtained a written statement or interviewed any person about its claims, and that no person—including any expert—had prepared a report pertaining to its claims.  EHA stated that, at least as of March 23,

1  2021, no report had been made concerning the subject matter of this case.  Ex. F, EHA Resp. Form

2  Int. No. 12.6.

3       98.    EHA's amended certificate of merit, submitted on July 27, 2022 and after EHA had

4  denied ever consulting with any expert in its discovery responses also included a letter from John

5  Meeker, however this time his opinion was based on a single test result from another lab.

6       99.    Again, Meeker acknowledged that acrylamide is the result of cooking—and

7  therefore that Plaintiff had an affirmative defense that would defeat the action.

8       100.   Nonetheless, Noam Glick certified that his presuit investigation did not prove any

9  affirmative defense.

10      101.   While Proposition 65 enforcers do not need to independently determine whether a

11  listed chemical causes cancer, they are obligated to investigate whether statutory affirmative

12  defenses defeat their claim (*Bucur v. Ahmad*, 244 Cal. App. 4th 175, 191 (2016) [affirming

13  sanctions against a party whose "assertion of claims so clearly barred by (the affirmative defenses)

14  res judicata, judicial admissions and judicial estoppel was objectively unreasonable."]; *see also*

15  *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1299 (5th Cir. 1994) (prior to filing suit, parties must consider

16  "whether any obvious affirmative defenses bar the case")); and all litigants are required to refrain

17  from knowingly violating California and Federal law.

18      102.   Here, Defendants were aware that an affirmative defense was available to B&G

19  Foods in both actions but conducted no research or investigation that could plausibly undermine

20  that defense.

21  **C.    Defendants' Failed To Adequately Investigate Their Claims Before Filing Suit.**
22      103.   Defendants' lawsuits are also shams for the separate and independent reason that

23  they were filed without adequate investigation and with no regard to the merits. Prior to filing suit,

24  Defendants did not meaningfully investigate whether the trace amounts of acrylamide allegedly

25  present in the Cookies would exceed the NSRL when considering the rate at which consumers

26  actually enjoy cookies – namely, infrequently and in small amounts. Nor did Defendants investigate

27  whether the NSRL should apply at all considering that acrylamide forms as a result of the baking

28  process, which is necessary to ensure the Cookies are safe to eat (or, indeed, are cookies at all and

FIRSTSECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

not mounds of raw dough). Because Defendants did not investigate either of these defenses prior to filing suit, and because these defenses would be fatal to their claims, Defendants' lawsuits are shams.

    **1.    Defendants' investigation showed that its claims were barred by the "No Significant Risk Level" exception to Proposition 65.**

104.    Proposition 65 does not require placing a cancer warning on the Cookie Cakes or Sandwich Cookies, and any reasonable pre-suit investigation by Defendants would have shown that B&G Foods has not violated Proposition 65.

105.    Cookie Cakes and Sandwich Cookies are the type of classic snack foods which consumers only enjoy at infrequent snacking intervals.  When the rate of consumption of the Cookie Cakes and Sandwich Cookies is considered, the amount of acrylamide allegedly present does not exceed the NSRL.

106.    Proposition 65 imposes a statutory duty on Defendants to certify they have "consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the exposure to the listed chemical that is the subject of the action, and that, based on that information, the person executing the certificate believes there is a reasonable and meritorious case for the private action."  Cal. Health & Safety Code, § 25249.7(d)(1).  This "Certificate of Merit" must be served with the enforcer's notice of violation.  The certificate of merit that is served on the Attorney General must have attached to it "[f]actual information sufficient to establish the basis of the certificate of merit, including" "the identity of the persons consulted with and relied on by the certifier, and the facts studies, or other data reviewed by those persons."  Cal. Health & Safety, § 25249.7(d)(1), (h)(2).

107.    "If a court finds that there was no credible factual basis for the certifier's belief that an exposure to a listed chemical had occurred or was threatened, then the action shall be deemed frivolous within the meaning of Section 128.5 of the Code of Civil Procedure."  Cal. Health & Safety, § 25249.7(h)(2).

108.    Defendants also had a duty to ensure that no obvious, statutory affirmative defenses foreclosed their claims.  *See* Cal. Code Civ. Proc. § 128.7; *Bucur v. Ahmad*, 244 Cal. App. 4th 175, 191 (2016) [affirming sanctions against a party whose "assertion of claims so clearly barred by (the

19

1  affirmative defenses) res judicata, judicial admissions and judicial estoppel was objectively

2  unreasonable."]; *see also F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1299 (5th Cir. 1994) (prior to filing

3  suit, parties must consider "whether any obvious affirmative defenses bar the case").  In fact,

4  Defendants both attested in their certificates of merit that they had conducted such an investigation.

5       109.    Both EHA and Embry stated in their certificates of merit that Noam Glick

6  understood "that 'reasonable and meritorious case for the private action' means that the information

7  provides a credible basis that all elements of the plaintiff's case can be established and the

8  information did not prove that the alleged violator will be able to establish any of the affirmative

9  defenses set forth in the statute." (July 26, 2022 Certificate of Merit, August 17, 2022 (ECF 52-2,

10  Ex. J, Ex. I))." That statement was not true.

11       110.    Ms. Embry did not do any research into how often people eat Cookie Cakes or

12  similar products before claiming in her complaint that people eat Cookie Cakes so frequently they

13  are at risk of cancer or birth defects.  Ex. A, Embry Dep. 82:22-83:22; Ex. B, Embry Supp. Resp.

14  RFA 2 ("Plaintiff admits she has not personally reviewed any scientific research, analysis, or

15  studies showing that acrylamide in food causes cancer, and that she instead defers to her expert on

16  these matters.")  Ms. Embry purports to rely on her attorney and experts, but she was not aware of

17  any expert analysis pertinent to her lawsuit against B&G Foods.

18       111.    EHA admitted in discovery that it "does not have, and has never had" any

19  documents concerning the frequency with which consumers consume cakes, cookies, bars, or any

20  other similar product, including the Sandwich Cookies, and relied exclusively on the National

21  Health Nutrition Examination Survey database (Ex. C, EHA Resp. to RFP No. 7)—which shows

22  that people eat cookies infrequently.

23       112.    Although Defendants now claim they did consult with an "expert" prior to filing

24  their lawsuit, their prior denials that any such expert existed, or was consulted, support the

25  inference that these "reports" were manufactured after the fact and/or were never included in

26  Defendants' original certificates of merit, making them false or defective.

27       113.    Further, Embry and EHA's "expert" did not research the rate of consumption of

28  Cookie Cakes, Sandwich Cookies, or other similar foods, as would be necessary to determine

~~FIRST~~SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

whether the Cookie Cakes or Sandwich Cookies require a Proposition 65 warning.  *See* ECF 52-2, Exs. I, J ("Amended Certificate of Merit"). *See Environmental Law Foundation v. Beech-Nut Nutrition Corp.* (2015) 235 Cal.App.4th 307, 327.

114.    Defendants' "expert" did not consider the test results conducted by B&G Foods and produced to Defendants which showed that the Devil's Food Cookie Cakes would not exceed the NSRL even if consumers ate one serving of Cookie Cakes per day.

115.    Defendants' "expert" appears to have relied solely on the testing conducted by Defendants, which was based on spoliated evidence.

116.    Therefore, neither EHA nor Embry investigated an obvious affirmative defense.

117.    Moreover, the information Defendants acquired prior to commencing their actions against B&G Foods demonstrated that their cases lacked merit.

**2.    Defendants' investigation showed that its claims were barred by the "Cooking" exception to Proposition 65.**

118.    Embry, EHA, and their "expert" knew that the acrylamide in the Cookie Cakes was created during the cooking process, and therefore falls within an exception to Proposition 65's labelling requirements.  (Ex. B, Embry Supp. Resp. RFA No. 7 ("Plaintiff understands this statement [that acrylamide may form in food when it is baked] to be true"); Ex. D, EHA Resp. RFA No. 7 (admitting "acrylamide may form in food when it is baked.").  *See* Health & Saf. Code, § 25249.7(k)(1)(B)(ii).

119.    Ms. Embry testified that acrylamide is "a chemical found in foods.  When cooked – baked at really high temperatures. . . . To my understanding, I – when it's at a very high temperature, baked and fried, that's when it forms."  Ex. A, Embry Dep. Tr. 61:11-22.

120.    EHA admitted that acrylamide may form in food when it is baked.  *See* Ex. D, EHA Resp. RFA No. 7.

121.    Defendants supposed "expert" explained that the acrylamide in the Cookie Cakes and Sandwich Cookies is created when "carbohydrate-rich foods are processed at high temperatures (such as cooking, frying, roasting, and baking)."  (July 26, 2022 Certificate of Merit, August 17, 2022 Certificate of Merit (ECF 52-2, Ex. J, Ex. I)).

