1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   B&G Foods North America, Inc.,                    No. 2:20-cv-00526-KJM-DB

12                       Plaintiff,                     ORDER

13          v.

14   Kim Embry and Environmental Health
     Advocates, Inc.,
15

16                       Defendants.

17

18          Plaintiff B&G Foods North America, Inc. (B&G) brings this action under 42 U.S.C.

19   § 1983 against defendants Kim Embry and Environmental Health Advocates, Inc. (EHA).  B&G

20   alleges defendants violated its First Amendment rights by bringing private enforcement actions

21   under California chemical disclosure rules commonly known as "Proposition 65."  Defendants

22   contend B&G's complaint is barred by *Noerr-Pennington* immunity and in the alternative urge

23   there is no state action.  In response, B&G argues defendants' Proposition 65 lawsuits are a sham

24   and are not entitled to protection under *Noerr-Pennington*, and it claims private enforcement

25   actions under Proposition 65 are state action.  Finding B&G plausibly pleads defendants'

26   Proposition 65 actions are shams and state action, the court **denies** defendants' motion to dismiss.

27   /////

                                                 1

1    Defendants also move for sanctions under Federal Rule of Civil Procedure 11.  They

2    claim B&G's factual allegations contradict the exhibits to its complaint and run afoul of this

3    court's previous orders.  In response, B&G contends defendants' Rule 11 motion itself violates

4    Rule 11 and accordingly requests sanctions.  As explained below, the court **denies** these motions.

5    **I.      BACKGROUND**

6    B&G sold and distributed devil's food cookie cakes and chocolate crème sandwich

7    cookies across the United States.  Second Am. Compl. (SAC) ¶ 7, ECF No. 57.  These cakes and

8    cookies contained acrylamide, a naturally occurring byproduct of all baking.  *Id.* ¶ 9.  Since 1990,

9    California has included acrylamide on its list of "known" carcinogens regulated by Proposition

10   65, although acrylamide was not detected in food until 2002.  *Id.* ¶ 10.

11   Proposition 65 imposes certain warning requirements on foods and drinks that contain

12   chemicals on this list, *see* Cal. Health & Safety Code §§ 25249.6, 25249.8(a), and it permits

13   private litigants to enforce those warning requirements after sending the alleged violator a

14   "Notice of Violation," *see id.* § 25249.7(d)(1).  This notice must also be provided to the

15   California Attorney General and local prosecutors 60 days before filing suit.  *Id.*  The notice must

16   further state the private enforcer "consulted with one or more persons with relevant and

17   appropriate experience or expertise who has reviewed facts, studies, or other data regarding the

18   exposure to the listed chemical."  *Id.*  If the Attorney General's Office does not believe the action

19   has merit, then it shall notify the parties of that determination, although that determination does

20   not preclude the private enforcer from proceeding with a lawsuit.  *Id.* § 25249.7(e)(1)(A).  If, in

21   the alternative, the Attorney General commences a public action, then the private party may not

22   pursue the claim.  *Id.* § 25249.7(d)(2).  Only if the 60-day period ends without public

23   enforcement may the private party file the lawsuit.  *Id.* § 25249.7(c), (d).  If the private party does

24   bring an action, it must notify the Attorney General when the action is filed, and again when the

25   action concludes in settlement or a judgment.  *Id.* § 25249.7(e)(2), (f)(1).  A court must approve

26   any settlement agreement, and the Attorney General may appear and participate in the settlement

27   proceedings without intervening.  *Id.* § 25249.7(f)(4), (f)(5).  Lastly, the Attorney General must

1    maintain records of private Proposition 65 enforcement actions, including reporting forms for

2    proposed settlement agreements.  *Id.* § 25249.7(g).

3          Defendants sent Notices of Violation to B&G about its cakes and cookies, intending to

4    require B&G to place a warning label on them.  SAC ¶¶ 11, 62–66.  Defendants later filed

5    lawsuits in state court to enforce Proposition 65.  *Id.* ¶¶ 68–69.  B&G alleges those lawsuits rest

6    on fraudulent allegations and are intended as "shake down actions."  *Id.* ¶¶ 19–21 (internal

7    quotation marks omitted).  B&G further alleges those lawsuits threaten it with "unconstitutional

8    speech requirements."  *Id.* ¶ 29.  B&G seeks injunctive relief against further acrylamide lawsuits

9    and a declaration that Proposition 65 is unconstitutional as applied to the cakes and cookies.  *Id.*,

10   Prayer for Relief A–B.  It also seeks damages.  *Id.*, Prayer for Relief C.

11         This court dismissed B&G's previous complaint without leave to amend as barred by the

12   *Noerr-Pennington* doctrine, assuming without deciding that private enforcers are state actors.  *See*

13   Prior Order (Oct. 7, 2020), ECF No. 33; *B&G Foods N. Am., Inc. v. Embry*, No. 20-0526,

14   2020 WL 5944330 (E.D. Cal. Oct. 7, 2020).  The Ninth Circuit affirmed the dismissal but

15   reversed and remanded to give B&G an opportunity to amend its complaint.  *See B&G Foods N.*

16   *Am., Inc. v. Embry*, 29 F.4th 527 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 212 (Oct. 3, 2022).

