J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
  borden@braunhagey.com
David H. Kwasniewski, Esq. (SBN: 281985)
  kwasniewski@braunhagey.com
Tracy O. Zinsou, Esq. (SBN: 285985)
  zinsou@braunhagey.com
H. Chelsea Tirgardoon, Esq. (SBN: 340119)
  tirgardoon@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

ATTORNEYS FOR PLAINTIFF
B&G FOODS NORTH AMERICA, INC.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B&G FOODS NORTH AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> KIM EMBRY and ENVIRONMENTAL HEALTH ADVOCATES, INC., acting as enforcement representatives under California Proposition 65 on behalf of the State of California, <br><br> Defendants. | Case No. 2:20-cv-00526-KJM-DB <br><br> **B&G FOODS NORTH AMERICA, INC.'S OPPOSITION TO DEFENDANTS KIM EMBRY AND ENVIRONMENTAL HEALTH ADVOCATES, INC.'S MOTION FOR SUMMARY JUDGMENT** <br><br> Date: August 23, 2024 <br> Time: 10:00 AM <br><br> Judge: Hon. Kimberly J. Mueller <br> Courtroom: 3 <br><br> SAC Filed: November 23, 2022 <br> Trial Date: None Set |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................................... 1

TABLE OF AUTHORITIES ..................................... **ERROR! BOOKMARK NOT DEFINED.**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 1

    A.    The Parties .................................................................................................... 2

    B.    B&G Foods' Claims ..................................................................................... 3

    C.    Relevant Procedural History ......................................................................... 4

ARGUMENT ......................................................................................................................... 5

I.    EVEN WITHOUT THE DISCOVERY DEFENDANTS ARE
WITHHOLDING, A REASONABLE JURY COULD FIND THAT
DEFENDANTS ENGAGED IN SHAM LITIGATION ................................................. 5

    A.    Defendants Spoliated Evidence ..................................................................... 6

        1.    Defendants Spoliated the Most Important Piece of Evidence in Every One of
Their Acrylamide Cases—the Product Samples They Tested ................... 6

        2.    Defendants Spoliated All Records of Their Pre-Suit Investigation ............ 7

    B.    Defendants' Expert Analysis and Laboratory Testing Was a Sham ...................... 8

        1.    Defendants Used Labs That They Knew Were Unreliable ....................... 9

        2.    Defendants Tampered with Samples They Submitted for Lab Testing .... 10

        3.    Defendants Employed a Captive Expert Who Rubber-Stamped Their
Lawsuits .................................................................................... 11

        4.    Defendants Manufactured Expert Reports ............................................. 12

    C.    [do we want to have a heading about EHA being a sham organization?] ........... 12

    D.    Defendants' Prop 65 Cases Are Pursued for Their Lawyers' Personal Gain, Not the
Public Interest ......................................................**Error! Bookmark not defined.**

II.    SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE
DEFENDANTS ARE WITHHOLDING MATERIAL EVIDENCE .............................. 13

III.    DEFENDANTS' MOTION IS PREDICATED ON TESTIMONY A
WITNESS B&G FOODS WITHDREW AS ITS DESIGNEE BECAUSE HE
WAS HAVING MEMORY DIFFICULTIES ............................................................... 17

IV.  A TRIABLE ISSUE EXISTS REGARDING DEFENDANTS' ROLE AS STATE ACTORS ................................................................................................. 19

    A.  Defendants Perform a Traditional, Exclusive Public Function ............................ 19

    B.  Defendants Act Jointly with the Attorney General................................................ 20

CONCLUSION.................................................................................................................... 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff B&G Foods North America, Inc. respectfully submits this opposition to Defendants Kim Embry and Environmental Health Advocates, Inc.'s ("EHA") Motion for Summary Judgment.

## INTRODUCTION

B&G Foods has been feeding America some of its most iconic foods for 130 years. Defendants are a fake environmental organization and a captive plaintiff who lives in Spain, and they have littered the courts with over 1,500 Prop 65 acrylamide suits in the last few years. This Court—affirmed by the Ninth Circuit—has enjoined filing such lawsuits because they violate the First Amendment by seeking to force companies to place false "cancer" warnings on products that do not cause cancer. Defendants, who keep filing such lawsuits notwithstanding the Court's Order, are the worst of the worst acrylamide filers. They know their cases have no merit because they intentionally destroyed the most salient piece of evidence in each one (the samples they purportedly tested), knowingly used an unreliable lab, deployed a captive expert who spends less than 10 minutes per report he prepares, and tampered with the samples they tested.

After spending more than a year refusing to produce evidence, Defendants now seek summary judgment on the ground that no issues of material fact exist. Their motion should be denied for two separate and independent reasons.

First, there is already overwhelming evidence from which a jury could conclude that Defendants have engaged in sham litigation. In its Order denying Defendants' third motion to dismiss, the Court found that if the facts alleged in the pleadings were true, a jury could find that Defendants had engaged in sham litigation. The Court specifically noted B&G Foods' allegations that Defendants had spoliated evidence, failed to investigate their claims before filing suit, submitted false complaints and pleadings before the state courts, and claimed to have brought their cases in the public interest when in fact Defendants are shills that file suits solely to enrich their lawyers. (Dkt. 82 (Order Denying MTD).)

Sufficient evidence exists from which a reasonable juror could conclude that Defendants engaged in all of these acts. Defendants have admitted that they destroyed every sample they have ever tested in anticipation of litigation and further destroyed all the emails of the EHA employees in charge of such testing during the pendency of their litigation with B&G Foods. Discovery has also

shown that Defendants relied on laboratories they knew produced unreliable results; lied to laboratories and doctored test samples; employed a captive expert who rubber-stamped their claims after reviewing them, on average, for ten minutes or less; engaged in no actual toxicological analysis; and held themselves out as environmental crusaders when in fact they are a captive crony and shell company that are beholden to their lawyers to the point of their lawyers signing settlement agreements on their behalf without their knowledge. Individually, and certainly taken together, this evidence compels the conclusion that Defendants' underlying Prop 65 litigation is a sham.