122. Proposition 65 provides an exception "where chemicals in food are produced by cooking necessary to render the food palatable or to avoid microbiological contamination." Cal. Code Regs. § 25703(b)(1).

123. Defendants base their entire case on a comparison of the level of acrylamide found in one lab result with the NSRL, without considering the rate with which consumers eat the Cookie Cakes or Sandwich Cookies as required (*see Beech-Nut Nutrition Corp.*, 235 Cal.App.4th 307, 327 (2015) (experts appropriately calculated exposure by averaging test results across lots and time, rather than evaluating individual exposure on the day of consumption.)), or the alternative NSRL that would be required by Cal. Code Regs. § 25703(b)(1). *See* Defs.' MPA iso MTD 13:21-28.

**D.    Defendants Made False Statements In Their Complaints.**

124. Defendants' lawsuits are also shams for the separate and independent reason that their complaints contain several false statements. In particular, Defendants misrepresented to the Court that acrylamide is "known" to the State to cause cancer; that they filed valid certificates of merit prior to bringing suit; that they performed an adequate pre-suit investigation; and that B&G Foods's products were not exempt from Proposition 65 under any known affirmative defenses.

125. EHA and Embry both allege that acrylamide is known to the state of California to cause cancer, the Cookie Cakes and Sandwich Cookies contain acrylamide, and therefore a Proposition 65 warning is required.

126. Defendants know that the state of California does not know acrylamide in foods causes cancer, and that the acrylamide found in the Cookie Cakes and Sandwich Cookies is caused by baking and therefore does not necessitate a cancer warning.

127. Defendants also allege that they provided code compliant notices of violation sixty days before filing suit. On the contrary, Defendants did not provide certificates of merit supported by evidence to the Attorney General, as required by law prior to filing suit. It was only when their certificates of merit were under scrutiny that they filed Amended Notices of Violation with the Attorney General attaching the substantiation for their certificates of merit.

128. No amendment would have been required had they included this information with the certificates of merit they initially served on the Attorney General

129.     Defendants failure to satisfy the certificate of merit requirements is fatal to their claims.  *See DiPirro v. Am. Isuzu Motors, Inc.*, 119 Cal. App. 4th 966, 972, (2004) (failure to provide certificate of merit prior to commencing action could not be cured by filing a certificate of merit after the litigation commenced.  Affirming dismissal with prejudice.)

130.     Below is a chart contrasting representations made by Defendants in their certificates of merit and complaints, and admissions obtained after the complaints were filed.

| Representation | Admissions |
|---|---|
| 131.     "Defendants manufactured, imported, sold, and/or distributed Products containing acrylamide in violation of Health and Safety Code, section 25249.6 et seq." (Ex. E ("Embry Compl.") ¶ 15; Ex. G ("EHA Compl.") ¶ 16) | 132.     Defendants were aware B&G Foods's products fall within exceptions to Proposition 65's labelling requirement. |
| 133.     "More than sixty days prior to naming each defendant in this lawsuit, Plaintiff issued a 60-Day Notice of Violation ("Notice") as required by and in compliance with Proposition 65." (Embry Compl. ¶ 20; EHA Compl. ¶ 21; Ex. H ("EHA Am. Compl.") ¶ 21.) | 134.     Defendants submitted "amended" sixty day notices including the requisite certificate of merit supported by the basis for their claims on July 27, 2022 and August 17, 2022—long after they filed their lawsuits.  (*See* ECF 52-2 Exs. I and J). |
| 135.     "Individuals exposed to acrylamides [sic] contained in the Products through direct ingestion resulting from reasonably foreseeable use of the Products have suffered and continue to suffer irreparable harm.  There is no other plain, speedy, or adequate remedy at law."  (Embry | 136.     Defendants admit they have no evidence that any individual exposed to acrylamide was harmed or that Proposition 65's warning requirement applies to Cookie Cakes or Sandwich Cookies. *See* Embry Suppl. Resp. RFA 1. ("Plaintiff is not aware of specific instances of the |

| | |
|---|---|
| Compl. ¶ 22; EHA Compl. ¶ 23; EHA Am. Compl. ¶ 23.) | Cookie Cakes causing cancer in any specific customer.") *See* EHA Resp. RFA No. 2 ("Plaintiff admits it has not personally reviewed any scientific research, analysis, or studies showing that acrylamide in food causes cancer, and that it instead defers to its expert on these matters.") |
| 137.   "Based on the information obtained through those consultations, and on all other information in my possession, I believe there is a reasonable and meritorious case for the private action.  I understand that 'reasonable and meritorious case for the private action' means that the information provides a credible basis that all elements of the plaintiff's case can be established and the information did not prove that the alleged violator will be able to establish any of the affirmative defenses set forth in the statute." (*See* ECF 52-2, Exs. I and J) | 138.   Noam Glick was aware that these cases were foreclosed by affirmative defenses.   139.   His alleged "consultation" with John Meeker revealed "acrylamide is a carcinogen that can form as a reducing sugars react with free asparagine when carbohydrate-rich foods are processed at high temperatures (such as cooking, frying, roasting, and baking), primarily through what is known as the Maillard reaction." (*See* ECF 52-2, Exs. I and J). |
| 140.   "This Complaint is a representative action brought by Plaintiff in the public interest of the citizens of the State of California ("the People.") (Embry Compl. ¶ 1).  Plaintiff KIM EMBRY ("Embry") is a citizen of the State of California dedicated to protecting the health of California citizens | 141.   Embry has admitted that she settles cases in a manner contrary to even her own definition of "the public interest". *See supra* paragraphs 172-188. |

24

FIRSTSECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

| | |
|---|---|
| through the elimination or reduction of toxic exposure from consumer products.  She brings this action in the public interest pursuant to Health and Safety Code section 25249.7" (Embry Compl. ¶ 6) | |
| 142.  "Plaintiff seeks to remedy Defendants' failure to inform the People of exposure to acrylamide, a known carcinogen." (Embry Compl. ¶ 1) | 143.  Embry testified that she had no personal knowledge regarding the merits of her case, and that she relies upon her expert and attorney.  *See supra* paragraphs 150-156.  She also testified to entering settlements that would not alert people to exposure to acrylamide.  *See supra* paragraphs 172-188. |
| 144.  "This Complaint is a representative action brought by Environmental Health Advocates, Inc. ("Plaintiff") in the public interest of the citizens of California ("the People).  Plaintiff seeks to remedy Defendants failure to inform the People of exposure to acrylamide, a known carcinogen."  (EHA Compl. ¶ 1; Am. Compl. ¶ 1) | 145.  EHA has admitted that it settles cases in a manner contrary to even its own definition of "the public interest".  *See supra* paragraphs 172-188. |

**E.** **Defendants Know That The Cookies Do Not Cause Cancer And There Would Be No Public Benefit To A Warning.**

146.  Defendants' lawsuits are also a sham for the separate and independent reason that they know, or reasonably should know, that the Cookies do not cause cancer. As detailed above at ¶¶ 40-61, *supra*, there is extensive, longstanding evidence that acrylamide in baked goods like the Cookies does not cause cancer. Despite this knowledge, Defendants filed these suits because their true intent is not to serve any public interest, but only to enrich themselves and their lawyers.

147.   Indeed, Embry and EHA have not conducted the research that one genuinely concerned with the health consequences of acrylamide would.

148.   EHA failed to provide or identify any evidence showing that acrylamide causes or potentially causes cancer.  *See e.g.* Ex. D, EHA Resp. RFA No. 1 ("Plaintiff is not aware of specific instances of the Subject Products causing cancer in any specific customer")

149.   EHA failed to provide or identify any evidence showing that acrylamide is known to the State of California to cause cancer.

150.   EHA admitted it had not reviewed any scientific research, analysis, or studies showing that acrylamide in food causes cancer.  *See* Ex. D, EHA Resp. RFA No. 2 ("Plaintiff admits it has not personally reviewed any scientific research, analysis, or studies showing that acrylamide in food causes cancer, and that it instead defers to its expert on these matters.")

151.   EHA admitted that it had done no research into the State of California's knowledge regarding acrylamide's carcinogenic effects.  *See* Ex. D, EHA Resp. RFA No. 4 ("Plaintiff is informed and believes that acrylamide causes cancer, but admits it has not done any independent research or analysis into the State of California's knowledge regarding its carcinogenic effect.")

152.   EHA stated that, at least as of March 23, 2021, no report had been made concerning the subject matter of this case. Ex. F, EHA Resp. Form Int. No. 12.6.

153.   Likewise, Embry has never read any scientific literature or analysis showing that acrylamide in food causes cancer. Ex. A, Embry Dep. 82:22-83:22; Ex. B, Embry Supp. Resp. RFA 2 ("Plaintiff admits she has not personally reviewed any scientific research, analysis, or studies showing that acrylamide in food causes cancer, and that she instead defers to her expert on these matters.")