17         Concurrently, while this case has unfolded, the California Chamber of Commerce pursued

18   similar claims and relief in this court.  *See Cal. Chamber of Com. v. Becerra*, 529 F. Supp. 3d

19   1099, 1110–11 (E.D. Cal. 2021), *aff'd*, 29 F.4th 468 (9th Cir. 2022), *cert. denied*, ___ S. Ct. ___,

20   2023 WL 2959385 (Apr. 17, 2023).  The Chamber of Commerce urged the court to find the

21   Proposition 65 warning requirement violates the First Amendment as applied to acrylamide in all

22   food and beverage products.  *See id.* at 1110.  On a motion for preliminary injunction, the court

23   enjoined new actions to enforce Proposition 65's warning requirements in that context.  *Id.* at

24   1123.  Following the preliminary injunction, defendants requested a stay of their litigation against

25   B&G.  SAC ¶ 26.

26         After the Ninth Circuit's remand in this case, B&G filed an amended complaint.  First

27   Am. Compl. (FAC), ECF No. 45.  This court again dismissed the complaint as barred by the

28   *Noerr-Pennington* doctrine, finding insufficient allegations to permit an inference defendants'

1    lawsuits are a sham.  *See* Prior Order (Nov. 3, 2022), ECF No. 56; *B&G Foods N. Am., Inc. v.*
2    *Embry*, ___ F. Supp. 3d ___, 2022 WL 16702141 (E.D. Cal. Nov. 3, 2022).  The court granted
3    leave to amend, explaining it appeared B&G could add factual allegations to plausibly plead
4    defendants' Proposition 65 litigation is a sham, for example by alleging defendants committed
5    fraud when purporting to comply with the Proposition 65 process.  *See* Prior Order (Nov. 3, 2022)
6    at 16.

7         B&G has now filed a second amended complaint.  *See generally* SAC.  It has added at
8    least four new categories of allegations to plead defendants' Proposition 65 litigation is a sham.
9    First, it alleges defendants chose a laboratory to test samples based on the lab's unreliable
10   methods, which in fact produced false results, then destroyed those samples so they could not be
11   retested.  *Id.* ¶¶ 75–85.  Second, it alleges defendants made false statements in their certificates of
12   merit, including by falsely stating they had consulted with experts.  *Id.* ¶¶ 86–102.  Third, it
13   alleges defendants did not conduct the required pre-lawsuit investigation, including investigating
14   whether an affirmative defense would block the action.  *Id.* ¶¶ 103–23.  Fourth, it alleges
15   defendants knowingly made false or misleading statements in their state court complaint.  *Id.*
16   ¶¶ 124–45.

17        Defendants now move to dismiss B&G's second amended complaint on the same grounds
18   as before.  *See* Mot. Dismiss, ECF No. 66.  They argue the complaint still does not plausibly
19   plead that the Proposition 65 litigation is a sham, nor that defendants are engaged in state action.
20   *Id.*  At the same time, defendants move for sanctions under Rule 11.  *See* Mot. Sanctions, ECF
21   No. 68.  B&G opposes both motions and also moves for sanctions.  *See* Opp'n to Mot. Dismiss,
22   ECF No. 69; Opp'n to Mot. Sanctions, ECF No. 71.  Defendants have replied.  *See* Reply on
23   Dismissal, ECF No. 75; Reply on Sanctions, ECF No. 76.  The court held oral argument on the
24   motions on March 10, 2023.  David Kwasniewski and Matthew Borden represented B&G, and
25   Noam Glick appeared for defendants.  The court submitted the motion.[1]  Hr'g Mins. (Mar. 10,
26   2023), ECF No. 79.

---

[1] After the hearing and the motions were submitted, the parties filed an unauthorized
"statement" and reply.  *See* Statement, ECF No. 80; Reply, ECF No. 81.  Parties must seek the

1 **II. MOTION TO DISMISS**

2   **A. Legal Standard and Introduction**

3   A party may move to dismiss for "failure to state a claim upon which relief can be

4 granted." Fed. R. Civ. P. 12(b)(6). On a motion to dismiss, the court assumes all factual

5 allegations are true, construing "them in the light most favorable to the nonmoving party."

6 *Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (mark and

7 citation omitted). The motion may be granted if the complaint's factual allegations do not

8 support a "cognizable legal theory." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114,

9 1122 (9th Cir. 2013). To survive a motion to dismiss, a complaint need contain only a "short and

10 plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2),

11 not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But

12 formulaic recitations of elements are inadequate. *Id.* "Sufficient factual matter" must state a

13 claim to relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

14   As the court explained previously, the Ninth Circuit's decisions conflict regarding

15 whether a plaintiff faces a heightened pleading standard to overcome *Noerr-Pennington*

16 immunity. *See* Prior Order (Nov. 3, 2022) at 3–5[2] (citing, among other cases, *Kottle v. Nw.*

17 *Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir. 1998); *Empress LLC v. City & County of San*

18 *Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005); *Kearney v. Foley & Lardner, LLP*, 590 F.3d

19 638, 646–47 (9th Cir. 2009)). As before, the court applies a heightened pleading standard to

20 *Noerr-Pennington* sham exceptions based on fraud under Rule 9(b) and otherwise applies the

21 Rule 8(a) standard. *See id.*; Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state

22 with particularity the circumstances constituting fraud or mistake."); *Kearney*, 590 F.3d at 647

23 (explaining "required specifics would include such things as exactly what representations

24 defendant made, or to whom; with whom defendant conspired; and what exactly its improper

25 and/or unlawful methods of advocacy were" (internal quotation marks and brackets omitted)).

___

court's leave before filing supplemental briefing. Because the parties did not do so, the court has
not considered these documents.

  [2] Pagination refers to the original document, not page numbers applied by the CM/ECF
system.

1   This court has twice assumed without deciding that if defendants are state actors who can

2   be sued under 42 U.S.C. § 1983, they would be entitled to the protections of the

3   *Noerr-Pennington* doctrine.  *See* Prior Order (Oct. 7, 2020) at 4; Prior Order (Nov. 3, 2022) at 6.