Second, Defendants' motion is predicated on two species of discovery abuse: (1) they are withholding material evidence and testimony related to, *inter alia*, their lab testing, their spoliation of evidence, and their pre-suit investigations; and (2) their entire motion is built around the testimony of a witness B&G Foods de-designated as its Rule 30(b)(6) witness in the middle of his deposition because he was having cognitive difficulties. B&G Foods immediately offered a new witness, but Defendants refused, hoping instead to obtain a favorable ruling that is not grounded in the facts of this case. B&G Foods tried to avoid both of these situations by asking Defendants to hold off on their filing until such time as the discovery issues had been resolved—a situation that has stalled because the parties' Magistrate Judge, the Honorable Deborah Barnes, retired *in media res*. Because Defendants refused to do so, the Court should separately deny summary judgment under Rule 56(d), as opposed to continuing it, which it is authorized to do.

For each of these reasons, Defendants' motion should be denied.

## **BACKGROUND**

### A.    The Parties

B&G Foods is a 130-year-old food company whose portfolio includes Crisco, Green Giant, and Ortega. One of its brands is Snackwell's, which made delicious cookies.

Defendant EHA was formed by a group of lawyers. Despite its name, EHA has not pursued any environmental activities. The only thing that it has done since its inception five years ago is act as a plaintiff in over 2,600 Prop 65 claims.[1] (Exs. 34–35.) Its former CEO was a paralegal at the law

---

[1] Defendants brought an average of 21 acrylamide cases and another 51 non-acrylamide Prop 65 claims per month from Embry's involvement in 2017 and EHA's inception in June 2019 until the filing of this case.

1  firm that filed all these claims. Its current CEO was also a former paralegal for one of EHA's

2  lawyers.

3      Defendant Kim Embry resides in Spain and is the former secretary of one of EHA's

4  founding lawyers. Ms. Embry does not know whether acrylamide in food is carcinogenic, does not

5  purchase the Prop 65 products she is suing over, is not consulted prior to the filing of any lawsuits

6  where she is plaintiff, takes no part in the investigation or prosecution of her claims, does not

7  discuss the cases with her lawyers, does not review the settlement agreements that her lawyers sign

8  on her behalf, does not confirm that settlements are being complied with, and does not know how

9  settlement money is distributed or used after it is received. (Ex. 6 (Embry Depo.))

10     Defendant EHA has secured over $5.93 million dollars in reported settlements. Of the

11 settlements secured, only about $580,065 was paid to the State of California. The remaining $5.5

12 million went to EHA and its lawyers. Defendant Embry has secured over $2.16 million dollars in

13 reported settlements. Of these settlements, only about $183,075 went to the State of California. The

14 remaining $1.97 million went to Ms. Embry and her lawyers. [cite]

15     **B.   B&G Foods' Claims**

16     B&G Foods filed this case because among the various Prop 65 acrylamide filers, Defendants

17 stood out as the worst for a number of reasons, including the sheer volume of their filings, the

18 number of suits they withdrew after they were unable to extract extortive "settlements," and other

19 facts that came to light after they sued B&G Foods, including that they spoliated the most important

20 piece of evidence (the sample of the accused product tested by their labs), filed fake or backdated

21 notices of violation, knowingly relied on junk science, and used captive plaintiffs, labs and experts,

22 to name a few. This Court has enjoined, and the Ninth Circuit affirmed, all Prop 65 acrylamide

23 lawsuits because they violate the First Amendment. *Cal. Chamber of Commerce v. Becerra*, 529 F.

24 Supp. 3d 1099 (E.D. Cal. 2021), *aff'd* 29 F.4th 468 (9th Cir. 2022).

25     Perhaps the most significant differentiator is that the Attorney General has admonished

26 Defendants multiple times for attempting to enter unlawful settlements and bringing duplicative

27 claims that were already resolved by a consent judgment. (Ex. 9 (private settlement was "contrary to

28 the law, against public policy, and not enforceable."); Ex. 10 ([defendant], which does not appear to

1   be represented by counsel, agrees to pay you and your client $14,900 and $100, respectively. . . .

2   [but] does not agree to take any corrective action"); Ex. 11 (claims brought by Defendant EHA were

3   barred by consent judgment entered three years earlier).) The Attorney General has only issued 36

4   public admonishments in the 37-year history of Proposition 65. (Ex. 8.)

5         B&G Foods's claims arise from two Prop 65 lawsuits filed by Defendants, by which they

6   tried to force B&G Foods to put false cancer warnings on its cookies, which do not cause cancer.

7   The purported basis for these lawsuits is that B&G Foods's cookies contain acrylamide.

8   Acrylamide, however, is a chemical naturally present in many foods, including all cookies and

9   baked goods. Acrylamide in food does not cause cancer. Even though this Court has enjoined

10   Defendants from filing further Prop 65 acrylamide lawsuits, they have continued to do so.[2]

11         **C.**     **Relevant Procedural History**

12         On June 1, 2023, the Court denied Defendants' third motion to dismiss and ordered

13   discovery to immediately commence. Despite the Court's order, Defendants have refused to provide

14   virtually any of the discovery requested by B&G Foods, violated the Court-ordered ESI Protocol,

15   and failed to comply with the Magistrate Judge's Orders. By way of example (and further detailed

16   in Section II below), (1) Defendant EHA produced a Rule 30(b)(6) designee who was unable to

17   testify as to the majority of the noticed topics, (2) Defendants' witnesses claimed that they had no

18   knowledge of the facts of the cases in which they were plaintiffs, but their lawyers refused to testify

19   in response to duly served subpoenas; (3) Defendants refused to produce Court-ordered discovery

20   on their notices of violation ("NOVs"), and (4) Defendants obstructed B&G Foods' efforts to obtain

21   information about testing and spoliation from the labs Defendants used for acrylamide testing. On

22   top of this, Defendants reduced the utility of the few documents they did produce by stripping out

23   the metadata so that the dates, authors, revisions, and transmissions were unknown.