154.   Embry was unaware of "any scientific study about whether the Cookie Cakes cause cancer or birth defects or whether any person had ever contracted cancer of has had a birth defect as a result of eating the Cookie Cakes. Ex. A, Embry Dep. Tr. 80:9-21; Ex. B, Embry Suppl. Resp. RFA 1. ("Plaintiff is not aware of specific instances of the Cookie Cakes causing cancer in any specific customer.")

155.   Embry did not do any research as to how often people eat Cookie Cakes or similar foods.  Ex. A, Embry Dep. Tr. 82:22-83:22.

156.   Embry purports to rely on her attorney and experts, but she was not aware of any expert analysis pertinent to her lawsuit against B&G Foods.

157.   On March 20, 2020, Plaintiff notified Defendants that the products at issue could not possibly violate Proposition 65, and that acrylamide in baked-goods does not cause cancer in humans.  B&G Foods provided Defendants with:

- OEHHA's "person most knowledgeable's" sworn testimony admitting that (a) she was not aware of any governmental health organization listing acrylamide as a known human carcinogen, (b) she was not aware of any pharmacodynamic data regarding rats and humans and acrylamide, and (c) OEHHA did not actually "know" that acrylamide was a human carcinogen.

- A review of the relevant epidemiologic studies demonstrated that there was no consistent evidence that dietary acrylamide exposure increases the risk of any type of cancer in humans.

- A consent judgment entered by the California Attorney General setting a safe-harbor level of 281 parts per billion of acrylamide in food products.

- A consent judgment entered by Center for Environmental Health setting a safe-harbor level of 350 parts per billion of acrylamide in food products.

- A consent judgment entered by Kim Embry setting a safe-harbor level of 280 parts per billion of acrylamide in food products.

- Test results showing the Cookie Cakes contain 47.6, 65.2, and 73.1 parts per billion of acrylamide.

158.   Defendants, however, refused to withdraw their notices unless Plaintiff paid a substantial sum or put a false cancer warning on the products.

159.   Neither Embry nor EHA produced any evidence supporting their claims at any time.  That is because they have no evidence that the Cookies cause cancer, that they violate Proposition 65, or that the public would receive any benefit from a false cancer warning on the Cookies.

**F.      Defendants' Lawsuits Against B&G Foods Are Part Of A Series Of Lawsuits Brought Without Regard To Their Merit And For An Unlawful Purpose.**

160.      Defendants file a high volume of Notices of Violation with the hope that some accused parties will pay them to go away.  This is their business model.  They are not interested in the merits of their cases, because their goal is to impose litigation costs on defendants.  The expense and burden of litigation is sufficient to coerce some defendants into labelling their products as carcinogens, regardless of whether it is true.  If Defendants' targets do not settle after considerable litigation costs are imposed, the case is abandoned.

161.      In concluding that a lawsuit is part of a series of lawsuits brought pursuant to their policy of starting legal proceedings without regard to their merit Courts ask "were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for the purposes of harassment?"  *B&G Foods N. Am., Inc. v. Embry,* 29 F.4th 527, 539 (9th Cir. 2022), *cert. denied,* No. 22-83, 2022 WL 4654543 (U.S. Oct. 3, 2022).

162.      These cases were not brought to address a legitimate grievance.  Defendants have and will continue to enter into settlement agreements that, by their own admission, they believe are harmful to the people of California as explained in the paragraphs below.

163.      Further, Defendants typically will abandon their claims prior to a final adjudication when their "shake-down" tactics do not work.

164.      On information and belief, Defendants routinely base their Notices of Violation on testing performed by an out-of-state laboratory, such as IEH.

165.      On information and belief, Defendants select this laboratory because it uses non-standard testing procedures that result in inflated test results.

166.      On information and belief, Defendants select IEH because it destroys products immediately after testing, making it impossible for anyone to retest the products and thus challenge the reliability or accuracy of the testing methods.

167.      On information and belief, Defendants select IEH because it is located out of state, thus making it more difficult to obtain discovery from the laboratory establishing its improper and inadequate testing and quality control regimen.

28

168.    Defendant Embry has filed at least 260 Notices of Violation pertaining to acrylamide.

169.    Of those, she withdrew 129 without filing suit or obtaining a settlement.

170.    Of the remaining 131 Notices of Violation, Defendant Embry settled just 25 cases.

171.    Thus, less than ten percent of Defendants' Proposition 65 acrylamide lawsuits have resulted in any sort of resolution.

172.    As discussed above, many of the settlements entered by Embry were contrary to her stated goal of serving the public interest.  Embry enters settlements that permit the defendant to sell products containing a level of acrylamide that Defendants claim is "not safe" without a warning, or requires warnings for products that contain a level of acrylamide Embry believes is so safe no warning label is needed.

173.    Many of these settlements require food producers to label foods that contain levels of acrylamide well below the NSRL.  On information and belief, the products at issue in these cases contained levels of acrylamide below the NSRL, but the defendants settled anyway because it was less expensive than litigation.  These "over-warnings" do not benefit the public.  Rather they undermine the purpose of Proposition 65.

174.    And virtually all of Embry's settlements were for small, five-figure sums—classic "nuisance value" settlements paid by defendants because, as detailed above, the nature of Proposition 65 makes defending lawsuits prohibitively expensive, and not because the claims have any merit.

175.    Similarly, EHA has filed over 800 Notices of Violation, including 316 Notices of Violation pertaining to acrylamide.

176.    Less than 30% of these Notices of Violation resulted in the filing of a complaint.

177.    Only approximately 20% of EHA's Notices of Violation resulted in any kind of settlement.

178.    As was the case with Embry, many of these settlements require food producers to label foods that contain levels of acrylamide well below the NSRL.  On information and belief, the products at issue in these cases contained levels of acrylamide below the NSRL, but the defendants

1  settled anyway because it was less expensive than litigation.  Again, these over-warnings do not

2  benefit the public.

3  179.  These settlements do not demonstrate that EHA's' cases were meritorious or

4  successful.  On the contrary they underscore that EHA prioritizes monetary rewards over the public

5  benefit or any good faith enforcement of Proposition 65.

6  180.  EHA and Embry traded a public benefit for money.  Specifically, they have entered

7  settlements that permit companies to sell products they believe are unsafe for the public to consume

8  so long as they get paid.

9  181.  Further, any Proposition 65 litigation that is not "in the public interest" is unlawful.

10  The statute requires that private enforcers act "in the public interest."  Cal. Health and Safety Code

11  § 25249.7(d).

12  182.  The Attorney General has found that Embry and Glick have attempted to enter at

13  least one settlement that was "contrary to the law, against public policy, and not enforceable."

14  Attorney General's Mar. 2, 2018, Letter re *Embry v. Earthbound Farm*, Out-of-Court Proposition

15  65 Settlement.  Upon receipt of this letter, Embry appears to have abandoned this litigation.

16  183.  In 2018, Embry attempted to settle a Proposition 65 claim against Earthbound Farm,

17  LLC.  The Attorney General objected to this settlement, which included $3,000 in civil penalties

18  and a $37,000 attorney fee award, because (1) Defendant Embry received more than 25% of the

19  civil penalties; (2) the settlement "is not likely to result in any benefit to the public," and (3)

20  Defendant Glick's $37,000 fee award was unreasonable.

21  184.  In response to this letter, the parties rescinded the settlement agreement and have not

22  submitted another for review.

23  185.  EHA and Embry's long history of meritless and unlawful Proposition 65 litigation is

24  relevant here because they are suing B&G Foods with the same cut-and paste complaint, based on

25  the same false certificate of merit they submit in all of these cases.  Their pattern and practice of

26  unlawful conduct directed by Noam Glick has now become a recurring problem for B&G Foods.

27

28

FIRSTSECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

186.    On information and belief, the "attorney's fees" claimed by Defendants in their settlements are inflated, and bear little to no relationship to the amount of time or effort Defendants' counsel expend in prosecuting Proposition 65 actions.

187.    Defendants are aware that it is unconstitutional to compel a company to falsely label its products, but they have sought to do so hundreds of times, and will continue to do so unless the Court intervenes.

188.    Therefore, Defendants' serial litigation was brought for an unlawful purpose.

**G.    Defendants Knew Their Claims Are Unconstitutional**

189.    Defendants' state court lawsuits are also shams for the separate and independent reason that Defendants knew, or reasonably should have known, that their litigation violated the First Amendment. Defendants' lawsuits against B&G Foods were both filed after serious constitutional questions were raised about Proposition 65 acrylamide litigation in *CalChamber*. Defendants have continued to prosecute their lawsuits even after the issuance of the injunction in *Calchamber*, such as by filing amended Notices of Violation. And Defendants continued to fil new Proposition 65 acrylamide lawsuits ***after*** the *CalChamber* injunction issued. This is because Defendants know that their lawsuits are objectively baseless, but file them anyway without regard for the merits.