4   The Ninth Circuit made the same assumption when resolving the appeal of this court's first order.

5   *See* 29 F.4th at 536 ("Assuming Defendants are state actors, our precedent compels the

6   conclusion that their activities were protected by the Petition Clause.").  For that reason, the court

7   begins with the same threshold question here as before: has B&G pled enough to permit a

8   reasonable inference defendants' Proposition 65 litigation is a sham and thus exempted from

9   *Noerr-Pennington* immunity?  The court concludes B&G now has, as explained below, then

10  addresses whether defendants are state actors.

11      **B.      Whether Defendants' Litigation Is a Sham**

12      "Under the *Noerr-Pennington* doctrine, those who petition any department of the

13  government for redress are generally immune from statutory liability for their petitioning

14  conduct."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  This protection arises from

15  the First Amendment's Petition Clause, *see id.*, and it includes litigation in a state's courts, *see*

16  *Kottle*, 146 F.3d at 1059.  The Petition Clause does not, however, shield a lawsuit if it is "a mere

17  sham."  *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *see*

18  *Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 51, 56 (1993).  A

19  person cannot claim the protections of the Petition Clause when a lawsuit is "not genuinely aimed

20  at procuring favorable government action," but rather seeks a result "*through improper means*."

21  *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (quoting *Allied Tube*

22  *& Conduit Corp. v. Indian Head, Inc.*, 485 U.S. 492, 500 n.4, 508 n.10 (1988)) (emphasis in

23  original).

24      The Ninth Circuit has "identified three circumstances in which the sham exception might

25  apply in the litigation context."  *B&G Foods*, 29 F.4th at 537.  First, a lawsuit is a sham when it is

26  objectively baseless and brought for an unlawful purpose.  *See Sosa*, 437 F.3d at 938.  Second, a

27  series of lawsuits can be a sham, even if some cases in the series have merit, when brought

28  "pursuant to a policy of starting legal proceedings without regard to the merits and for an

1   unlawful purpose." *B&G Foods*, 29 F.4th at 537 (quoting *Sosa*, 437 F.3d at 938).  Third,

2   litigation predicated on "intentional misrepresentations to the court" is a sham if that "knowing

3   fraud . . . deprive[s] the litigation of its legitimacy." *Kottle*, 146 F.3d at 1060 (quoting *Liberty*

4   *Lake Invs., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir. 1993)).

5          This court has previously explained why those three circumstances must not be treated as

6   rigid and independent categories.  Prior Order at 7–8.  The court also has described why the

7   inquiry must focus on whether the alleged harm was caused by an outcome of legitimate process

8   or an abuse of the process itself.  *Id.*; *see also Manistee Town Ctr. v. City of Glendale*, 227 F.3d

9   1090, 1095 (9th Cir. 2000).  As explained below, assuming the complaint's allegations are true,

10  as the court must at this early stage, the court can infer B&G could prove the underlying litigation

11  was a sham because it was predicated on misrepresentations.  Three sets of allegations support

12  this conclusion.

13         First, B&G claims defendants "intentionally and willfully destroyed the only products

14  they tested to support their claims," which prevents B&G from assessing the test's accuracy.

15  SAC ¶ 75.  It alleges defendants chose "an out-of-state laboratory that uses non-standard testing

16  procedures (including the destruction of all samples immediately after testing)," and as a result,

17  the laboratory's "improper or unreliable testing methodologies . . . produce skewed results

18  showing unusually high levels of acrylamide are present in foods." *Id.* ¶ 76.  Those results, which

19  form the basis of defendants' lawsuits, are plausibly fraudulent in part because "B&G Foods' own

20  testing showed that the acrylamide levels in the Cookies were . . . below the [No Significant Risk

21  Level (NSRL)]," the threshold below which Proposition 65 warnings do not apply.  *Id.*

22  Moreover, when B&G contacted the lab plaintiffs used about retesting the cakes and cookies, it

23  responded "it had destroyed the samples at Ms. Embry's instruction," just after she filed her

24  lawsuit. *Id.* ¶ 80.  When B&G discussed this issue with Ms. Embry, she said "it was her practice

25  to spoliate the product samples in every Proposition 65 case she brought." *Id.* ¶ 82.  Specific

26  allegations about a defendant's efforts to suppress crucial evidence can allow a court to infer an

27  otherwise protected petition was a sham.  *See Kearney*, 590 F.3d at 647.  Although defendants

28  provide a reasonable explanation for the destruction of these samples, *see* Mot. Dismiss at 5–6,

the court does not resolve this factual dispute here, nor can it substitute B&G's allegations with defendants' explanations; it must take B&G's allegations as true and draw reasonable inferences in its favor.

Second, B&G alleges defendants' certificates of merit, which private enforcers are required to serve on an alleged violator and the Attorney General, falsely claimed they had consulted with experts before filing their private enforcement actions. *Id.* ¶¶ 86–88, 96–97. B&G avers "EHA admitted that it had not obtained a written statement or interviewed any person about its claims, and that no person—including any expert—had prepared a report pertaining to its claims." *Id.* ¶ 97. If defendants did not consult with an expert before filing, but claimed they had, then the lawsuits are a sham because they are predicated on intentional misrepresentations. *See Kottle*, 146 F.3d at 1060 (quoting *Liberty Lake*, 12 F.3d at 158).