24         Magistrate Judge Barnes was overseeing discovery, but she retired before many of these

25   issues could be litigated. Some of these issues—such as the efforts to obtain discovery (including

26   crime-fraud discovery) from Defendants' lawyers, have been briefed (*e.g.*, Dkts. 111, 137, 139;

27

28   [2] *See* Exs. X (June 15, 2022 Settlement Agreement); X (September 22, 2023 Consent Judgment).

Case No. 2:24-mc-00014-JNW, Dkt. 1; Case No. 2:24-mc-00002, Dkt. 1; Case No. 2:24-mc-00003, Dkt. 1; Case No. 2:24-mc-00011, Dkt. 1; Case No. 2:24-mc-00014, Dkt. 1). Others have not, since there is nobody to present them to at this point. While B&G Foods' position is that summary judgment should be denied on the merits, as detailed further in Section II below, these discovery disputes need to be resolved before summary judgment could ever be considered.

## ARGUMENT

Summary judgment is only allowed where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court must "draw[] all justifiable inferences in favor of [B&G Foods]" and "view[] the evidence in the light most favorable to [B&G Foods] to determine if there are any genuine issues of material fact and whether [Defendants are] entitled to judgment as a matter of law." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citations omitted). Defendants "bear[] the initial burden of informing the court of the basis for [their] motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact." *Dias v. Nationwide Life Ins. Co.*, 700 F. Supp. 2d 1204, 1213 (E.D. Cal. 2010) (citation omitted).

## I.   DEFENDANTS ENGAGED IN SHAM LITIGATION

Defendants' Motion should be denied because even with Defendants' significant discovery violations, there is sufficient evidence from which a reasonable jury could find that Defendants engaged in sham litigation. There are "three circumstances in which the sham exception might apply in the litigation context." *B&G Foods v. Embry*, 29 F.4th 527, 537 (9th Cir. 2022). "First, a lawsuit is a sham when it is objectively baseless and brought for an unlawful purpose." Order Denying MTD at 6 (citing *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006)). "Second, a series of lawsuits can be a sham, even if some cases in the series have merit, when brought 'pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose." *Id.* at 6-7 (quoting *B&G Foods*, 29 F.4th at 537). And "[t]hird, litigation predicated on 'intentional misrepresentations to the court' is a sham if that 'knowing fraud . . . deprive[s] the litigation of its legitimacy." *Id.* at 7 (quoting *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th

Cir. 1998)). Under any of these three theories, a juror could find that Defendants' acrylamide Prop 65 litigation is a sham.

## A.      Defendants Spoliated Evidence

Spoliation of evidence is sham litigation, as this Court observed in ruling on Defendants' third motion to dismiss. (Order Denying MTD at 7 ("Specific allegations about a defendant's efforts to suppress crucial evidence can allow a court to infer an otherwise protected petition was a sham."); *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 647 (9th Cir. 2009) (allegations of destruction or suppression of evidence were "precisely the sort the sham exception was created to address.").) A reasonable juror could conclude Defendants spoliating the most important piece of evidence in every one of their acrylamide Prop 65 cases shows that Defendants could not have a good faith belief that they could ever ultimately prevail on such claims.

### 1.      Defendants Spoliated the Most Important Piece of Evidence in Every One of Their Acrylamide Cases—the Product Samples They Tested

All of Defendants' Prop 65 lawsuits are based on laboratory testing of products that purportedly showed the products contained acrylamide. In every case, after performing the testing, Defendants destroyed the product samples they had tested (or instructed the testing laboratory to dispose of them). This is quintessential spoliation. *Williams v. Russ*, 167 Cal. App. 4th 1215, 1223 (2008) ("Spoliation of evidence means the destruction or significant alteration of evidence or the failure to preserve evidence for another's use in pending or future litigation."); *Reeves v. MV Transportation, Inc.*, 186 Cal. App. 4th 666, 681 (2010) ("[D]estruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.").

There is ample evidence that Defendants engaged in spoliation. The laboratory Defendant Embry used, IEH, admitted that it had destroyed the samples it tested at Ms. Embry's instruction on or about 30 days after it tested the sample—approximately May 4, 2019, after Plaintiff initiated the litigation by filing her April 19, 2019, Notice of Violation. (Ex. 22 (April 6, 2021 Letter).) The laboratory Defendant EHA used also produced documents showing that EHA instructed it to destroy the sample it tested after testing. (Ex. 23 (April 7, 2021 Letter) (admission from Defendants

that the products they tested had been destroyed).) That laboratory has since disavowed the test results because they were procured by EHA lying about the true purpose of the testing. (Declaration of General Mills, Inc. d/b/a Medallion Labs, ¶¶ 3, 7-8.)

Defendants do not dispute they destroyed the product samples they tested after testing them. Instead they assert that the destruction of the samples was made pursuant to the "policy" of the testing laboratories. (Mot. at 12.) That is false. The testing order form for IEH required Defendants to affirmatively select whether the product was to be preserved, returned, or destroyed. Defendants selected destruction. (Dkt. 70-1.) Medallion similarly gave Defendants' the option to preserve the products, but they did not request Medallion do so. (Ex. X.) And even if it were the laboratories' policy to destroy samples after testing, this would not make it any less spoliation. *E.g.*, *Hynix Semiconductor Inc. v. Rambus Inc.*, 897 F. Supp. 2d 939, 978-80 (N.D. Cal. 2012) (destroying documents pursuant to a pre-established document retention policy was nevertheless bad faith or willful spoliation warranting sanctions).