190.    From the outset, Defendants have prosecuted their claims despite knowing, or having a reasonable basis to know, that their claims are unconstitutional. In October, 2019 – prior to either Embry or EHA's lawsuit, the California Chamber of Commerce filed a lawsuit claiming the First Amendment prohibits California from forcing businesses to make false statements, so because California does not "know" that eating food with acrylamide causes cancer in people, Proposition 65 is unconstitutional if it mandates that assertion.

191.    On March 30, 2021, this Court held in *California Chamber of Commerce v. Becerra*, 529 F. Supp. 3d 1099 (E.D. Cal. 2021), *aff'd* 29 4th 468 (9th Cir. 2022) ("*Calchamber*"), that the available evidence, including much of the evidence that B&G Foods provided to Defendants on March 20, 2020, shows that the state does not, in fact "know" acrylamide causes cancer.

~~FIRST~~SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

192. This Court observed in that case that "Some evidence does support [an inference that acrylamide in food causes cancer in humans], including laboratory experiments with mice and rats, in vitro studies of human cells, and statistical investigations of tumor genomes. But dozens of epidemiological studies have failed to tie human cancer to a diet of food containing acrylamide. Nor have public health authorities advised people to eliminate acrylamide from their diets . . . In short, [Proposition 65's] safe harbor warning is controversial because it elevates one side of a legitimately unresolved scientific debate about whether eating foods and drinks containing acrylamide increases the risk of cancer." *California Chamber of Com. v. Becerra*, 529 F. Supp. 3d 1099, 1117 (E.D. Cal. 2021), *aff'd sub nom. California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022).

193. A preliminary injunction issued: "no person may file or prosecute a new lawsuit to enforce the Proposition 65 warning requirement for cancer as applied to acrylamide in food and beverage products. This injunction applies to the requirement that any "person in the course of doing business" provides a "clear and reasonable warning" for cancer before "expos[ing] any individual to" acrylamide in food and beverage products under California Health & Safety Code § 25249.6. It applies to the Attorney General and his officers, employees, or agents, and all those in privity or acting in concert with those entities or individuals, including private enforcers under section 25249.7(d) of the California Health & Safety Code." That injunction was dissolved, then reinstated by the Ninth Circuit.

194. Defendants were aware of the controversy over Proposition 65 labels for food products that contain acrylamide, whether acrylamide in food causes cancer, and whether the state could "know" that acrylamide in food causes cancer in humans, before bringing their lawsuits.

195. Defendants are aware of this Court's holdings, and the Ninth Circuit's holdings, in *California Chamber of Com. v. Becerra*. *See e.g.* Ex. I, Plaintiff Kim Embry's Memo. P. and A. iso Mot. to Stay Court Proceedings (April 20, 2021), Case No. RG20057491 at 1:18.

196. Defendants are aware, and are obliged to know, that Plaintiff cannot be compelled to make false or controversial statements about its own products.

~~FIRST~~SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

197.   Nonetheless, Defendants seek to compel Plaintiff to make statements about its products that are false or at least controversial in violation of the United States and California constitutions.  When provided evidence that there is—at the very least—a controversy over whether acrylamide causes cancer, Defendants responded by demanding hundreds of thousands of dollars.

198.   Defendants continue to prosecute their unconstitutional claims against Plaintiff because they hope to leverage settlements from Plaintiff.

199.   Defendants believed, and continue to believe, that the costs of litigation are sufficient to pressure Plaintiff to pay them to go away.  This abuse of the litigation process is the core of their business model.

200.   The end result that is likely to result from Defendants' lawsuit is irrelevant to their calculus regarding whether these cases should be filed or prosecuted.  The goal of the lawsuit is to cause enough harm to B&G Foods through injury to their reputations and litigation costs that they pay Defendants to go away.

**H.   Compelling B&G Foods To Make False Or Controversial Statements About Its Products Violates The U.S. Constitution.**

201.   Defendants lawsuits are a sham for the separate and independent reason that their lawsuits are unconstitutional. A lawsuit is a sham if "no reasonable litigant could have realistically expected success on the merits . . . ." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000). That is necessarily true here because Defendants' lawsuits are unconstitutional on their face, as this Court correctly held in *CalChamber.*

202.   The First Amendment to the United States Constitution prohibits state actors from compelling false or controversial statements.

203.   The government may compel truthful disclosure in commercial speech as long as the compelled disclosure is reasonably related to a substantial governmental interest.  The required disclosure must be limited to purely factual and uncontroversial information.  *California Chamber of Com. v. Becerra*, 529 F. Supp. 3d 1099, 1116 (E.D. Cal. 2021), *aff'd sub nom. California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022).

FIRSTSECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

204. 65. The warning label that Defendants seek to compel Plaintiff to place on its products is false.  The State of California does not know that acrylamide in food causes cancer, or that the Cookie Cakes or Sandwich Cookies cause cancer.

205. 66. For these very reasons, on March 30, 2021, this Court enjoined future prosecution of Proposition 65 acrylamide lawsuits.  In issuing that injunction, the Court explained:

> [T]he State has not shown [the Proposition 65 acrylamide cancer warning] is purely factual and uncontroversial. By asserting vaguely that consuming a product can "expose" a person to acrylamide—a chemical most people have likely never used in preparing food or even heard of—the warning implies incorrectly that acrylamide is an additive or ingredient. . . .
>
> [D]ozens of epidemiological studies have failed to tie human cancer to a diet of food containing acrylamide. Nor have public health authorities advised people to eliminate acrylamide from their diets. . . . California has also decided that coffee, one of the most common sources of acrylamide, actually reduces the risks of some cancers. . . . In short, the safe harbor warning is controversial because it elevates one side of a legitimately unresolved scientific debate about whether eating foods and drinks containing acrylamide increases the risk of cancer.

*Calchamber*, 529 F. Supp. 3d at 1117-18.  On March 17, 2022, the Ninth Circuit affirmed this Court's *Calchamber* decision.  29 F.4th 468.  Notwithstanding the injunction, Defendants have continued to threaten Plaintiff with prosecution of their claims and have continued to file new Proposition 65 claims based on the presence of acrylamide in food.

III.    **PROPOSITION 65 AS APPLIED TO ACRYLAMIDE IS UNCONSTITUTIONALLY VAGUE.**

67.    Proposition 65 purports to give food companies objective information from which to determine whether they must apply cancer warning labels to their products.

68.    But that information is vague and does no such thing.

69.    **First**, the State exempts from regulation products "where chemicals in food are produced by cooking necessary to render the food palatable or to avoid microbiological contamination . . . ."  Cal. Code Regs. § 25703(b)(1).

70.    On its face, this cooking exemption should protect companies like B&G Foods that make or sell baked goods; however, state enforcers have continued to bring acrylamide actions anyway.

34

71.    That is because the burden is on defendants to show that the exemption applies to their products, and to qualify for this "cooking" exception, a business must also show that "sound considerations of public health support an alternative level [of acrylamide]" must be found in a product before a cancer warning is required.  *Id.*

72.    If the facts that:

      1.   acrylamide appears naturally in cooked foods, and

      2.   in foods that the government recommends that people eat, and

      3.   there is no evidence that the acrylamide that forms naturally during cooking causes cancer in humans,

are sufficient to demonstrate that baked goods are always exempt from Proposition 65's labeling requirements for products that expose consumers to naturally occurring acrylamide as a matter of law, then no action alleging otherwise could be brought or maintained in good faith.

73.    If those facts are insufficient to exempt baked goods from Proposition 65's labelling requirement for products containing naturally occurring acrylamide, then the cooking exemption is unconstitutionally vague.  No one who makes or sells baked goods could ever be sure whether the exemption applies to their products, or if they are required to label their breads, cookies, or crackers as carcinogens.

74.    The language of the cooking exemption is also vague on its face and subject to a multitude of differing interpretations.

75.    There is no objective standard for determining "sound considerations of public health support an alternative level [of acrylamide]."

76.    The cooking exemption does not provide notice to businesses of whether their cooked foods will qualify, and the only way that a business can learn if their products require a label is *after* they have been prosecuted for a Proposition 65 violation and litigated the defense.

77.    **Second**, the State exempts a food company from regulation if it "can show that the exposure [to acrylamide] poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer[.]"  Cal. Health & Safety Code § 25249.10(c).  This threshold is commonly referred to as the "No Significant Risk Level" ("NSRL").

35

1   For some listed substances, OEHHA has published a quantitative NSRL, often referred to as a "safe

2   harbor". 27 Cal. Code Regs. § 25705.

3          78.    To determine whether exposure from acrylamide in a food product exceeds the

4   NSRL, the exposure is calculated based on the "average rate of intake or exposure for average users

5   of the consumer product[.]" 27 Code Regs. § 25721(d)(4).