Third, the allegations about the certificates of merit are bolstered by B&G's allegations that defendants did not conduct the required pre-lawsuit investigation. *See, e.g.*, SAC ¶ 103. As relevant here, B&G alleges "Ms. Embry did not do any research into how often people eat Cookie Cakes or similar products," *id.* ¶ 110, and EHA admitted it never had documents about the frequency with which consumers eat cakes, cookies or similar products, *id.* ¶ 111. B&G also claims defendants' expert did not consider the rate of consumption, which would be necessary to determine whether the cakes and cookies required a Proposition 65 warning. *Id.* ¶¶ 113–15. These allegations could show, as B&G says, that defendants did not investigate "an obvious affirmative defense," as required, *id.* ¶ 116, which would be a further misrepresentation.

As the court has previously emphasized, litigation is unlikely to be protected petitioning activity when the plaintiff has abused the process in pursuit of an improper goal. *See* Prior Order (Nov. 3, 2022) at 7–8, 14–15. Here, in light of the allegations reviewed above, B&G also puts forward allegations of abuse of legal process. B&G pleads defendants "are not interested in the merits of their cases, because their goal is to impose litigation costs . . . [and] coerce" action, while generating fees from settlements. SAC ¶ 160. B&G alleges less than ten percent of Ms. Embry's and about twenty percent of EHA's cases result in a favorable resolution. *Id.* ¶¶ 171, 177. This court previously concluded these numbers alone could not show the litigation is a sham

and that "[m]ore facts would be needed to tip the scale from possible to plausible."  Prior Order
(Nov. 3, 2022) at 12.  B&G now has included the necessary facts.  In addition to the new
allegations discussed above, B&G alleges two instances of the Attorney General objecting to
defendants' prior proposed settlement agreements.  *See* SAC ¶¶ 182–84.  First, the Attorney
General objected to one of defendants' prior proposed Proposition 65 settlement agreements
because it was contrary to law and against public policy; defendant "appears to have abandoned
this litigation" after receiving the letter.  *Id.* ¶ 182.  Second, the Attorney General objected to a
proposed settlement agreement based on the distribution of penalties and fees, concluding the
agreement was "not likely to result in any benefit to the public."  *Id.* ¶ 183.  In response, the
parties "rescinded the settlement agreement" and did not submit another for review.  *Id.* ¶ 184.
B&G also alleges "the products at issue in [defendants' other cases] contained levels of
acrylamide below the NSRL."  *Id.* ¶ 173.

These allegations tip the scale and plausibly plead defendants engaged in sham litigation.
In short, B&G alleges defendants use an unreliable, out-of-state laboratory to produce inaccurate
NSRL results; destroy the product samples so they cannot be retested; refuse to conduct the
required pre-lawsuit investigation; and use fraudulent test results in Notices of Violation and
lawsuits with the aim of collecting fees rather than ending violations of Proposition 65, all
without a legitimate basis.  *See, e.g.*, *id.* ¶¶ 164–67.  These allegations plausibly support B&G's
claims that defendants are not entitled to the protection of the *Noerr-Pennington* doctrine because
their underlying lawsuits do not seek vindication in the courts, but rather abuse legal process for
private gain.

In their motion to dismiss, defendants raise a litany of arguments for why these allegations
fall short.  *See* Mot. Dismiss at 5–8, 11–12.  Defendants' arguments share a common flaw.  They
contend the complaint's allegations are contradicted and disproven by extrinsic evidence or
otherwise should not be taken at face value.  However, in deciding a motion to dismiss for failure
to state a claim, it is hornbook law that a court not only assumes all factual allegations are true; it
also construes those allegations "in the light most favorable to the nonmoving party."  *Steinle*,
919 F.3d at 1160.  Defendants would have this court do the opposite.

1    For example, defendants argue B&G's exhibits undermine its allegation that Ms. Embry

2  disposed of the samples.  Mot. Dismiss at 5 (citing SAC ¶ 80).  Although the exhibit does not

3  show Ms. Embry instructed the lab to destroy the samples, its contents do not contradict or

4  undermine the complaint's allegations.  *Compare* SAC ¶ 80 *with* Kwasniewski Decl. Ex. J, ECF

5  No. 57-10.  On this record, the court cannot draw an adverse inference against B&G.  Similarly,

6  defendants claim the destruction of evidence is in fact "a regular disposal practice of perishable

7  product samples," and that the test results, not the particular products tested, are the evidence.

8  Mot. Dismiss at 5.  Neither argument is persuasive at this stage.  The first argument is

9  contradicted by B&G's allegation that destruction of samples after testing is "non-standard," and

10  the second is contradicted by the allegation that B&G could not "ever uncover[] how Defendants

11  tested the products or [determine] if the testing was accurate or reliable."  SAC ¶ 76.  Defendants'

12  contentions do not eviscerate B&G's allegations.

13    For similar reasons, defendants cannot obtain a dismissal under Rule 12(b)(6) by now

14  rationalizing their interrogatory responses from the underlying litigation, which B&G offers as an

15  illustration of its allegation that defendants' certificates of merit were false.  Mot. Dismiss at 7;

16  *see* SAC ¶ 97; Ex. F, Pl. Resp. to Form Interr., ECF No. 57-6.  The court cannot reduce B&G's

17  allegations to only the information verified by the complaint's exhibits.  Nor is it clear at this

18  early stage whether defendants' rationalizations are persuasive on their own terms.  *See* Opp'n to

19  Mot. Dismiss at 10 (advancing plausible competing interpretation of interrogatory response).

20    As a final example, defendants cannot prevail by claiming B&G's allegations about

21  inadequate pre-lawsuit investigations are contradicted by the Notices of Violation.  Mot. Dismiss

22  at 11 (citing Exs. C, D, Req. for Judicial Notice).[3]  The court takes judicial notice of the Notices