### 2.      Defendants Spoliated All Records of Their Pre-Suit Investigation

A jury could separately conclude that Defendants engaged in spoliation because Defendants deleted the email accounts of the individuals who actually performed the investigations into the accused cookies—while this litigation was pending. These individuals were Charlotte Zell, Lindsay Beatty, Anissa Elhaiesahar, and Samantha Dice, former investigators for Defendants' lawyers (one of whom also doubled as EHA's CEO for a time). These individuals were responsible for, among other things, procuring the cookies, sending the cookies to the lab, analyzing the test results, transmitting the test results to Defendants' captive expert, and compiling the materials for the Notice of Violation. (Exs. X, E (Testing Form Submitted by Lindsay Beatty), X at 14:14–16, 16:5–7 (Deposition of Anissa Elhaiesahar), X (Samatha Mason's LinkedIn).) These individuals were the only investigators who worked on the claims asserted against B&G Foods. (Dkt. 19-2.) According to Defendants, all four of these individuals' email accounts were deleted when they left the firm.

Based on these individuals' publicly listed departure dates, it appears their email accounts were deleted after this litigation was filed.[3] (Ex. X.)

This, too, is spoliation. *Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F. Supp. 2d 976, 991-92 (N.D. Cal. 2012) (party's failure to suspend email deletion policy prior to complaint filing amounted to spoliation and warranted adverse inference instruction); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (even if party had a "long standing polic[y]" of deleting emails, it was "required to cease deleting emails once the duty to preserve attached"). This is a separate and independent reason why a juror could conclude that Defendants' acrylamide lawsuit are a sham.

**B.      Defendants' Expert Analysis and Laboratory Testing Was a Sham**

Evidence showing that Defendants failed to conduct adequate presuit investigations shows that Defendants (1) knowingly or recklessly filed cases without regard to the merit, and (2) violated Prop 65's certificate of merit requirement by intentionally misrepresenting to the Attorney General that they were filing meritorious claims.

Filing a claim that does not conform with Prop 65's predicates is objectively baseless under the relevant statutes and case law. Cal. Code Regs. tit. 11 § 3101; *In re Vaccine Cases*, 134 Cal. App. 4th 438, 458 (2005) (failure to comply with any of these mandatory prerequisites of the Act "does bar plaintiffs' action."); *DiPirro v. Am. Isuzu Motors, Inc.*, 119 Cal. App. 4th 966, 971 (2004) (affirming dismissal of Prop 65 case for failure to comply with prelitigation certificate of merit requirement); *Physicians Comm. for Responsible Med. v. Applebee's, Int'l, Inc.*, 224 Cal. App. 4th 166, 182 (2014) (upholding dismissal without leave to amend and holding that plaintiff "cannot cure its defective certificate and notice by later conducting discovery to fill in the gaps in what it knew when counsel executed the certificate and filed the notice").

Likewise, Defendants' misrepresentations about the extent of their presuit investigation and consultation with experts (discussed in Section __ below) also shows that their acrylamide Prop 65 cases are a sham. (Order Denying MTD at 8 ("If defendants did not consult with an expert before

---

[3] Despite repeated requests, Defendants have refused to say when, exactly, the emails were deleted or whether they have made any efforts to recover the deleted data.

filing, but claimed they had, then the lawsuits are a sham because they are predicated on intentional misrepresentations.").) *See also Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, (9th Cir. 1998) ("[L]itigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'" (quoting *Liberty Lake Inv., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir. 1993))).

A juror could conclude that the predicate expert analysis and laboratory results for Defendants' acrylamide cases were a sham because Defendants did not properly investigate their claims: (1) they filed acrylamide Prop 65 cases based on test results obtained from a laboratory they knew was unreliable; (2) they tampered with samples; (3) they procured test results by fraud; (4) they used a captive expert, John Meeker, to claim the testing showed the products were likely to cause cancer, even though his copy-and-paste reports—typically prepared in ten minutes or less—cite no studies, analyses, or other reliable scientific data that the products in question, or even acrylamide in general, causes cancer; and (5) it also appears that Defendants misrepresented that they had consulted an expert prior to submitting their notice of violation to B&G Foods, and later manufactured a backdated report. Each of these facts is a separate and independent basis for concluding that Defendants' lawsuits were shams.

### 1.    Defendants Used Labs That They Knew Were Unreliable

Since its founding in 2017, EHA used IEH to perform testing in support of its Prop 65 NOVs. On November 18, 2020, in connection with a billing dispute between Defendants and IEH, one of Defendants' lawyers sent IEH an email stating:

> Attached is a small sampling of the problems we encountered with the reliability of IEH's lab results. We have had to withdraw notices, and even dismiss filed complaints, as a result. This has cost us dearly in terms of attorney and staff time, and costs – many, many times more than IEH's invoices for this faulty work.

(*Id.*)

With respect to B&G Foods' cookies in particular, Defendants' internal testing separately showed that IEH's testing was unreliable. Defendants relied on IEH's testing to prepare a submit their NOV with respect to B&G Foods' cookie cakes. Afterwards, they tested the products again

with two different laboratories, both of which produced results showing much lower levels of acrylamide than IEH:

| Date | Laboratory | Product | Result |
|---|---|---|---|
| **April 1, 2019** | IEH Laboratories | Cookie Cakes | 643 ppb |
| **March 26, 2020** | Medallion Labs | Cookie Cakes | 160 ppb |
| **October 26, 2020** | Adamson Analytical Laboratories | Cookie Cakes | Non-detect |

B&G Foods also shared its internal testing with Defendants on March 20, 2020, which showed the cookie cakes had less than a tenth of the acrylamide found in the IEH testing. (Ex. X.) Yet despite abundant evidence that IEH's testing was unreliable, Defendants elected to proceed with their claims based on their original NOV for another three years. (Ex. X.)

Defendants also obtained test results from Medallion Labs without telling the laboratory why they sought this testing. Because the testing violated Medallion's terms of service, Medallion has disavowed the test results. [cite]

### 2.    Defendants Tampered with Samples They Submitted for Lab Testing

A juror could conclude that Defendants' litigation is a sham because Defendants tampered with at least some of the samples that they submitted for acrylamide testing by burning them prior to testing. In specific, Defendants at times instructed labs to "burn," "toast," or "blacken" samples prior to testing to "get a higher acrylamide result" because acrylamide forms in the cooking process. (Exs. XXX.) Because heat is what can cause acrylamide to form, a juror could conclude that Defendants subjected samples to burning to artificially generate higher acrylamide levels. Such practices not only violate ethical standards but also render their test results unreliable.