6          79.    Exposure can be determined by looking at the average consumer's consumption of

7   the Cookie Cakes or Sandwich Cookies over a period of time and then measuring the exposure to

8   acrylamide based on that consumption over such period.

9          80.    Proposition 65 lawsuits are pervasive even for chemicals, like acrylamide, that have

10  a "safe harbor" NSRL because the safe harbor is an affirmative defense that is expensive to

11  establish.

12         81.    Even if a food business engages a full range of experts and consumption scientists

13  for every food product it formulates and sells in the State, the State and enforcers disagree on how

14  average consumption of acrylamide is calculated.

15         82.    Food companies have expended millions of dollars in cases simply to show that the

16  State enforcer is wrong about the application of Proposition 65 in a given case.

17         83.    As a result, businesses like Plaintiff have no means of protecting themselves when

18  selling products in California—because the determination of the applicable NSRL and related safe

19  harbor is very burdensome and because compliance does not prevent a company from being sued—

20  such as in this case.

21         84.    California jurists have recognized how onerous Proposition 65 suits can be for

22  anyone doing business in California.

23         85.    "[L]awsuits under Proposition 65 can be filed and prosecuted by any person against

24  any business based on bare *allegations* of a violation unsupported by any evidence of an *actual*

25  violation—or even a good faith belief that a defendant is using an unsafe amount of a chemical

26  known by the state to cause cancer." *Consumer Cause, Inc. v. SmileCare*, 91 Cal. App. 4th 454, 477

27  (Vogel, J., dissenting) (emphasis in original).

28

1    86.    This burden-shifting regime results in "judicial extortion" where many private

2    parties bring Proposition 65 claims (without an appropriate assessment that an exposure exceeds

3    the NSRL) and force the defendant to settle to avoid legal fees and the costs of performing an

4    expensive expert scientific assessment.  *Id.* at 477-79.

5    87.    Nor does demonstrated compliance immunize food businesses from lawsuits in the

6    first instance or from future enforcement efforts.  *See DiPirro v. Bondo Corp.*, 153 Cal. App. 4th

7    150, 185 (2007).

8    88.    The one way to obtain certainty is to enter extortive monetary settlements with state

9    representatives like Defendants, even though the business has attempted to comply in good faith

10    and has made a product which poses no health risk.

11    89.    NSRL levels do not effectively deter a plaintiff with significant financial incentives

12    from initiating suit in the hopes of collecting a settlement.

13    90.    Moreover, the State admits that the acrylamide found in cooked food does not cause

14    cancer in humans, yet enforcers still bring actions against defendants alleging that their products

15    have exceeded the NSRL for acrylamide.

16

17    **I.    Compelling B&G Foods To Make False Or Controversial Statements About Its Products Violates The California Constitution.**

18    206.    Defendants' state court lawsuits are a sham for the separate and independent reason that they violate the California Constitution. Even if Defendants' lawsuits were not unconstitutional

19    under the First Amendment, they would still be objectively baseless and shams because they violate

20    the broad free speech rights guaranteed by the California Constitution.

21    207.    Article I, section 2 of the California Constitution provides: "(a) Every person may

22    freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse

23    of this right. A law may not restrain or abridge liberty of speech or press."

24    208.    Article I's free speech clause enjoys existence and force independent of the First

25    Amendment to the federal constitution. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal. 4th 468,

26    489 "*Gerawan I*".)

27    209.    The state Constitution's free speech clause is at least as broad, and in some ways

28    broader, than the comparable provision of the federal Constitution. (*Kasky v. Nike, Inc.* (2002) 27

37

FIRST SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  Cal.4th 939, 958–959.) The California Constitution's protection of speech "on all subjects" extends

2  without limitation to non-misleading commercial speech. (*Id.* at p.959.)

3      210.    Article I, section 2 "comprises both a right to speak freely and also a right to refrain

4  from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he

5  otherwise would say and also by compelling him to say what he otherwise would not say."

6  (*Gerawan I, supra*, at p. 491.) "For corporations as for individuals, the choice to speak includes

7  within it the choice of what not to say." (*Pacific Gas & Elec. Co. v. Public Util. Comm'n, supra*,

8  475 U.S. 1, 16, 106 S.Ct. 903, 89 L.Ed.2d 1.)

9      211.    "[T]his general rule, that the speaker has the right to tailor the speech, applies not

10  only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker

11  would rather avoid." (*Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston* (1995)

12  515 U.S. 557, 573, 115 S.Ct. 2338, 132 L.Ed.2d 487.)

13      212.    "[A]rticle I's right to freedom of speech, without more, would not allow compelling

14  one who engages in commercial speech to say through advertising what he otherwise would not

15  say, when his message is about a lawful product or service and is not otherwise false or

16  misleading." (*Gerawan I, supra*, at p. 509.)

17      213.    B&G Foods therefore cannot be compelled to label its products as carcinogenic

18  under California law.

19      214.    Therefore, Defendants' lawsuits have been brought for an unlawful purpose.

20  **III.**    ~~IV.~~  ~~DEFENDANTS' INFRINGEMENT ON B&G FOODS'S CONSTITUTIONAL~~
    ~~RIGHTS~~ **MAY BE REMEDIED THOUGH A SECTION 1983**
21  ~~ACTION.~~**DEFENDANTS ARE STATE ACTORS**

22      ~~A.~~    ~~Defendants Are State Actors.~~

23      215.    ~~91.~~ The State is responsible for, and benefits from, Defendants' conduct.

24      216.    ~~92.~~ Under Proposition 65, the State authorizes numerous persons to prosecute the

25  statute on the State's behalf:  the Attorney General, a district attorney, a variety of local government

26  officials or a private enforcer, such as Ms. Embry or EHA.  California Health & Safety Code §

27  25249.7(c) and (d).

28

38

217. 93. The State allows all these enforcement representatives to seek penalties of up to $2,500 per day for each violation. *Id.* § 25249.7(b).

218. 94. Anyone who brings a case is eligible to recover 25 percent of the penalty, *id.* § 25249.12(d), as well as reasonable attorneys' fees and costs, Cal. Code Civ. Proc. § 1021.5.

219. 95. This creates strong incentives for litigation and a perverse incentive for abusive conduct. *See, e.g., Anthony T. Caso, Bounty Hunters and the Public Interest—A Study of California's Proposition 65*, 13 ENGAGE 30, 31 (Mar. 2012) (describing case in which "law firm created an 'astroturf' environmental group to be a plaintiff in Proposition 65 litigation," which group "consisted of partners from the law firm" and which "sent out hundreds of demand letters charging businesses with failure to provide warnings" and "extort[ing] payments of attorney fees or contributions to the front group").

220. 96. In addition to penalties, the State allows enforcement representatives to seek injunctive relief to require mandatory consumer warnings by food companies in "a court of competent jurisdiction." Cal. Health & Safety Code § 25249.7(a).

221. 97. Enforcement representatives rely on OEHHA to identify chemicals and concentration levels that are supposedly "known" to cause cancer. *Id.* §§ 25249.8(a)-(b).

222. 98. Acrylamide currently is listed as a cancer-causing substance by OEHHA.

223. 99. The State encourages enforcement representatives like Defendants to sue food companies for injunctive and monetary relief.

224. 100. If a product such as the Cookie Cakes or Sandwich Cookies is found to contain acrylamide at the proscribed level, the State, through its representatives, requires food companies to notify consumers that the affected product contains acrylamide which is "known to the State of California to cause cancer":

> WARNING: Consuming this product can expose you to [Acrylamide], which is known to the State of California to cause cancer.  For more information, go to www.P65Warnings.ca.gov/food.

27 Cal. Code Regs § 25607.2(a)(2).

225. 101. The required warnings on product labels mandated by the State and enforced by prosecutors must be large and obvious, *i.e.*, "must be set off from other surrounding information" and "enclosed in a box." *Id.* § 25607.1(b).

226. 102. The State revises and regulates these requirements from time to time, and consults with its private enforcement representatives in doing so.

227. 103. Under Proposition 65, private plaintiffs are required to provide 60-days' notice to the California Attorney General, the district attorney, city attorney, or prosecutor in whose jurisdiction the violation is alleged to have occurred, and to the alleged violator before filing suit. Cal. Health & Safety Code § 25249.7(d)(1).

228. 104. The California Attorney General maintains a database of these 60-day notices, available at https://oag.ca.gov/prop65/60-day-notice-search.

229. 105. To date, there have been nearly 600 601420 60-day notices for alleged violations of the Proposition 65 warning requirement with respect to alleged exposures to acrylamide have been filed.

230. Two hundred and sixty-three of these acrylamide notices were filed by Embry, and 316 were filed by EHA.

231. 106. More than 500Hundreds of these 60-day notices relate to acrylamide in food products.

232. 107. These 60-day notices include alleged violations related to potato and potato-based products (more than 90 notices); nut butters, including peanut and almond butter (more than 40 notices); almonds (more than 30 notices); cereals (more than 20 notices); and olives (more than 10 notices).