---

[3] Defendants request the court take judicial notice of a series of documents comprised of official public records and court filings in other matters.  *See* Req. for Judicial Notice, ECF No. 66-2.  The request is unopposed.  A court may "take judicial notice of adjudicative facts 'not subject to reasonable dispute.'"  *United States v. Chapel*, 41 F.3d 1338, 1342 (9th Cir. 1994) (quoting Fed. R. Evid. 201(b)).  "Adjudicative facts are simply the facts of the particular case."  Advisory Notes to Fed. R. Evid. 201.  Where, as here, a party requests judicial notice of a series of documents, two problems arise.  One issue is some documents might not be a proper source for the facts included, and another is the significant volume of information often presents irrelevant facts, which are by their nature not adjudicative.  *See Fed. Energy Regul. Comm'n v. Vitol Inc.*,

1   of Violation, *see* Ex. C, Req. for Judicial Notice, ECF No. 66-2; Ex. D, Req. for Judicial Notice,

2   ECF No. 66-2, as they are relevant, public documents and not subject to reasonable dispute.

3   However, the documents do not support defendants' position for two reasons.  First, as B&G

4   argues in its opposition, *see* Opp'n to Mot. Dismiss at 11, the expert's report does not state

5   whether defendants investigated the rate of consumption.  It thus does not undermine B&G's

6   allegations that defendants did not conduct a reasonable pre-lawsuit investigation because they

7   did not consider whether actual consumption of the cakes and cookies would exceed the NSRL.

8   *See* SAC ¶¶ 105–11, 113–15.  Second, the two Notices of Violation cited by defendants are

9   amended violation notices; defendants used a different laboratory for those notices and served

10   them after filing the lawsuits.  *See* Exs. C, D, Req. for Judicial Notice.  In light of defendants'

11   other allegations, the inclusion of an expert report using a different expert and different laboratory

12   supports an inference the defendants did not conduct the *pre*-lawsuit investigation required under

13   Proposition 65.  *See* Opp'n to Mot. Dismiss at 9.

14        Defendants' many other arguments are unpersuasive for the same basic reason: at this

15   stage, the court assumes the complaint's allegations are true and draws reasonable inferences in

16   B&G's favor; it does not investigate whether evidence from outside the complaint contradicts

17   B&G's claims or whether its allegations cannot be taken at face value.

18        In sum, the court finds B&G has plausibly pled defendants' Proposition 65 litigation is a

19   sham.  *Noerr-Pennington* immunity therefore does not apply to defendants' conduct at this stage,

20   and the court turns to whether B&G plausibly pleads defendants' private enforcement lawsuits are

21   state action.

22        **C.   Whether Defendants' Litigation Is State Action**

23        B&G claims defendants violated its First Amendment rights and seeks relief under

24   section 1983.  "Although most rights secured by the Constitution are protected only against

25   infringements by the government, in certain circumstances, a litigant may seek damages under

---

2021 WL 6004339, at *1 (E.D. Cal. Dec. 20, 2021).  The court therefore considers specific facts, when those facts are relevant and not subject to reasonable dispute, and takes judicial notice of them and relies on them.

42 U.S.C. § 1983 from a private party based on a violation of a constitutional right."  *Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1209 (9th Cir. 2002) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982)).  "Section 1983 liability extends to a private party where the private party engaged in state action under color of law and thereby deprived a plaintiff of some right, privilege, or immunity protected by the Constitution or the laws of the United States."  *Id.* (citing *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc)).

        As a result, a threshold question here is whether defendants' Proposition 65 litigation is state action.  Courts typically use four tests to identify state action, satisfaction of any one of which would be sufficient: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus."  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835–36 (9th Cir. 1999)).  Each test asks a common question: "is the alleged infringement of federal rights fairly attributable to the government?"  *Sutton*, 192 F.3d at 835 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)) (brackets omitted).  "What is fairly attributable as state action is a matter of normative judgment, and the criteria lack rigid simplicity or clarity.  No one fact can function as a necessary condition across the board nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government."  *Kirtley*, 326 F.3d at 1092 (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001)) (cleaned up).  In short, this is a "fact-intensive" inquiry.  *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).  The plaintiff bears the ultimate burden of showing state action.  *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978)).

        To summarize, B&G's theory of state action relies at its core on its allegations that Proposition 65 deputizes private enforcers as "bounty hunters" to enforce the state's police powers, SAC ¶ 234(b), that the state regulates, monitors and encourages defendants' lawsuits, *id.* ¶¶ 234(c)–(f), and that the state dedicates an entire department to work with private enforcers, helps private enforcers pursue litigation and receives monetary compensation from them in return, *id.* ¶¶ 234(j)–37.  In short, B&G alleges defendants' lawsuits are attributable to the state because

1   they could not bring Proposition 65 lawsuits without the state's accommodation and assistance.

2   *See generally id.* ¶ 234.  B&G urges the court to find it has sufficiently pled that defendants'

3   conduct qualifies as state action under all four tests, *see* Opp'n to Mot. Dismiss at 17–20, and

4   defendants insist their conduct is not state action under any test, *see* Mot. Dismiss at 15–20;

5   Reply on Dismissal at 8–10.  Although the question makes for a close call, assuming the

6   allegations in B&G's complaint are true, the court can "draw the reasonable inference"

7   defendants acted under color of law; that conclusion is "more than [a] mere possibility" at this

8   early stage.  *Iqbal*, 556 U.S. at 678.

9        Applying the four commonly cited legal tests for state action can be a challenging

10   exercise.  The reasoning behind those tests can be difficult to generalize beyond the

11   circumstances of their creation.  At this early stage of the case, two of the four tests operate

12   together to permit the reasonable inference under *Iqbal* that defendants' Proposition 65

13   enforcement actions are "fairly attributable to the government."  *Sutton*, 192 F.3d at 835 (quoting

14   *Rendell-Baker*, 457 U.S. at 838).