Even if there was no evidence that Defendants tampered with evidence, the integrity of Defendants' samples is highly questionable due to a broken chain of custody. Defendants removed the samples from their original packaging and tampered with them before testing. (Ex. X.) This breach not only compromises the authenticity of the samples but also raises serious doubts about the validity of the test results, such that Defendants could not reasonably expect to prevail on any of their claims because they had intentionally compromised their test samples.

### 3.    Defendants Procured Acrylamide Test Results by Fraud

Defendants obtained test results by lying about the purpose of their testing. For this reason, Medallion has disavowed their test results. Declaration of General Mills, Inc. d/b/a Medallion Labs, ¶¶ 3-6.) Additionally, Defendants manipulated samples to ensure acrylamide levels would be high, such as by burning the samples before testing.  (Ex. X.)

### 4.    Defendants Employed a Captive Expert Who Rubber-Stamped Their Lawsuits

Defendants' expert prepared over 750 1-page reports for Defendants without performing any scientific analysis or relying on any evidence that the products at issue or the acrylamide in them causes cancer. Meeker, who also prepared the reports in the cases Defendants brought against B&G Foods, typically prepares his copy-and-paste reports in ten minutes or less. (Ex. X.)

Unlike standard toxicologists, in preparing his report, Meeker does not study the route or pathway of exposure to acrylamide in cookie consumers, study the magnitude or frequency of exposure to acrylamide from eating cookies, or test for biomarkers to see if acrylamide is present in the blood of cookie consumers. (Ex. X (Jan. 19, 2024 Meeker Dep.) at 51–52: 25–22.) He does not consult the National Health and Nutrition Examination Survey ("NHANES"), or any other database to consider the frequency of consumer consumption for cookies in general. (*Id.* at 52:18.) *See Environmental Law Foundation v. Beech-Nut Nutrition Corp.* 235 Cal. App. 4th 307, 327 (2015) (holding that the frequency of consumption is material to determining whether a Prop 65 violation has occurred). He is not aware of any scientific evidence that the cookies cause cancer.

Instead, Meeker's reports cite only to a handful of articles about acrylamide in food. Every one of these articles states that there is no proven link between acrylamide in food and cancer, and that to say there is would be speculation. (Ex. X, n.4 ("During the past years, many new 9 epidemiological studies have been carried out to investigate the association of dietary AA or occupational AA exposure with cancer in humans…epidemiological studies do not suggest a clear association of cancer with dietary or occupational exposure to AA."); Exs. XXXX [rest of Meeker's fns/test].)

Meeker's reports were also based only on the initial testing shown to him by Defendants. He did not investigate whether the laboratories were accredited to perform the testing. (Ex. X (Meeker

Depo.), at 82:23-83:16.) He did not update his reports to reflect additional test results obtained by Defendants or provided by B&G Foods. (Ex. X (MEEKER_000068).

### 5.    Defendants Backdated Expert Reports

It also appears that Defendants may have backdated one or both of Meeker's reports. Ordinarily, a Proposition 65 plaintiff is required to consult with an expert prior to filing a Notice of Violation. *In re Vaccine Cases*, 134 Cal. App. 4th at 458 (2005); *DiPirro*, 119 Cal. App. 4th at 971; *Physicians Comm. for Responsible Med.*, 224 Cal. App. 4th at 182. Yet neither Defendant included any expert report with the NOVs they submitted to B&G Foods. In verified discovery responses in the ensuing state-court lawsuits, the Defendants stated they had not consulted with any experts. (Ex. X.) Yet on July 27, 2022, Defendants served "amended" NOVs that included Meeker's reports.

In discovery in this case, B&G Foods has requested all metadata surrounding Meeker's reportsThe Magistrate Judge ordered Defendants to produce the metadata on [date]. Defendants have still not produced it.

### C.    Defendants are Shills for their Lawyers

A jury could conclude that Defendants' serial Prop 65 cases are pursued not in the public interest, but rather for the benefit of Defendants' lawyers. B&G Foods took the depositions of Defendant Embry and Defendant EHA's Rule 30(b)(6) designee. Both witnesses testified that neither Defendant has any personal knowledge of or participation in the underlying acrylamide Prop 65 cases—or any motive to benefit the public interest. (Exs. X, X.)

EHA was founded by Defendants' attorneys Noam Glick and Craig Nicholas. Despite its name, EHA has not engaged in any environmental advocacy since its inception; instead, the only thing it has done since its inception is file thousands of Prop 65 claims. (Ex. X.) These lawsuits primarily target small, out-of-state companies to extract settlements, with the bulk of the settlements consisting of inflated attorneys' fees that benefit EHA's founders—not the public interest. (Ex. X.) The board of directors of EHA has no involvement in these litigations and possesses little to no knowledge of Prop 65. (Ex. X, X, X.)

Defendants' motivations are also made plain by the nature of the settlements they obtain in their lawsuits. Instead of meaningful penalties, Defendants secure minimal civil fines (of which

75% is remitted to the State) while obtaining substantial attorneys' fees (retained entirely by Defendants and their lawyers). (Ex. X; Kwasniewski Decl. ¶ _.) Moreover, as the Attorney General has pointed out, these settlements offer negligible injunctive relief because they do not mandate reformulations or warnings. Essentially, Defendants are exchanging dismissals for significant financial gain, subverting the law's purpose and demonstrating the sham nature of their cases.

## II.   SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE DEFENDANTS ARE WITHHOLDING MATERIAL EVIDENCE

Defendants' motion should also be denied for the separate and independent reason that Defendants moved for summary judgment, knowing that they have withheld substantial discovery that is likely to yield facts supporting B&G Foods's claims. Where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Rule 56(d) requests are "generally granted with liberality." *Blake v. City of Sacramento*, No. 2:12–2061 WBS KJN, 2014 WL 880356, at *1 (E.D. Cal. Mar. 5, 2014) (quoting *Freeman v. ABC Legal Servs., Inc.*, 827 F. Supp. 2d 1065, 1071 (N.D. Cal. 2011)).