233. 108. The rate of notices of violation for acrylamide have steadily increased in recent years, from just 32 notices in 2016 to 205 in 2019.

109.   Ms. Embry and EHA's enforcement efforts are just a small part of the tidal wave of acrylamide litigation targeting innocent food companies.

234. 110. As described below, Defendants Embry and EHA are state actors purporting to act on behalf of the government of California.

a.    The State is intimately entwined in, encourages, and closely monitors Defendants' Proposition 65 litigation, which it directly and indirectly regulates, controls and guides through the California Attorney General's office.

b.    Prior to initiating any private action, bounty hunters like Defendants serve a Notice of Violation on the State through the Attorney General's office, together with evidence supporting the supposed merit of the bounty hunter's allegations.

c.    This is so that the State can regulate, monitor, and encourage the proposed action.

d.    If the State believes the notice lacks merit, it serves a letter on the parties to object to any action.  Cal. Health & Safety Code § 25249.7(f).  In doing so, the State takes an active role as gatekeeper to permit supposedly meritorious cases to proceed and to reject or contest cases that lack merit.

e.    The State also monitors the activity of its Proposition 65 enforcement representatives such as Defendants by, among other things: requesting pre-approval of any potential settlement or consent judgment, receiving and reviewing notices regarding the progress of acrylamide case litigation, intervening in particular cases, regulating the conduct of representatives, demanding to receive proportional cuts of civil penalties, and retaining the ability to change, alter or amend the regulations governing a particular Proposition 65 chemical and enforcement activity.

f.    The Attorney General specifically regulates individual settlement agreements involving Defendants.

g.    For example, in 2018, Defendants attempted to settle a Proposition 65 claim against Earthbound Farm, LLC.  The Attorney General objected to this settlement, which included $3,000 in civil penalties and a $37,000 attorney fee award, because (1) Defendant Embry received more than 25% of the civil penalties; (2) the settlement "is not likely to result in any benefit to the public," and (3) Defendant Glick's $37,000 fee award was unreasonable.

h.    The Attorney General concluded the settlement agreement was "contrary to the law, against public policy, and not enforceable."  Attorney General's Mar. 2, 2018, Letter re *Embry v. Earthbound Farm*, Out-of-Court Proposition 65 Settlement.

1    ~~i.      In response to this letter, the parties rescinded the settlement agreement and~~

2    ~~have not submitted another for review.~~

3          **g.** ~~j.~~ Defendants' actions are so substantively "entwined" in the State's

4    enforcement regime that their action constitutes state conduct by the government.

5          **h.** ~~k.~~ Indeed, without the State's imprimatur, support, guidance and regulations,

6    Defendants would not have the ability to threaten and impose upon Plaintiff's constitutional rights.

7    *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, (1961) (where restaurant leased premises

8    from a government agency and both parties benefited financially from the arrangement, restaurant's

9    racial discrimination constituted state action).

10         **i.** ~~l.~~ Defendants also are performing a quintessential state function by acting as

11   California's enforcement arm relating to the presence of targeted chemicals in the environment.

12         **j.** ~~m.~~ Moreover, the State is not merely a passive actor in such activity, but has

13   an entire department devoted to regulating, following, and encouraging the unconstitutional activity

14   at issue here. *See Lee v. Katz*, 276 F.3d 550, 554-57 (9th Cir. 2002) (private lessee of a public

15   outdoor area owned by the city performed a traditional sovereign function when it sought to

16   regulate free speech activity on the land).

17         **k.** ~~n.~~ Defendants are further engaged in state action because, on information and

18   belief, they conspire with state officials to deprive businesses of their free speech right by enforcing

19   Proposition 65 in violation of the First Amendment to the United States Constitution, in exchange

20   for which state officials receive substantial compensation. *See Dennis v. Sparks*, 449 U.S. 24

21   (1980) (private person who bribed a judge to obtain an injunction was engaged in state action).

22         **235.** ~~111.~~ And, Defendants are serving as government actors because California has

23   interjected itself into this dispute by virtue of the fact that Proposition 65 is a state statute and

24   Defendants have filed suit in state court. *See Grant v. Johnson*, 15 F.3d 146, 149 (9th Cir. 1994)

25   (existence of state statute and necessary involvement of state judge provided state action necessary

26   to present challenge to Oregon statute allowing appointment of temporary guardian ad litem for

27   person deemed mentally incompetent).

28

236. 112. On information and belief, the State's employees have communicated with Defendants repeatedly over the last several years and encouraged and assisted them in securing monetary penalties from food companies accused of having acrylamide in their products.

**B.      Defendants Have Filed Sham Lawsuits Against B&G Foods.**

113.   On April 22, 2019, Defendant Embry notified the State and Plaintiff that she intended to require Plaintiff to place a warning label on all the Cookie Cakes to tell consumers that the products "cause cancer."

114.   The State did not object to Embry's Notice of Violation or seek to curtail or limit it.

115.   Ms. Embry's Notice of Violation seeks relief on behalf of the "Public" of California and pursuant to the State's regulations and enforcement guidelines discussed above.

116.   On October 8, 2020, Defendant EHA notified the State and Plaintiff that it intended to require Plaintiff to place a warning label on all Sandwich Cookies to tell consumers that the products "cause cancer."

117.   The State did not object to EHA's Notice of Violation or seek to curtail or limit it.

118.   EHA's Notice of Violation seeks relief on behalf of the "Public" of California and pursuant to the State's regulations and enforcement guidelines discussed above.

119.   On information and belief, the State has communicated with Defendants about these or similar acrylamide cases in the past and has encouraged such lawsuits.

237. 120. The State also has received monetary compensation from Defendants in connection with frivolous acrylamide lawsuits against other food companies and would receive compensation should Defendants obtain monetary relief from Plaintiff.

121.   Plaintiff notified Defendants that the products at issue could not possibly violate Proposition 65.

122.   Defendants, however, refused to withdraw their notices unless Plaintiff paid a substantial sum or put a cancer warning on the products.

123.   Defendants have relied upon the *Noerr-Pennington* doctrine to protect their extortionate practices.

124.   The *Noerr-Pennington* doctrine derives from the Petition Clause of the First Amendment and provides that those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct.

125.   The Ninth Circuit has held that the *Noerr-Pennington* doctrine can be applied to state actors.  The Ninth Circuit also acknowledges, however, that neither the Petition Clause nor the *Noerr-Pennington* doctrine protect sham petitions.

126.   Immunity is not extended to conduct that, although ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor, or to otherwise abuse the publicity/lobbying process.

127.   The sham exception applies to the *Noerr-Pennington* Doctrine applies to litigation in three circumstances:  first, where the lawsuit is objectively baseless and defendant's motive in bringing it was unlawful; second, where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose; third, if the allegedly unlawful conduct consists of making intentional misrepresentations to the court.

128.   Defendants' litigation against B&G Foods is a sham for all three of these reasons.

   1.   **Defendants' litigation was commenced without regard to the merits and with the improper intent of extorting money from          B&G Foods.**

129.   As explained above, there is no evidence that acrylamide in food causes cancer.  But even if acrylamide were properly included in the Proposition 65 list, Defendants could not state a valid claim against B&G Foods.

130.   Cookie Cakes and Sandwich Cookies are the type of classic snack foods which consumers only enjoy at infrequent snacking intervals.  When the rate of consumption of the Cookie Cakes and Sandwich Cookies is considered, the amount of acrylamide allegedly present does not exceed the NSRL.

FIRSTSECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

131.   Additionally, the only acrylamide present in the Cookie Cakes and Sandwich Cookies was the natural consequence of the cooking process, the same way acrylamide forms in any other cookie or baked good.

132.   For the foregoing reasons, Proposition 65 does not require placing a cancer warning on the Cookie Cakes or Sandwich Cookies, and any reasonable pre-suit investigation by Defendants would have shown that B&G Foods has not violated Proposition 65.

133.   But Defendants performed no such investigation because their intent was never to file claims that had any merit, but instead to extort money from B&G Foods.

134.   Ms. Embry has never read any scientific literature or analysis showing that acrylamide in food causes cancer.

135.   She likewise has no idea what a safe level of acrylamide in food would be, even though she acknowledged that she had entered into settlement agreements in the past allowing for acrylamide levels of up to 280 parts per billion.

136.   She was unaware of "any scientific study about whether the cookie cakes" cause cancer or birth defects or whether any person had ever contracted cancer or has had a birth defect as a result of eating the Cookie Cakes.  Deposition of Kim Embry, Nov. 13, 2020 ("Embry Dep."), 80:9-21.

137.   Ms. Embry did not do any research as to how often people eat Cookie Cakes before claiming in her complaint that people eat Cookie Cakes so frequently they are at risk of cancer or birth defects.  Embry Dep. 82:22-83:22.