15        First, consider the public function test.  It "treats private actors as state actors when they

16   perform a task or exercise powers traditionally reserved to the government."  *Ohno v. Yasuma*,

17   723 F.3d 984, 996 (9th Cir. 2013) (collecting cases).  The function must be "both traditionally

18   and exclusively governmental."  *Lee*, 276 F.3d at 555 (citing *Rendell-Baker*, 457 U.S. at 842).

19   The Supreme Court has identified certain functions traditionally exclusively reserved to the state,

20   such as the administration of elections, the operation of a company town, eminent domain,

21   peremptory challenges in jury selection[4] and in some circumstances the operation of a municipal

---

[4] At first glance, peremptory challenges in jury selection might not appear to be state action—to be a traditional and exclusive governmental function—because they are the province of attorneys often representing private interests in litigation.  However, as the Supreme Court has explained:

> Just as a government employee was deemed a private actor because of his purpose and functions in *Dodson*, so here a private entity becomes a government actor for the limited purpose of using peremptories during jury selection.  The selection of jurors represents a unique governmental function delegated to private litigants by the government and attributable to the government for purposes of

1  park.  *See United Auto Workers, Loc. No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 907 (4th

2  Cir. 1995); *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974) (cataloging cases).

3  Like the powers identified in this varied list, the function B&G traces out is a longstanding, core

4  power of the government: protecting the public from dangers to the public's health and safety.

5  Private enforcers exercise delegated enforcement power "relating to the presence of targeted

6  chemicals in the environment."  SAC ¶ 234(i).  They sue "in the public interest," not in their own

7  interest.  Cal. Health & Safety Code § 25249.7(d).  They do not need to purchase the offending

8  product or consume it.  *Id.*

9      In this way, Proposition 65 contrasts with the legal tools that might at first glance seem to

10  be privately available analogs—that is, legal tools similar to Proposition 65 enforcement actions

11  that could demonstrate defendants have wielded a power that is not traditionally exclusive to the

12  government.  The legal tools within this class remedy a wrong to a particular plaintiff, such as

13  product liability actions, negligence claims, the pursuit of an implied warranty or even an action

14  for declaratory judgment.  They are examples of classic "cases" and "controversies" that underly

15  the Supreme Court's conclusion that when the Constitution's authors wrote about the "judicial

16  power" in Article III, they were thinking of disputes in which one person has suffered or will

17  imminently suffer some "concrete" harm and asks a court to redress that injury with a favorable

18  decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992) (citation and quotation marks

19  omitted).

---

> invoking constitutional protections against discrimination by reason
> of race . . . .  [W]hen private litigants participate in the selection of
> jurors, they serve an important function within the government and
> act with its substantial assistance.  If peremptory challenges based on
> race were permitted, persons could be required by summons to be put
> at risk of open and public discrimination as a condition of their
> participation in the justice system.  The injury to excluded jurors
> would be the direct result of governmental delegation and
> participation.  Finally, we note that the injury caused by the
> discrimination is made more severe because the government permits
> it to occur within the courthouse itself.

*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627–28 (1991).

14

1      The parties point to nothing in Proposition 65 to suggest it compensates individuals for

2  injuries they suffer.  Private enforcers cannot recover damages, for example.  Nor have

3  defendants cited any other legal tools that allow private persons to protect the greater public, as

4  Proposition 65 does, which likewise would be necessary to undergird the conclusion that

5  defendants are not exercising a power that has been traditionally reserved exclusively to the

6  government.  This is not to say there are no such examples; there may very well be.[5]  But

7  defendants bear the burden to explain the basis of their motion, and they have not.  *See, e.g.*,

8  *Bryant v. Apotex, Inc.*, No. 12-01377, 2013 WL 394705, at *5 (E.D. Cal. Jan. 30, 2013) ("It is the

9  burden of the party bringing a motion to dismiss for failure to state a claim to demonstrate that the

10  requirements of Rule 8(a)(2) have not been met." (quoting *Gallardo v. DiCarlo*, 203 F. Supp. 2d

11  1160, 1165 (C.D. Cal. 2002))).

12      Second, under the joint action test, the court considers "whether 'the state has so far

13  insinuated itself into a position of interdependence with the private entity that it must be

14  recognized as a joint participant in the challenged activity.'"  *Kirtley*, 326 F.3d at 1093 (quoting

15  *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir. 1995)).  "This occurs when

16  the state knowingly accepts the benefits derived from unconstitutional behavior."  *Id.*  "Mere

17  approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding

18  the State responsible for those initiatives."  *Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982).

19  Here, drawing reasonable inferences in B&G's favor, the complaint alleges California has

20  implicitly blessed defendants' strategy of shakedown litigation and gone beyond mere approval of

21  it: the state has acceded to defendants governmental power that a private person would not

22  ordinarily possess, *see* SAC ¶ 234(a)–(d), the state communicates with defendants and receives

23  compensation as a result of defendants' enforcement efforts, *see id.* ¶¶ 234(j)–37, and the state

---

     [5] Defendants cite several statutes that permit private enforcement in the context of
protecting the public interest later in their motion.  *See* Mot. Dismiss at 20 (citing the Clean Water
Act, 33 U.S.C. § 1365; the Endangered Species Act, 16 U.S.C. § 1540(g); the Safe Drinking
Water Act, 42 U.S.C. § 300j-8; and California's Private Attorneys General Act, Cal. Lab. Code
§ 2699(i)).  However, they raise these statutes only when discussing a policy argument.  They do
not draw the connection to the public function test, nor discuss whether private enforcers of those
statutes are state actors for the purposes of section 1983.