As detailed below, the Court should deny Defendants' motion because they moved for summary judgment knowing that they had intentionally withheld the following discovery:

*Defendants' Unprepared Rule 30(b)(6) Deponent:* Defendant EHA has failed to produce a properly prepared witness for its Rule 30(b)(6) deposition. EHA designated James Roy Holliday, an unemployed individual who held no official role at EHA. (Kwasniewski Decl., ¶ X.) Mr. Holliday was unprepared to testify to Topic Nos. 4, 6, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, and 29. (Ex. X (May 7, 2024 Holliday Dep.), at 68:25-72:6.) These topics pertained to relevant issues, including:

- **Topic No. 4** requests testimony regarding the reliability of Defendants' test results.

This evidence is material to B&G Foods' contention that (a) the test results EHA uses to support its Proposition 65 claims are unreliable, and (b) EHA is aware of this unreliability.

- **Topic No. 6** requests testimony about the basis for Defendants' contention that acrylamide in food causes cancer in humans.

This evidence will show that EHA is aware that the State of California does not know whether acrylamide causes cancer, and that EHA made no efforts to determine such but pursued claims alleging acrylamide in the Snackwells products regardless.

- **Topics Nos. 12–18, 22–23, 25–26, & 28** request testimony regarding EHA's claim that it advances these cases for the public benefit.

This evidence will demonstrate that EHA is not acting in the public interest because it does not seek any public benefit with its lawsuits but rather extorts businesses for ransom payments. *See Consumer Cause, Inc. v. Johnson & Johnson*, 132 Cal. App. 4th 1175, 1185 (2005) (plaintiff lack standing when suits are not brought in the public interest); *Consumer Advoc. Grp., Inc. v. Kintetsu Enters. of Am.*, 141 Cal. App. 4th 46, 50 (2006) (plaintiff must certify it files suit in the public interest before settling claim).

- **Topic Nos. 19–21 & 29** request testimony regarding the legitimacy of EHA, including information regarding EHA's business management.

This evidence will show that EHA is a shell entity that engages in a "pattern of [filing] baseless, repetitive [Prop 65] claims" to enrich its lawyers. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49, 58 (1993) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 512 (1972)) (internal quotations omitted).

- **Topic No. 27** requests testimony regarding EHA's policy for preserving ESI.

This evidence is relevant to determining why none of EHA's board members have any responsive documents, why EHA's lawyers destroyed the emails of the only persons who investigated EHA's claims against B&G Foods after EHA had filed suit, and whether EHA has instructed any of its consultants or experts to retain evidence. All of this goes to spoliation.

<u>*Attorney Subpoenas:*</u> EHA's board members, EHA's Rule 30(b)(6) witness, and Defendant Embry knew nothing about the extent of Defendants' pre-suit investigation, the basis for their claims against B&G Foods, their belief that acrylamide in food causes cancer in humans, and their relationship with the Attorney General. They all testified that only their lawyers knew this. (Exs. X, X, X, X.) Given that the sufficiency of the investigation and bases for the claims (sham or not) are the core issues in this case, such testimony is critical.

1      Such discovery is necessary before a motion for summary judgment can be heard because

2   EHA had no understanding of the cases it brought or what was done to work them up. Former EHA

3   CEO Anissa Elhaiesahar testified that Defendants' lawyers never consulted EHA's board about

4   EHA's Prop 65 cases and that EHA "had no role in litigating" them. (Ex. X at 60:13-62:13.) EHA's

5   board never engaged in discussions regarding strategic decisions, product investigations, testing, or

6   expert opinions. (*Id.* at 63:14–65:24.)

7      EHA's current CEO, Fred Duran, testified similarly: he stated that he never attended any

8   board meetings as a director of EHA, and that in either his role as a director or CEO, he is not

9   consulted prior to the filing of any lawsuits, has no involvement in filing them, and is unaware of

10  the contents of consent judgments—even when his own signature has been added to them. (Ex. X

11  (Duran Depo.), at 34:3-5 (Duran never attended a board meeting as a director of EHA); 49:20-50:8

12  (Duran is not consulted or involved at all in filing EHA's lawsuits); 75:24-76:12 (Duran is unaware

13  of the contents of EHA consent judgments bearing his own signature).

14     Likewise, Defendant Embry testified that she did not "conduct any independent

15  investigation into the truth of the allegations in the complaint" she filed against B&G Foods (Ex. X

16  at 75:23–76:1, 76:16–23. She also testified that she does not decide which products to submit

17  notices of violation on. (*Id.* at 23:1–9.) Defendants also concede that neither Defendant Embry, nor

18  EHA's Board of Directors, hold any documents or information regarding Defendants' Proposition

19  65 claims, and have identified Defendants' lawyers as the sole custodians for this case. (Ex. X, at

20  35:5–8.) B&G Foods' inability to obtain relevant information from Defendants themselves

21  underscores the necessity of B&G Foods' deposition of Defendants' attorneys, who are the sole

22  source of this critically relevant information. But Defendants' attorneys have flat-out refused to

23  appear for their depositions or comply with B&G Foods' subpoenas.

24     *Document Production:* The Court ordered Defendants to produce a random sampling of 70

25  Notices of Violation ("NOVs") to determine the extent of their investigation, including their

26  affirmative defenses and documentation supporting their claims that the acrylamide lawsuits are in

27  the public interest (Dkt. 164). Defendants have not completed this production or provided all ESI

28  associated with their supporting documents, including the documents' author information, creation

date, modification date, revision number, document title, contributors, and other metadata fields. (Kwasniewski Decl., ¶ X). Consequently, B&G Foods lacks information on whether Defendants' claims genuinely enforce Prop 65, including details on settlements, documentation submitted to the Attorney General, and the sufficiency of their pre-suit investigation.