138.   Ms. Embry never purchased the Cookie Cakes and did not know of anyone who ever had.  Embry Dep. 77:12-14.

139.   In short, Ms. Embry simply lends her name to her lawyer and has no personal knowledge of any of the allegations in her complaints.

140.   She purports to rely on her attorney and experts, but she was not aware of any expert analysis pertinent to her lawsuit against B&G Foods.

141.   Ms. Embry produced no evidence supporting the allegations in her claims at any time during discovery.

1      142.   Ms. Embry also spoliated evidence.

2      143.   On February 16, 2021, B&G Foods served IEH with a subpoena for records relating

3  to its testing of the Cookie Cakes on behalf of Ms. Embry and the accuracy of its testing

4  methodology.

5      144.   On March 30, 2021, IEH responded to the subpoena by producing some documents

6  regarding its acrylamide testing protocols, and a letter noting that it was withholding all other

7  responsive documents based on an objection interposed by Ms. Embry that the requested

8  documents were "consumer records."

9      145.   On April 1, 2021, B&G Foods asked IEH if it had retained any of the Cookie Cakes

10  it tested.

11      146.   IEH stated that it had destroyed the samples at Ms. Embry's instruction on or about

12  30 days after it tested the sample—approximately May 4, 2019, after Plaintiff initiated the litigation

13  by filing her April 19, 2019, Notice of Violation.

14      147.   B&G Foods requested that Ms. Embry dismiss her claim, given the evidence upon

15  which she based her entire lawsuit had been destroyed after commencement of the action.

16      148.   Ms. Embry declined to do so, admitting that the spoliation was intentional and,

17  indeed that it was her practice to spoliate the product samples in every Proposition 65 case she

18  brought.

19      149.   Ms. Embry demanded B&G Foods pay her $500,000 in exchange for a dismissal.

20      150.   When B&G Foods did not pay, Ms. Embry moved to stay the case.

21      151.   EHA is a sham organization formed by Noam Glick so that he can file Proposition

22  65 cases without the inconvenience of an actual client.

23      152.   EHA did not produce any evidence supporting its claims.

24      153.   EHA admitted in discovery that it "does not have, and has never had" any

25  documents concerning the frequency with which consumers consume cakes, cookies, bars, or any

26  other similar product, including the Sandwich Cookies, and ruled exclusively on the National

27  Health Nutrition Examination Survey database—which shows that people eat cookies infrequently.

28

FIRSTSECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

154.   EHA failed to provide or identify any evidence showing that acrylamide causes or potentially causes cancer.

155.   EHA failed to provide or identify any evidence showing that acrylamide is known to the State of California to cause cancer.

156.   EHA did not produce any documents supporting its claim.

157.   EHA admitted it had not reviewed any scientific research, analysis, or studies showing that acrylamide in food causes cancer.

158.   EHA admitted that it had done no research into the State of California's knowledge regarding acrylamide's carcinogenic effects.

159.   EHA also admitted that acrylamide forms in food when it is baked.

160.   EHA stated that it believed it is not safe for consumers to consume foods containing up to 280 parts per billion of acrylamide; but Mr. Glick signed off on a consent judgment in another matter permitting the defendant to sell products with an average level of 280 parts per billion or less without a Proposition 65 warning.

161.   EHA also admitted that it had not obtained a written statement, or interviewed any person about its claims, and that no person—including any expert—had prepared a report pertaining to its claims.

162.   This failure to investigate a claim prior to initiating a Proposition 65 action violates the requirements of Proposition 65. A private enforcer must execute a certificate of merit stating it "has consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the exposure to the listed chemical that is the subject of the action, and that, based on that information, the person executing the certificate believes there is a reasonable and meritorious case for the private action." Cal. Health and Safety Code § 25249.7(d)(1).  The certificate of merit must be served on the Attorney General.  *Id.*

163.   Neither has dismissed their claims, even though they have no evidence showing that they are meritorious, and they are aware that it is unconstitutional to compel B&G Foods to place a false label on its products.

2.   ~~Defendants' lawsuits against B&G Foods are part of a series of lawsuits brought pursuant to their policy of starting legal proceedings without regard to their merit and for an unlawful purpose.~~

164.   ~~Defendants file a high volume of Notice of Violation with the hope that some accused parties will pay them to go away. This is their business model. They are not interested in the merits of their cases, because their goal is to impose litigation costs on defendants. The expense and burden of litigation is sufficient to coerce some defendants into labelling their products as carcinogens, regardless of whether it is true.~~

165.   ~~Defendants typically will abandon their claims prior to a final adjudication when these "shake-down" tactics do not work.~~

166.   ~~Defendant Embry has filed at least 260 Notices of Violation.~~

167.   ~~Of those, she withdrew 129 without filing suit or obtaining a settlement.~~

168.   ~~Of the remaining 131 Notices of Violation, Defendant Embry settled just 25 cases.~~

169.   ~~Apart from her suit against B&G Foods, the remainder have not been meaningfully prosecuted.~~

170.   ~~Thus, less than ten percent of Defendants' Proposition 65 acrylamide lawsuits have resulted in any sort of resolution.~~

171.   ~~And virtually all of those settlements were for small, five-figure sums—classic "nuisance value" settlements paid by defendants because, as detailed above, the nature of Proposition 65 makes defending lawsuits prohibitively expensive, and not because the claims have any merit.~~

172.   ~~These settlements do not demonstrate that Defendants' cases were meritorious or successful, but rather simply underscore that Defendants have a successful "shake-down" racket.~~

173.   ~~Therefore, Ms. Embry's litigation history has produced no meaningful public benefit, and is comprised overwhelmingly of meritless cases she was unwilling or unable to prosecute.~~

174.   ~~Similarly, EHA has filed over 800 Notices of Violation.~~

175.   ~~Less than 30% of these Notices of Violation resulted in the filing of a complaint.~~

176.   ~~Only approximately 20% of EHA's Notices of Violation resulted in any kind of settlement.~~

48

1    177.   Defendants do not bring these cases out of a genuine interest in redressing a
2    grievance or protecting the public.

3    178.   Rather, Defendants fire off Notices of Violation at a blistering rate, without
4    meaningful pre-suit investigation, hoping that they will acquire quick nuisance settlements.

5    179.   On information and belief, Defendants are willing to trade away benefits to the
6    public and the State in exchange for larger settlement payments.

7    180.   On information and belief, the "attorney's fees" claimed by Defendants in their
8    settlements are inflated, and bear little to no relationship to the amount of time or effort
9    Defendants' counsel expend in prosecuting Proposition 65 actions.

10   181.   Defendants are aware that it is unconstitutional to compel a company to falsely label
11   its products, but they have sought to do so hundreds of times, and will continue to do so unless the
12   Court intervenes.

13
14   **3.   Third, Defendants' lawsuits against B&G Foods are predicated on a succession of misrepresentations to the state courts.**

15   182.   Defendants' lawsuits allege acrylamide in food causes cancer, and is known to the
16   state of California to cause cancer; but as Defendants know full well, there is no sound, scientific
17   basis for that notion.

18   183.   Defendants also allege that the Cookie Cakes and Sandwich Cookies cause cancer,
19   despite knowing full well that there is no evidence to support that allegation.

20   184.   Defendants also represent to the Court that they have completed an investigation
21   into the facts of their claims and have found that it is likely that B&G Foods's products require
22   Proposition 65 warning labels, which is not true.

23
24   **IV.   DEFENDANTS' CONDUCT HAS INJURED B&G FOODS**

238.   185. Defendants' conduct has caused B&G Foods to incur monetary damages by
25   imposing litigation costs in excess of $345,000, and impugning the reputation of its products and
26   brands.

27                                    **CAUSES OF ACTION**

28                          **First Cause of Action against All Defendants**

                                              49

**(42 U.S.C. § 1983)**
**(Violation of the First ~~and Fourteenth Amendments~~Amendment to the United States Constitution)**

239. ~~186.~~ Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

240. ~~187.~~ The Free Speech Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech." U.S. CONST. AMEND. I. The Fourteenth Amendment of the United States Constitution made this proscription applicable to the States and their political subdivisions. *Id.* AMEND. XIV § 1.

241. ~~188.~~ In addition to providing protections against restrictions on speech, the First Amendment provides protection against the government *compelling* individuals or entities to engage in speech.

242. ~~189.~~ Under the First Amendment, laws compelling speech receive strict scrutiny. *Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977). Laws regulating commercial speech generally receive at least intermediate scrutiny, *i.e.*, they are prohibited if they do not directly and materially advance the government's interest, or are more extensive than necessary. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). And even laws that require businesses to provide information in connection with commercial transactions are permissible only if the compelled disclosure is of information that is purely factual and uncontroversial, reasonably related to a substantial government purpose, and not unjustified or unduly burdensome. *Nat'l Inst. of Family Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372, 2377; *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).

243. ~~190.~~ A Proposition 65 warning, irrespective of the specific language used, conveys that the chemical at issue (here, acrylamide) causes cancer in humans.