1    keeps tabs on those enforcement efforts and can speak up when the private enforcer goes too far,

2    but it has not done so in this case, *see id.* ¶¶ 234(c)–(f).  Moreover, as discussed above,

3    defendants could not bring the contested lawsuits without the state's participation, including the

4    state's role in selecting which chemicals require warnings and reviewing Notices of Violation and

5    settlement agreements.

6          For these reasons, this case is unlike others in which courts have held private lawsuits are

7    not state action simply because they were brought in the public interest.  *See, e.g.*, *Am. Mfrs. Mut.*

8    *Ins. Co. v. Sullivan*, 526 U.S. 40, 53 (1999) ("[Courts] have never held that the mere availability

9    of a remedy for wrongful conduct, even when the private use of that remedy serves important

10   public interests, so significantly encourages the private activity as to make the State responsible

11   for it."); *The Real Est. Bar Ass'n for Mass., Inc. v. Nat'l Real Est. Info. Servs.*, 608 F.3d 110, 122

12   (1st Cir. 2010) (holding private enforcement action for unauthorized practice of law is not state

13   action).  B&G alleges the state has delegated its authority to private litigants, accommodates their

14   filing of those lawsuits, reviews the merits of their claims, encourages them to pursue action and

15   takes a cut of the award.[6]

16         Perhaps the closest analog the court has identified to this case is the set of lawsuits

17   alleging California Private Attorneys General Act (PAGA) actions infringe on constitutional

18   rights.  Under PAGA, employee-plaintiffs who have suffered labor code violations may sue their

19   employer for violations suffered by themselves and other current and former employees on behalf

20   of California's Labor and Workforce Development Agency.  *See* Cal. Lab. Code. § 2698 *et seq.*

21   In that context, courts have found PAGA plaintiffs are not state actors because state officials are

22   not involved in PAGA litigation; all the state did was create PAGA in the first place.  *See, e.g.*,

23   *Nabor Well Servs. Co. v. Bradshaw*, No. 05-8334, 2006 WL 8432088, *3 (C.D. Cal. Feb. 15,

---

[6] The court notes it seems unlikely California could have knowingly benefitted from defendants' unconstitutional sham litigation if it was unaware of the sham, which would undermine an attempted showing of joint action.  In fact, the Supreme Court has held that "private misuse of a state statute does not describe conduct that can be attributed to the State." *Lugar*, 457 U.S. at 941.  However, at this early stage, given B&G's allegations about substantial cooperation and communication between defendants and the state, the court draws the reasonable inference the state is aware of defendants' sham litigation.

2006); *Pineda v. Sun Valley Packing L.P.*, No. 20-0169, 2022 WL 1308141, at *4 (E.D. Cal. May 2, 2022).  In contrast to these cases, and as discussed in depth above, B&G alleges more than passive regulation and monitoring; it alleges communication and encouragement of defendants' shakedown litigation.  B&G's allegations of California's active role in defendants' litigation thus factually distinguishes *Nabor Well* and *Pineda*.  *See, e.g.*, SAC ¶ 234(j) ("[T]he State is not merely a passive actor in such activity, but has an entire department devoted to regulating, following, and encouraging" private Proposition 65 enforcement actions.).

To be clear, the court does not take sides in the parties' substantive disagreement regarding the nature and structure of Proposition 65's enforcement mechanisms.  The ultimate inquiry is "fact-intensive."  *Lee*, 276 F.3d at 554.  And it is far from clear B&G could ultimately prove California has condoned the alleged shakedown.  However, the question at this stage is whether B&G has pled its claim so as to survive dismissal.  And the court cannot dismiss B&G's complaint simply because "actual proof of [the alleged] facts is improbable."  *Twombly*, 550 U.S. at 556.

Defendants emphasize B&G's allegations do not establish every element of a particular state-action test.  *See* Mot. Dismiss at 15–20; Reply on Dismissal at 8–10.  But B&G's allegations need not prove its claims or delineate the proof it will offer at trial.  *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002).  It need only offer "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  In any event, the four "tests" courts typically use to identify state action do not describe rigid and independent categories:

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity.  From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding

/////

/////

/////

1         state action; nor is any set of circumstances absolutely sufficient, for
2         there may be some countervailing reason against attributing activity
3         to the government.

4 *Brentwood Acad.*, 531 U.S. at 295–96.  B&G plausibly pleads state action by tracing the outlines

5 of defendants' exercise of a traditionally exclusive public function and joint action with

6 California.  Accordingly, the court **denies** defendants' motion to dismiss.

7 **III.    MOTION FOR SANCTIONS**

8     "[T]he central purpose of Rule 11 is to deter baseless filings in district court

9 and . . . streamline the administration and procedure of the federal courts."  *Cooter & Gell v.*

10 *Hartmarx Corp.*, 496 U.S. 384, 393 (1990).  Imposing sanctions under Rule 11 is reserved for the

11 "rare and exceptional case where the action is clearly frivolous, legally unreasonable or without

12 legal foundation, or brought for an improper purpose."  *Operating Eng'rs Pension Tr. v. A-C Co.*,

13 859 F.2d 1336, 1344 (9th Cir. 1988).  In short, "Rule 11 is an extraordinary remedy, one to be

14 exercised with extreme caution."  *Id.* at 1345.

15     "Where, as here, the complaint is the primary focus of Rule 11 proceedings, a district

16 court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or

17 factually 'baseless' from an objective perspective, and (2) if the attorney has conducted a

18 'reasonable and competent inquiry' before signing and filing it."  *Christian v. Mattel, Inc.*,

19 286 F.3d 1118, 1127 (9th Cir. 2002) (quoting *Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir.