*ESI Production:* Defendants have failed to produce full, complete, and usable electronically stored information ("ESI"). Defendants' ESI production is (1) corrupted, rendering documents inaccessible; (2) missing any metadata, including author information, creation date, modification date, and revision number; (3) stamped with duplicative and overlapping bates numbering; and (4) stamped with bates numbers that do not reflect the page range of the documents stamped. Defendants do not dispute these issues with their ESI production. Instead, Defendants have made an initial, incomplete production of ESI, which includes load files and metadata, but refuse to complete the production unless B&G Foods pays for it, which is contrary to standard practice, not to mention the ESI Protocol governing this case. These ESI issues hinder B&G Foods' ability to establish timelines and verify document authenticity. Defendants' refusal to produce metadata prevents B&G Foods from verifying if the investigation was timely or fabricated to deceive the Attorney General and the Court.

*Obstruction of Third-Party Discovery:* Defendants also have obstructed B&G Foods' ability to obtain key discovery in response to a subpoena it served on third party IEH. IEH is Defendants' captive laboratory, which for years supplied Defendants with test results that purportedly showed foods contained the chemical acrylamide when they did not, or at least not at the level at which Prop 65 would be violated. Based on these test results, Without this discovery, B&G Foods is unable to ascertain the nature of the flaws in IEH's testing methodology and the extent to which Defendants were aware that IEH's test results were unreliable.

Discovery as to these fundamental issues is highly likely to elicit additional facts that are relevant and "essential" to B&G Foods' ability to present a complete opposition to Defendants' Motion. *Blake*, 2014 WL 880356, at *1. B&G Foods' lack of access is due solely to Defendants' obstruction, which warrants denial of their motion*Baca v. Biter*, No. 1:15cv1916-DAD-HBK (PC), 2021 WL 1130794, at *2 (E.D. Cal. Mar. 24, 2021).

### III. DEFENDANTS' MOTION IS PREDICATED ON TESTIMONY FROM A WITNESS THAT DOES NOT REPRESENT B&G FOODS

Throughout their Motion, Defendants repeatedly rely on deposition testimony from a witness that B&G Foods withdrew as its 30(b)(6) witness during his deposition because he was unable to testify accurate. Right after the deposition, which occurred over three months ago—long before the discovery cutoff—B&G Foods repeatedly offered Defendants the opportunity to depose a qualified witness. Defendants refused those opportunities, instead choosing to cite testimony from a witness who does not represent the company.

Defendants deposed Mr. Juvenile Marchisio on April 26, 2024. (Kwasniewski Decl. ¶ X.) During the course of that deposition, it became clear that Mr. Marchisio was experiencing difficulties recalling information regarding several of the noticed topics even after re-reviewing documents and speaking with other B&G Foods employees during breaks in the deposition. (*Id.* ¶ X.) Immediately following the deposition, B&G Foods sent a letter to Defendants offering to produce a new witness to allow Defendants to obtain the testimony they sought. (Ex. [_].) Defendants again refused. (Kwasniewski Decl. ¶ X.) On June 19, 2024, B&G again wrote to Defendants to offer a qualified witness; Defendants refused again. (*Id.* ¶ X.)

Defendants argue they can rely on Mr. Marchisio's testimony because B&G Foods "identified only one company witness" on Defendants' noticed topics But, when a 30(b)(6) witness is unable to testify to the noticed topics, the relief is testimony of another witness. *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. CV 18-06825-GW-(RAOx), 2020 WL 8102054, at *15 (C.D. Cal. July 9, 2020) ( "the proper remedy 'if a designated deponent is unable to answer all questions... is the designation of another witness who can answer those questions.'").

On May 30, 2024, B&G Foods served a notice of errata for Mr. Marchisio's deposition, which is reflective of the testimony Mr. Marchisio intended to provide. (Ex. [_]):

| Motion Cites to 30(b)(6) Testimony | 30(b)(6) Errata Sheet Updated Testimony |
|---|---|
| "Mr. Marchisio sat for deposition and verified he never heard of this 4-year-old lawsuit until three weeks before his deposition [Ex. D, Marchisio 30(b)(6) Dep. Tr. at 28:23-29:19, 197:22-25]" Mot. at 5. | "A. No, I reviewed my files, refreshed my memory and recalled that I knew of the lawsuit in November 2023, if not sooner." [29:15–19] |
| "Mr. Marchisio could not, for example, provide an evidentiary basis for the claims that: | "A. I reviewed my files and saw that in verified discovery responses as mentioned in the |

| | |
|---|---|
| Defendants manufactured Dr. Meeker's expert reports after the fact [*id.*, 160:15-165:8]…" Mot. at 5. | Second Amended Complaint, Defendants admitted they did not obtain an expert report prior to submitting their notice of violation." [162:1-11] |
| "…Embry/EHA did not provide COMs with factual support to the Attorney General [id., 172:19-174:25]…" Mot. at 5.<br><br>"Unsurprisingly, B&G's 30(b)(6) witness was unable to provide a factual basis for this allegation. Ex. D (Marchisio 30(b)(6) Dep. Tr. at 172:19-174:24, 252:10-256:1, 274:22-276:6)." Mot. at 15 | "A. No, I know the factual basis, but I was having a difficult time recalling the information about this. After I reviewed Defendants' discovery responses and documents produced by third parties, I refreshed my recollection and recalled that, for example, that Defendants' certificate of merit was not valid for a few reasons, including their own admission that they never obtained an expert report." [174:8-12; *see also* 255–256:20–1, 275:10–17] |
| "…Defendants' Prop 65 suits were based on false or fraudulent COMs [id., 274:22-276:6]; or that Embry/EHA failed to investigate claims prior to filing suit. *Id.*, 276:7-23." Mot. at 5. | "A. Yes, I reviewed my case file and found some examples: Defendants used unreliable test results, did not consult an expert in advance of filing their NOVs, and did not investigate affirmative defenses that foreclosed their claims, among many other things." [275:10–17] |
| "Ultimately, B&G was not prevented from, and indeed admits to, conducting its own testing of the subject cookies. *Id.* at 213:24-214:10 (verifying B&G conducted testing after receipt of Embry's NOV)…" Mot. at 12-13. | "A. No, after I spoke with Mr. Rick Drummond, head of our regulatory team, I learned that as a general practice, the products are not tested for Prop 65 compliance prior to commercialization. All testing conducted by B&G Foods is done through counsel. All testing relevant to this dispute has been previously produced." [224–225:23–5] |
| B&G's own 30(b)(6) witness could not articulate the factual or evidentiary basis for this defamatory allegation. Ex. D (Marchisio 30(b)(6) Dep. Tr. at 160:15-165:8; 246:3-250:23)." Mot. at 14. | "A. I could not comment because I was having a difficult time recalling the information about this. I reviewed my files and recalled that in verified discovery responses, as mentioned in the Second Amended Complaint, Defendants admitted they did not obtain an expert report prior to submitting their notice of violation." [164:10-15.] |