244. ~~191.~~ Contrary to the warning mandated by Proposition 65, there is no reliable scientific evidence that dietary acrylamide found in the Cookie Cakes or Sandwich Cookies increases the risk of cancer in humans.

245. ~~192.~~ To the contrary, a large number of epidemiological studies suggest that there is no association between exposure to acrylamide from food products and cancer in humans.

246. ~~193.~~ Nor does California "know" that dietary acrylamide causes cancer.

50

247. ~~194.~~ In fact, the California agency responsible for implementing Proposition 65, OEHHA, has admitted that it does *not* know that acrylamide is a human carcinogen.

248. ~~195.~~ The Proposition 65 warning requirement as applied to acrylamide in the Cookie Cakes or Sandwich Cookies thus seeks to compel speech that is literally false, misleading, and factually controversial.  *See California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022).

249. ~~196.~~ Because Proposition 65's warning requirement as applied to acrylamide in the Cookie Cakes and Sandwich Cookies is false, misleading, and factually controversial, it cannot survive any level of constitutional scrutiny.  *See Video Software Dealers Ass'n v.  Schwarzenegger*, 556 F.3d 950, 967 (9th Cir.  2009) ("[T]he State has no legitimate reason to force retailers to affix false information on their products.").  Proposition 65's warning as applied constitutes impermissible compelled speech under the First Amendment and should be enjoined.

250. ~~197.~~ Defendants are enforcement representatives of the State of California.  Their actions are regulated, governed by and ostensibly taken to economically benefit the State.

251. ~~198.~~ Defendants seek to enforce Proposition 65 against Plaintiff based on the alleged presence of acrylamide in the Cookie Cakes and Sandwich Cookies.

252. ~~199.~~ Defendants' threatened enforcement and prosecution violates Plaintiff's rights under the First Amendment to the Constitution, by impermissibly seeking to require Plaintiff to place an objectionable warning on its products that would falsely tell consumers the products cause cancer.  *See California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022).

253. ~~200.~~ Cookie Cakes and Sandwich Cookies have never caused cancer.

254. ~~201.~~ Defendants' threatened enforcement is made under color of state law for many reasons highlighted throughout this Complaint:  The State is entwined and has a symbiotic relationship with Defendants; Defendants are fulfilling a traditional governmental function; and Defendants and the State are engaged in conduct that would rise to a conspiracy.

255. ~~202.~~ All of those actions involve an intended violation of Plaintiff's First Amendment Rights.

256. 203. Further, a California statute and California court are necessarily involved in this dispute.

257. 204. Plaintiff is entitled to an injunction against further prosecution or threats of prosecution under Proposition 65 related to the alleged acrylamide in its Cookie Cakes and Sandwich Cookies, and to an award of double Plaintiff's damages, including attorneys' fees and costs, as permitted under Section 1983.

258. 205. Federal courts are obligated under Section 1983 to provide a remedy against state prosecutions impinging on Constitutional rights, including the First Amendment. *Mitchum v. Foster*, 407 U.S. 225, 227 (1972).

259. 206. Moreover, Defendants' Proposition 65 litigation relating to the alleged acrylamide in the Cookie Cakes and Sandwich Cookies is not protected petitioning activity because their lawsuits are objectively baseless and Defendants' motive in bringing them was to extort money from B&G Foods; Defendants initiated litigation against B&G Foods as part of a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of extorting settlements; and, Defendants made intentional misrepresentations to the court.

**Second** Cause of Action Against All Defendants
(42 U.S.C. § 1983)
(Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution)

207.   Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

208.   One of the most basic guarantees of Due Process is that laws "be sufficiently clear so as not to cause persons of common intelligence …necessarily [to] guess at its meaning and [to] differ as to its application …." *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996) (quoting *Connallly v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

209.   For this reason, courts have long recognized that laws which are vague are voided by the Due Process Clause, the so-called void-for-vagueness doctrine.  This doctrine is premised on the notion that:

[v]ague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. ... Third, but related, where a vague statute "abuts upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of those freedoms." Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

210.    Thus, where a regulation implicates speech, as here, "heightened vagueness scrutiny applies." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001).

211.    In the vagueness context, the requirement that laws be precise is aimed at preventing "chill":  rather than risk sanctions, citizens will steer far wider than necessary to avoid engaging in prohibited speech; the First Amendment, however, needs breathing space to survive.  Accordingly, "the standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432-33 (1963).

212.    Proposition 65's warning requirement for acrylamide, as applied to the Cookie Cakes and Sandwich Cookies, is impermissibly vague for two separate and independent reasons.

213.    **First**, Proposition 65's cooking exception is impermissibly vague because it requires a business to show that "sound considerations of public health" merit an alternative risk level, an undefined and undefinable term.

214.    Accordingly, Proposition 65's warning requirement for acrylamide violates the Due Process Clause as applied to the Cookie Cakes and Sandwich Cookies.

215.    **Second**, because the NSRL is not predetermined, but rather established on a case-by-case basis and only after litigation, it is impossible for businesses to know whether a warning is required.

216.    This is particularly so in the context of acrylamide because the NSRL level is very low and not in any way related to the risk dietary acrylamide poses to humans (namely, none at all).

217.    Moreover, Defendants' Proposition 65 litigation relating to the alleged acrylamide in the Cookie Cakes and Sandwich Cookies is not protected petitioning activity because their lawsuits

53

1   are objectively baseless and Defendants' motive in bringing them was to extort money from B&G

2   Foods; Defendants initiated litigation against B&G Foods as part of a series of lawsuits brought

3   pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of

4   extorting settlements; and, Defendants made intentional misrepresentations to the court.

5         218.   Defendants are enforcement representatives of the State of California.  Their actions

6   are regulated, governed by and ostensibly taken to economically benefit the State.

7         219.   Defendants seek to enforce Proposition 65 against Plaintiff based on the alleged

8   presence of acrylamide in the Cookie Cakes and Sandwich Cookies.

9         220.   Cookie Cakes and Sandwich Cookies have never caused cancer.

10        221.   Defendants' threatened enforcement is made under color of state law for many

11   reasons highlighted throughout this Complaint:  The State is entwined and has a symbiotic

12   relationship with Defendants; Defendants are fulfilling a traditional governmental function; and

13   Defendants and the State are engaged in conduct that would rise to a conspiracy.

14        222.   Further, a California statute and California court are necessarily involved in this

15   dispute.

16        223.   Plaintiff is entitled to an injunction against further prosecution or threats of

17   prosecution under Proposition 65 related to the alleged acrylamide in its Cookie Cakes and

18   Sandwich Cookies, and to an award of double Plaintiff's damages, including attorneys' fees and

19   costs, as permitted under Section 1983.

20        224.   Federal courts are obligated under § 1983 to provide a remedy against state

21   prosecutions impinging on Constitutional rights, including the First Amendment.  *Mitchum v.*

22   *Foster*, 407 U.S. 225, 227 (1972).

23        225.   Moreover, Defendants' Proposition 65 litigation relating to the alleged acrylamide in

24   Cookie Cakes and Sandwich Cookies is not protected petitioning activity because their lawsuits are

25   objectively baseless and Defendants' motive in bringing them was to extort money from B&G

26   Foods; Defendants initiated litigation against B&G Foods as part of a series of lawsuits brought

27   pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of

28   extorting settlements; and, Defendants made intentional misrepresentations to the court.

~~Third~~ **Cause of Action against All Defendants**
**Declaratory Judgment**
(28 U.S.C. § 2201)

260. ~~226.~~ Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

261. ~~227.~~ There is an actual and imminent controversy between the parties regarding whether the application of Proposition 65's acrylamide warning requirement to the Cookie Cakes and Sandwich Cookies violates the First ~~and/or Fourteenth~~ Amendments to the United States Constitution.

262. ~~228.~~ Plaintiff accordingly requests a declaration that the enforcement of Proposition 65 against the Cookie Cakes and Sandwich Cookies is unconstitutional.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief against Defendants as follows:

A.     For an injunction against further unconstitutional threats and lawsuits against Plaintiff regarding the acrylamide in its Cookie Cakes and Sandwich Cookies products.

B.     A declaration that the Proposition 65 warning requirement for cancer as applied to Cookie Cakes and Sandwich Cookies violates the First Amendment of the United States Constitution.

C.     For damages in an amount to be determined according to proof.

D.     Plaintiff's attorneys' fees and costs.

E.     All such other and further relief as the Court may deem just, proper, and equitable.

Dated: ~~July 7~~November 23, 2022                                          Respectfully Submitted,

                                                                                    BRAUNHAGEY & BORDEN LLP


                                                                                    By:  */s/ J. Noah Hagey*_____
                                                                                         J.  Noah Hagey

                                                                                    *Attorneys for Plaintiff*
                                                                                    *B&G Foods North America, Inc.*