20 1997)). The filing of a motion under Rule 11 is also subject to sanctions if the motion itself

21 violates the rule, and "[a] party defending a Rule 11 motion need not comply with the separate

22 document and safe harbor provisions when counter-requesting sanctions."  *Patelco Credit Union*

23 *v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001).  "If, judged by an objective standard, a reasonable

24 basis for the position exists in both law and in fact at the time that the position is adopted, then

25 sanctions should not be imposed."  *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d

26 1531, 1538 (9th Cir. 1986).

27     Defendants claim B&G's complaint violates two of Rule 11's four prohibitions.  First,

28 they claim the complaint's factual allegations do not have evidentiary support and would not have

evidentiary support after a reasonable opportunity for discovery.  *See* Mot. Sanctions at 6–9; Fed. R. Civ. P. 11(b)(3).  Second, they argue B&G's claims and defenses are not warranted by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law.  *See* Mot. Sanctions at 9–12; Fed. R. Civ. P. 11(b)(2).  B&G opposes both arguments and urges the court to find defendants' Rule 11 motion for sanctions itself violates Rule 11.  *See generally* Opp'n to Mot. Sanctions.

The court finds the parties' respective requests for sanctions unpersuasive.  First, defendants' motion relies on countervailing evidence and discrepancies between the operative complaint and its exhibits to claim the complaint's allegations are false, but it does not present evidence showing the allegations are in fact demonstrably false.  For example, defendants point to the discrepancy between the allegation EHA did not obtain an expert report and the form interrogatory response objecting to premature disclosure of experts.  Mot. Sanctions at 6.  But, as discussed above, a complaint's allegations do not need to be supported by exhibits at this stage, and the court cannot draw an adverse inference from the fact an allegation is not proved by a directly corresponding exhibit.  Similarly, defendants point to evidence the laboratory had a policy to destroy samples, but this evidence does not disprove that defendants instructed the lab to destroy the samples.  *Compare* SAC ¶ 80 *with* Kwasniewski Decl., Ex. J *and* RJN, Ex. M at 4:4–6.  Defendants' other examples fit this pattern, and none show the allegations are false.  Without evidence showing the allegations are false, the court cannot conclude the complaint is factually baseless.

Second, defendants argue B&G's allegations defy the relevant legal standards.  *See* Mot. Sanctions at 9–12.  This characterization does not match the record before the court.  As explained above, the court finds B&G's new allegations permit a plausible inference B&G could ultimately show defendants' Proposition 65 litigation is a sham.  As a result, some of those allegations are relevant to the applicable legal standards.  Although some arguments in the complaint are at odds with this court's previous orders, *see* Mot. Sanctions at 10–11, those arguments are not in contempt.  For example, defendants point to B&G's argument that defendants' lawsuits are a sham because they knew the cakes and cookies do not cause cancer.

*See id.*  B&G's argument is inconsistent with this court's previous legal conclusion that potentially viable affirmative defenses do not render an allegation baseless.  *See* Prior Order (Nov. 3, 2022) at 9.  But not all ultimately meritless arguments are frivolous.  *See Arrowhead Cap. Fin., Ltd. v. Picturepro, LLC*, 2023 WL 109722, at *2 (9th Cir. Jan. 5, 2023).  Defendants do not show the complaint advances arguments that are frivolous or could not be supported by good-faith requests to extend the law.  Defendants' motion for sanctions is **denied**.

For its part, B&G urges the court to find defendants' sanctions motion itself violates Rule 11.  Opp'n to Mot. Sanctions at 8.  Although the court denies defendants' motion, a reasonable attorney could believe defendants might prevail on their motion for sanctions, in light of this court's prior order granting limited leave to amend with a Rule 11 admonition.  *See* Prior Order (Nov. 3, 2022) at 16.  The defense motion has "a sound basis in law and in fact" because it pointed to discrepancies between the second amended complaint, its exhibits and extrinsic evidence, and also because the objective baselessness standard is at odds with the complaint's allegations.  *Golden Eagle*, 801 F.2d at 1538.

B&G also claims defendants' motion for sanctions was filed for an improper purpose.  Opp'n to Mot. Sanctions at 18.  B&G states it "repeatedly asked Defendants to provide substantiation for the disputed facts that Defendants seek to resolve . . . but Defendants refused to provide it."  *Id.*  On this basis, B&G concludes defendants are motivated by an improper purpose.  However, B&G has not shown defendants were obligated to provide substantiation, beyond that attached to the motion for sanctions.  Defendants' refusal to supply additional information to B&G on its own is not sufficient to show improper purpose.  On this record, and in light of the court's prior Rule 11 admonition, *see* Prior Order (Nov. 3, 2022) at 16, the court cannot conclude the motion was filed for an improper purpose.  B&G's cross-request for sanctions is **denied**.

## IV.   CONCLUSION

In sum, as explained above, the court **denies** defendants' motion to dismiss and motion for sanctions and **denies** B&G's cross-request for sanctions.

The court previously noted it would revisit pretrial scheduling after the resolution of these motions.  *See* Min. Order (Feb. 23, 2023), ECF No. 74.  The court thus **sets** the Status (Pretrial

1   Scheduling) Conference for June 29, 2023, at 2:30 PM, with the filing of a joint status report due

2   fourteen days prior.

3          This order resolves ECF Nos. 66, 68, 71.

4          IT IS SO ORDERED.

5    DATED:  May 31, 2023.


                                            _____
                                            CHIEF UNITED STATES DISTRICT JUDGE