Defendants failed to inform the Court that B&G Foods de-designated Mr. Marchisio as its

Rule 30(b)(6) designee, and also failed to inform the Court about the errata submitted relating to his

testimony. Both of these omissions are fatal to their efforts to rely on Mr. Marchisio's uncorrected

testimony.

In any event, as discussed above, Mr. Marchisio's now-retracted testimony does not change the fact that there are several triable issues of fact and discovery misconduct necessitating denial of Defendants' Motion.

## IV.   DEFENDANTS ARE AS STATE ACTORS

The Court has already held that "B&G plausibly pleads state action by tracing the outlines of defendants' exercise of a traditionally exclusive public function and joint action with California." Order Denying MTD at 18:4-6. In making this finding, the Court noted that the "ultimate inquiry is 'fact-intensive'." Defendants' Motion does nothing more than rehash the same legal arguments that this Court has already rejected. The Court should therefore, again, deny their Motion.

### A.   Defendants Perform a Traditional, Exclusive Public Function

Defendants argue that Prop 65's statutory scheme is not an exclusive government function because an action may be brought by the Attorney General and also by a private individual acting "in the public interest." (Mot. at 18.) But this is the same argument the Court previously rejected, finding that Defendants failed to cite "any other legal tools that allow private persons to protect the greater public, as Prop 65 does, which likewise would be necessary to undergird the conclusion that defendants are not exercising a power that has been traditionally reserved exclusively to the government." (Order Denying MTD at 15.) Defendants again fail to do so. Instead, they repeat their attempt to liken Prop 65 to PAGA and other environmental statutes (Mot. at 18-19), but the Court has already found this analogy fails. (Order Denying MTD at 15 n.5, 16-17.)

Defendants also previously admitted that Prop 65 is a "quasi-criminal" "health and safety" statute, in which "the Attorney General had a meaningful opportunity to investigate." (Dkt. 31 at 2-3; Dkt. 52-1 at 17-18.) Yet Defendants continue to argue that their enforcement of the "quasi-criminal" Prop 65 is no different from declaratory judgment suits held not to be state action in *Real Estate Bar Ass'n for Mass., Inc. v. Nat'l Real Estate Information Services*, 608 F.3d 110, 122 (1st Cir. 2010). (Mot. at 18.) But in that case, the statute at issue did "nothing more than grant bar associations… standing to bring suit enforcing the unauthorized-practice-of-law statute" and "obtain a declaration as to legality." By contrast, the "quasi-criminal" Prop 65 deputizes "private prosecutors" with the authority to both sue in the public interest and to "collect funds for the public

treasury." *Consumer Advoc. Grp.*, 150 Cal. App. 4th at 963. Where, as here, private citizens hare empowered to enforce a public health and food labeling law on behalf of the public interest, they are performing functions that traditionally and exclusively belong to the government.

**B.    Defendants Act Jointly with the Attorney General**

The Court has also found that the "joint action test" is met here and factual issues remain. (Order Denying MTD at 15-16.) Defendants argue that Proposition 65 requires only "independent actions of the government and private citizens." (Mot. at 19.) But the Court already found the joint action test is met where "the state knowingly accepts the benefits derived from unconstitutional behavior" including, as alleged by B&G:

> the state has acceded to defendants governmental power that a private person would not ordinarily possess, *see* SAC ¶ 234(a)–(d), the state communicates with defendants and receives compensation as a result of defendants' enforcement efforts, *see id.* ¶¶ 234(j)–37, and the state keeps tabs on those enforcement efforts and can speak up when the private enforcer goes too far, but it has not done so in this case, *see id.* ¶¶ 234(c)–(f).

(Order Denying MTD at 15-16.)

Ms. Embry and EHA's receipt of millions of dollars in settlements indicate their substantial involvement in enforcing Prop 65 in ways that align them closely with the Attorney General's office. Even though the state receives less than 10% of the settlements, the bulk of the $8.1 million going to Defendants and their attorneys suggests they function with state-like authority and influence. The Attorney General's frequent admonishments of their actions show a pattern of oversight that implies a joint, concerted effort by Defendants and the Attorney General. Indeed, these actions, regulated and corrected by the Attorney General, reveal a working relationship that goes beyond mere private enforcement. The Annual Reports of Settlements on the California Department of Justice website confirm that Defendants act as extensions of the State's legal apparatus because their operations are closely monitored and aligned with state objectives, making them state actors.

Nor do Defendants dispute that they work jointly with the Attorney General. The Attorney General's office not only reviews and preserves documents but also actively communicates with Defendants to ensure compliance and legitimacy.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CONCLUSION</u>

For the foregoing reasons, B&G Foods respectfully requests the Court deny Defendants'
Motion for Summary Judgment in its entirety.

Dated:  August 2, 2024                           Respectfully submitted,

                                                 BRAUNHAGEY & BORDEN LLP


                                                 By:  _____*DRAFT*_____
                                                          Matthew Borden

                                                 *Attorneys for Plaintiff*
                                                 *B&G Foods North America, Inc.*